UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 24 2017

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED FEB 24 2017

CLERK

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN CHEMISTRY COUNCIL, AMERICAN FOREST & PAPER ASSOCIATION, AMERICAN IRON AND STEEL INSTITUTE, AMERICAN PETROLEUM INSTITUTE, AMERICAN WOOD COUNCIL, ASSOCIATION CONNECTING ELECTRONICS INDUSTRIES, MOTOR & EQUIPMENT MANUFACTURERS ASSOCIATION, NATIONAL OILSEED PROCESSORS ASSOCIATION, and SOCIETY OF CHEMICAL MANUFACTURERS & AFFILIATES,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

No. 17-1064

**PETITION FOR REVIEW**

Pursuant to Section 7006 of the Solid Waste Disposal Act, 42 U.S.C. § 6976(a), and Rule 15(a) of the Federal Rules of Appellate Procedure, American Chemistry Council, American Forest & Paper Association, American Iron and Steel Institute, American Petroleum Institute, American Wood Council, Association Connecting Electronics Industries, Motor & Equipment Manufacturers Association, National Oilseed Processors Association, and Society of Chemical Manufacturers & Affiliates hereby petition this Court to review a Final Rule issued by the United States Environmental Protection Agency. The Final Rule, which

was published on November 28, 2016, is set forth in the Federal Register as

Hazardous Waste Generator Improvements Rule, 81 Fed. Reg. 85,732 (Nov. 28,

2016), and is attached as Exhibit A. This Court has jurisdiction and is the proper

venue for this action pursuant to 42 U.S.C. § 6976(a).

The Final Rule should be set aside because it is unlawful, arbitrary,

capricious, an abuse of discretion, or not otherwise in accordance with law.

Respectfully submitted,

Kenneth M. Kastner
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5653
ken.kastner@hoganlovells.com

*Counsel for American Chemistry Council,
American Forest & Paper Association,
American Iron and Steel Institute, American
Petroleum Institute, American Wood
Council, Association Connecting Electronics
Industries, Motor & Equipment
Manufacturers Association, National
Oilseed Processors Association, and Society
of Chemical Manufacturers & Affiliates*

Dated: February 24, 2017

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 24 2017

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED FEB 24 2017

CLERK

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN CHEMISTRY COUNCIL, AMERICAN FOREST & PAPER ASSOCIATION, AMERICAN IRON AND STEEL INSTITUTE, AMERICAN PETROLEUM INSTITUTE, AMERICAN WOOD COUNCIL, ASSOCIATION CONNECTING ELECTRONICS INDUSTRIES, MOTOR & EQUIPMENT MANUFACTURERS ASSOCIATION, NATIONAL OILSEED PROCESSORS ASSOCIATION, and SOCIETY OF CHEMICAL MANUFACTURERS & AFFILIATES,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

No. 17-1064

**PETITIONERS' CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, American Chemistry Council, American Forest & Paper Association, American Iron and Steel Institute, American Petroleum Institute, American Wood Council, Association Connecting Electronics Industries, Motor & Equipment Manufacturers Association, National Oilseed Processors Association, and Society of Chemical Manufacturers & Affiliates hereby submit this Corporate Disclosure Statement. All petitioners are "trade association[s]" within the meaning of Circuit Rule 26.1(b).

The American Chemistry Council (ACC) represents the leading companies engaged in the business of chemistry. ACC members apply the science of chemistry to make innovative products and services that make people's lives better, healthier and safer. ACC is committed to improved environmental, health and safety performance through Responsible Care®, common sense advocacy designed to address major public policy issues, and health and environmental research and product testing. The business of chemistry is a $797 billion enterprise and a key element of the nation's economy. It is the nation's largest exporter, accounting for fourteen percent of all U.S. exports. Chemistry companies are among the largest investors in research and development. Safety and security have always been primary concerns of ACC members, and they have intensified their efforts, working closely with government agencies to improve security and to defend against any threat to the nation's critical infrastructure.

American Forest & Paper Association (AF&PA) serves to advance a sustainable U.S. pulp, paper, packaging, tissue and wood products manufacturing industry through fact based public policy and marketplace advocacy. AF&PA member companies make products essential for everyday life from renewable and recyclable resources and are committed to continuous improvement through the industry's sustainability initiative—*Better Practices, Better Planet 2020*. The forest products industry accounts for approximately 4 percent of the total U.S.

manufacturing GDP, manufactures over $200 billion in products annually, and employs nearly 900,000 men and women. The industry meets a payroll of approximately $50 billion annually and is among the top 10 manufacturing sector employers in 45 states.

The American Iron and Steel Institute (AISI) serves as the voice of the North American steel industry in the public policy arena and advances the case for steel in the marketplace as the preferred material of choice. AISI also plays a lead role in the development and application of new steels and steelmaking technology. AISI is comprised of 18 member companies, including integrated and electric furnace steelmakers, and approximately 120 associate members who are suppliers to or customers of the steel industry.

The American Petroleum Institute (API) represents over 625 member companies in all aspects of the oil and gas industry, including science and research, exploration and production of oil and natural gas, transportation, refining of crude oil and marketing of oil and gas products. API's members are leaders of a technology-driven industry that supplies most of America's energy, supports more than 9.8 million jobs and 8 percent of the U.S. economy, and, since 2000, has invested nearly 2 trillion dollars in U.S. capital projects to advance all forms of energy, including alternatives.

The American Wood Council (AWC) is the voice of North American wood products manufacturing, representing over 75 percent of an industry that provides approximately 400,000 men and women in the United States with family-wage jobs. AWC members make products that are essential to everyday life from a renewable resource that absorbs and sequesters carbon. Staff experts develop state-of-the-art engineering data, technology, and standards for wood products to assure their safe and efficient design, as well as provide information on wood design, green building, and environmental regulations. AWC also advocates for balanced government policies that affect wood products.

The Association Connecting Electronics Industries (IPC) is a global industry association based in Bannockburn, IL, dedicated to the competitive excellence and financial success of its 3,700 member companies which represent all facets of the electronics industry, including design, printed board manufacturing, electronics assembly and test. As a member-driven organization and leading source for industry standards, training, market research and public policy advocacy, IPC supports programs to meet the needs of an estimated $2 trillion global electronics industry. IPC maintains additional offices in Taos, NM; Washington, D.C.; Atlanta, GA; Stockholm, Sweden; Moscow, Russia; Bangalore and New Delhi, India; Bangkok, Thailand; and Qingdao, Shanghai, Shenzhen, Chengdu, Suzhou and Beijing, China.

The Motor & Equipment Manufacturers Association (MEMA) represents more than 1,000 companies that manufacture motor vehicle systems and parts for use in the light and heavy-duty vehicle original equipment and aftermarket industries. Motor vehicle component manufacturers are the largest sector of manufacturing jobs in the U.S. and directly employ over 871,000 workers in all 50 states. MEMA represents its members through four divisions: Automotive Aftermarket Suppliers Association, Heavy Duty Manufacturers Association, Motor & Equipment Remanufacturers Association and Original Equipment Suppliers Association.

The National Oilseed Processors Association (NOPA) is a national trade association that represents 13 companies engaged in the production of food, feed, and renewable fuels from oilseeds, including soybeans. NOPA's member companies process more than 1.8 billion bushels of oilseeds annually at 64 plants located in 20 states throughout the country, including 58 plants that process soybeans.

Since 1921, the Society of Chemical Manufacturers & Affiliates (SOCMA) has represented a diverse membership of small, medium and large chemical companies located around the world bringing world-class support uniquely tailored to enhance the operational excellence of our member companies. SOCMA is the only U.S.-based trade association dedicated solely to the specialty chemical

industry, making us the leading authority on this sector. For more information, visit www.socma.com. Collectively, SOCMA members are key drivers to a successful economy, contributing $24 billion annually to the U.S. GDP. Our members play an indispensable role in the global chemical supply chain by producing intermediates, specialty chemicals and ingredients used to develop a wide range of industrial, commercial and consumer products, essential to the well-being and lives of people everywhere.

Respectfully submitted,

Kenneth M. Kastner
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5653
ken.kastner@hoganlovells.com

*Counsel for American Chemistry Council,
American Forest & Paper Association,
American Iron and Steel Institute, American
Petroleum Institute, American Wood
Council, Association Connecting Electronics
Industries, Motor & Equipment
Manufacturers Association, National
Oilseed Processors Association, and Society
of Chemical Manufacturers & Affiliates*

Dated:  February 24, 2017

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I caused copies of the foregoing Petition for Review and Corporate Disclosure Statement to be delivered via personal delivery to the following:

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

Kenneth M. Kastner

Dated: February 24, 2017

# EXHIBIT A

85732 Federal Register / Vol. 81, No. 228 / Monday, November 28, 2016 / Rules and Regulations

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 257, 258, 260, 261, 262, 263, 264, 265, 266, 267, 268, 270, 271, 273, and 279**

**[EPA–HQ–RCRA–2012–0121; FRL 9947–26–OLEM]**

**RIN 2050–AG70**

# Hazardous Waste Generator Improvements Rule

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** With this action, the United States Environmental Protection Agency (EPA) is finalizing revisions to the Resource Conservation and Recovery Act's (RCRA) hazardous waste generator regulatory program proposed on September 25, 2015. There are several objectives to these revisions. They include reorganizing the hazardous waste generator regulations to make them more user-friendly and thus improve their usability by the regulated community; providing a better understanding of how the RCRA hazardous waste generator regulatory program works; addressing gaps in the existing regulations to strengthen environmental protection; providing greater flexibility for hazardous waste generators to manage their hazardous waste in a cost-effective and protective manner; and making technical corrections and conforming changes to address inadvertent errors and remove obsolete references to programs that no longer exist. This final rule responds to the comments of EPA stakeholders, taking into consideration the mission of EPA and the goals of RCRA.

**DATES:** This final rule is effective on May 30, 2017. The incorporation by reference of certain publications listed in the regulations is approved by the Director of the Federal Register as of May 30, 2017.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–RCRA–2012–0121. All documents in the docket are listed on the *http://www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *e.g.*, CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Jim O'Leary, U.S. Environmental Protection Agency, Office of Resource Conservation and Recovery, (MC: 5304P), 1200 Pennsylvania Ave. NW., Washington, DC 20460, (703) 308–8827, (*oleary.jim@epa.gov*) or Kathy Lett, U.S. Environmental Protection Agency, Office of Resource Conservation and Recovery, (MC: 5304P), 1200 Pennsylvania Ave. NW., Washington, DC 20460, (703) 605–0761, (*lett.kathy@epa.gov*).

**SUPPLEMENTARY INFORMATION:**

## I. Table of Contents

The information presented in this preamble is organized as follows:

I. Table of Contents
II. General Information
  A. Does this action apply to me?
  B. Incorporation by Reference
III. Statutory Authority
IV. What is the intent of this final rule?
V. Background
  A. History of the Hazardous Waste Generator Program
  B. Hazardous Waste Generator Demographics
VI. Reorganization of the Hazardous Waste Generator Regulations and Organization of the Preamble
  A. Moving and Integrating Regulations From 40 CFR 261.5 Into 40 CFR Part 262
  B. SQG and LQG Conditions for Exemption (40 CFR 262.16 and 262.17)
  C. EPA Identification Number (40 CFR 262.12)
  D. What changed since proposal?
  E. Guidance and Implementation
VII. Detailed Discussion of Revisions to 40 CFR Part 260—Hazardous Waste Management System: General
  A. Generator Category Definitions (40 CFR 260.10)
  B. Generators That Generate Both Acute and Non-Acute Hazardous Waste in the Same Calendar Month (40 CFR 260.10)
  C. Definition of Central Accumulation Area (40 CFR 260.10)
VIII. Detailed Discussion of Revisions to 40 CFR Part 261—Requiring Biennial Reporting for Owners or Operators of Facilities That Recycle Hazardous Waste Without Storing It (40 CFR 261.6(c)(2))
  A. Introduction
  B. What is EPA finalizing?
  C. Major Comments
IX. Detailed Discussion of Revisions to 40 CFR Part 262—Standards Applicable to Generators of Hazardous Waste
  A. Addition of Terms Used in This Part and Changes to Purpose, Scope and Applicability (40 CFR 262.1 and 262.10)
  B. Waste Determinations (40 CFR 262.11)
  C. Determining Generator Category (40 CFR 262.13)
  D. Very Small Quantity Generator Conditions for Exemption (40 CFR 262.14)
  E. Marking and Labeling and Hazardous Waste Numbers (40 CFR 262.15(a)(5), 262.16(b)(6), 262.17(a)(5), 262.32(b)–(d), 263.12(b) and 268.50(a)(2)(i)
  F. Revisions to Satellite Accumulation Area (SAA) Regulations for SQGs and LQGs (262.15)
  G. Accumulation of Hazardous Waste by SQGs and LQGs on Drip Pads and in Containment Buildings
  H. Special Requirements for Ignitable and Reactive Wastes for LQGs (40 CFR 262.17(a)(1)(vi))
  I. LQG Closure Regulations (40 CFR 262.17(a)(8))
  J. Documentation of Inspections of Waste Accumulation Units
  K. Allowing VSGQs To Send Hazardous Waste to LQGs Under the Control of the Same Person (40 CFR 262.14(a)(5)(viii) and 262.17(f))
  L. EPA Identification Numbers and Re-Notification for SQGs and LQGs (40 CFR 262.18)
  M. Provision Prohibiting Generators from Disposing of Liquids in Landfills (40 CFR 262.14(b) and 262.35)
  N. Clarification of Biennial Reporting Requirements (40 CFR 262.41, 264.75 and 265.75)
  O. Extending Time Limit for Accumulation Under Alternative Requirements for Laboratories Owned by Eligible Academic Entities (40 CFR Part 262 Subpart K)
  P. Deletion of Performance Track and Project XL Regulations
X. Addition to 40 CFR Part 262 for Generators That Temporarily Change Generator Category as a Result of an Episodic Event
  A. Introduction
  B. What is EPA finalizing?
  C. What changed since proposal?
  D. Major Comments
XI. Detailed Discussion of Preparedness, Prevention, and Emergency Procedures Provisions for SQGs (40 CFR 262.16) and LQGs (40 CFR 262.17 and 40 CFR Part 262 Subpart M)
  A. Introduction
  B. What is EPA finalizing as proposed?
  C. What is EPA finalizing with changes to proposed rule language?
  D. What is EPA not including in the final rule?
XII. Technical Corrections and Conforming Changes to 40 CFR Parts 257, 258, 260 Through 265, 270, 273, and 279
  A. What is EPA finalizing?
  B. What changed since proposal?
  C. Major Comments
XIII. Electronic Tools To Streamline Hazardous Waste Reporting and Recordkeeping Requirements
  A. Waste Determination Tools
  B. Emergency Response Executive Summary App
  C. Recordkeeping and Reporting Tools
  D. Analysis of Comments
XIV. Enforceability
XV. State Authorization
  A. Applicability of Rules in Authorized States
  B. Effect on State Authorization of Final Rule
XVI. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

B. Paperwork Reduction Act (PRA)
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act
E. Executive Oder 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use
I. National Technology Transfer and Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
K. Congressional Review Act (CRA)

## II. General Information

*A. Does this action apply to me?*

Entities potentially affected by this action include between 424,099 and 676,890 industrial entities that generate hazardous waste regulated under the RCRA Subtitle C regulations. Of this universe, between 353,441 and 591,809 are very small quantity generators (VSQGs),[1] previously called conditionally exempt small quantity generators, whose regulatory obligations will only be affected if they choose to take advantage of either of the two voluntary programs being promulgated. Entities potentially affected by this final rule include practically every industrial sector, including printing, petroleum refining, chemical manufacturing, plastics and resin manufacturing, pharmaceutical manufacturing, paint and coatings, iron and steelmaking, secondary smelting and refining, metal manufacturing, electroplating, circuit board manufacturing, and automobile manufacturing, among other industries.

As discussed in section XVI.A, the Regulatory Impact Analysis (RIA) for this action, available in the docket for this action, estimates the future annualized cost to industry to comply with the requirements is between $5.9 and $13.3 million (at a 7% discount rate). The estimated annualized benefits for entities opting to take advantage of two voluntary programs in the final rule (*e.g.*, consolidation of VSQG waste by large quantity generators (LQGs) under the same ownership, and generators who change regulatory status episodically) are between $8.3 and $14.4 million (at a 7% discount rate). This results in a net annualized benefit for the rule of $2.4 million for the low-end estimate and $1.1 million for the high-end estimate at a 7% discount rate.

The Hazardous Waste Generator Improvements Rule is expected to yield a variety of benefits as generators change several of their waste management practices to comply with the regulations. These benefits reflect the rule's focus on enhancing protection of human health and the environment while improving the efficiency of the RCRA hazardous waste generator standards. Ideally, the Agency would prefer to quantify and monetize the rule's total benefits. However, only some categories of benefits are quantifiable; sufficient data are not available to support a detailed quantitative analysis for a majority of the benefit categories. For example, the added flexibility from allowing a large quantity generator accumulating ignitable or reactive hazardous waste to obtain an approval from the authority having jurisdiction (AHJ) over the fire code for the 50-foot property line requirement at 40 CFR 265.176 (provided other safety requirements are met) is difficult to quantify. In addition, quantifying the benefits associated with emergency response due to changes in container labeling would require data on the annual number of emergencies at generator sites, the current risks associated with these incidents, the extent to which more detailed labeling would affect the procedures of emergency responders, and the reduction in risk associated with these changes. Detailed data on these items are not readily available. In this and in similar cases, the benefits are described qualitatively.

*B. Incorporation by Reference (IBR)*

This final rule is not adding any new IBR material; however, EPA is reorganizing one of the existing requirements containing IBR material to make the regulation easier for the reader to follow. EPA is copying § 265.201(g)(2) to § 262.16(b)(3)(vii)(B). To accommodate this change, EPA is updating § 260.11(d)(1), which is the IBR reference section for these regulations, by adding a reference to § 262.16. The materials being incorporated by reference are for the National Fire Protection Association (NFPA), Flammable and Combustible Liquids Code (NFPA 30), 1977 and 1981. NFPA 30 addresses the fire and prevention codes associated with flammable and combustible liquids. The 1981 edition modifies Chapter 4, Container and Portable Tank Storage of the 1977 edition to address such areas as portable tanks, basement storage areas, cutoff rooms and attached buildings, indoor storage and general purpose warehouses. They are available for inspection through NFPA's Free Access site, *http://www.nfpa.org/freeaccess.* Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. (For ordering information, call toll-free 1–800–344–3555 or visit *http://www.nfpa.org/codes-and-standards.*)

## III. Statutory Authority

These regulations are promulgated under the authority of sections 2002, 3001, 3002, 3003, 3004, 3005, 3007, and 3010 of the Solid Waste Disposal Act of 1965, as amended by the Resource Conservation and Recovery Act of 1976 (RCRA), as amended by the Hazardous and Solid Waste Amendments of 1984 (HSWA), 42 U.S.C. 6921, 6922, 6923, and 6924. This statute is commonly referred to as "RCRA."

## IV. What is the intent of this final rule?

This final rule promulgates over 60 revisions and new provisions to the hazardous waste generator regulatory program. The primary intent of these provisions is to foster improved compliance by hazardous waste generators in the identification and management of the hazardous waste they generate and, as a result, improve protection of human health and the environment. Another major objective of this rule is to support the efficient implementation of the hazardous waste generator regulations by the states.

The Agency intends to achieve these objectives in several ways. For example, the most frequent comment the Agency received when it conducted a program evaluation of the hazardous waste generator regulatory program in 2004 was to improve the user-friendliness of the regulations. Prior to this action, the generator regulations were found in several parts of the Code of Federal Regulations (CFR). This final rule reorganizes and consolidates most of the generator regulatory program into 40 CFR part 262, with exceptions for very technical and lengthy regulations, such as the RCRA air emissions standards and the land disposal restriction requirements.

Another important component of this rule is to explain in greater detail how the hazardous waste generator regulations actually work. As explained later on, there are two types of regulatory standards for the hazardous waste generator program: Conditions that must be met in order to obtain an exemption from permitting ("conditions for exemption") and requirements that apply to generators regardless of

[1] EPA is finalizing its proposed change to rename "Conditionally exempt small quantity generators" as "Very small quantity generators." A discussion of this change can be found in section VII.A.

whether or not they choose to obtain an exemption from the permit requirement ("independent requirements"). The Agency notes that these clarifications regarding the distinction between independent generator requirements and the conditions for exemption do not fundamentally alter the way the generator regulatory scheme has operated over the last 30 years. Similarly, the enforcement consequences of independent requirement violations and non-compliance with conditions for exemption do not signal a change from how the great majority of enforcement efforts have been pursued when violations of these regulations are detected.

This final rule also incorporates numerous clarifications to different components of the hazardous waste generator regulatory program made by the Agency through the years in **Federal Register** notices, guidance, correspondence, and policy. For example, a key component of the program is that generators need to make accurate hazardous waste determinations. While the Agency has stated in **Federal Register** preambles and correspondence from the beginning of the program that solid and hazardous waste determinations must be made at the point of generation before any dilution, mixing, or other alteration of the waste occurs, we have never incorporated such an important concept into regulation. This final rule does so. Also, most generators use knowledge of their processes and feedstocks to determine if they have generated a hazardous waste. In response to comments from the regulated community, this final rule provides additional information and clarity as to what constitutes "generator knowledge" to determine whether a listed and/or characteristic hazardous waste has been generated. Providing this information to the regulated community enables the generators to more readily comply with the requirements.

Similarly, this final rule clarifies that a generator can only be in one category for a calendar month and explains how to count the hazardous waste it generates (*i.e.*, acute hazardous waste, non-acute hazardous waste, and residues from the cleanup of acute hazardous waste generated in a calendar month) to determine its regulatory category, and therefore, which set of regulations to comply with. Another important clarification explains the implications of when a generator mixes a solid waste with a hazardous waste, and the regulations a generator must be aware of if it decides to mix wastes. Further clarifications address closure, biennial reporting, waste accumulation, liquids in landfills, emergency response, and the marking and labeling of containers, tanks, drip pads, and containment buildings. All together, these revisions to the generator program provide the generators themselves better access to both the regulations with which they are required to comply and some of the information that was previously only available in guidance.

From experience through the years, the Agency also has identified regulatory gaps resulting in either program inefficiencies or ineffectiveness. For example, prior to this final rule, large quantity generators (LQGs) were not required to notify EPA or most states when they close their facility. Without such information, implementing agencies did not have confirmation a whether or not the generators complied with specified closure performance standards. Generators also were not required to identify and communicate the hazards associated with the hazardous waste they generate and accumulate on-site, nor to ensure working relationships with local emergency authorities. This final rule addresses these concerns.

Similarly, prior to this rulemaking, SQGs were only required to submit a notification when they first identified themselves as a hazardous waste generator to obtain a RCRA identification number, and to be able to ship hazardous waste off-site to a permitted treatment, storage and disposal facility (TSDF). As a result, the Agency and many states databases for this universe of generators became unreliable because there was no notification if the generator went out of business, changed ownership, or changed their regulatory category. This final rule addresses this data gap by requiring SQGs to re-notify every four years.

With this final rule, the Agency also has responded to requests that additional flexibility be provided in the implementation of the program. For example, VSQGs will now be able to send their hazardous waste to LQGs under the control of the same person to allow consolidation and improved management of their hazardous waste. Another provision being added in this final rule will allow VSQGs and SQGs to maintain their existing regulatory category when they generate additional amounts of hazardous wastes as a result of an episodic event, provided they comply with specific conditions. This final rule also will allow an LQG to apply for a site-specific approval from the authority having jurisdiction (AHJ) over the fire code when they are unable to meet the 50 feet property line requirement for the accumulation of ignitable or reactive waste. Together, these provisions that add flexibility to the regulations better represent the real-world conditions that many of the smaller hazardous waste generators operate under and ensure and allow proper management of hazardous waste while under those conditions.

The RCRA hazardous waste generator regulatory program is primarily administered by the states, and therefore, its success is predicated in EPA supporting their inspection, enforcement and permitting activities. The Agency will work with the states to support their efforts in becoming authorized for these program revisions and will support both the regulated community and the implementing agencies in their efforts to comply with these new provisions.

## V. Background

### *A. History of the Hazardous Waste Generator Program*

For the most part, the regulations for hazardous waste generators have not changed significantly since 1980, except for three major modifications. First, as a result of the Hazardous and Solid Waste Amendments (HSWA) of 1984, EPA promulgated a rule that created three generator categories; *i.e.*, conditionally exempt small quantity generators, small quantity generators and large quantity generators (51 FR 10146, March 24, 1986). Prior to that rule the regulatory framework for hazardous waste generators consisted of two categories: Small quantity generators and large quantity generators. The 1986 rule split the SQG category in two and created conditionally exempt small quantity generators (CESQG) (now known in this final rule as very small quantity generators).

Second, also as a result of HSWA and the Land Disposal Restriction (LDRs) regulations,[2] hazardous waste generators were required to ensure that their hazardous waste either met a specified treatment standard or performance standard, or, if neither, that the waste was treated to specified concentrations or performance standards prior to land disposal.

Third, the Agency modified the Uniform Hazardous Waste Manifest regulations and associated manifest

[2] There are several regulations associated with LDRs. The more important **Federal Register** notices associated with these regulations include: 51 FR 40636, November 7, 1986; 52 FR 25787, July 8, 1987; 53 FR 31211, August 17, 1988; 54 FR 26647, June 23, 1989; 55 FR 22520, June 1, 1990; 57 FR 37194, August 18, 1992.

document used to track hazardous waste from a generator's site to its ultimate disposition (70 FR 10776, March 4, 2005; 70 FR 35034, June 16, 2005). The revisions to the manifest standardized the content and appearance of the manifest form, made the forms available from a greater number of sources, and adopted new procedures for tracking certain types of hazardous waste shipments with the manifest. Otherwise, the changes that have occurred to the hazardous waste generator regulatory program have been relatively minor.

*B. Hazardous Waste Generator Demographics*

In 2013, approximately 25,300 generators reported generating approximately 35.2 million tons of hazardous waste. Of the total number of reporting generators, approximately 20,800 were LQGs while 4,500 were non-LQGs, meaning these entities submitted a biennial report but did not report generating sufficient amounts of hazardous waste to be categorized as an LQG.[3]

In 2013, LQGs generated approximately 35.2 million tons of hazardous waste in the aggregate. The 50 largest hazardous waste generators reported generating 29.2 million tons, or 83 percent of the total reported amount. While in total LQGs managed on average 13 waste streams (the mean), approximately 11,000 LQGs (or approximately 53 percent) managed 6 waste streams (the median) or less. Approximately 9600 LQGs (or approximately 46 percent) generated between 1 and 5 waste streams. These generators included sites from the waste treatment industry as well as academic and industrial laboratories. Overall, the Agency estimates that LQGs generate between 6 and 13 hazardous waste streams each year, which represents the median and mean number of wastes streams per LQG.[4]

Of the 35.2 million tons of hazardous waste generated by LQGs in 2013, 33.4 million tons, or 95 percent, were generated in just five industrial sectors: Chemical manufacturing (NAICS 325); petroleum and coal products manufacturing (NAICS 324); waste management and remediation services (NAICS 562); primary metal manufacturing (NAICS 331); and mining (NAICS 212).[5]

Unlike LQGs, who must submit a biennial report every two years describing the types and quantities of hazardous waste generated and its subsequent disposition, SQGs have not been required to provide such information to the Agency. Consequently, EPA lacks the level of detail for SQGs that is available for LQGs. However, based on a review of biennial report data provided by treatment, storage, and disposal facilities[6] (which must report waste received from all hazardous waste generators) and site identification data (from SQGs obtaining an EPA ID number), EPA estimates the number of SQGs to range from approximately 49,900 to 64,300.[7]

Because VSQGs are not required to obtain a RCRA ID, the information available to the Agency is limited to those states that require their VSQGs to obtain a RCRA ID. Therefore, in estimating the size of the VSQG universe, the Agency developed a methodology that extrapolated the size of the VSQG universes based on the data available in those states that require VSQGs to obtain a RCRA ID. We first calculated the ratio of VSQGs to SQGs and VSQGs to LQGs in those states where information was available on the VSQG universe. Wethen used those ratios to estimate the size of a state's VSQG universe where VSQG information was unavailable. Using this methodology, EPA currently estimates the size of the VSQG universe to range from 353,400 to 591,800.[8]

## VI. Reorganization of the Hazardous Waste Generator Regulations and Organization of the Preamble

EPA is finalizing its proposal to reorganize the hazardous waste generator regulations to make the regulations more user-friendly, which EPA expects will improve generator compliance. The most frequent stakeholder comment EPA received as part of its 2004 Program Evaluation of the hazardous waste generator program was to improve the user-friendliness of the regulations. EPA proposed a reorganization on September 25, 2015 (80 FR 57918), and took comment on all aspects of that reorganization. The majority of the commenters supported EPA's proposal to reorganize the regulations, stating that they agreed with the Agency that the new framework is easier to understand, simpler, and will facilitate improved compliance by the regulated community. EPA also received some comments opposing the reorganization from commenters who were concerned that the changes would result in confusion for those who already understand the regulations and from commenters concerned about the cost of any necessary changes. After considering the comments, EPA has determined that reorganizing the regulations will result in a better, more straightforward set of regulations that is, on balance, easier for most people to understand, now and in the future of the generator program.

This section serves as an introduction and a reference to the new look and feel of the generator regulations. This section makes passing mention of many of the provisions and revisions that we cover in much more detail later in the preamble. EPA has organized this preamble to correspond with the new organization of the regulations, discussing each provision being changed in its new relative place within the structure of the generator regulations. In addition, after the discussion in this section of where each provision will be found in the reorganized regulations, all following citations to regulatory text in this final rule will use the new citations found in the promulgated regulatory text. If applicable, we are including a note at the end of each section to direct the reader to where the same provision was found before the reorganization.

EPA recognizes that the reorganization of these regulations may be a big adjustment for all those who use them, but has determined that the new structure makes better sense for a generator navigating through the system for the first time. Although many existing generators are familiar with the current regulations, every year many generators either enter the hazardous waste generator program or switch their generator category and therefore need to become familiar with their obligations. Similarly, an existing generator may need to examine a particular regulatory citation to ensure it is complying with the regulations correctly. The Agency believes that providing these generators with a user-friendly regulatory framework is an effective way to make the regulations easier to understand for those who need to comply with them.

EPA intends to work closely with the states and other implementing agencies as well as the regulated community, particularly during the initial implementation period. EPA's efforts

[3] See "Regulatory Impact Assessment of the Potential Costs, Benefits, and Other Impacts of the Final Hazardous Waste Generator Improvements Rule." A copy of the analysis is available in the docket for this action.

[4] Ibid.

[5] Ibid.

[6] See the Waste Received (WR) form as part of Biennial Report (EPA Form 8700–13A/B).

[7] See "Regulatory Impact Assessment of the Potential Costs, Benefits, and Other Impacts of the Final Hazardous Waste Generator Improvements Rule." A copy of the analysis is available in the docket for this action.

[8] Ibid.

will be to ensure all stakeholders are trained on the new organization and are given an opportunity to revise forms, guidance, and other materials as necessary. EPA will also be revising its own materials to reflect the new citations in the regulations.

EPA is finalizing the following general organizational changes:

(1) Integrating the generator regulations in § 261.5 into the generator regulations at part 262 by moving § 261.5 (which contains the regulations applicable to VSQGs, counting of hazardous waste, and mixing of hazardous wastes with non-hazardous wastes);

(2) Separating the existing regulations at § 262.34 for SQGs, LQGs and SAAs into three new sections:

(a) Conditions for exemption for satellite accumulation areas (SAA) for small and large quantity generators,

(b) Conditions for exemption for an SQG that accumulates hazardous waste; and

(c) Conditions for exemption for an LQG that accumulates hazardous waste;

(3) Using subtitles in these new sections; and

(4) Where reasonable, incorporating the text of relevant part 265 regulations into these new sections, rather than merely cross referencing them, as was the former approach.

*A. Moving and Integrating Regulations From 40 CFR 261.5 Into 40 CFR Part 262*

Historically, certain hazardous waste generator regulations have been located in a different part of the regulations (40 CFR 261.5) from the rest of the generator regulations (40 CFR part 262). Many of the commenters on the proposal confirmed what EPA had heard from stakeholders who stated that the location of § 261.5 was confusing and not user-friendly. Many commenters agreed that locating those requirements in part 262 to consolidate all the generator regulations in the same part was a useful revision that will alleviate much confusion in the regulated community and, in the process, will foster greater compliance with the regulations.

Specifically, EPA is moving the definition of a VSQG that generates non-acute hazardous waste at § 261.5(a) into the VSQG definition at § 260.10, moving § 261.5(c) through (e) about counting hazardous waste and § 261.5(h) though (j) about VSQGs mixing waste to a new section at § 262.13 titled "Generator category determination" and moving § 261.5(b) and (f) and (g) to a new section at § 262.14 titled "Conditions for exemption for a very small quantity generator." [9]

1. Hazardous Waste Generation Quantity Limits for VSQGs (40 CFR 260.10)

Section 261.5(a) was previously used to set forth the non-acute hazardous waste quantity limits for a VSQG and § 261.5(e) to provide quantity limits for generating acute hazardous waste and any residue or contaminated soil, waste, or other debris resulting from the cleanup of a spill of acute hazardous waste. Under the reorganized regulations, EPA now defines each category of generator at § 260.10, and, thus, § 261.5(a) and (e) are incorporated into those definitions.

2. Determining Generator Category (40 CFR 262.13)

Section 261.5(c) and (d) previously set forth the provisions for a hazardous waste generator to use in making its generator category determination. Every hazardous waste generator must because determine its generator category in order to identify which regulations are applicable to it. Because § 261.5(c) and (d) are applicable to all hazardous waste generators, it makes sense to move them into 40 CFR part 262, with the other hazardous waste generator regulations. To further aid in making the regulations more user friendly, the Agency has promulgated a new section for generator category determination at § 262.13, titled "Generator category determination." This new section is thus located because, after a generator of a solid waste determines it has generated a hazardous waste (§ 262.11), the generator must then determine its hazardous waste generator category for the calendar month.

In addition, § 261.5(h) through (j), regarding the rules that apply for the mixing of hazardous waste with solid waste, including mixtures with used oil by VSQGs, have been relocated to § 262.13, making them independent requirements rather than conditions for exemption. This move is logical in the context of the reorganization because the outcome of any determination a VSQG makes about the consequences of mixing waste ultimately affect its generator category first. In addition, § 262.13 also contains a new citation to the mixing rule in § 261.3 and makes it clear that the mixing rule applies to SQGs and LQGs. These revisions to the generator regulations are all discussed in more depth later in this preamble.

Table 1—Crosswalk of Previous Citations to New Citations for Definitions and General Standards provides a summary of the crosswalk between the previous and new regulatory citations for determining a generator's category.

TABLE 1—CROSSWALK OF PREVIOUS CITATIONS TO NEW CITATIONS FOR DEFINITIONS AND GENERAL STANDARDS

| Regulation | Previous citation | New citation | Comment |
|---|---|---|---|
| Definitions of Generator Categories. | §§ 260.10, 261.5 and 262.34 | § 260.10 | Previous definition of SQG in § 260.10 was outdated. Generator categories were based on §§ 261.5 and 262.34. |
| Hazardous Waste Limits for VSQGs. | § 261.5(a) and (e) | § 260.10 | Included in the new definition of VSQG. |
| Purpose, Scope, and Applicability | § 262.10 | § 262.10 | Not moved, but expanded significantly. |
| Hazardous Waste Determination and Recordkeeping. | §§ 262.11 and 262.40(c) | § 262.11 | Content in § 262.11 is expanded and § 262.40(c) is incorporated. |

[9] EPA is renaming CESQGs to VSQGs (very small quantity generators). For a detailed discussion on this change, see section VII.A of this preamble.

TABLE 1—CROSSWALK OF PREVIOUS CITATIONS TO NEW CITATIONS FOR DEFINITIONS AND GENERAL STANDARDS—Continued

| Regulation | Previous citation | New citation | Comment |
| --- | --- | --- | --- |
| Generator Category Determination | § 261.5(c), (d), and (h)–(j) | § 262.13 | New section that explains how to count hazardous waste to determine generator category. |
| EPA Identification Numbers | § 262.12 | § 262.18 | Re-notification requirements are also in this section. |
| Landfill Ban for Liquids | § 258.28 | § 262.35 | For SQGs and LQGs. |

3. VSQG Conditions for Exemption (40 CFR 262.14)

Previous sections 261.5(b) and (f) through (j) established the regulations for VSQGs when accumulating acute and non-acute hazardous waste, identified where the acute and non-acute hazardous waste may be managed off site, and explained the implications of mixing hazardous waste with solid waste or used oil. Since these regulations set forth conditions for exemption for VSQGs, similar to how the regulations found in previous § 262.34 set forth conditions for exemption for SQGs and LQGs, EPA is moving § 261.5(b) and (f) and (g) to the newly created § 262.14 titled, "Conditions for exemption for a very small quantity generator." All the conditions for exemption for generators are now located parallel to one another in part 262. Section 262.14 also includes the VSQG landfill ban for liquids and a new VSQG consolidation provision by LQGs under the control of the same person.

In addition, VSQGs who episodically generate higher amounts of hazardous waste may follow the newly promulgated standards for episodic generation in part 262 subpart L in order to maintain their VSQG status while managing these higher amounts of hazardous waste. Table 2—Crosswalk of Previous Citations to New Citations for VSQGs provides a crosswalk between the previous and the new VSQG conditions for exemption.

TABLE 2—CROSSWALK OF PREVIOUS CITATIONS TO NEW CITATIONS FOR VSQGS

| Regulation | Previous citation | New citation | Comment |
| --- | --- | --- | --- |
| VSQG Definition | § 261.5(a) | § 260.10 | Moved into new definition of VSQG. |
| VSQG Mixtures | § 261.5(h)–(j) | § 262.13(f) | Moved into Generator category determination. |
| Conditions for Exemption for a Very Small Quantity Generator. | § 261.5(b), (f), and (g) | § 262.14 | Included in VSQG conditions for exemption. |
| VSQG Consolidation by LQGs Within the Same Company. | N/A | § 262.14(a)(5)(viii) | New provision. |
| Landfill Ban for Liquids | § 258.28 | § 262.14(b) | Specific citation for VSQGs. |
| Episodic Generation | N/A | Part 262 subpart L | New provision. |

*B. SQG and LQG Conditions for Exemption (40 CFR 262.16 and 262.17)*

SQGs and LQGs may accumulate their hazardous waste on site without complying with the storage facility permit and operating requirements, provided they follow all of the conditions for exemption established originally in § 262.34. Section 262.34 became difficult to navigate because the SQG and LQG conditions for exemption were intertwined and contained many cross-references to sections in 40 CFR part 265. Therefore, the Agency is dividing § 262.34 into three new sections at §§ 262.15, 262.16 and 262.17. Section 262.15 lays out the conditions for exemption for SQGs and LQGs operating an SAA, § 262.16 identifies conditions for exemption for SQGs, and § 262.17 identifies the conditions for exemption for LQGs.

1. Satellite Accumulation Area Conditions for Exemption for SQGs and LQGs (40 CFR 262.15)

Many generators use SAAs at their sites. These areas allow generators to accumulate hazardous waste near the point of generation under the control of the operator of the process generating the waste, which provides for efficiency and greater safety in the handling of hazardous waste. When the generator has accumulated 55 gallons of hazardous waste (or one quart of acute hazardous waste) in the SAA, the generator must then move the hazardous waste to the 90- or 180-day central accumulation area within three days. Under the old framework, the conditions for exemption for operating an SAA were located at § 262.34(c), between the hazardous waste accumulation conditions for LQGs and those for SQGs. This created confusion as to whether the provisions apply to LQGs only or to both SQGs and LQGs. In this final rule, the Agency is therefore moving 40 CFR 262.34(c) into its own section at § 262.15 titled, "Satellite accumulation area regulations for small and large quantity generators."

Additionally, the Agency is copying the text in §§ 265.171, 265.172 and 265.173(a) (which previously were simply referenced in § 262.34(c)(1)(i)) into § 262.15 in order to eliminate cross-referencing and improve the user friendliness of the regulations. Table 3—Crosswalk of Previous Citations to New Citations for SAAs provides a summary of the crosswalk between previous and new regulations for SAAs.

TABLE 3—CROSSWALK OF PREVIOUS CITATIONS TO NEW CITATIONS FOR SAAS

| Regulation | Previous citation | New citation | Comment |
|---|---|---|---|
| Satellite Accumulation Area Provisions. | § 262.34(c) | § 262.15 | Moved from § 262.34. |
| Selected Part 265 Subpart I Provisions. | § 265.171 | § 262.15(a)(1) | Duplicated from part 265. |
| Selected Part 265 Subpart I Provisions. | § 265.172 | § 262.15(a)(2) | Duplicated from part 265. |
| Selected Part 265 Subpart I Provisions. | § 265.173(a) | § 262.15(a)(4) | Duplicated from part 265. |

2. Conditions for Exemption for an SQG Accumulating Hazardous Waste (40 CFR 262.16)

As previously mentioned, the Agency is promulgating a new section 40 CFR 262.16 titled, "Conditions for exemption for a small quantity generator that accumulates hazardous waste." This reorganization moves § 262.34(d) through (f) and (m) into § 262.16. Specifically, the Agency is moving the bulk of § 262.34(d) to § 262.16(b),[10] § 262.34(e) to § 262.16(c), § 262.34(f) to § 262.16(d) and § 262.34(m) to § 262.16(e). EPA has also added subtitles and eliminated several cross-references to 40 CFR part 265 in order to make the regulations easier to navigate.

*a. Addition of subtitles.* EPA has added subtitles throughout § 262.16 to highlight to the reader the topic of each section or paragraph. Every subtitle is italicized after the regulatory citation. For example § 262.16(b)(2) addresses "*Accumulation of hazardous waste in containers.*"

*b. Incorporating 40 CFR part 265 subpart I, § 265.201, and part 265 subpart C into 40 CFR 262.16.* EPA has integrated three portions of 40 CFR part 265 into § 262.16: Subpart I, § 265.201 and subpart C. First, the regulations previously found at § 262.34(d)(2) stated an SQG must comply with subpart I of part 265 except for §§ 265.176 and 265.178. Therefore, EPA has simply incorporated the text of the appropriate subpart I regulations at § 262.16(b)(2). Second, the regulations previously found at § 262.34(d)(3) stated that an SQG must comply with § 265.201 in subpart J when using a tank. Thus, EPA has incorporated the text of § 265.201—except for paragraph (a)—into § 262.16(b)(3). Incorporation of paragraph (a) of § 265.201 is not necessary because it describes what is already stated in § 262.16—the conditions for exemption for an SQG accumulating hazardous waste in a tank for less than 180 days and accumulating no more than 6,000 kg on site at any time. Third, the regulations previously found at § 262.34(d)(4) stated that an SQG must comply with subpart C of part 265. Therefore, EPA has incorporated the text of subpart C—Preparedness and Prevention—at § 262.16(b)(8) and (9).

*c. Other part 262 provisions for SQGs.* In addition, part 262 subpart L contains new standards for SQGs who episodically generate higher amounts of hazardous waste to maintain their designation as SQGs during these episodic events. Also, § 262.35 is the landfill ban for liquids that applies to SQGs and LQGs.

Table 4—Crosswalk of Previous Citations to New Citations for SQGs provides a summary of changes between the previous citations in the regulations and new citations for SQGs.

TABLE 4—CROSSWALK OF PREVIOUS CITATIONS TO NEW CITATIONS FOR SQGS

| Regulation | Previous citation | New citation | Comment |
|---|---|---|---|
| Definition of Small Quantity Generator. | § 262.34(d) | § 260.10 | Moved into new definition of SQG. |
| Accumulation Time Limit | § 262.34(d) | § 262.16(b) | Moved. |
| Accumulation Limit | § 262.34(d)(1) | § 262.16(b)(1) | Moved. |
| Accumulation in Containers | § 262.34(d)(2) (references part 265 subpart I). | § 262.16(b)(2) | Duplicated from part 265. |
| Accumulation in Tanks | § 262.34(d)(3) (references part 265 subpart J). | § 262.16(b)(3) | Duplicated from part 265. |
| Accumulation on Drip Pads | | § 262.16(b)(4) references part 265 subpart W. | No previous regulatory reference for SQGs using drip pads. |
| Accumulation in Containment Buildings. | | § 262.16(b)(5) references part 265 subpart DD. | No previous regulatory reference for SQGs using containment buildings. |
| Marking of Tanks and Containers | § 262.34(d)(4) (references § 262.34(a)(2) and (3)). | § 262.16(b)(6) | Copied from § 262.34 with some changes. |
| Preparedness and Prevention | § 262.34(d)(4) (references part 265 subpart C) and. § 262.34(d)(5) | § 262.16(b)(8) and (9) | Duplicated from part 265 and moved from § 262.34. |
| Land Disposal Restrictions | § 262.34(d)(4) (references part 268). | § 262.16(b)(7) | There is still a cross reference to part 268. |
| Transporting Over 200 Miles | § 262.34(e) | § 262.16(c) | Moved from § 262.34. |
| Accumulation Time Limit Extension | § 262.34(f) | § 262.16(d) | Moved from § 262.34. |
| Rejected Loads | § 262.34(m) | § 262.16(e) | Moved from § 262.34. |
| Episodic Generation | N/A | Part 262 subpart L | New provision. |

[10] The portions of § 262.34(d) that state what the generation limits are for this category of generator are moved to the definition of "small quantity generator" in § 262.10.

3. Conditions for Exemption for an LQG Accumulating Hazardous Waste (40 CFR 262.17)

As previously mentioned, the Agency is promulgating a new section 40 CFR 262.17 titled, "Conditions for exemption for a large quantity generator that accumulates hazardous waste." The Agency is moving § 262.34(a),(b),(g) through (i) and (m) into § 262.17. Specifically, the Agency is moving § 262.34(a) to § 262.17(a), moving § 262.34(b) to § 262.17(b), moving § 262.34(g) to § 262.17(c), moving § 262.34(h) to § 262.17(d), moving § 262.34(i) to § 262.17(e), and moving § 262.34(m) to § 262.16(g). EPA has also deleted paragraphs (j) through (l), which deal with Performance Track, since the program is no longer in operation. EPA has also added subtitles and eliminated some cross-references to part 265 in order to make the regulations easier to navigate.

a. *Addition of subtitles.* EPA is adding subtitles to § 262.17 to highlight to the reader the central concept addressed by each section or paragraph. Every subtitle is italicized after the regulatory citation. For example § 262.17(a)(1) addresses "*Accumulation of hazardous waste in containers.*"

b. *Incorporating 40 CFR part 265 subpart I into 40 CFR 262.17.* EPA is incorporating the 40 CFR part 265 subpart I regulations, which were previously referenced at § 262.34(a)(1)(i), into § 262.17(a)(1). EPA also considered incorporating the text of other subparts of part 265 that contain technical standards for LQGs into the new section § 262.17 (*i.e.,* part 265 subparts J, W, AA, BB, and CC), but ultimately decided not to incorporate the text of these subparts due to their length.

c. *Emergency planning and procedures regulations for LQGs in part 265 subpart M.* For generator preparedness and planning regulations, EPA removed the reference to part 265 subparts C and D for the preparedness, prevention, and emergency procedure regulations for LQGs and instead incorporated those regulations in part 262 with the other generator regulations. However, due to the length of these subparts, rather than copying the text of these subparts to § 262.17, EPA created a new subpart M in part 262. EPA believes including these provisions in part 262, along with the rest of the generator regulations, will make the regulations easier to navigate.

d. *Other part 262 provisions for LQGs.* In addition, § 262.17(f) contains the newly promulgated standards for LQGs who accept and consolidate hazardous waste from VSQGs. Also, § 262.35 includes the landfill ban for liquids that applies to SQGs and LQGs.

Table 5—Crosswalk of Previous Citations to New Citations for LQGs provides a summary of changes between the previous citations and the new citations for LQGs.

TABLE 5—CROSSWALK OF PREVIOUS CITATIONS TO NEW CITATIONS FOR LQGS

| Regulation | Previous citation | New citation | Comment |
|---|---|---|---|
| Definition of Large Quantity Generator. | N/A | § 260.10 | New definition. |
| Accumulation Time Limit | § 262.34(a) | § 262.17(a) | Moved from § 262.34. |
| Accumulation in Containers | § 262.34(a)(1)(i) references part 265 subparts I, AA, BB, and CC. | § 262.17(a)(1) (§ 262.17(a)(1) also references part 265 subparts AA, BB, CC). | There is still a cross-reference to part 265 subparts AA, BB, and CC because of the length of these regulations. |
| Accumulation in Tanks | § 262.34(a)(1)(ii) references part 265 subparts J, AA, BB, and CC. | § 262.17(a)(2) references part 265 subparts J, AA, BB, CC. | There is still a cross- reference to part 265 subparts J, AA, BB, CC because of the length of these regulations. |
| Accumulation on Drip Pads | § 262.34(a)(1)(iii) (§ 262.34(a)(1)(iii) also references part 265 subpart W). | § 262.17(a)(3) (§ 262.17(a)(3) also references part 265 subpart W). | Accumulation time limit and recordkeeping provisions move to § 262.17 and the extensive technical standards remain in part 265. |
| Accumulation in Containment Buildings. | § 262.34(a)(1)(iv) (§ 262.34(a)(1)(iv) also references part 265 subpart DD). | § 262.17(a)(4) (§ 262.17(a)(4) also references part 265 subpart DD). | Accumulation time limit, labeling, and recordkeeping provisions move to § 262.17 and the extensive technical standards remain in part 265. |
| Marking and Labeling | § 262.34(a)(2) and (3) | § 262.17(a)(5) | Moved from § 262.34. |
| Preparedness, Prevention, and Emergency Procedures. | § 262.34(a)(4) references part 265 subparts C and D. | § 262.17(a)(6) references part 262 subpart M. | Cross-references remain but to a new subpart of the generator regulations. |
| Personnel Training | § 262.34(a)(4) | § 262.17(a)(7) | Moved from § 262.34. |
| Closure | § 262.34(a)(1)(iv)B) references §§ 265.11 and 265.114. Section 265.111 references other sections in part 265. | § 262.17(a)(8) | Duplicated from §§ 265.11 and 114 with some revisions. |
| Land Disposal Restrictions | § 262.34(a)(4) references applicable parts of part 268. | § 262.17(a)(9) | There is still a cross-reference to part 268. |
| Extension of Accumulation Times | § 262.34(b) | § 262.17(b) | Moved from § 262.34. |
| Accumulation of F006 | § 262.34(g) through (i) | § 262.17(c) through (e) | Moved from § 262.34. |
| Accepting waste from VSQGs under the control of the same person to consolidate before sending to TSDF. | N/A | § 262.17(f) | New provision. |
| Rejected Loads | § 262.34(m) | § 262.17(g) | Moved from § 262.34. |

*C. EPA Identification Number (40 CFR 262.12)*

In the interest in keeping the generator regulations in a logical order for a generator proceeding through the process for the first time, EPA has relocated the previous § 262.12—EPA identification number—to § 262.18. Section 262.12 has been reserved to prevent confusion by anyone referring to old guidance documents. EPA believes this move will improve the flow of the hazardous waste generator regulations as it places the section addressing EPA identification number after § 262.13, which addresses how a generator determines its generator category. This sequence is appropriate because a hazardous waste generator must first determine its generator category in order to determine which regulations—including the requirement to obtain an EPA ID number—it must comply with. (For example, SQGs and LQGs must obtain an EPA identification number, but a VSQG does not).

*D. What changed since proposal?*

In the final rule, EPA is not making any significant changes to the structure of the reorganization in the proposal. The majority of commenters supported the changes EPA proposed and stated the changes would make the regulations more clear to the majority of stakeholders.

One minor change from the proposal that EPA is making in this final rule is to relocate the regulations on mixing solid waste and hazardous waste from each generator category section into § 262.13 for the reasons discussed previously.

*E. Guidance and Implementation*

As part of the implementation of this final rule, EPA is planning outreach to all stakeholders to discuss the reorganization in particular. The reorganization of the regulations will require adjustment by all parties that rely on EPA's generator regulations and EPA is committed to easing that adjustment through guidance and training.

**VII. Detailed Discussion of Revisions to 40 CFR Part 260—Hazardous Waste Management System: General**

*A. Generator Category Definitions (40 CFR 260.10)*

1. Introduction

As part of the reorganization of the regulations and in an effort to make the generator regulations more accessible and easier to understand, EPA proposed to codify definitions for the three categories of hazardous waste generators (VSQG, SQG and LQG) and, in conjunction with those definitions, to also define "acute hazardous waste" and "non-acute hazardous waste" for the purposes of use in the definitions (80 FR 57925–6).

In the proposal, EPA noted that the term "small quantity generator" is codified in the regulations, but is outdated, whereas "conditionally exempt small quantity generator" and "large quantity generator" have been used within the RCRA hazardous waste community for several decades, but their exact definitions have not been codified. The regulations differentiate among the categories by stating the quantity of hazardous waste generated in a calendar month in each instance, leading to cumbersome phrasing throughout the text.

As a part of the codification of these definitions, EPA also proposed replacing "conditionally exempt small quantity generator," the term for the smallest quantity category of generator, with "very small quantity generator."[11] EPA proposed this revision to remove confusion behind the phrase "conditionally exempt." All three categories of generators are conditionally exempt from storage facility permit, interim status, and operating requirements, not just the smallest category. In addition, the new term is more descriptive of what the definition of the category actually represents. EPA notes this change is consistent with some states, such as Minnesota, that are already using the VSQG term. All regulations previously applicable to a CESQG apply to a VSQG.

VSQGs are generators that generate 100 kilograms or less of non-acute hazardous waste and 1 kilogram or less of acute hazardous waste in a calendar month; SQGs are generators that generate greater than 100 kilograms of non-acute hazardous waste but less than 1,000 kilograms of non-acute hazardous waste and 1 kilogram or less of acute hazardous waste in a calendar month; and LQGs are generators that generate 1,000 kilograms or greater of non-acute hazardous waste and/or greater than 1 kilogram of acute hazardous waste in a calendar month. However, generators often fail to consider residues from the cleanup of a spill of acute hazardous waste or do not count both the non-acute and acute hazardous waste they generate in a calendar month. Codifying definitions for these terms clarifies what categories of waste must be considered in determining generator category.

[11] EPA is finalizing this revision and, therefore, will use this term to refer to the smallest generator category in this preamble discussion.

2. What is EPA finalizing?

EPA is finalizing the generator category definitions as proposed to incorporate all the various categories of hazardous wastes—that is, acute hazardous waste, non-acute hazardous waste, and residues for the cleanup of a spill of acute hazardous wastes. Users of the generator regulations will benefit from the inclusion of the definitions of terms that are commonly used throughout the program. As a part of these revisions, EPA is also finalizing the definitions for "acute hazardous waste" and "non-acute hazardous waste" and the replacement of "conditionally exempt small quantity generator" with "very small quantity generator."

The generator category definitions are based solely on the amount of hazardous waste generated. While EPA acknowledges that accumulation limits may trigger different generator regulations, those accumulation limits do not affect a generator's generation category, which is based on how much hazardous waste is generated in a calendar month. Therefore, EPA is adding definitions for each of the generator categories to § 260.10.

A very small quantity generator is a generator who generates less than or equal to the following amounts in a calendar month: (1) 100 kilograms (220 lbs) of non-acute hazardous waste; and (2) 1 kilogram (2.2 lbs) of acute hazardous waste listed in § 261.31 or § 261.33(e); and (3) 100 kilograms (220 lbs) of any residue or contaminated soil, water, or other debris resulting from the cleanup of a spill, into or on any land or water, of any acute hazardous waste listed in § 261.31 or § 261.33(e).

A small quantity generator is a generator who generates the following amounts in a calendar month: (1) Greater than 100 kilograms (220 lbs) but less than 1,000 kilograms (2,200 pounds) of non-acute hazardous waste; and (2) less than or equal to 1 kilogram (2.2 lbs) of acute hazardous wastes listed in § 261.31 or § 261.33(e); and (3) less than or equal to 100 kilograms (220 lbs) of any residue or contaminated soil, water, or other debris resulting from the cleanup of a spill, into or on any land or water, of any acute hazardous waste listed in § 261.31 or § 261.33(e).

*A large quantity generator* is a generator who generates any of the following amounts in a calendar month: (1) Greater than or equal to 1,000 kilograms (2,200 lbs) of non-acute hazardous waste; or (2) greater than 1 kilogram (2.2 lbs) of acute hazardous waste listed in § 261.31 or § 261.33(e); or (3) greater than 100 kilograms (220 lbs)

of any residue or contaminated soil, water, or other debris resulting from the cleanup of a spill, into or on any land or water, of any acute hazardous waste listed in § 261.31 or § 261.33(e).

In the comments addressing these revisions, several commenters suggested that the use of the word "and" between the types of waste being considered in the definitions of VSQG and SQG would mean that a generator must generate all three types of waste to qualify for the generator category. EPA disagrees, noting that zero kilograms of acute hazardous waste would qualify as "less than or equal to 1 kilogram" and zero kilograms of residue from a spill would qualify as "less than or equal to 100 kilograms." If these "and"s were changed to "or"s, as many of the commenters suggested, then a generator could, for instance, qualify as a VSQG just by having less than 1 kilogram of acute hazardous waste regardless of how much non-acute hazardous waste or residues it had generated.

EPA is also finalizing the proposal to replace "conditionally exempt small quantity generator" with "very small quantity generator" and is replacing all references in the regulations with this term. EPA will also be updating its materials and guidance to take into consideration the new term.

In addition, EPA is adding definitions to § 260.10 for the terms "acute hazardous waste" and "non-acute hazardous waste." These terms are necessary because they are used in the definitions of the generator categories discussed above and because they have specific meanings within the hazardous waste generator program. The term acute hazardous waste is used for hazardous wastes that are particularly dangerous to human health and is defined as those hazardous wastes that meet the listing criteria in § 261.11(a)(2) and are therefore listed in § 261.31 and assigned the hazard code of (H) or are listed in § 261.33(e), also known as the RCRA P-list. In this rulemaking, any distinctions between acute and non-acute hazardous wastes are made only in the context of determining generator category. Otherwise, throughout the regulations, preamble, and guidance, the term "hazardous waste" refers to both acute and non-acute hazardous waste.

3. What changed since proposal?

EPA is finalizing the definitions for the generator categories as proposed with no changes. EPA is finalizing the replacement of "conditionally exempt small quantity generator" with "very small quantity generator" with no changes. EPA is finalizing the definitions of acute and non-acute hazardous waste as proposed with no changes.

EPA is making some changes to another area of the regulations as a result of some comments that showed that there is confusion about how the accumulation limits for VSQGs operate. EPA received multiple comments stating that the accumulation limits for VSQGs of 1,000 kg of hazardous waste, 1 kg of acute waste or 100 kg of residues from cleanup of a spill of acute hazardous waste (in § 262.14) and for SQGs of 6,000 kg of hazardous waste (in § 262.16) should be part of the definitions of the generator categories in § 260.10 and a factor in making a generator category determination.

EPA maintains that although these limits are related to the generator definitions, particularly for SQGs, the accumulation limits are not part of the definition of a generator's category, but instead have operated as a separate provision. For SQGs, the accumulation limit has always been a condition for the exemption from permitting and certain other hazardous waste regulations, meaning that if the limit is violated, the generator is no longer exempt from these regulations. The generator category is, as is stated in the statute, based on the amount of waste generated "during a calendar month."[12] An SQG is limited to generating less than 1,000 kg of hazardous waste per month and to shipping that waste off site within 180 days of generation. Therefore, an SQG cannot accumulate more than 6,000 kg of hazardous waste without either generating more than 1,000 kg in one of the past six months (which would make it an LQG) or accumulating its waste beyond the 180-day limit. In this situation, the SQG can choose to become an LQG and manage the hazardous waste as an LQG. Alternatively, the SQG will lose its exemption from regulation as a storage facility and be subject to the requirements in parts 264–268, part 270, and the notification requirements at section 3010 of RCRA.

If a VSQG exceeds the accumulation limit, the exemption can be maintained if the waste is managed under the more extensive conditions for exemption of a larger generator category, but the VSQG does not itself have to become an SQG or LQG. To maintain the exemption, VSQGs that accumulate more than 1,000 kg of non-acute hazardous waste must manage the waste under the conditions for exemption for SQGs, and VSQGs that accumulate more than 1 kg of acute waste or 100 kilograms of any residue from the cleanup of a spill of acute hazardous waste must manage the waste under the conditions for exemption of an LQG.

EPA based the language in the final rule on accumulation limits for VSQGs on the previous regulations in § 261.5(f)(2) and (g)(2), which state the same principle. However, in order to make it more clear how these provisions operate, EPA has included the exact provisions that would apply to the excess waste to clarify this provision in § 262.14(a)(3) and (4). In addition, EPA is clarifying here that when the amount of waste that is accumulated exceeds the accumulation limit, all the accumulated waste at the VSQG must be managed under the requirements for an LQG, as EPA stated in the preamble to the 1980 generator final rule at 45 FR 76621 (November 19): "The revised regulation also clarifies that once the accumulated amounts exceed *1000* kilograms, all of those wastes and those subsequently added to that accumulation are fully regulated until all the waste is sent to a hazardous waste treatment, storage or disposal facility. This rule means that those wastes remain subject to full regulation even if the quantity of wastes accumulated or stored becomes less than 1000 kilograms."

4. Major Comments

EPA received support from a variety of stakeholders on its proposal to promulgate definitions for the generator categories in the final rule. Many stakeholders agreed with EPA's assessment that officially defining the commonly-used terms for these generators in the regulations would be a helpful addition.

Some commenters offered additional suggestions, such as revising the SQG threshold to be greater than 100 kg and less than or equal to 1,000 kg to be easier to remember, to use "less than" (<) and "greater than" (>) signs in the regulations, to change the primary unit of measurement in the regulations to pounds from kilograms and to rely on monthly averages for waste generation rather than actual monthly amounts. EPA is not making changes to the regulations in response to these comments. Although EPA understands that the quantity limits in the regulations for SQGs are not exactly parallel to the other generator categories, EPA sees little or no benefit in making a change that shifts the generator category by a single kilogram of hazardous waste or a revision of the units of measurement in the regulations. Both these revisions would require administrative changes throughout the

[12] The Solid Waste Disposal Act as Amended by the Hazardous and Solid Waste Amendments of 1984, Section 3001(d).

hazardous waste generator system. In addition, EPA believes that the meaning of "greater than" and "less than" is clear without the use of the arithmetic symbols.

Finally, EPA does not agree with the commenters who stated that it would be appropriate to allow a generator to average hazardous waste generation over several months and use the average to determine its generator category. Beyond the practical implementation concerns with this approach, and despite the commenters' argument that this approach would be consistent with the statute's intent, EPA has long interpreted the RCRA statement that a generator's category be based on the amount of waste generated "during a calendar month" at face value: The generator must know the quantity of hazardous waste it generates per month, not as an average of some sort, and be regulated accordingly.[13] EPA rejected similar approaches in the March 24, 1986, final rule that established the current small quantity generator regulations and is not changing that interpretation as a part of this rulemaking.[14]

EPA does agree with the comment that any acute hazardous waste cleaned up in debris is counted as part of the "residue or contaminated soil, water, or other debris resulting from the cleanup of a spill . . . of any acute hazardous waste" and is not counted separately as acute hazardous waste.

Regarding "conditionally exempt small quantity generators," EPA received comments on the proposal arguing that the users of the term "conditionally exempt small quantity generator" are familiar with its meaning and do not need a revision and that states will need to update materials and forms with the new term, VSQG. EPA has determined that although the users of the regulation are familiar with this term as it is used currently, there is real value in revising it so that those who will be introduced to the RCRA generator program in the future can make more sense of the terms. As stated previously, EPA will be revising its own materials, as necessary, to account for the new term and will work with states to phase in the changed terminology over time.

*Effect of the Reorganization:* This section is not affected by the reorganization.

*B. Generators That Generate Both Acute and Non-Acute Hazardous Waste in the Same Calendar Month (40 CFR 260.10)*

1. Introduction

As stated previously in the discussion of the definitions of the categories, when a generator is determining its generator category, it must consider three relevant types of hazardous waste: Hazardous waste (or "non-acute hazardous waste," for purposes of this discussion), acute hazardous waste, and residues from the cleanup of a spill of acute hazardous waste. Historically, the RCRA hazardous waste regulations have not addressed situations involving combinations of wastes and Agency statements about this issue have been inconsistent. This situation led EPA to propose regulations to clarify a generator's category for a calendar month during which it generates any combination of non-acute hazardous waste, acute hazardous waste, and residues from the cleanup of a spill of acute hazardous waste.

EPA discussed its history of statements on this topic in the proposed rule at 80 FR 57927, noting examples of contradictory EPA statements that a generator can have just one category per calendar month and EPA statements that a generator can manage acute hazardous waste as one category of generator and non-acute hazardous waste as a different category of generator in the same calendar month.

EPA proposed a more practical approach that a generator can be in only one generator category in a calendar month and noted that many EPA Regions and states have taken this same approach in implementing the RCRA hazardous waste program.

2. What is EPA finalizing?

EPA is finalizing definitions of the generator categories that expressly state which generator category would apply to hazardous waste generators that generate a combination of non-acute hazardous waste, acute hazardous waste, and/or residues from the cleanup of spills of acute hazardous waste in a calendar month as discussed earlier in this section of the preamble.

In conjunction with these changes, EPA is finalizing a new section § 262.13 explaining how a generator determines its applicable generator category. This topic is fully discussed in section IX.C of this preamble.

EPA's decision to finalize this approach is based partially on developing a practical solution to situations where a generator generates, for example, acute and non-acute hazardous waste in the same month. This approach is analogous to situations in which a generator that generates only non-acute hazardous wastes counts its various hazardous wastes. In those situations, a generator must consider the total amount of all its different kinds of non-acute hazardous waste, not the amount of each type of hazardous waste (*e.g.*, type of waste identified by individual EPA hazardous waste number) separately. Therefore, a generator must similarly follow the same logic in considering the combination of acute hazardous wastes, non-acute hazardous wastes, and residues from the cleanup of a spill of acute hazardous waste generated in a calendar month when determining which category a generator belongs to.

We note that many EPA Regions and states have taken this same approach in implementing the RCRA hazardous waste program and many of the state agencies that commented on the proposed rule stated they were in support of these changes to the regulations for the reasons EPA described in the preamble to the proposed rule, particularly because of the inconsistencies in the guidance.

In practice, five waste generation scenarios exist with different combinations of acute hazardous waste, non-acute hazardous waste, and residues from the cleanup of spills of acute hazardous waste generated in a calendar month. These scenarios are summarized in Table 6—Generator Categories Based on Quantity of Waste Generated.[15]

---

[13] The Solid Waste Disposal Act as Amended by the Hazardous and Solid Waste Amendments of 1984, Section 3001(d).

[14] 51 FR 10154, March 24, 1986.

[15] This table is being finalized in the regulations as Table 1 to § 262.13.

TABLE 6—GENERATOR CATEGORIES BASED ON QUANTITY OF WASTE GENERATED

| Quantity of acute hazardous waste generated in a calendar month | Quantity of non-acute hazardous waste generated in a calendar month | Quantity of residues from the cleanup of spilled acute hazardous waste generated in a calendar month | Generator category |
|---|---|---|---|
| > 1 kg | Any amount | Any amount | LQG. |
| Any amount | ≥ 1,000 kg | Any amount | LQG. |
| Any amount | Any amount | > 100 kg | LQG. |
| ≤ 1 kg | > 100 kg and < 1,000 kg | ≤ 100 kg | SQG. |
| ≤ 1 kg | ≤ 100 kg | ≤ 100 kg | VSQG. |

**Note:** When calculating generator categories, the quantities of acute hazardous waste and non-acute hazardous waste are considered separately.

In three of the five possible scenarios, the generator is an LQG; in one scenario, the generator is an SQG; and in one scenario, the generator is a VSQG.

As the table indicates, in the first three scenarios, the generator is an LQG if it generates any of the following in a calendar month: More than 1 kilogram of acute hazardous waste, 1,000 kilograms or more of non-acute hazardous waste, or more than 100 kilograms of residues from the cleanup of a spill of acute hazardous waste. This is true regardless of the amount of waste generated in the other categories. This fact is made clear in the final regulatory definition of "LQG" by stating that a generator is an LQG if it generates "any" of the types of hazardous waste in the amounts listed and by using of the word "or" between (1), (2), and (3).

As an LQG, the generator must comply with the independent requirements for LQGs (specified in § 262.10) and the conditions for exemption for LQGs (specified in § 262.17), as well as any applicable conditions for exemption for SAAs at § 262.15.

In the fourth scenario, the generator is an SQG if, in a calendar month, it generates greater than 100 kilograms and less than 1,000 kilograms of non-acute hazardous waste and also 1 kilogram or less of acute hazardous waste and 100 kilograms or less of residues from the cleanup of a spill of acute hazardous waste.[16] The final regulatory text expresses this scenario by using the word "and" between (1), (2), and (3) in the definition of SQG.

As an SQG, the generator must comply with the independent requirements for SQGs (specified in § 262.10) and the conditions for the exemption for SQGs (specified in § 262.16), as well as any applicable conditions for exemption for SAAs at § 262.15.

[16] Amount of hazardous waste accumulated on site at any given time can also impact what regulations the SQG must comply with.

Finally, in the fifth scenario, if a generator generates 1 kilogram or less of acute hazardous waste and 100 kilograms or less of non-acute hazardous waste and 100 kilograms or less of residue from the cleanup of a spill of acute hazardous waste, then the generator is a VSQG for that calendar month. The regulatory text expresses this scenario by using the word "and" between (1), (2), and (3) in the definition.

As a VSQG, the generator must comply with the independent requirements for VSQGs (specified in § 262.10) and the conditions for exemption for VSQGs (specified in § 262.14).

3. What changed since proposal?

EPA is finalizing the definitions for the generator categories as proposed and has not made revisions to how it expects generators to determine their generator category when they generate acute and non-acute hazardous waste.

4. Major Comments

Some commenters who opposed EPA's proposal that a generator should manage all its waste under the same generator category argued this would be a change to how they are currently operating and that it is burdensome to operate a whole generator site as an LQG because of the existence of LQG levels of acute hazardous waste.

EPA recognizes commenters' concerns about disruption to, and burdens on, current operations. However, EPA has determined that if the definitions of the generator categories are going to depend on the amounts of hazardous waste generated, it does not, in the end, make practical sense to have a generator that is operating in more than one category. EPA notes that some comments stated that there will be a difference for those generators that have been managing acute hazardous waste in a separate area and only having a RCRA contingency plan for that area, but believes that those generators are LQGs and should be following the independent requirements and conditions for exemption for LQGs for all waste areas. Again, many states and EPA Regions commented that they are already interpreting the regulations in this way so EPA does not anticipate that these changes will have a major effect in program implementation. In fact, these revisions are making the regulations consistent with how most programs are operating currently.

*Effect of the Reorganization:* This section is not affected by the reorganization.

*C. Definition of Central Accumulation Area (40 CFR 260.10)*

1. Introduction

In the proposal at 80 FR 57927, the Agency discussed defining the term "central accumulation area" (CAA) in § 260.10. LQGs may accumulate hazardous waste on site without a permit or complying with the interim status standards for up to 90 days, provided they comply with the conditions of § 262.17 and SQGs may do the same for up to 180 days, provided they comply with the conditions of § 262.16.[17] Over the years, stakeholders have used different terms to refer to these on-site generator accumulation areas, including "generator accumulation areas," "less-than-90-day areas," and "less-than-180-day areas." In December 2008, EPA promulgated a definition of "central accumulation area" in subpart K of part 262 to refer to these types of areas.[18] EPA codified the term "central accumulation area" for the sake of convenience to distinguish these types of accumulation areas from satellite accumulation areas and laboratories, which are both subject to different regulations than central accumulation areas are in that rule. At the time, EPA promulgated the term in

[17] SQGs can also accumulate hazardous waste for up to 270 days if they ship the hazardous waste greater than 200 miles.

[18] "Academic Labs Rule"; 73 FR 72912, December 1, 2008.

§ 262.200 and indicated the definition only applied to part 262 subpart K. Since then, the term has become more widely used and therefore EPA proposed to define the term "central accumulation area" in § 260.10 to allow its use when referring to all generator accumulation areas, including those that are not operating under part 262 subpart K.

2. What is EPA finalizing?

EPA is finalizing the definition of "central accumulation area" to mean any on-site hazardous waste accumulation area with hazardous waste accumulating in units subject to either § 262.16 (for small quantity generators) or § 262.17 (for large quantity generators).[19] The definition also states that a CAA at an eligible academic entity that chooses to be subject to part 262 subpart K must also comply with § 262.211 when accumulating unwanted material and/or hazardous waste.

EPA emphasizes again that we are defining the term "central accumulation area" only as a matter of convenience. It is helpful for both the regulated community and the implementers to use a common term when referring to locations where generators accumulate hazardous waste other than satellite accumulation areas. Furthermore, the term is helpful for EPA to use when writing regulations, preamble, and guidance. The addition of the term does not establish any new regulatory standards or burden on generators.

EPA also wants to emphasize that generators may continue to have more than one CAA on site, as long as all CAAs meet the conditions for accumulation of hazardous waste. We are making this clear in the definition by stating that a "central accumulation area" means *any* on-site hazardous waste accumulation area with hazardous waste accumulating in units subject to either § 262.16 or § 262.17.

Further, the use of the word "central" does not denote a physical location or indicate that the generator must establish the CAA in a location that is centrally located within the site. The term "central" is used in the sense that many generators consolidate or *centralize* their hazardous waste from multiple satellite accumulation areas at a CAA prior to shipment off site. The CAA can be in any location at the generator site as long as it meets the conditions for the accumulation of hazardous waste.

As a result of making this change for all of part 262, we are also removing the definition of "central accumulation area" from part 262 subpart K.

3. What changed since proposal?

EPA is finalizing the definition for "central accumulation area" as proposed.

4. Major Comments

EPA received comments on the proposed revisions that expressed concern that the word "central" might be misconstrued to mean a generator might be limited to maintaining just one CAA or that the CAA might have to be in the center of the generator's property. Commenters suggested other terms, such as "generator accumulation area" or "hazardous waste accumulation area." Although these terms would likely work equally well in many respects, "central accumulation area" is already commonly understood by many stakeholders. It has been in use for many years and has been in the regulations since the promulgation of the Academic Labs Rule. EPA has addressed the commenters concerns about the word "central" in the previous discussion and does not see a compelling reason to promulgate a term different than the one proposed.

*Effect of the Reorganization:* This section is affected by the reorganization. The definition of "central accumulation area" references other regulatory citations that are part of the reorganization. The reorganization is discussed in section VI of this preamble.

**VIII. Detailed Discussion of Revisions to 40 CFR Part 261—Requiring Biennial Reporting for Owners or Operators of Facilities That Recycle Hazardous Waste Without Storing It (40 CFR 261.6(c)(2))**

*A. Introduction*

As part of this rulemaking, EPA proposed to modify 40 CFR 261.6(c)(2) and require owners or operators of facilities that recycle hazardous waste without storing the wastes, or facilities that receive and partially reclaim hazardous wastes prior to producing a commodity-like material as described at § 260.31, to comply with the biennial reporting requirements at 40 CFR 265.75. This modification was primarily a clarification of the existing rules because the Agency was concerned, based on an analysis of biennial reports, that not all of these type facilities were completing a biennial report when they should have been doing so. Recycling facilities and partial reclamation facilities receiving manifested hazardous waste by a hazardous waste transporter are similar to permitted TSDFs that also must complete a biennial report. Without biennial report information, the Agency and states may have an incomplete picture of which facilities recycle hazardous waste and the quantities of regulated hazardous wastes that are recycled, impeding EPA and the states' ability to provide adequate oversight for those facilities.

The Agency believes that only a few recycling facilities will be affected by this change. Additionally, considering that most facilities already have sophisticated information systems to manage and track incoming shipments of hazardous waste, we believe the burden imposed on such facilities should be minimal if they are affected by this change.

*B. What is EPA finalizing?*

The Agency is finalizing the proposal at § 261.6(c)(2). Owners or operators of facilities that receive and partially reclaim hazardous wastes into a commodity like material, or recycle regulated hazardous waste (*i.e.*, hazardous secondary materials not excluded from the definition of solid waste, or hazardous waste not exempt other recycling regulations) without storing it prior to recycling must comply with the biennial reporting requirements at 40 CFR 265.75. However, based on a few comments, the Agency wishes to make clear that this provision is only applicable to owners and operators of facilities that receive regulated hazardous waste from off site and/or do not store incoming hazardous waste prior to recycling. LQGs that generate and recycle their own regulated hazardous wastes continue to be regulated under § 261.6(b).

In an effort to ensure the universe of facilities affected by this new provision is aware of their obligation to complete and submit a biennial report, the Agency will highlight these changes in the Biennial Report Instructions and Forms and describe what facilities must do to complete and submit a report. Similarly, the Agency, as part of its outreach efforts for this new rule, will educate facilities about this new reporting requirement where appropriate.

*C. Major Comments*

Most commenters supported this provision but a few commenters questioned the utility of this provision. As stated previously, the Agency is

[19] This definition includes citations to the newly promulgated sections of part 262 that are as part of the reorganization of the generator regulations. The predecessors to the small quantity generator regulations are at § 262.34(d) through (f) and the predecessors to large quantity generator regulations are at § 262.34(a). For a full discussion of the reorganization, see section VI of the preamble.

aware of situations through the years where a partial reclamation facility or a recycling facility that does not store prior to recycling (and hence may not have a need for a RCRA storage permit) failed to complete and submit a required Biennial Report because they were receiving regulated hazardous waste. Without this information, the Agency and states have an incomplete understanding of hazardous waste recycling activities occurring nationally. This provision is meant to make such facilities aware of their biennial reporting obligations. In addition, such recycling facilities cannot accept regulated hazardous waste from generating facilities without the recycling facilities having a RCRA identification number.

## IX. Detailed Discussion of Revisions to 40 CFR part 262—Standards Applicable to Generators of Hazardous Waste

### *A. Addition of Terms Used in this Part and Changes to Purpose, Scope, and Applicability (40 CFR 262.1 and 262.10)*

As previously discussed, one of the objectives of this rulemaking is to revise the hazardous waste generator regulations to make them more user-friendly and easily understood by both the regulated community and federal and state regulators. The hazardous waste generator regulations have long been located primarily in three different parts of the CFR (40 CFR parts 261, 262, and 265), making it sometimes difficult to determine what components of the regulations apply to different categories of hazardous waste generators.

The reorganization is addressing some of these problems by reducing the need to refer to separate parts of the regulations through consolidation of the generator regulations into part 262 and by organizing the regulations based on a generator's category so generators can more easily determine which regulations apply to them. As described in section VI, EPA is finalizing three new sections in part 262 subpart A to set forth the conditions for exemption for each of the categories of generators that accumulate waste on site and one new section to set forth the conditions for exemption for SAAs. These new sections are § 262.14 for VSQGs, § 262.15 for SAAs, § 262.16 for SQGs, and § 262.17 for exemption for LQGs.

In concert with the reorganization of the generator conditions for exemption for on-site accumulation of hazardous waste, EPA is adding regulatory language to more clearly explain how the regulations work for generators and to lay out which provisions apply to each of the different categories of generators. EPA is making additional changes to otherwise clarify the framework of the hazardous waste generator program, including the addition of § 262.1 and the revisions to § 262.10. EPA is also adding an explicit prohibition on sending hazardous waste to a facility that is not authorized to accept it and is removing outdated and unnecessary provisions.

Note that the changes to the regulatory text for § 262.10 in this action take into account the revisions being made as a part of the "Hazardous Waste Export-Import Revisions" Final Rule (Docket ID EPA–HQ–RCRA–2015–0147; FRL–9947–74–OLEM), including replacing the reference to § 262.12 in paragraph (d) with a reference to § 262.18 and referring to subpart H of part 262 for provisions on imports and exports of hazardous waste instead of to subparts E and F, which are being removed and reserved.

#### 1. Regulatory Framework for Independent Requirements and Conditional Exemptions for Generators (Sections 262.1, 262.10(a), and 262.10(g))

a. *Introduction.* In developing the proposed rule, EPA determined that the RCRA regulations could be clarified regarding the distinction between the two types of generator requirements: (1) Those requirements that any generator generating hazardous waste must meet, which EPA is calling "independent requirements," and (2) those conditional requirements that a generator who also accumulates waste must meet only if it wants the benefits of an exemption from RCRA storage facility permitting (or interim status) requirements, which EPA is calling "conditions for exemption." In order to make the regulations clearer regarding this distinction, EPA proposed to include definitions for these types of provisions in a new section of the regulations, to list which regulations for generators are independent requirements and which are conditions, and to clarify the regulatory difference between those types of requirements with regards to enforcement. These changes were proposed in a new § 262.1 and in revisions to the existing § 262.10(a) and (g).

b. *What is EPA finalizing?* EPA is finalizing the proposal to clearly define and reflect in the regulations the distinction between independent requirements and conditions for exemption that has existed, less explicitly, in the RCRA generator regulations since their initial implementation over 30 years ago. Because some commenters expressed continuing confusion over the distinction, a more extended discussion here will help to address and further clarify the meanings of the terms.

The difference between independent requirements and conditions for exemption lies in the nature of each type of provision and in the consequences that may result if each is not met. An "independent requirement" in part 262 is the common type of regulatory requirement one usually thinks of, equivalent to a law that can be broken: It is the statement of a duty that must be met, or else a violation of RCRA or the regulations has occurred that is subject to a penalty. In other words, in the context of 40 CFR part 262, an "independent requirement" is an unconditional requirement or demand that is imposed upon the generator and with which the generator must comply. Because the sole purpose of the independent requirement is to achieve or prohibit the stated behavior, event, or standard, the only potential legal consequence to the generator from failing to meet an independent requirement, is some form of enforcement action for violating that particular requirement (*e.g.,* a notice of violation, civil or criminal penalties, or injunctive relief under section 3008 of RCRA).

Most important to the distinction between an "independent requirement" and a "condition for exemption" in part 262 is the fact that an independent requirement does not provide a mechanism for the generator to avoid having to comply with other requirements, such as the storage facility regulations in parts 264, 265 and 270.

Also important to note is that the "independent requirements" of part 262 are not legally tied to the accumulation of hazardous waste. These part 262 independent requirements are applicable and enforceable, and must be met, by a generator of hazardous waste, whether or not the generator actually accumulates hazardous waste on site. In that sense, they are "independent" of the conditions for exemption from storage facility regulation, which are only applicable to generators who also accumulate hazardous waste. The independent requirements of part 262 are therefore enforceable whether or not the generator has obtained, or is attempting to obtain, an exemption from the storage facility permit (or interim status) and operations requirements by meeting the conditions for that exemption in §§ 262.14, 262.15, 262.16, or 262.17.

An example of such an "independent requirement" is § 262.30, the pre-transport waste packaging requirement. This requirement is an unconditional demand, and failure to meet this requirement is subject to penalty or injunctive relief for violating § 262.30. The requirement applies without regard to whether the generator accumulates waste on site; and it applies and is enforceable regardless of whether the generator has an exemption from storage facility permit and operations regulations.

A condition for exemption, on the other hand, is a requirement that is contingent in nature: It is only necessary to meet the condition if the generator is using it to obtain an optional exemption from other requirements. A condition for exemption is not the common type of regulatory requirement that absolutely demands compliance under threat of penalty for violation of that requirement. Meeting a condition for exemption is required only if the generator wants an exemption, and then is "required" only in the sense that it is a necessary step to take in order to successfully obtain that optional exemption.

The primary legal consequence of *not* complying with the condition for exemption is that the generator who accumulates waste on site can be charged with operating a non-exempt storage facility (unless it is meeting the conditions for exemption of a larger generator category). A generator operating a storage facility without any exemption is subject to, and potentially in violation of, many storage permit and operations requirements in parts 124, 264 through 268, and 270.

As an example, § 262.17 provides the conditions for the LQG exemption from storage facility regulation by stating that the LQG may accumulate hazardous waste on site without a permit or interim status, and without complying with storage facility operating requirements, provided it meets the conditions stated in that paragraph. The stated conditions for exemption in § 262.17 are the necessary steps the LQG can take to obtain the exemption, if it chooses to do so.

The distinction between part 262 independent requirements and part 262 conditions for exemption is also important because violation of an independent requirement (as discussed previously in this section), such as an SQG failing to obtain an EPA identification number, can result in a notice of violation and enforcement action for that particular independent requirement only. In contrast, noncompliance with a condition for

exemption, such as an LQG accumulating hazardous waste for more than 90 days may result in an entity losing its storage facility exemptions and becoming the operator of a non-exempt storage facility subject to the applicable requirements for storage facilities in parts 124, 264 through 268, and 270.

The first part of the revisions EPA is finalizing contains the definitions for "independent requirement" and "condition of exemption," so that the meaning of the terms will be clear as we have described them here. We use these terms throughout this preamble and the final regulations to distinguish between these two types of provisions for generators in part 262.

EPA is also finalizing the changes to § 262.10(a) with some revisions. Section 262.10(a) addresses the purpose, scope, and applicability of the hazardous waste generator regulations and contains both a list of which independent requirements apply to each generator category and also references to the later sections at which generators can find the full list of conditions for the applicable generator exemption. At the same time, § 262.10(a) distinguishes which generator provisions are independent requirements and which are conditions for a generator exemption.

The language in § 262.10(a) also continues to explain the significance of the conditional exemption from storage facility permit, interim status, and operating requirements by stating specifically that if the conditions for exemption (those requirements in § 262.14, 262.15, 262.16, or 262.17) are not met, then the generator will be subject to the permitting or interim facility provisions in parts 124, 264 through 268, 270, and section 3010 of RCRA.

The reaction to the proposed changes was mixed among the states. Many states agreed that the explanations of conditions for exemption from permitting for generators accurately describes how the generator regulations have operated all along and stated that including this explanation in a straightforward way in the regulations would be a benefit and would make the RCRA program more transparent to the regulated community. Some states, however, expressed concern that the new regulations would limit their flexibility in how they enforce the RCRA regulations within their states and were opposed to the changes for that reason.

Comments from industry stakeholders expressed great concern that the language EPA proposed represented a

major shift in the Agency's enforcement paradigm to a draconian system of enforcement that would lead to an excessive number of violations and penalties. EPA disagrees with this comments and did not intend to create any sort of shift in EPA's enforcement actions. In response to these comments on the proposal, EPA has revised the final language to be clearer and to further explain the regulations.

In this final rule, EPA reiterates that the distinction between independent requirements for all generators and conditions for exemption from the storage facility regulations that are available to generators who are accumulating hazardous waste on site has always existed in the RCRA program. It has been the Agency's longstanding position that generators that do not comply with a condition of a generator exemption fail to qualify for the exemption and (if they have not qualified for a larger generator exemption) they would be considered an operator of a non-exempt storage facility, in addition to being a generator. The changes to § 262.10 in this rule do not constitute a substantive change to this long-standing position.

Thus, these revisions to the regulations make this distinction more clear to all generators by listing the independent requirements and conditions for exemption applicable to all hazardous waste generators based on their generator category. The reason for this change is to reduce confusion for the regulated community in the context of compliance and any enforcement actions.

Additionally, EPA is revising another part of § 262.10 in its effort to make the framework of the regulations more clear. Historically § 262.10(g) has stated that a generator is subject to the compliance requirements and penalties prescribed in section 3008 of [RCRA] if it does not comply with the requirements of part 262. However, this paragraph did not previously explain the distinction between the potential penalties for violating part 262 independent requirements and the consequences of not complying with the conditions for a generator exemption that are not subject to direct penalties. As a result, confusion has persisted over the legal consequences of failure to comply with the conditions for exemption and this confusion is reflected in the comments to our proposed rule.

Therefore, EPA is revising § 262.10(g) to make the legal framework clear to the regulated community. Section 262.10(g)(1) establishes that violation of an independent requirement, such as the hazardous waste determination

requirement of § 262.11 or the EPA ID number requirement of § 262.18 is subject to penalty and injunctive relief under section 3008 of RCRA. However, § 262.10(g)(2) establishes, as explained throughout this portion of the preamble, that noncompliance with a condition for exemption is not subject to penalty and injunctive relief under section 3008 of RCRA as a violation of part 262. Rather, noncompliance with a condition for exemption by a generator accumulating waste on site results in the generator losing the storage facility exemption from parts 124, 264 through 268, and 270. Without an exemption, the generator is subject to the requirements of those parts of the storage facility regulations, the violation of which is subject to penalty and injunctive relief under section 3008 of RCRA.

As a whole, EPA believes that these three sets of revisions—the new definitions in § 262.1 and the revisions to § 262.10(a) and (g)—will clarify EPA's longstanding position on how the RCRA generator program works and how the two types of requirements—independent requirements and conditions for exemption—interact and apply. As stated previously, EPA does not consider these revisions to the regulatory language as a change to the RCRA generator program because the regulations that were previously in § 262.34 (now in §§ 262.14–17) and the provisions for VSQGs that were in § 261.5 [20] were always conditions for exemption from storage facility permit, interim status, and operating requirements and have always worked in the same way as we are explaining in this rule.

As explained in the preamble to the proposal, the clarifications regarding the distinction between independent generator requirements, and the conditions for exemption from storage facility regulations for generators that accumulate hazardous waste on site, do not alter the way the generator regulatory scheme has operated over the last 30 years. Similarly, the clarifications regarding the enforcement consequences of independent requirement violations and non-compliance with conditions for exemption do not signal a change from how most enforcement actions have been pursued when a generator has been found in noncompliance with a condition for exemption.

For violations of independent generator requirements, federal and state regulatory agencies continue to retain full enforcement discretion authority to determine whether an enforcement action is warranted and if so, what enforcement tools, including notices of violation, civil and criminal complaints, penalties and injunctive relief, are appropriate to address any detected violations.

Likewise, regulatory agencies retain the same discretion and authority regarding bringing various types of enforcement actions that they have always exercised in situations where non-compliance with conditions for exemptions have been detected. The clarifications in this rule do not mandate that regulatory agencies pursue enforcement actions where they previously would have exercised enforcement discretion in forgoing such actions. In addition, this final rule does not mandate charging and penalization of every violation of regulatory requirements that legally may result when a generator loses its exemption from the storage permit and operations requirements, when, for example, such action would be disproportionate to the seriousness of the generator's violations. EPA and states have always had, and continue to have, enforcement discretion to bring charges and seek penalties that accurately reflect the seriousness of the violations and their potential for harm.

In addition, we do note that when implementing the regulations, enforcement agencies can elect to cite violations based on the failure to obtain a permit in part 270; or on a specific requirement in the storage facility operations regulations in parts 264 and 265 that is a companion to the out-of-compliance condition found in part 262; or both; and/or other violations found in the operations regulations that are applicable to the generator as a result of the non-compliance.

*c. What changed since proposal?* In the definitions in § 262.1, EPA made some changes to the language of the definition of "condition for exemption" to clarify the wording, to complete the list of sections in which conditions for exemption are found, and to correct the list of parts of 40 CFR from which generators can be exempted. EPA removed part 268 from that list. Although part 268 focuses on the technical requirements for land disposal, some parts of it apply to generators, notably parts of § 268.7 and § 268.9. EPA did not want to cause confusion by stating generators would be exempt from part 268 provisions, because those particular part 268 provisions are designed specifically for generators and do apply.

EPA has also made a few changes to the language in § 262.10(a) since the proposal. Some commenters on the proposed rule suggested that we include a list of the independent requirements applicable to VSQGs in § 262.10(a)(1) to make the regulations parallel for VSQGs, SQGs, and LQGs. VSQGs have very few independent requirements, but a VSQG does have to make a waste determination and determine its generator category. EPA agrees with this comment and, therefore, we have inserted a new § 262.10(a)(1)(i) for VSQGs and listed these two independent requirements there.

In addition to that change, we also revised the language in § 262.10(a)(2) to clarify the language and to correct the list of parts that would be applicable to generators that fail to meet the conditions for exemption by deleting part 263 for transporters of hazardous waste and adding the permit requirements in part 270. EPA realized the proposed language was not consistent and, in some places, included references that would not be accurate.

EPA also made changes to the revisions in § 262.10(g) in response to comments that this language was confusing and too "legalistic." It is important to EPA that the regulated community understand the concepts we are describing. Therefore, in § 262.10(g)(1), EPA revised the language to make it clear that the provision is focused on the independent requirements for generators that, by definition, appear in part 262 of the regulations and not requirements in other parts.

EPA also made changes to § 262.10(g)(2), which addresses noncompliance with conditions for exemption. Several comments stated that the language here was confusing. To address this concern, EPA revised the language in an attempt to clarify it for the average generator. The language now explains what might happen in the case of noncompliance in a more narrative fashion, stating what the consequences are of not qualifying for the exemption from the permitting regulations, as EPA has already described in this preamble. Finally, EPA revised the list of parts that apply to a generator that does not qualify for the exemption from the storage facility regulations, in order to be consistent with other places in the rule.

*Effect of the Reorganization:* Sections 262.1 and 262.10(g) are not affected by the reorganization. Section 262.10(a) is affected by the reorganization—the section now describes the structure of much of part 262. The reorganization is discussed in section VI of this preamble.

[20] Previously referred to as "conditionally exempt small quantity generators."

2. Generators Shall Not Transport to a Non-Designated Facility

*a. Introduction.* As the Agency has stated numerous times in the development and implementation of the RCRA hazardous waste program, a fundamental aspect of the program is the responsibility placed on the generator of hazardous waste to ensure its hazardous waste is properly managed from cradle to grave. Numerous existing regulatory provisions are designed to ensure that generators send their hazardous waste only to authorized TSDFs or other authorized facilities. See for example, §§ 262.18(c),[21] 262.20(b), 262.40(a). However, from experience with implementing the program, the Agency has found situations where a generator failed to send its hazardous waste to a facility authorized to receive that waste, thus creating both regulatory and potential hazardous waste mismanagement problems. The Agency believes that a statement expressly prohibiting a generator from sending hazardous waste to a facility not authorized to accept it is necessary to ensure that generators understand they have this obligation. Therefore, the Agency proposed adding such a new independent requirement at § 262.10(a)(3).

*b. What is EPA finalizing?* EPA is finalizing this provision as proposed and is promulgating § 262.10(a)(3), which clearly and explicitly states that a generator cannot offer or otherwise cause its waste to be sent to a facility that is not authorized to accept it.

This provision is being added to the regulatory framework and not replacing §§ 262.18(c), 262.20(b), 262.40(a), as those provisions are aimed at other aspects of the generator program (for example, ensuring manifests are properly completed).

EPA received general support from most of the commenters on this provision, with one commenter stating that the provision was unnecessary. EPA believes that the provision is necessary, as it is a cornerstone of the generator program and should be explicitly stated in the regulations to ensure that all generators are aware of it.

*Effect of the Reorganization:* This section is not affected by the reorganization.

3. Deletion of § 262.10(c)

*a. Introduction.* EPA proposed deleting and reserving § 262.10(c) of the hazardous waste regulations because it is outdated, confusing and unnecessary. The provision describes the requirements for a generator who treats, stores, or disposes of hazardous waste on site and includes a list of provisions these generators must comply with.

When § 262.10(c) was initially promulgated on February 26, 1980, the hazardous waste generator regulations distinguished between the generators that sent hazardous waste to be managed off site and those that managed their hazardous waste on site. Generators that sent hazardous waste off site could manage it for 90 days in an accumulation area, but generators that managed hazardous waste on site were expected to manage it under their permits or under interim status regulations. The purpose of § 262.10(c) was to provide the list of requirements that generators managing hazardous waste were required to follow in addition to those permits or interim status requirements.

This distinction meant that the two types of generators had very different standards for the areas where newly generated hazardous waste was managed. Significantly, generators sending hazardous waste off site could easily make physical changes to their accumulation areas, whereas a similar generator managing hazardous waste on site under a permit had to go through the permit modification process to make the same kind of changes. EPA effectively eliminated the distinctions by revising these regulations (45 FR 76624, November 19, 1980 and 47 FR 1248, January 11, 1982). The final rule promulgated in January 11, 1982, made a change to § 262.10(c) that added the generator accumulation provisions at § 262.34 to the list of provisions that apply to a generator that treats, stores, or disposes of hazardous waste on site. Currently, the Agency does not make this distinction between generators that send waste for treatment off site and those that manage waste on site. This revision is therefore outdated and, thus, should be deleted and reserved.

*b. What is EPA finalizing?* EPA received general support from most commenters who addressed this issue and is finalizing the deletion of the paragraph. Section 262.10(c) will be reserved to avoid reusing that specific paragraph.

*Effect of the Reorganization:* This deletion is not affected by the reorganization.

4. Deletion of Reference to Laboratory XL Project Regulations (40 CFR 262.10(j) and Part 262 Subpart J)

The Laboratory XL Project was created for Boston College, the University of Massachusetts, and the University of Vermont, and was finalized in the **Federal Register** on September 28, 1999 (64 FR 53292). Originally, the program was to expire on September 30, 2003. But on June 21, 2006, EPA extended the program and the new expiration date was changed to April 15, 2009 (71 FR 35550). Since the program has now expired, EPA is deleting paragraph (j) from § 262.10, as well as part 262 subpart J and reserving them.

*Effect of the Reorganization:* This deletion is not affected by the reorganization.

*B. Waste Determinations (40 CFR 262.11)*

1. Introduction

Under RCRA, generators are the first critical link in ensuring safe management of hazardous waste. They are the cradle in the cradle-to-grave RCRA system. The first and most important step in the regulations is for generators of solid waste (as defined at § 261.2) to determine whether their waste is also a hazardous waste by using § 262.11. If a generator fails to identify a hazardous waste as hazardous, it will not start the waste down the hazardous waste management path and the critical gateway to the RCRA Subtitle C safe management system will be missed. Such mismanagement of hazardous waste may result in damage to human health and/or the environment.

Thus, the success of the hazardous waste regulatory program depends, to a great extent, on generators making accurate hazardous waste determinations. However, as described in the proposal, EPA has observed through various efforts that generators struggle with this crucial first step with the estimated rates of non-compliance ranging from 20 to 30 percent.[22] With an estimated generator universe in the hundreds of thousands, the potential for the mismanagement of hazardous waste and the impact on public health and the environment is significant. Therefore, given the importance of this regulatory provision, the Agency proposed several changes to the waste determination regulations at § 262.11 in an effort to clarify them, and thereby foster

[21] Section 262.18(c) has been moved as part of the reorganization from § 262.12(c).

[22] Hazardous Waste Determination Program Evaluation, IEc, April 2013. *http://www.epa.gov/evaluate/pdf/waste/haz-waste-determination.pdf*; and Summary of Waste Determination Meetings with VT and NH State Officials on September 27–28, 2010; and "10 Most Common Hazardous Waste (RCRA) Violations in Georgia: 40 CFR 262.11 "Hazardous Waste Determination," Georgia Department of Natural Resources *https://epd.georgia.gov/sites/epd.georgia.gov/files/related_files/site_page/guidehwdet.pdf*. For more citations, see the proposed Generator Improvements Rule, page 57936–57937, September 25, 2015.

improved compliance by generators. These proposed changes were intended primarily to codify Agency interpretations that have been developed and implemented over the last 35 years in **Federal Register** notices, policy, letters, and other guidance.

Specifically, the proposed rule included revisions to the § 262.11 regulations that would (1) clarify that hazardous waste determinations must be accurate; (2) confirm that a generator's waste must be classified at its point of generation and, for wastes potentially exhibiting a hazardous characteristic, at any time during the course of its management when the properties of the wastes may change in such a way as to change the hazardous waste determination; (3) revise the language on how to make a determination for listed hazardous waste in § 262.11 to explain more fully how generators can make this kind of determination using generator knowledge; (4) explain more completely in the regulations at § 262.11 how a generator should evaluate its waste to determine whether the waste may exhibit one of the hazardous characteristics; (5) move the independent recordkeeping and retention requirements for hazardous waste determinations currently found at § 262.40(c) into § 262.11 to integrate this provision more directly into the hazardous waste determination regulations; (6) revise the hazardous waste determination recordkeeping regulations to require that SQGs and LQGs maintain records of any test results, waste analyses, or other determinations made in accordance with § 262.11 for at least three years, including waste determinations where a solid waste (as defined in § 261.2) is found not to be a RCRA hazardous waste (as defined in § 261.3); (7) revise the hazardous waste determination regulations by copying § 262.40(d) into § 262.11 to address situations where an enforcement action has been initiated and the period of record retention (*e.g.*, three years from when the record was generated) must be extended automatically during the course of any unresolved enforcement action regarding the regulated activity or as requested by the Administrator, and (8) require generators identify all applicable EPA hazardous waste numbers (EPA hazardous waste codes) in subparts C and D of part 261 if the solid waste is determined to be a hazardous waste.

The Agency also requested comment regarding how best to emphasize the importance of accurate hazardous waste determinations and the length of time records must be maintained. Finally, EPA also asked for comment on the utility of developing an electronic decision making tool for hazardous waste determinations.

2. What is EPA finalizing?

The Agency is finalizing the following changes to § 262.11:

(1) Requiring that a solid and hazardous waste determination must be accurate, and expanding on why this determination is important; *i.e.*, to ensure the proper management of the waste within the RCRA framework;

(2) Requiring that a hazardous waste determination for each solid waste must be made at the point of waste generation, before any dilution, mixing, or other alteration of the waste occurs, and at any time in the course of its management that it has, or may have, changed its properties as a result of exposure to the environment or other factors such that its waste classification may have changed;

(3) Incorporating regulatory language that elaborates on how to make a hazardous waste determination for listed and characteristic hazardous waste;

(4) Referencing the applicable RCRA regulations for identifying possible exclusions or exemptions for the hazardous waste at in § 262.11(e).

(5) Moving the independent recordkeeping and retention requirements for hazardous waste determinations currently found at § 262.40(c) into § 262.11(f), with clarifications on what records must be kept; and

(6) Requiring SQGs and LQGs to identify the applicable RCRA waste codes for the hazardous waste they have generated, but clarifying that such identification must occur no later than immediately prior to shipping hazardous waste off site to a RCRA permitted treatment, storage and disposal facility in accordance with the requirements of § 262.32.

The Agency is not finalizing the proposed requirement that SQGs and LQGs maintain records of their non-hazardous waste determinations. Nor is the EPA finalizing a requirement for SQGs and LQGs to maintain records of their hazardous waste determinations until the generator closes its site.

Finally, EPA requested feedback regarding the feasibility and effectiveness of developing electronic decision-making tools for hazardous waste determinations and whether such tools would be a helpful to generators. Based on comments, the Agency is not finalizing any provision related to electronic decision-making tools for hazardous waste determinations but will continue to explore feasibility in the future. The Agency took comment on a number of electronic tools and reporting options and has organized our discussions of all of these options in section XIII of this preamble. See this section for a more in-depth discussion regarding electronic waste determination decision tools and other electronic options.

*a. Solid and hazardous waste determinations must be accurate.* The Agency is finalizing the proposed requirement for generators to make accurate hazardous waste determinations. However, we are also modifying the proposed regulatory text in response to comments to provide a rationale for this change by stating that the accurate determination is in order to ensure wastes are properly managed under RCRA. Accurate hazardous waste determinations are necessary to ensure the proper management of waste within the RCRA framework; in doing so, environmental protection will be enhanced and greater generator accountability fostered.

EPA believes that waste determinations are of utmost importance and warrant this emphasis regarding accuracy. As one commenter stated, "Accurate waste determinations are required to ensure that each waste stream generated by a company is properly managed. Additionally, accurate waste determinations protect workers by making the company and the worker(s) aware of the dangers of the waste(s) being managed. Further, accurate waste determinations will ultimately lead to an accurate generator status determination." [23]

Some commenters argued that addition of the term "accurate" to the regulation would be superfluous, as the Agency's intent that hazardous waste determinations be accurate is self-evident, and that adding this term may even imply that other aspects of the RCRA program need not be accurately implemented. The Agency's intent is that all parts of the RCRA regulatory program be implemented in the manner required by the regulations. In adding the term "accurate" to the waste determination requirement of § 262.11, the Agency intends to emphasize the importance of this step in the waste management process. Inaccurate hazardous waste determinations will lead to violation of other RCRA regulatory requirements and mismanagement of the waste, which may result in damage to human health or the environment.

[23] Comment by individual consumer. Docket number: EPA–HQ–RCRA–2012–0121–0160

Another reason for including the language explaining a generator must make an accurate waste determination to ensure the wastes are properly managed is to clarify the applicability of § 262.11 in instances in which generators choose to manage their non-hazardous wastes as hazardous wastes. Even if the waste may not be hazardous, "over managing" the waste is acceptable and meets the requirements in § 262.11 because the generator has made a determination intended to ensure, beyond a doubt, proper and protective management of the waste within the RCRA regulatory program. The practice of over-managing non-hazardous waste as hazardous waste has been in existence for years and EPA's final language in § 262.11 continues to allow this practice.

In addition to concerns about the regulatory status of over-classified wastes, commenters also expressed concerns about generators using the best available information and still making an inaccurate determination because of the errors and omissions of others. Generators are, and always have been, ultimately responsible for making accurate hazardous waste determinations. Hiring a third party contractor, waste broker, or consultant, or reliance on information provided by suppliers does not transfer this responsibility to those third parties. While the Agency understands that reliance on third parties may sometimes result in an inaccurate waste determination, the responsibility remains with the generator. It would be prudent for the generators to practice due diligence and establish processes and procedures that ask questions of their suppliers and waste management companies to understand why their materials are hazardous or not.

One commenter mentioned that the term 'accurate' also does not provide any guidance about how intensive or deep a generator's research must be to meet the intended standard. This commenter goes on to discuss that a five-minute review of a Safety Data Sheet (SDS) and product brochure may well be 'accurate' but much too superficial to ensure the generator has considered all potentially hazardous attributes of the waste. The Agency disagrees with this commenter. Waste determinations are site specific and each generator must evaluate the amount of time and effort needed to make an accurate waste determination. In some cases, a review of an SDS may suffice because the identification of the constituents and their concentration ranges may make it clear whether the chemical is or is not a hazardous waste upon disposal. Conversely, the Agency can see a number of situations where a generator must conduct analysis and testing to meet this requirement. Regardless of the effort invested in making a hazardous waste determination, the Agency's intent is that the *results* of the determination be accurate and bring about the proper management of the waste under the RCRA regulatory framework.

*b. A hazardous waste determination must be made at the point of generation before any dilution, mixing, or other alteration of the waste occurs.* As described in the proposed rule, the Agency's policy and position from the beginning of the RCRA program has been that a waste determination must be made at the point of generation (*i.e.,* the point at which the material first becomes a solid waste under RCRA; See, for example, 55 FR 11830, March 29, 1990). This includes both the time and place the waste was first generated. By requiring that the hazardous waste determination be made at the point of generation in § 262.11(a), the final regulation clarifies that the determination cannot be made downstream in the process, where other materials could be mixed with the waste or where the waste may have changed its physical or chemical characteristics. A generator's hazardous waste determination at the initial point of generation is critical to ensure proper management of the waste not only by the generator, but also by transporters and TSDFs who rely on the generator's determination to allow them to safely manage the waste and provide appropriate treatment and disposal. This proposed revision to § 262.11 is not a substantive change to the program; preambles to a number of previous rules explain that EPA has always maintained that hazardous waste determinations must be made at the initial point of generation.[24] The Agency is finalizing this requirement as proposed.

Many commenters expressed concern with EPA's proposed requirement that hazardous waste determinations must be made at the point of generation. For many generators, the Agency believes making a hazardous waste determination on new wastes should be an infrequent evaluation. An analysis of 2013 biennial report data identified 46 percent of LQGs generated between one and five waste streams. Similarly, this same analysis found that overall LQGs generated a median of 6 hazardous waste streams and a mean of 13 hazardous waste streams.[25] Many of these generators continue to generate the same wastes over long time periods, and absent changes in the waste, the generator may continue to rely on an initial determination of the waste's RCRA status (particularly for listed hazardous wastes). Of course, should a generator in this scenario change either its production feedstocks or production process, or know of any other factors that may result in changes to the waste's origin or properties, the generator may have a new waste requiring a new waste determination.

Based on EPA's 2013 Hazardous Waste Determination Program Evaluation [26] and stakeholder discussions, the Agency has determined that most generators make a hazardous waste determination by using knowledge of their processes, including feedstocks and possible side reactions, and other materials used at the facility to evaluate whether waste is hazardous or not. In order to properly classify and manage waste, generators must make a hazardous waste determination when the waste is first generated. Most generators should have sufficient knowledge of their waste to determine whether the waste is hazardous and why it is hazardous *i.e.,* whether the waste meets one of the listing descriptions in subpart D of part 261 [27] or whether the waste may exhibit one or more hazardous waste characteristics described in subpart C of part 261, and to manage the hazardous waste according to its hazards, under RCRA. When generator knowledge is inconclusive or uncertain, testing may be appropriate.

We have and continue to recognize that situations will occur where a generator is not able to make an accurate waste determination based on knowledge alone, and the generator will need to send a representative sample of the waste to be tested. However, as the EPA has stated in the past, the generator must manage the waste as hazardous waste until the results of the test are received, and continue to manage it as

---

[24] See 45 FR 33095–96, May 19, 1980 and 55 FR 11830, March 29, 1990.

[25] See "Regulatory Impact Assessment of the Potential Costs, Benefits, and Other Impacts of the Final Hazardous Waste Generator Improvements Rule." A copy of the analysis is available in the docket for this action.

[26] Hazardous Waste Determination Program Evaluation, IEc, April 2013. *http://www.epa.gov/evaluate/pdf/waste/haz-waste-determination.pdf.*

[27] **Note:** If the waste is listed, a generator may file a delisting petition under 40 CFR 260.20 and 260.22 to EPA or the authorized state to demonstrate that the waste from this particular site or operation is not a hazardous waste.

hazardous waste if the hazardous waste determination is confirmed by the test.[28]

The Agency is also aware that many generators, such as academic and industrial laboratories, generate new or different waste streams frequently, and that making hazardous waste determinations for multiple waste streams is more difficult than when a generator has a small number of waste streams that seldom vary. However, EPA stresses that in the laboratory setting, it may be even more important to make accurate hazardous waste determinations at the point of generation, so that emergency scenarios involving mixing of incompatible wastes or other dangerous situations can be avoided and lab worker safety maintained. Whether a generator generates one new waste daily or annually, the process for making a hazardous waste determination is still the same. Through knowledge of the process or materials, and/or through testing, all generators must make a hazardous waste determination at the point of generation. The Agency would expect generators producing new wastes frequently to establish efficient processes to make those waste determinations, particularly to the extent they can use knowledge of the materials or feedstocks in the waste determination process.

Both the retail and laboratory sectors raised concerns about the undue waste determination burden from the large numbers of potentially hazardous wastes that might be generated at their sites. EPA realizes that both of these sectors operate differently from the traditional industrial hazardous waste generators. In fact, to address laboratory sector concerns, EPA developed an optional set of alternative standards in 40 CFR part 262 subpart K, entitled, "Alternative Requirements for Hazardous Waste Determination and Accumulation of Unwanted Material for Laboratories Owned by Eligible Academic Entities." This rule was designed to account for the manner in which academic laboratories operate. In addition, a few years ago, the EPA began a review of how RCRA hazardous waste regulations apply to the retail sector in order to better understand retailers' challenges in complying with RCRA regulation. These efforts are on-going.

A few commenters disagreed with the proposal to add language clarifying that waste determinations must be made at the "point of generation," arguing that the Agency has issued waste determinations in the past contradicting this policy. The Agency disagrees with this commenter. EPA has been consistent in its position that a waste determination must be made at the point of generation, unless for some unforeseen and rare circumstance, the determination must be made in a subsequent location. Without clarifying in the regulation that a waste determination must be made at the point of generation, the RCRA "cradle to grave" system could be easily circumvented, with generators and handlers able to delay the waste determination process until a convenient time and place, including by a subsequent handler who knows little about the waste.

However, in response to comments, the Agency is stating that existing guidance and memoranda addressing specific situations relating to the point of generation are not superseded by this final rule. Specific examples of such situations are discussed in the Agency's Response to Comment document found in the docket to this rule.

As part of finalizing § 262.11(a), the Agency is also finalizing the language that explicitly clarifies the waste determination policies identified and discussed in 1980 (45 FR 33095–96, May 19, 1980); *i.e.*, that the point of generation is identified as the point at which the material is first identified as a solid waste under RCRA, before any dilution, mixing, or other alteration of the waste occurs. Further, RCRA solid and hazardous waste must be reevaluated at any time in the course of its management that it has, or may have, changed its properties as a result of exposure to the environment or other factors that may change the properties of the waste, such that the RCRA classification may have changed. As discussed in the proposal rule at 80 FR 57938, and in referring to characteristic hazardous wastes, the Agency stated:

> This implies that a generator's waste characterization obligations may continue beyond the determination made at the initial point of generation. In the case of a non-hazardous waste that may, at some point in the course of its management, exhibit a hazardous waste characteristic, there is an ongoing responsibility to monitor and reassess its regulatory status if changes occur that may cause the waste to become hazardous. Thus, the generator must monitor the waste for potential changes if there is reason to believe that the waste may physically or chemically change during management in a way that might cause the waste, or a portion of the waste, to become hazardous.

Many commenters were concerned that in practice, this provision would require them to constantly re-evaluate their wastes. However, the Agency stands by and is not changing this long-standing position. Generators have a responsibility to understand the properties of their waste, not only to make an accurate determination, but also to manage the waste properly. In many instances, the properties of the waste most likely will not change. But in other situations, exposure to the elements, or the very nature of the chemicals in the waste may cause its properties to change. Generators have a responsibility as part of the waste determination and waste management processes to be aware of those situations.[29] In such situations, generators should also notify any subsequent waste handlers to monitor for changes in waste properties. The Agency emphasizes that a generator needs to understand what type of waste it has generated, why it is or is not hazardous at the point of generation, and proceed accordingly in managing and monitoring its waste. If a generator is aware that its waste tends to have the potential to change over time, the generator may wish to establish processes to determine whether the nature of its waste has changed and make a new hazardous waste determination.

*c. Use of generator knowledge and testing in making a hazardous waste determination.* At § 262.11(c) and at § 262.11(d)(2), the Agency, in its proposed rule, elaborated on the existing regulatory text associated with the use of generator knowledge to determine whether wastes are either listed hazardous wastes and/or characteristically hazardous waste, respectively. As part of this proposed change, the Agency provided examples of the types of knowledge and information deemed acceptable that generators may use. The types of information identified in § 262.11(c) and § 262.11(d)(2) that generators could use as acceptable knowledge in determining if their wastes are listed wastes, or characteristically hazardous, were not all inclusive, or limited to those examples. However, this may not have been clear in the proposal. The Agency, therefore, is finalizing § 262.11(c) and now § 262.11(d)(1) with slight changes to clarify that the examples identified in the regulatory text are not limited to those kinds of information.[30]

[28] See letter from Lowrance to Axtell, April 21, 1989, RCRA Online 11424.

[29] See for example, discussion at 80 FR 57939 and 55 FR 39410, September 27, 1990.

[30] **Note:** As stated below, the Agency reversed § 262.11(d)(1) and (d)(2) in the final rule, with paragraph (d)(1) emphasizing the types of knowledge a generator could use in making a hazardous waste determination and paragraph (d)(2) addressing test methods.

Similarly, in the proposal at § 262.11(d)(1), the Agency elaborated on the test methods generators may use to determine whether their wastes are hazardous. Included were test methods set forth in subpart C of part 261 or an equivalent method approved by the Administrator under § 260.21. The Agency, in its proposal, also stated under § 262.11(d)(2) that where a test method is specified in the regulation, the results of the regulatory test, when properly performed, are "definitive" for determining the regulatory status of the waste.

The Agency received numerous comments on this latter provision, with commenters expressing concerns that by stating a regulatory test, when properly performed, is "definitive" in determining a waste's regulatory status, EPA was also implying that use of generator knowledge was not definitive and less trustworthy as a means to make a hazardous waste determination. Several commenters went so far as to suggest the Agency, for all practical purposes, was eliminating the ability to use process knowledge for waste determinations and was requiring actual testing.

These commenters misinterpreted the proposed change. The Agency reaffirms that generators may use knowledge of their processes and of the materials used in the process, among other types of information (as described in the proposal preamble), to make a hazardous waste determination. In fact, generators can only use knowledge of their process and knowledge of the materials used in the production process to determine whether their waste meets any of the F-, K-, P- and U-waste listings.

Further, in determining whether wastes may exhibit a hazardous characteristic, EPA expects that most generators will use generator knowledge to make waste determinations, and this is appropriate provided that such knowledge results in an accurate determination. Where generator knowledge is inconclusive or uncertain, testing using the test methods described in part 261 subpart C, or equivalent methods approved by the Agency in § 260.21, will resolve any uncertainty. The results of such testing, when properly performed, are definitive because these tests are part of the regulatory definition for those parts of the hazardous characteristics that include them. The Agency is reversing the order of the proposed § 262.11(d)(1) and (d)(2) in the final regulations to clarify the roles of knowledge and testing in making hazardous waste determinations.

One commenter mentioned that while EPA has adopted the terminology "acceptable knowledge" in the rule from its waste analysis guidance, we have not identified what is unacceptable knowledge and we may be adding confusion to the process. While the Agency believes the term "acceptable knowledge" is clear, and has used it in discussing this topic in older **Federal Register** notices, and also included examples of those types of information that may assist a generator in making an accurate hazardous waste determination in the proposal preamble, the Agency also stated above that the examples provided do not comprise an inclusive list, but rather are examples. As to what the Agency would view as "unacceptable," guessing is not acceptable. The Agency also views using resources that do not contain information about the process that produced the waste or the chemicals in the waste as unacceptable. It is also unacceptable for generators to simply assume their waste is non-hazardous until told otherwise by the relevant regulatory agency. In using the phrase "acceptable knowledge", the Agency intends that knowledge-based determinations be based on relevant and reliable (*i.e.,* verifiable) information from any source that indicates, to a greater or lesser degree, that the waste is either hazardous or non-hazardous under part 261 subpart C and D regulations, and that such information is organized or presented in a logical way that illustrates how it supports the generator's conclusions. Such determinations are inherently done on a case-by-case basis. In some cases, this may be clear and straightforward and in others more complex or uncertain, depending on the waste and the availability of reliable and relevant information. Similarly, the Agency cannot *a priori* determine how much information is "enough", as this too is case-specific. As discussed previously, the Agency's intent is that hazardous waste determinations, regardless of their basis, be accurate and result in appropriate management of the waste under RCRA.[31]

One commenter also suggested that the word "applicable" be inserted before "methods" in proposed § 262.11(d)(1) to read: "The person must test the waste according to the *applicable* methods set forth in Subpart C of § Part 261 or according to an equivalent method approved by the administrator under § 260.21 and in accordance with the following . . . (emphasis added)". The commenter argued that by adding the word "applicable," this rule will make clear, for example, that if a waste is being evaluated for the toxicity characteristic, a Method 1311 test should be used, as opposed to one of the test methods that must be used to evaluate whether a waste is ignitable. The Agency agrees with this clarification and has modified the regulatory text accordingly.

*d. Possible exclusions and restrictions for the waste at § 262.11(e).* The Agency is moving the language that was proposed at § 262.11(g) to § 262.11(e) in the final rule. This language states that if the waste is determined to be hazardous, the generator must refer to the applicable RCRA regulations of this chapter to determine whether other possible exclusions or restrictions apply to the management of the specific waste. The Agency believes, in retrospect, that this paragraph belongs more appropriately immediately after the generator has determined whether it has generated either a listed and/or characteristically hazardous waste. As a result of this change, subsequent paragraphs in this section shift in numbering as well.

*e. Recordkeeping Requirements at § 262.11(f).* The Agency is finalizing, with clarifications, a number of revisions to the waste determination recordkeeping requirements proposed at § 262.11(e), but being finalized at § 262.11(f). First, we are finalizing the move of the waste determination recordkeeping requirements previously found in § 262.40(c), into § 262.11, in order to highlight the recordkeeping requirement for hazardous waste determinations. The Agency is also providing a reference in § 262.40(c) to the new regulatory location of the hazardous waste determination recordkeeping requirement in § 262.11(f) instead of deleting and reserving § 262.40(c). EPA is finalizing this change as a conforming change with the reorganization to prevent generators that are looking for recordkeeping requirements in § 262.40 to miss the other recordkeeping requirement now located in § 262.11.

Second, we are finalizing the proposed expanded language to better articulate the types of waste determination information that must be maintained as records of hazardous waste determinations made using

[31] In using knowledge of a waste to make a hazardous waste determination, the Agency would also offer the advice that generators review and account for information they may identify that may tend to refute their conclusions. A conclusion that considers and honestly weighs adverse information is much more likely to be accepted by the Agency than is a conclusion based on data carefully selected to support the conclusion and which ignores contrary information that may be more convincing.

generator knowledge and/or testing. This language includes a list of specific types of records that might be used when making a waste determination by either method. To further clarify, the Agency is incorporating into the final rule language the term "other determinations," which was previously in the text in § 262.40(c). This term captures the concept that records must be kept for hazardous waste determinations made by any method.

While the Agency is aware that some states interpret the words "other determinations" in the existing § 262.40(c) recordkeeping requirement to include non-hazardous waste determinations, as discussed in the proposed rule, EPA has not held, and continues to not hold, the same interpretation. By adding this language back into the final hazardous waste determination recordkeeping regulatory section rather than deleting it, as proposed, it is possible that those states will maintain their more stringent interpretation.

As discussed in more detail later on, EPA is not finalizing the requirement that generators maintain records of their non-hazardous waste determinations. However, the Agency will continue to recommend that generators document their non-hazardous waste determinations as a best management practice, particularly in situations where wastes contain known hazardous chemical attributes that could be mistaken for a hazardous waste.

Third, the Agency is finalizing the time period as proposed: Waste determination records must be maintained for at least three years. EPA asked for comment on extending the time period to the life of the facility and commenters were practically unanimous in opposing the extension, responding with various reasons why extending this time period is not practical, including the existence of a statute of limitations after which no enforcement actions can be brought against a generator, and the fact that once a production process changes and a particular waste is no longer generated, those records are not needed for the life of the facility.

EPA proposed to change when the three-year clock would start for this recordkeeping requirement to the date last generated. However, we are reverting to the original § 262.40(c) language that states that three years is measured from the date that the waste was last sent to on-site or off-site treatment, storage, or disposal. The few comments on this proposed change referred to previously existing regulatory language as if the

commenters did not realize we had proposed a change. The Agency has reconsidered this issue and concludes that generators will have an easier time maintaining records of when their waste was sent for disposal rather than generated. Moreover, maintaining the status quo in the original regulations eliminates the need for generators to change operating procedures.

Fourth, the Agency is deleting the sentence regarding the co-mingling of wastes proposed at § 262.11(e). With the Agency addressing the mixing of solid with hazardous wastes by generators at § 262.13(f), this statement in § 262.11 is not needed.

Fifth, a few commenters suggested that types of information not be limited to those cited in the proposed rule at § 262.11(e). The Agency believes that the language in § 262.11(e) is very broad intentionally to capture any type of information used to support a hazardous waste determination. Thus, we believe that the examples provided are not all-inclusive and this is already implicit in the regulatory text and we have not made a change.

Finally, the Agency is reaffirming in preamble that inspectors have the existing authority to require a generator to perform a waste determination during an inspection to support their finding that the waste of concern is not a hazardous waste if no documentation exists.

*f. SQGs and LQGs must identify the RCRA waste codes associated with the hazardous waste.* The Agency is finalizing at § 262.11(g), the requirement proposed at § 262.11(f) that all applicable EPA hazardous waste numbers (EPA hazardous waste codes) be identified, but with two clarifications: (1) This requirement only applies to SQGs and LQGs; and (2) the codes do not need to be marked on the container until the hazardous waste is being prepared for shipment off site (*i.e.* pre-transport requirements). However, SQGs and LQGs may have waste management practices in place and choose to identify the RCRA waste codes sooner than prior to shipment.

EPA is limiting this requirement in the final rule to SQGs and LQGs because VSQGs have no requirement to label or mark their hazardous waste. Without this labeling or marking requirement, the Agency believes it is unnecessary for the VSQG to identify all applicable hazardous waste codes.

Currently, there is no direct or explicit regulatory linkage between the hazardous waste identification requirements of § 262.11 and hazardous waste manifesting requirements of subpart B of part 262 where RCRA waste

codes must be identified. From stakeholder discussions, the EPA understands that some states interpret the hazardous waste determination process to include identifying the waste codes. We view this requirement to simply provide the connection between what wastes are in the container and what is on the hazardous waste manifest document. The Agency believes this linkage is important to program integrity and received support from commenters.

These commenters mentioned that the proposed identification of RCRA waste codes on containers at the time of the pre-transport requirements at § 262.32 provides another level of hazard communication for regulatory inspectors and emergency responders. They also suggested that this requirement decreases overall burden for generators, transporters and TSDFs because there will be fewer instances when a generator has failed to identify its hazardous waste, and therefore fewer cases where a designated facility needs to identify the hazardous waste or send the wastes back to the generator for proper identification. Similarly, this additional marking information also provides for quicker and more confident acceptance screening at the receiving facility.

Commenters opposing this requirement raised concerns about the increase in burden and potential conflicts with DOT requirements, such as with 49 CFR 172.401. EPA disagrees that this is an increase in burden. Generators have always had to identify hazardous waste codes for the manifest and many states already require waste codes on containers. Without EPA hazardous waste codes, TSDFs may not be able to treat the waste to meet LDR requirements. In terms of potential DOT conflicts, EPA's pre-shipment marking requirements in § 262.32 (where we are finalizing the marking of hazardous waste codes on containers) are designed to be in compliance with 49 CFR 172.304 and these regulations reference that the marking must be in compliance with the DOT regulations.

Other commenters raised the concern that adding waste codes to containers managed on site does not improve a generator's ability to properly manage that waste. EPA agrees with these comments that generators treating, storing, or disposing their hazardous waste on site do not need to identify the hazardous waste codes because they should have sufficient information already about their waste to ensure they meet the proper LDR requirements.

Finally, as discussed in more detail in the marking and labeling section IX.E, EPA is finalizing the requirement in

§ 262.32 to add the waste codes to containers with the clarification that in lieu of marking their containers with EPA waste codes, generators may use a nationally recognized electronic systems such as bar coding (common industry practice) that includes the EPA waste codes. Also, EPA reaffirms that it is not changing the manifest waste code procedures. See the marking and labeling section IX.E for additional discussion.

*g. Non-hazardous waste determination documentation.* The Agency is not finalizing the proposed recordkeeping requirement that generators maintain documentation of their non-hazardous waste determinations. The objective of this proposed change was to foster a change in generator behavior related to their waste determination processes and procedures. By requiring such documentation, generators would need to further consider why the solid waste was not a hazardous waste and provide a rationale in writing.

Numerous organizations voiced disapproval of the Agency's proposal to require SQGs and LQGs to document their non-hazardous waste determinations. Reasons included, but were not limited to, the following themes:

(1) The Agency has no legal authority to require such documentation because the Subtitle C regulations do not regulate non-hazardous wastes;

(2) There is no compelling reason to require such documentation because generators have a very strong incentive to ensure they have accurately classified their wastes, given that failure to do so can result in significant penalties for the illegal management of hazardous waste;

(3) The Agency failed to account for generators that generate numerous waste streams every day, such as the retail sector and academic and industrial laboratories; and

(4) The rule would create so much regulatory uncertainty that the only way to protect themselves against non-compliance would be to document every waste stream generated.

Counterbalancing these arguments were comments from other organizations supportive of the non-hazardous waste determination recordkeeping requirement with the following themes:

(1) Accurate waste determinations are difficult for regulators to verify if records are not kept, particularly for unknown waste that reasonably may display the attributes of a hazardous waste but for which there is no written evaluation showing it as non-hazardous;

(2) Unknown wastes must be assumed to be hazardous and managed accordingly unless and until evaluated to be otherwise;

(3) Recordkeeping costs are overstated. Businesses spend time and effort identifying and purchasing certain materials based on their characteristics so they should already have information about the nature of these materials;

(4) Lack of documentation of waste determinations leads to confusion when knowledge is lost during staff turnover and must be re-created by the replacement staff; and

(5) Most generators already keep this information as part of best practices.

The Agency concludes that many of these arguments, both in favor of and against the proposal, have some measure of validity. However, the Agency strongly recommends that as a best management practice, generators document their non-hazardous waste determinations, particularly in situations where the waste may display the attributes of a hazardous waste and where staff turnover may cause a worker to question the contents of a container. Most importantly, when situations warrant, inspectors have the authority to ask that a hazardous waste determination be performed by the generator in the absence of any documentation and the attributes of the waste suggest a potential problem.

Several commenters questioned the Agency's authority to require such documentation of non-hazardous waste determinations because the Subtitle C regulations do not regulate non-hazardous wastes. The commenters are incorrect. The Agency has the authority under sections 3007 and 2002 of RCRA to require such records be kept, but instead has chosen not to finalize our use of such authority in this case and rather follow an alternative approach.

Specifically, RCRA section 3007 allows us to gather information about any material when we have reason to believe that it may be a solid waste and possibly a hazardous waste within the meaning of RCRA section 1004(5). A generator will not know definitively whether a waste that has potential to be hazardous is hazardous or non-hazardous unless it identifies the waste and documents that identification, even if the waste turns out to be non-hazardous. Moreover, RCRA section 2002 also gives EPA authority to issue regulations necessary to carry out the purposes of RCRA. The intent of the proposed requirement to document non-hazardous waste determinations is to provide basic information to EPA about the potentially hazardous nature of the waste that is generated (even if it is

ultimately determined to be non-hazardous) in order to ensure its proper management, enable regulatory agencies to monitor compliance adequately and to ensure appropriate environmental protection.

Several commenters also questioned the need for such documentation because generators have a very strong incentive to ensure they have accurately classified their wastes, given that failure to do so can result in significant penalties for the illegal management of hazardous waste. The Agency does not disagree with this argument, but in reality, not all generators are motivated to comply, given the high rate of non-compliance with making accurate hazardous waste determinations.

Other commenters, particularly in the retail and academic and industrial laboratory sectors, stated that the Agency failed to account for organizations with numerous waste streams generated every day when proposing documentation of non-hazardous waste determinations. The Agency was aware of and did identify several sectors (including these) in the proposal where this requirement had the potential to be more challenging, given the high number of waste streams generated. Also, the Agency sought comment on how best to address this potential burden. However, the Agency is not finalizing this provision.

A few commenters also stated that most generators already keep this information because their state requires it or because they realize the importance of systematically evaluating the waste streams they generate to ensure they are managing it properly. As stated previously, the Agency supports this non-hazardous waste determination recordkeeping practice by industry and recommends it as a best management practice.

The Agency did receive a number of comments supporting the proposal to require SQGs and LQGs to document their non-hazardous waste determinations. This support bolsters the Agency's conclusion that more work is needed to ensure generators make accurate hazardous waste determinations. At this time, in lieu of requiring such documentation, the Agency is considering initiating a dialogue with industry and states to identify the root causes of this problem and identify potential solutions. Such solutions may include establishing best management processes and practices, along with the possible development of generic decision tools or other technical assistance information that can assist generators with the process of

evaluating whether the solid waste they have generated is a hazardous waste.

*C. Determining Generator Category (40 CFR 262.13)*

A generator must correctly count the quantity of hazardous waste that it generates in order to determine its generator category. During the development of the proposed rule, EPA determined that the extent of the counting requirements in the generator regulations at the time consisted of lists in § 261.5(c)–(d) and (h)–(j) of what materials must and must not be included when counting waste. These regulations did not address other counting considerations. EPA therefore proposed a new § 262.13 to describe how a generator determines its generator category, containing the previously existing language in § 261.5(c)–(d) as well as some specific steps to calculate an amount that includes the correct amounts of hazardous waste.

Elsewhere in the proposed rule, EPA proposed regulatory language for each of the categories of generators describing how the rules regarding mixing from § 261.5(h)–(j) would impact their generator categories and how to count mixtures of hazardous waste and solid waste. EPA is consolidating the discussion of counting hazardous waste from all these areas of the proposed rule into § 262.13 for the final rule in order to make these requirements easily understandable by the regulated community and thus improve compliance and consistency.

1. Counting Hazardous Waste

*a. Introduction.* The purpose of proposed § 262.13 was to lay out the framework for making a generator category determination in paragraph (a) and to stress that the generator's category can change from month to month. The proposed regulation set forth procedures to determine whether a generator is a VSQG, an SQG, or an LQG for a particular month, as defined in § 260.10. As EPA discussed in the proposed rule, the regulations in § 262.13 do not constitute a new requirement for generators, but in the regulations up to this point, the counting requirements have not been presented in a clear and succinct manner.

*b. What is EPA finalizing?* EPA is finalizing a new § 262.13 to address how to make a generator category determination. It includes the language discussed in this section on counting as well as the mixing requirements discussed later in this chapter of the preamble. The addition of the definitions of generator categories to § 260.10 and this paragraph on how to make a generator category determination provide specific instructions on this matter for the regulated community and thereby improve compliance with the generator regulations.

The introductory language of § 262.13 states that a generator must determine its generator category and that the category is based on the amount of hazardous waste that is generated in a calendar month. This requirement for a generator category to be based on a monthly generation amount is derived from the RCRA statute and is critical to the framework of the generator regulations.[32] The regulations also state that a generator's category can change from month to month. Although many generators change categories several times a year, depending on various factors such as inputs, demand, processing volume, and production, EPA knows many generators choose to operate as LQGs all the time to simplify their regulatory compliance. EPA encourages this practice, but notes in the regulations that actual generator category can change month to month.

In addition, EPA notes that a VSQG or an SQG that generates more hazardous waste in a particular calendar month than allowed in its generator category must make a determination that it now meets the higher generator category (if it is not covered by the episodic generation provisions discussed in section X of this preamble).

Paragraph (a) of § 262.13 presents basic procedures for counting hazardous waste generated in the calendar month, subtracting or excluding anything that is exempt and using the difference to determine the generator category. Paragraph (b) of § 262.13 specifically addresses the situation in which a generator generates any combination of non-acute hazardous waste, acute hazardous waste, and the residues from the cleanup of a spill of acute hazardous waste. This paragraph presents a series of steps for a generator to follow when determining its generator category to ensure it selects the appropriate category for the total amount and types of hazardous waste generated.

Sections 262.13(c) and (d) are existing provisions that EPA is moving from § 261.5(c) and (d) of the existing regulations with a few small wording changes to reinforce that category determinations are made monthly and do not otherwise represent a change in the generator regulations.

Section 262.13(e) completes the main process of counting by stating that based on the generator category that is determined under the steps laid out in the section, the generator should determine which of the sets of generator provisions apply to it.

*c. What changed since proposal?* EPA made several changes to § 262.13(a)–(e) in response to the comments received on the proposed rule. First, several commenters pointed out that this section tailors its procedures for generators that generator acute and non-acute hazardous waste in the same month, but does not directly address generators that generator only acute hazardous waste or non-acute hazardous waste. EPA agrees with this comment and, therefore, converted the proposed paragraph (a) to introductory language for the section and made a new § 262.13(a) that addresses those generators that generate only acute or non-acute hazardous waste. This section includes a simplified version of the same procedures in paragraph (b) for those without both types of hazardous waste.

Commenters also noted that although EPA included a Table 1 to § 262.13 in the regulations, the table was not referenced in the regulations. EPA therefore added references to Table 1 in the regulatory text in paragraphs (a) and (b). Also, in Table 1 in this section, we are deleting the first column of numbers that denoted which generation scenario was being represented by each row. This column was potentially useful in the preamble discussion, but served no purpose in the regulations and has been removed.

In addition, several commenters stated that although a generator's category is based on the amount of hazardous waste it generates in a calendar month, every generator need not make an exact category determination every month. The commenters argued that many generators have a very accurate sense of what category they are month-to-month because their processes generate consistent amounts of hazardous waste over time. Only those generators with generation amounts near the limit would have to count regularly to make the category determination. These commenters stated that many generators with categories that fluctuate from month-to-month choose to operate as LQGs full time and would, therefore, not need to count every month to determine generator category.

EPA agrees with the commenters and therefore has made revisions to the introductory language for the section to state that a generator is required to determine its generator category. The language continues to stress that a category is based on monthly generation

[32] RCRA 3001(d).

and may change from month to month, but generators are not required to follow the included steps every month. EPA notes, however, that an LQG must keep track of its amounts of hazardous waste for the purpose of completing the Biennial Report, when applicable.

Finally, EPA added the language in § 262.13(e) upon determining that although the purpose of the section is to lead the generator through counting its hazardous waste for the purpose of determining the correct generator category, the proposed regulations did not include the final step in the process.

*Effect of the Reorganization:* This section is partially affected by the reorganization. Some of the language in § 262.13 on what materials to count when determining generator category moved from previous § 261.5, but much of this regulation is new text. Section VI of this preamble discusses the reorganization.

2. Mixtures of Non-Hazardous Waste and Hazardous Waste

a. *Introduction.* In an effort to explain how mixtures of non-hazardous waste (solid waste) and hazardous waste affect generator category determinations, the Agency proposed a series of modifications in §§ 262.14, 262.16 and 262.17 for VSQGs, SQGs and LQGs, respectively. The proposed rule also discussed how SQGs and LQGs are subject to the mixture rules in § 261.3. As explained in the preamble to the proposed rule on page 57928, this clarification was also designed to clarify the language that was found at §§ 261.5(h) and (i) which addressed the mixing of hazardous waste and non-hazardous waste by a VSQG and the implications to its generator category if the mixture is determined to be a hazardous waste. The language specifically addressed how the regulations apply when VSQG hazardous waste is mixed with non-hazardous solid waste and the resulting combination exceeds the VSQG quantity limits.

b. *What is EPA finalizing?* The Agency is finalizing the regulations applicable to generators mixing hazardous waste with solid waste as follows:

1. Moving the proposed relevant provisions of §§ 262.14(b), 262.16(d) and 262.17(f) applicable to mixtures of hazardous waste and solid waste to § 262.13(f). The act of mixing a solid waste and a hazardous waste is not the same as a generator accumulating hazardous waste, nor is the act of mixing in any way related to the conditions for exemption from permitting. The purpose of moving the requirements for mixtures to § 262.13 is to make generators aware of the regulations applicable to mixtures of hazardous waste and solid waste, and to accurately explain how the mixing of a hazardous waste with a solid waste may affect a generator's category determination for the calendar month.

2. Clarifying that a VSQG mixing hazardous waste with solid waste can remain subject to § 262.14, even though the mixture may exceed the VSQG quantity limits (either 100 kg per month generated or 1,000 kg accumulated on site at any one time) unless the mixture exhibits one or more of the characteristics of a hazardous waste. If the resultant mixture exhibits a hazardous waste characteristic, the VSQG must add the quantity from the resulting mixture with any other regulated hazardous waste generated in the calendar month and determine whether the total quantity generated exceeds the generator calendar month quantity identified in the definition of generator categories found in 40 CFR 260.10.

3. For both SQGs and LQGs:

a. Reemphasizing that both the hazardous waste portion of the resulting mixture and other amounts of hazardous waste generated in a calendar month must be counted towards a generator's category determination.

b. Making SQGs and LQGs aware of the § 268.3(a) prohibition of impermissible dilution of a hazardous waste with a solid waste to decharacterize the hazardous waste. The regulation at 40 CFR 268.3(a) states, ". . . no generator, transporter, handler, or owner or operator of a treatment, storage, or disposal facility shall in any way dilute a restricted waste or the residual from treatment of a restricted waste as a *substitute for adequate treatment to achieve compliance* (emphasis added) with Subpart D of this part . . ." In particular, if a solid waste is mixed with a characteristic hazardous waste, the solid waste must provide a useful and effective contribution to de-characterizing the hazardous waste (*i.e.* possess a unique property to remove the hazardous characteristic from the hazardous waste instead of merely diluting it).

c. Stating that SQGs and LQGs are subject to the regulations applicable to mixtures found in § 261.3(a)(2)(iv), (b)(2) and (3), and (g)(2)(i).

d. Stating that SQGs or LQGs that mix a characteristic hazardous waste with a solid waste to remove any hazardous characteristics are subject to the treatment standards found at § 268.40, as well as the "impermissible dilution" requirements in § 268.3.[33]

4. For all generators, reminding them they must make a hazardous waste determination at § 262.11 when mixing a hazardous waste with a solid waste.

c. *What changed since proposal?* As discussed previously, the Agency made a significant number of clarifying changes in the final rule for this provision based on review and evaluation of comments. These include the following: Moving the relevant proposed provisions of §§ 262.14, 262.16 and 262.17 applicable to mixtures of hazardous waste and solid waste to § 262.13 (f); stating that SQGs and LQGs are subject to the mixture rule found in §§ 261.3(a)(2)(iv), (b)(2) and (3), and (g)(2)(i); stating that SQGs and LQGs must comply with § 268.3(a), which prohibit's impermissible dilution to avoid regulation; for all generators, stating that both the hazardous waste portion generated from mixing and the hazardous waste generated in a calendar month must be counted for establishing the generator category for that month; and stating that all generators must make a hazardous waste determination for their mixed waste.

d. *Major comments.* Many commenters supported the proposed changes to include the application of the mixture rules in a generator's regulatory category determination. Others, however, requested greater clarity and specificity regarding these regulatory provisions. They asked for an explanation of the parameters allowed when mixing a solid waste and a hazardous waste. They also asked for clarification about when an SQG or LQG that mixes a characteristic hazardous waste with a solid waste and generates a mixture that no longer exhibits the hazardous characteristic must also meet the treatment standards found at § 268.40, and a clarification that a hazardous waste determination is also required for wastes resulting from mixing of solid waste and hazardous waste. EPA made adjustments to § 262.13(f) in response to these comments where appropriate.

One commenter pointed out that the applicable regulations for mixtures are unrelated to the conditions for an exemption from operating without a permit and therefore, the requirements applicable to mixtures do not belong under §§ 262.14, 262.16, and 262.17. The Agency agrees these are valid

[33] Also see EPA document, Land Disposal Restrictions: Summary of Requirements, U.S. EPA Office of Solid Waste and Emergency Response and Office of Enforcement and Compliance Assurance, EPA–530–R–01–007, Revised August 2001.

comments and has incorporated these changes as already described.

*Effect of the Reorganization:* This section is affected by the reorganization. The mixing provisions for VSQGs that are now found in § 262.13 were previously located in § 261.5(i) and (h). The reorganization is discussed in section VI of this preamble.

*D. Very Small Quantity Generator Conditions for Exemption (40 CFR 262.14)*

The regulations for VSQGs have moved, with some changes, from their previous location in § 261.5 to § 262.14 as part of the reorganization of the generator regulations. Although there are some changes to these regulations, they were mainly relocated from one part to the other. Please see section VI of this preamble for a discussion of the reorganization and for an overview of the new § 262.14.

*E. Marking and Labeling and Hazardous Waste Numbers (40 CFR 262.15(a)(5), 262.16(b)(6), 262.17(a)(5), 262.32(b)–(d), 263.12(b) and 268.50(a)(2)(i)*

This section discusses the final rules associated with the marking and labeling of hazardous waste accumulated on site by SQGs and LQGs in containers and tanks. This section also addresses the marking and labeling requirements for (1) hazardous waste transporters that store containers of hazardous waste at transfer facilities (see 40 CFR 263.12) and (2) TSDFs that store containers of hazardous waste under the storage prohibition of the land disposal restriction requirements at 40 CFR 268.50(a)(2)(i). Lastly, in this section, we discuss the application of EPA hazardous waste codes to containers prior to shipment off site to a designated facility.

The regulatory changes EPA proposed to the marking and labeling for waste accumulation units are designed to enhance three critical areas: Risk communication, emergency preparedness and prevention, and the accuracy of hazardous waste determinations. Although labeling may appear to be an inconsequential "paperwork" exercise, it is, in fact, vitally important to ensuring that waste is identified and managed properly. Without proper labeling, hazardous waste may be mismanaged as non-hazardous waste, or as the wrong type of hazardous waste, which could cause harm to human health and the environment. As one commenter stated, "The department appreciates the opportunity to revisit this important topic, as we believe [it] is of critical importance in both the prevention of releases and in ensuring that, in the event of a release, the response to the incident is appropriate for the materials being stored."[34] Accordingly, EPA proposed to strengthen the marking and labeling for containers and tanks throughout the cradle to grave management chain, including for SAAs, SQGs, LQGs, VSQGs that send their hazardous waste to LQGs under the same control, episodic generators, transfer facilities, and TSDFs. The Agency proposed consistent changes for marking and labeling throughout the regulations, and many of the comments we received on the topic marking and labeling are relevant throughout, so the primary discussion of those changes will be in this section. In certain instances, specific aspects of the marking and labeling requirements are addressed in other sections of this preamble, such as with VSQGs that send their hazardous waste to LQGs under the same control, episodic generators, and SQGs and LQGs that accumulate on drip pads and in containment buildings.

1. Marking and Labeling for SQGs and LQGs With Containers in SAAs (40 CFR 262.15(a)(5))

*a. Introduction.* The previous regulations for SAAs in § 262.34(c)(1)(ii) required an SQG or LQG to mark its SAA containers "either with the words 'Hazardous Waste' *or* with other words that identify the contents of the containers" [emphasis added]. The Agency proposed two modifications to strengthen the labeling and marking regulations for containers accumulating hazardous waste in SAAs. First, EPA proposed to change the "or" to an "and" and thus require that generators mark containers in the SAA with both the words "Hazardous Waste" and "other words to identify the contents of the container." Although the words "Hazardous Waste" are important to convey that the container contains a waste, as opposed to a product, and that a hazardous waste determination has been made for the contents, it does not convey more practical information regarding the contents of the container that workers must be familiar with for purposes of on-site handling.

Second, while the words "Hazardous Waste" on containers provide some measure of information regarding the contents, this information fails to describe the specific hazards of the contents and what risk these wastes could pose to human health and the environment. EPA believes it is important that employees, transporters, downstream handlers, emergency personnel, and EPA and state inspectors know as much as possible about the potential hazards of the contents in containers being accumulated, transported, and managed, whether on site and/or off site, so that the hazardous wastes are managed in an environmentally sound manner. Therefore, EPA proposed that SQGs and LQGs must indicate the hazards of the contents of the containers while giving them flexibility in how to comply with this new provision. That is, we proposed that generators could indicate the hazards of the contents of the container using any of several established methods, including, but not limited to an EPA hazardous waste characteristic(s) (ignitable, corrosive, reactive or toxic); a hazard class label consistent with the DOT requirements at 49 CFR part 172 subpart E (labeling); a label consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200; a chemical hazard label consistent with NFPA code 704; or a hazard pictogram consistent with the United Nations' Global Harmonized System (GHS). We also proposed that generators could also use any other marking or labeling commonly used nationwide in commerce that would alert workers and emergency responders to the nature of the hazards associated with the contents of the containers.

These proposed changes were designed to alert workers, emergency responders, and others to the potential hazards posed by the contents of a container. Identifying the hazard increases awareness to workers and others who might come into contact with the hazardous waste container and reduces potential risks to human health and the environment from container mismanagement. EPA reasoned that the pre-transport requirements of part 262 subpart C already require hazardous waste generators to comply with the DOT labeling/marking requirements of 49 CFR part 172. By requiring generators to include information on container labels while *on site,* the Agency proposed that generators perform a task that is already required when preparing the container prior to transporting the hazardous waste *off site* for subsequent waste management. Because, in most cases the hazardous waste will be shipped off site and thus be subject to DOT regulations, we proposed that SQGs and LQGs could use the DOT hazard class labels to comply with the new labeling and marking regulation for containers in SAAs. However, we proposed several alternatives to using DOT hazard labels (as noted previously)

[34] Missouri Department of Natural Resources, EPA–HQ–RCRA–2012–0121–0223.

from which generators could choose to indicate the hazards of the container.

In summary, EPA proposed to modify the marking and labeling regulations for SAAs to require SQGs and LQGs to mark containers with the following: (1) The words "Hazardous Waste"; (2) other words that identify the contents of the containers (examples which may include, but are not limited to the name of the chemical(s), such as "acetone" or "methylene dichloride," or the type or class of chemical, such as "organic solvents" or "halogenated organic solvents" or, as applicable, the proper shipping name and technical name markings used to comply with DOT requirements at 49 CFR part 172 subpart D); and (3) an indication of the hazards of the contents of the container. Examples of hazards include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); a hazard class label consistent with the DOT requirements at 49 CFR part 172 subpart E (labeling); a label consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200; a chemical hazard label consistent with the NFPA code 704; or a hazard pictogram consistent with the United Nations' GHS. EPA also proposed that SQGs and LQGs could use any other marking and labeling commonly used nationwide in commerce that would alert workers and emergency responders to the nature of the hazards associated with the contents of the containers. EPA did not propose to change the existing requirement for when the SAA maximum accumulation volumes are exceeded, to "mark the container holding the excess accumulation of hazardous waste with the date the excess amount began accumulating" (40 CFR 262.34(c)(2)).

*b. What is EPA finalizing for the marking and labeling of containers in SAAs?* The final regulations for marking and labeling of containers in SAAs require SQGs and LQGs to mark containers with the following: (1) The words "Hazardous Waste"; and (2) an indication of the hazards of the contents of the container including, but not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); hazard communication consistent with the DOT requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the NFPA code 704).

*c. What changed since proposal?* The Agency received a large number of comments regarding the marking and labeling changes throughout the proposed rule. In response to comments, we have simplified the proposed marking and labeling for containers in SAAs by eliminating the requirement that SQGs and LQGs mark their containers with words that identify the contents of their containers. Commenters argued, and EPA agrees, that a requirement to identify the contents of a container could be subject to much interpretation and problems with implementation and compliance could emerge. One commenter suggested that EPA's regulations should not interfere with a practice that is often already done as a best management practice.[35] Another commenter suggested that we allow generators to choose between identifying the contents of the container and identifying the hazards of the contents.[36] EPA considered this option, but concluded the potential for interpretation and implementation problems would remain for those generators that chose the option of identifying the contents of the container and, therefore, decided against this approach. Nevertheless, while the Agency is not finalizing the requirement that generators identify the contents of their containers, we not only encourage, but would expect, that generators would identify the contents of hazardous waste in their containers considering both the operational and potential downstream regulatory problems that would likely emerge if the contents were not identified. As one commenter noted, "it is a best management practice for generators to know the nature of the wastes they generate and accumulate, as well as for emergency responders to know the nature of the wastes they may encounter." [37] One other minor change is that we removed the mention of the United Nations Globally Harmonized System (GHS) as a means of identifying the hazards of the contents of the container. Now that OSHA has aligned its regulations with the GHS, it is no longer necessary to identify the GHS separately.

*d. Major comments.* While some commenters supported our proposed marking/labeling regulations, many other commenters objected to the burden imposed by the additional marking/labeling requirements. Commenters questioned the benefits and the practicality of the proposed requirements, although one commenter noted it had similar marking and labeling procedures in place for over twenty years and they worked very well.[38] Several commenters, particularly emergency responders, expressed a preference for identifying the hazards of the contents over identifying the contents in the container. In large part, this expressed preference helped EPA decide to retain the requirement to identify the hazards of the contents and eliminate the requirement to identify the contents of the container.

Some commenters had the misperception that we are requiring the use of DOT hazard class labels on containers during on-site accumulation. In actuality, the Agency is providing flexibility to generators in how they identify the hazards of the hazardous waste in the container, and using DOT hazard communication such as hazard class labels (or placards, if appropriate) is one option for complying with this requirement. In fact, one commenter supported EPA's approach of "giving generators options to accomplish this strengthened communication." [39] However, as a matter of practicality, it would benefit many generators to consider the use of DOT hazard communication, since such a method would not only satisfy EPA's requirement, but it may also satisfy DOT requirements when the wastes are shipped off site to a RCRA-designated facility, such as an interim status or permitted TSDF. It is important to note that if generators choose to identify the hazards of the contents of their containers using the DOT, OSHA or NFPA labeling methods, those methods must be used appropriately. Furthermore, if a method other than DOT hazard communication is used while the waste is accumulating on site, when the waste is shipped off site, generators and transporters must ensure that those markings and labels are located away from and do not obscure DOT marking and labeling.[40]

A number of commenters also had the misperception that the requirement for identifying the hazards of the contents is duplicative with OSHA requirements and/or DOT requirements. On the contrary, EPA notes that the marking

[35] Colorado Department of Public Health and Environment (CDPHE), EPA–HQ–RCRA–2012–0121–0085.

[36] Department of Energy, EPA–HQ–RCRA–2012–0121–0123.

[37] Savannah River Site, EPA–HQ–RCRA–2012–0121–0092.

[38] Savannah River Site, EPA–HQ–RCRA–2012–0121–0092.

[39] Institute of Makers of Explosives, EPA–HQ–RCRA–2012–0121–0126.

[40] See 49 CFR 172.304(a)(4) which requires DOT markings to be "located away from any other marking (such as advertising) that could substantially reduce its effectiveness. Also see 49 CFR 172.406(f) which states that a "label must be clearly visible and may not be obscured by markings or attachments.

and labeling of containers is not duplicative of other regulations: OSHA Hazard Communication does not apply to hazardous waste (See 29 CFR 1900.1200(b)(6)(i)) and DOT requirements only apply during transportation. In fact, under the RCRA rules being finalized in this rulemaking, the Agency believes it is closing a loophole for hazard communication for hazardous wastes accumulated on site.

On a separate but related matter, one commenter reminded EPA that OSHA has new regulations for hazard communication that align with the GHS system and that the regulated community needs to adjust to these before RCRA changes are adopted.[41] OSHA's transition to the GHS regulations have been phased in over time, with June 1, 2016, as the final phase-in date. These RCRA final regulations will not be effective in most states until the authorized state adopts the revised regulations, and therefore, most generators will have ample time to plan for these RCRA marking and labeling changes before they become effective. Furthermore, generators may choose to use the OSHA/GHS system for identifying the hazards of the contents of their containers and thereby reduce the burden of learning additional marking/labeling mechanisms. It is important to note, however, that EPA is requiring only that the hazards of the contents are identified. And although generators may use the OSHA/GHS system to comply with this provision, we are not requiring full OSHA/GHS compliant marking and labeling for hazardous wastes. For our purposes, an OSHA/GHS hazard statement or pictogram would be sufficient.

Finally, commenters asked EPA to clarify several aspects of the container marking and labeling requirements. First, one commenter asked us to specify that the labeling should occur at the initial point of generation.[42] We concur with this commenter that the marking and labeling requirements apply at the point of generation of the hazardous waste which is both the time and place where the hazardous waste is initially generated. Second, in keeping with existing EPA guidance, generators would be able to continue to mark outer/secondary containers, such as labpacks, color-coded bins, etc. with the words "Hazardous Waste" and the hazards of the hazardous waste instead of marking a small container (*e.g.,* tubes, vials, etc.) that is placed inside the secondary container.[43] Alternatively, as one commenter suggested, generators using small containers may attach a tag to a container to comply with the marking and labeling requirements.[44] Third, if a hazardous waste is in a container that already has the appropriate marking and labeling (*e.g.,* the hazardous waste is an unused commercial chemical product that is in its original container with an intact label), the existing marking and labeling would be sufficient. The generator would not need to duplicate the marking and labeling, assuming the original label contains the information necessary to comply with the marking and labeling requirements.

2. Marking and Labeling for SQGs and LQGs With Containers in CAAs (40 CFR 262.16(b)(6) and 262.17(a)(5))

*a. Introduction.* The previous LQG and SQG regulations in § 262.34(a)(3) and § 262.34(d)(4), respectively, required each container to be labeled or marked clearly with the words, "Hazardous Waste." The Agency proposed two modifications to strengthen the labeling and marking for SQGs and LQGs accumulating hazardous waste in containers. In order to provide continuity and consistency, these changes were similar to those proposed for containers in satellite accumulation areas (see section IX.E.1.) First, the Agency proposed that SQGs and LQGs accumulating hazardous waste in containers mark them with the words "Hazardous Waste." Second, EPA proposed that SQGs and LQGs mark or label their containers in CAAs with "other words that identify the contents of the containers." Third, we proposed that SQGs and LQGs mark and label their containers with an indication of the hazards of the contents. EPA stated that this approach would establish consistency between the marking and labeling practices of hazardous wastes accumulated in containers in SAAs and CAAs, and thereby allowing some degree of business efficiency as containers are moved from SAAs into CAAs. We did not propose to change the existing provision that requires SQGs and LQGs to mark clearly and visibly the date accumulation began on each container and make that marking visible for inspection.

*b. What is EPA finalizing?* The Agency is finalizing the following marking and labeling provisions for SQGs and LQGs accumulating hazardous wastes in containers located in CAAs. SQGs and LQGs accumulating hazardous waste in containers must mark their containers with the words "Hazardous Waste." SQGs and LQGs also must mark and label their containers with an indication of the hazards of the contents of the containers. Examples of hazards include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the DOT requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the NFPA code 704. Also, as discussed in section IX.E.7, SQGs and LQGs are required to mark their containers with the applicable EPA hazardous waste number(s) prior to shipping their containers off site to a RCRA-permitted TSDF.

The marking and labeling requirements for containers in CAAs are consistent and identical to the marking and labeling requirements for hazardous wastes accumulated in containers located in SAAs. For the reasons cited under the SAA discussion (*i.e.,* simplifying requirements, avoiding implementation problems, responding to commenter concerns), EPA is finalizing the same marking and labeling requirements for hazardous wastes accumulated in containers located in CAAs and SAAs. The only difference is that SQGs and LQGs must mark or label containers in SAAs with the date that maximum volumes (or mass) are exceeded, while SQGs and LQGs must mark or label containers in CAAs with the date the hazardous waste first began accumulating. Both of these dating requirements are existing requirements that remain unaffected by this final rule.

*c. What changed since proposal?* For the same reasons discussed under section IX.E.1, the Agency is not finalizing the requirement for SQGs and LQGs with CAAs to mark or label their containers with "other words that identify the contents of the container."

3. Marking and Labeling for SQGs and LQGs With Tanks in CAAs (40 CFR 262.16(b)(6)(ii) and 262.17(a)(5)(ii))

*a. Introduction.* The Agency also proposed a number of changes to improve the marking and labeling of hazardous wastes accumulated in tanks by both SQGs and LQGs at § 262.16(b)(6)(ii) and § 262.17(a)(5)(ii),

[41] Tennessee Chamber of Commerce & Industry, EPA–HQ–RCRA–2012–0121–0225.

[42] Tennessee Department of Environment and Conservation, EPA–HQ–RCRA–2012–0121–0116.

[43] See Robert Springer, Director of Office of Solid Waste to RCRA Directors, Regions 1–10, Frequently Asked Questions About Satellite Accumulation Areas, March 17, 2004.

[44] Carl Severn, EPA–HQ–RCRA–2012–0121–0079.

respectively. Specifically, the Agency proposed that SQGs and LQGs: (1) Mark or label their tanks with the words "Hazardous Waste"; (2) use inventory logs, monitoring equipment, or records to identify the contents of the tank and its associated hazards; (3) use inventory logs, monitoring equipment or records to identify the date each period of accumulation begins; and (4) keep inventory logs or records with the above information in close proximity to the tank.

*b. What is EPA finalizing?* EPA is finalizing the following marking and labeling requirements for SQGs and LQGs accumulating hazardous waste in tanks: (1) While hazardous wastes are being accumulated on site, SQGs and LQGs must mark their tanks with the words "Hazardous Waste"; (2) consistent with the revised requirements for the marking and labeling of containers, SQGs and LQGs must mark or label their tanks with an indication of the hazards of the contents. Examples of hazards include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); hazard communication consistent with the DOT requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the NFPA code 704); (3) use inventory logs, monitoring equipment, or other records to demonstrate that hazardous waste has been emptied within 180 days for SQGs (or 90 days for LQGs) of first entering the tank if using a batch process, or in the case of a tank with a continuous flow process, demonstrate that estimated volumes of hazardous waste entering the tank daily exit the tank within 180 days for SQGs (or 90 days for LQGs) of first entering; and (4) keep inventory logs or records with the above information on site and readily available for inspections.

*c. What changed since proposal?* Three changes were made between the proposed rule and the final rule. First, consistent with the changes to container marking and labeling, SQGs and LQGs are not required to identify the contents of their tanks, although we strongly recommend generators maintain records identifying the contents of the tanks as a best management practice. Second, we have modified where inventory logs or records for tanks must be kept. We had proposed that the information must be in close proximity to the tank. Commenters indicated that having records in close proximity may not always be practical or even desirable. For instance, some hazardous waste accumulation tanks are outside and having records in close proximity would mean that the records would be exposed to the elements. In response to comments, we have modified the regulations so that the records must be kept on site and readily available for inspections. Ideally these records will be in close proximity to where hazardous waste is being accumulated in the tank, or if not practical (*i.e.*, exposure to weather, physically infeasible, etc.) in a control room, or other central location at the facility.

Third, the Agency changed the dating requirement for tanks at SQGs and LQGs so that instead of using logs, monitoring equipment or records to identify when the 180- or 90-day accumulation period begins, generators must use logs, monitoring equipment or other records to demonstrate that hazardous waste is either emptied or removed from the tank within 180 or 90 days, with the final regulations now addressing both batch and continuous flow processes. While the Agency discussed both types of processes in the preamble to the proposed rule, the regulatory text in the proposed rule failed to address continuous flow processes. SQGs and LQGs with batch process tanks must demonstrate that their tanks are emptied every 180 or 90 days, respectively. However, the Agency recognizes that when hazardous waste is accumulated in tanks with continuous flow processes it may not be possible for SQGs and LQGs to demonstrate that a tank is emptied every 180 or 90 days, respectively, from when the hazardous waste first entered the tank. Therefore, generators with tanks with a continuous flow process have flexibility in how to demonstrate that hazardous waste has been turned over (as opposed to emptied) in a tank. For a continuous flow process, this demonstration involves a generator identifying the estimated daily input or inflow of hazardous wastes into the tank, the estimated outflow from the tank, and the capacity of the tank to estimate how many days the hazardous waste will reside in the tank before exiting.

As an example, if a tank with a continuous flow process has a capacity of 10,000 gallons, an inflow of hazardous wastes of 1,000 gallons per day and an outflow estimated at 500 gallons per day, then the expected residence time of the hazardous waste in the tank would be 20 days. The residence time would be calculated by first subtracting the daily outflow from the daily inflow (1,000 − 500 = 500). Then the tank capacity would be divided by the difference between the outflow and the inflow (10,000/500 = 20). The resulting residence time is 20 days.

*d. Major comments.* Commenters were supportive of the proposed changes for marking and labeling of tanks with the words "Hazardous Waste" and maintaining records that prove the amount of time hazardous waste remained in the tank did not exceed either 90 or 180 days for LQGs and SQGs, respectively. One commenter mentioned, and EPA agrees, that the markings must be visible and legible to a person observing the tank. Another commenter supported the options we proposed for indicating the hazards of tanks, noting that it will help generators be able to choose the method that work best for their facility. Several commenters were supportive of the flexibility provided to generators to prove the amount of time hazardous waste remained in the tank (*e.g.*, inventory logs, monitoring equipment, or records). EPA notes that generators may use paper or electronic records, provided they are on site and readily available for inspection. Several commenters expressed concern that EPA did not explicitly discuss tanks with continuous flow processes in the proposed regulatory text (though they are discussed in the preamble to the proposed rule). As discussed previously, the Agency has revised the regulatory text of the final rule to explicitly address these comments.

4. Marking and Labeling for SQGs and LQGs With Drip Pads and Containment Buildings

In the proposed rule, the Agency proposed marking and labeling requirements for generators accumulating hazardous waste on drip pads and in containment buildings. Upon review of comments and further evaluation, the Agency now believes the marking and labeling provisions for these type of units belongs more appropriately under the discussion of the waste accumulation regulations for these types of units. Therefore, for further discussion, the Agency directs the reader to section IX.G.—Accumulation of Hazardous Waste by SQGs and LQGs on Drip Pads and in Containment Buildings.

5. Marking and Labeling for Transfer Facilities (40 CFR 263.12(b))

*a. Introduction.* The Agency proposed to change the marking and labeling requirements for transporters handling hazardous waste in containers at transfer facilities, found at § 263.12(b), to be consistent with the proposed

changes for marking and labeling for containers for SQGs, for LQGs, and in SAAs. More specifically, EPA proposed that transporters storing hazardous wastes in containers at transfer facilities mark the containers with the following: (1) The words "Hazardous Waste"; (2) other words that identify the contents of the containers, with examples that may include, but are not limited, the name of the chemical(s), or, as applicable, the proper shipping name and technical name markings used to comply with DOT requirements at 49 CFR part 172 subpart D; and (3) an indication of the hazards of the contents of the container. In addition to these proposed changes, EPA also proposed to require that containers of hazardous waste at transfer facilities be labeled with the applicable EPA hazardous waste number(s) (EPA hazardous waste codes), which would help the TSDF receiving the hazardous waste comply with the LDR regulations in 40 CFR part 268.

The Agency proposed these modifications to ensure hazardous wastes are appropriately labeled and marked throughout its cradle-to-grave management, including transportation to a RCRA-permitted or interim status TSDF or to another transfer facility. Similarly, this additional information on the container would alert workers and other handlers to the contents of the container and the potential hazards of the materials therein.

In proposing these changes, the Agency believed that, in almost all cases, containers received by the transfer facility would already be marked and labeled by the generator, and therefore, any additional burden on the transfer facility would be minimal. However, in the preamble to the proposed rule, the Agency identified other situations where a transporter would be required to initiate the marking and labeling of a container; *e.g.,* when the transporter consolidates two containers with the same hazardous waste into a new container or when it is able to combine and consolidate two different hazardous wastes that are compatible with each other and are able to be subsequently managed consistently in compliance with the applicable regulations in parts 264, 265, 267, 268 and 270 of this chapter.

*b. What is EPA finalizing?* The Agency is requiring that transporters must mark or label containers with the words "Hazardous Waste" when they consolidate the contents of two or more containers with the same hazardous waste into a new container, or when the transporter consolidates hazardous wastes that are compatible with each other. As discussed in section IX.E.7, when such consolidation occurs, the transporter will also be required to mark or label the container with the applicable RCRA waste codes, in compliance with § 262.32(b) or (c).

*c. What changed since proposal?* First, consistent with the marking and labeling requirements being finalized in several sections of this rule, transporters are not required to mark or label the container with its contents. However, the Agency expects that transporters, as well as generators, will identify the contents of the container as a best management practice. Second, as discussed elsewhere, in cases where a transporter must mark its containers with the applicable EPA hazardous waste codes, they will have flexibility in how they comply. Third, because containers at transfer facilities are, by definition, in transport, DOT marking and labeling apply to them. As a result, we have removed the proposed requirement to identify the hazards of the container, since it would be duplicative of (and possibly even contradictory to) the DOT requirements. Fourth, consistent with the pre-transport requirements for SQGs and LQGs in § 262.32, the Agency is clarifying that the marking and labeling applies to transporters using containers of 119 gallons or less (*i.e.,* what DOT refers to as non-bulk packaging).

*d. Major comments.* Comments both supported and opposed this provision. Critical comments questioned the need for this provision because generators are responsible for the marking and labeling of containers that subsequently arrive at transfer facilities. Similarly, more than one commenter questioned the need for transporters to mark containers with the applicable EPA hazardous waste codes and discussed the problems requiring this information would cause to the waste management industry since they have well-established waste profile systems that accomplish that function. One commenter also was critical of the manner in which the regulatory text was written whereby the Agency made it the responsibility of the transporter to ensure all marking and labeling information is correct. Another commenter pointed out that as per DOT regulations, rail cars used to accumulate and transport hazardous waste and other bulk shipments do not have to be labeled "Hazardous Waste" in transit. As discussed in an earlier section, the Agency took these comments into account when finalizing this rule.

6. Marking and Labeling for TSDFs With Containers and Tanks (40 CFR 268.50(a)(2)(i))

*a. Introduction.* As part of its effort to improve risk communication with respect to the management of hazardous waste, the Agency also proposed changing the regulations for marking and labeling containers at TSDFs in § 268.50(a)(2)(i)—consistent with the proposed marking and labeling changes for SAAs, SQGs, LQGs, and for transfer facilities. More specifically, EPA proposed that TSDFs storing hazardous wastes in containers mark their containers with the following: (1) The words "Hazardous Waste"; (2) other words that identify the contents of the containers, with examples that may include, but are not limited, the name of the chemical(s), or, as applicable, the proper shipping name and technical name markings used to comply with DOT requirements at 49 CFR part 172 subpart D; and (3) an indication of the hazards of the contents of the container. The Agency also proposed that containers must be labeled with the applicable EPA hazardous waste number(s) (EPA hazardous waste codes), which help the TSDF comply with the applicable land disposal restriction (LDR) regulations. The LDR regulations list many of the treatment standards based on the hazardous waste code. In the proposal, the Agency left unchanged the pre-existing provisions of § 268.50(a)(2)(i), which require TSDFs to clearly mark each container to identify its contents and the date each period of accumulation begins.

*b. What is EPA finalizing?* The Agency is finalizing the requirement for TSDFs to mark or label containers of hazardous waste with the words "Hazardous Waste," an indication of the hazards of the contents, and the applicable EPA hazardous waste numbers (waste codes) consistent with § 262.32(b)–(d). As with transfer facilities, EPA expects almost all incoming containers received by a TSDF will already have the appropriate marking and labeling information and, therefore, that a TSDF will usually only need to mark or label a container themselves when receiving shipments from facilities that are neither SQGs nor LQGs. As an example, TSDFs may receive hazardous wastes directly from VSQGs. Under the federal program, VSQGs are not required to mark and label their containers "Hazardous Wastes" and identify the hazards associated with the wastes in the container. In this situation, the TSDF must mark or label the container with the words "Hazardous Waste," the

applicable hazardous waste codes, and identify the hazards of the container. Additionally, consistent with the pre-existing regulations at § 268.50(a)(2)(i), a TSDF must also continue to mark or label each container of hazardous waste to identify the contents of the container and the date each period of accumulation begins, regardless of whether the TSDF receives the containers from a VSQG, SQG, LQG, or transfer facility. The Agency is also reiterating that if a TSDF generates its own hazardous waste, it must follow the applicable RCRA generator regulations in part 262, including the marking and labeling provisions for containers and tanks.

*c. What changed since proposal?* The Agency revised the marking and labeling requirements pertaining to identifying the hazards of the container, consistent with changes in other parts of this rule (*i.e.*, the SAAs, SQGs, LQGs, and transfer facilities marking and labeling requirements).

*d. Major comments.* The Agency received few comments concerning this provision of the rule. Some commenters supported the proposed changes while other commenters stated that these changes were unnecessary. As discussed previously, the Agency believes it has responded to commenters who expressed concerns by clarifying the applicability of this provision.

7. Hazardous Waste Numbers (Waste Codes) (40 CFR 262.32(b) and (c))

*a. Introduction.* The Agency proposed § 262.32(c) to require SQGs and LQGs to mark their containers with the applicable EPA hazardous waste number (RCRA hazardous waste code) prior to transporting their hazardous waste off site to a designated RCRA facility for subsequent management. EPA proposed this revision so that TSDFs can readily identify the contents of hazardous waste containers they are receiving from generators and effectively treat the wastes to meet LDRs. As stated in the preamble to the proposed rule, the Agency believes most generators, or their designated waste handlers, already mark their containers with the applicable EPA hazardous waste numbers prior to transporting their hazardous waste off site. As part of this discussion, the Agency stated that by marking containers with EPA hazardous waste numbers, the overall burden would be decreased because the TSDF would avoid the need to identify the hazardous waste or send the waste back to the generator for proper identification.

*b. What is EPA finalizing?* The Agency is finalizing the pre-transport marking requirements at § 262.32 by modifying § 262.32(b) to include the EPA hazardous waste number or code as part of the marking requirements for containers, and also adding § 262.32(c) to allow generators, transporters and TSDFs, in lieu of § 262.32(b), to use a nationally recognized electronic system, such as a bar-coding system that is part of a waste management industry's waste profiling system, to identify the applicable EPA hazardous waste numbers. A waste profiling system typically consists of bar codes, scanners, and an associated computer system. Waste management industry commenters indicated that they use bar code electronic systems, similar to commercial transport companies, to profile hazardous waste. Information often includes a description of the hazardous waste in terms of physical state, common name, hazard codes, LDR treatment standards, and DOT description.[45] Some of these electronic systems also include the EPA hazardous waste numbers. This approach also allows for the development of future technologies to accomplish the same function as the bar-coding system. The Agency is providing this flexibility because while there is considerable movement by generators and the waste management industry in adopting the use of electronic systems that contain detailed waste profiling information, it is neither universal nor mandatory. EPA is requiring that SQGs and LQGs include EPA hazardous waste codes, either by marking their containers or through electronic means, to inform the receiving TSDF of the container's contents in order to ensure hazardous wastes are managed to meet the applicable LDR treatment standards.

For lab packs, which typically contain many different wastes, we are providing an exception to the requirement to include EPA hazardous waste numbers if the lab packs will be incinerated. Specifically, lab packs that will be treated using the alternative treatment standard of incineration, as allowed by § 268.42(c), do not have to be marked or labeled with the EPA hazardous waste numbers. However, lab packs that contain D004 (arsenic), D005 (barium), D006 (cadmium), D007 (chromium), D008 (lead), D010 (selenium) or D011 (silver), the EPA hazardous waste number must be marked or labeled with the EPA hazardous waste numbers (or use electronic means may be used).

[45] See comments from Veolia ES Technical Solutions LLC, EPA–HQ–RCRA–2012–0121–0181; Environmental Technology Council, EPA–HQ–RCRA–2012–0121–0134; Waste Management, EPA–HQ–RCRA–2012–0121–0159

These specific metals must be identified because § 268.42(c)(4) requires any incinerator residues from lab packs that contain any of these specific metals to undergo further treatment prior to land disposal.

*c. What changed from proposal?* In response to comments, the Agency is providing needed flexibility in complying with this requirement to account for alternative ways of marking containers with EPA hazardous waste codes. By doing so, the Agency is accommodating existing processes used by many generators and the waste management industry. Also in response to comment, we are providing an exception for lab packs that will be incinerated.

*d. Major comments.* Several commenters pointed out that while many generators still mark their containers with the applicable EPA hazardous waste codes, the industry trend is for generators to rely on their waste handlers who have developed sophisticated computerized systems that use detailed waste profiling procedures with bar codes and scanners (similar to package shipping and other national logistics companies). They use these systems to accurately identify individual drum contents and some include the EPA hazardous waste numbers. As stated by one commenter, TSDFs commonly prepare labels and shipping papers for their generator customers, and as part of this service, also utilize a waste profiling process that fully describes the waste in terms of physical state, common name, hazard codes, LDR applicability, and DOT description.[46] This commenter argues that to not allow this industry-wide service to continue would only cause confusion to a well-established process. EPA agrees and has modified the requirement accordingly.

*F. Revisions to Satellite Accumulation Area (SAA) Regulations for SQGs and LQGs (262.15)*

Hazardous waste generators are allowed, though not required, to use SAAs, provided that the generators meet the conditions for their use. SAAs are designed to assist generators who generate and accumulate small amounts of hazardous waste in different areas of their facilities. Alternatively, SQGs and LQGs may choose to accumulate hazardous waste only in CAAs rather than in SAAs. If an SQG or LQG does choose to accumulate hazardous waste in an SAA, the generator may accumulate a limited amount of

[46] Environmental Technology Council, EPA–HQ–RCRA–2012–0121–0134.

hazardous waste within each SAA. Once that threshold is reached, the SQG or LQG must transfer the hazardous waste to a CAA. Alternatively, a generator may accumulate hazardous waste within an SAA and never move the waste to a CAA once the threshold is reached, but instead, ship the waste directly off site to a RCRA designated facility (*e.g.*, a TSDF).

The Agency proposed six changes to the regulations for SAAs, now found at § 262.15. These six proposed regulatory changes and the final regulatory changes are individually discussed here in detail. In addition to these six proposed regulatory changes, EPA discussed two additional issues in the preamble to the proposed rule: (1) Our intention to rescind a guidance memo regarding the accumulation of reactive (D003) hazardous waste at locations away from the point of generation and (2) examples to help generators better understand the term "under the control of the operator," which is used in the SAA regulations. These proposed changes were in response to stakeholder requests for additional clarification, additional flexibility or increased environmental protection that have been expressed through the years in various interactions, including the 2004 Generator Initiative,[47] with the regulated community, as well as state and regional regulators.

The Agency is finalizing these six proposed regulatory changes, with minor modifications, along with three additional minor changes. These nine regulatory changes are all summarized individually here, and six of the changes are discussed in further detail later on. First, SQGs and LQGs that accumulate hazardous waste in SAAs will now be required to comply with the special requirements for incompatible wastes found at § 265.177 (with minor revisions). Second, we are providing regulatory flexibility by providing limited exceptions to the regulation requiring generators to keep containers closed at all times (with minor revisions). Third, when maximum volumes are reached in SAAs, we are clarifying that generators will have three consecutive calendar days to remove the hazardous waste from the SAA or come into compliance with the CAA regulations. Fourth, we are providing additional flexibility to allow generators that accumulate acute hazardous waste in SAAs to choose between using a maximum accumulation volume (1 quart for liquids) or maximum accumulation weight (1 kg or 2.2 lbs for solids). Fifth, we are clarifying the regulations for situations when the maximum volume (or weight) is exceeded in an SAA. Sixth, containers used in SAAs will be subject to the strengthened marking and labeling standards (note these marking and labeling changes are the same as those for containers in CAAs and were discussed previously in section IX.E. of the preamble to this final rule). The seventh change being made to SAA regulations pertains to the applicability of preparedness, prevention and emergency procedures. The eighth change is a minor wording change in response to a comment from the Association of State and Territorial Solid Waste Management Officials (ASTSWMO).[48] They recommend, and we agree, that under § 262.15(a)(1), the regulatory language should have the word "immediately" added to state explicitly that if a container in an SAA is leaking, the generator must *immediately* transfer the hazardous waste to a container in good condition that does not leak (emphasis added). Similarly, a generator has the option to transfer a damaged or leaking container to a CAA, also immediately, and we have added language to clarify that the CAA must be operated in compliance with the CAA regulations. Therefore, § 262.15(a)(1) now states that if a container holding hazardous waste is not in good condition, or if it begins to leak, the generator must immediately transfer the hazardous waste from this container to a container that is in good condition and does not leak, or immediately transfer and manage the waste in a central accumulation area operated in compliance with § 262.16(b) or § 262.17(a). The ninth change is rewording of § 262.15(a) to be consistent with changes made to the SQG and LQG regulations to make it clear that an SQG or LQG can choose to operate an SAA and that the SAA is not required to comply with the SQG regulations of § 262.16(b) or LQG regulations of § 262.17(a), and is not required to have a permit or interim status, and is not required to comply with parts 124, 264 through 267, and 270, provided the generator complies with the conditions of exemption for an SAA.

With regard to the non-regulatory actions pertaining to SAAs that were discussed in the proposed rule, we are moving forward to rescind the January 13, 1988 memo that allowed a storage shed outside of a building where a reactive hazardous waste (D003) is initially generated to be considered an SAA.[49] Finally, we will further discuss in the preamble what is meant by "under the control of the operator," a term that is used in the SAA regulations. These two non-regulatory actions are discussed individually in detail later.

1. Requiring SQGs and LQGs To Comply With the Special Requirements for Incompatible Wastes for Containers Accumulating Hazardous Wastes in SAAs (40 CFR 262.15(a)(3))

We *proposed* that SQGs and LQGs accumulating hazardous waste in SAAs must comply with the special requirements for incompatible wastes found at § 265.177. The regulations at § 265.177 include three requirements (1) incompatibles must not be placed in the same container unless § 265.17 (b)[50] is complied with, (2) hazardous waste must not be placed in an unwashed container that previously held an incompatible unless § 265.17 (b) is complied with and (3) a container holding an incompatible must be separated from the other material by means of a dike, berm, wall, or other device. The Agency believes that in developing the regulations for SAAs in 1984, it inadvertently failed to account for SQGs and LQGs that might accumulate incompatible wastes. Most commenters were supportive of requiring SQGs and LQGs that accumulate hazardous waste in SAAs to comply with the special requirements for incompatible wastes found at § 265.177, including a few states that said they already have corrected this oversight in their state regulations. However, some commenters argued it was unnecessary to add it to the regulations because it is in a generator's best interest to keep incompatibles separate and therefore they already comply with this best management practice at their SAAs. The Agency is encouraged to hear from commenters that they believe generators already routinely segregate their incompatibles. Nevertheless, for additional clarity and to ensure generators that are not following these best management practices adopt them, the Agency is finalizing the requirement that SQGs

[47] In 2004, EPA held a series of public meetings to solicit input from stakeholders about the generator regulations.

[48] Association of State and Territorial Solid Waste Management Officials (ASTSWMO), EPA–HQ–RCRA–2012–0121–0217.

[49] Letter from Marcia E. Williams, Director of EPA's Office of Solid Waste, to Michael E. Young, Atlantic Research Corporation, January 13, 1988, RCRA Online 11317.

[50] Section 265.17(b), which is entitled General requirements for ignitable, reactive, or incompatible wastes is in part 265 subpart B, the General Facility Standards that apply to interim status TSDFs. Section 265.17(b) also applies to SQGs and LQGs that accumulate ignitable, reactive, or incompatible wastes in CAAs.

and LQGs accumulating hazardous waste in SAAs comply with the part 265 subpart I container management standards for incompatible hazardous wastes at § 265.177. We agree with the commenter who "view[s] this as a codification of an existing safe practice." [51]

Several commenters objected to the third requirement of § 265.177 in that they felt it unnecessary and impracticable to require that a container holding an incompatible hazardous waste in an SAA be separated from the other material by means of a dike, berm, wall, or other device. This proposed regulatory language was taken directly from the language in § 265.177, which applies to interim status TSDFs, as well as CAAs at SQGs and LQGs. The commenters argue that a dike, berm or wall would not be feasible in the confines of an SAA, which is only allowed to accumulate a maximum of 55 gallons of hazardous waste. The Agency agrees that most SAAs would not accommodate a dike, berm or wall. Although, the proposed regulatory language also allows for "other device[s]," to keep incompatibles segregated, the Agency has decided to replace the regulatory language "by means of a dike, berm, wall or other device" with the phrase "by any practical means" in order to address commenters' concerns. One commenter provided an example of what they do to avoid potential comingling of incompatible wastes in their CAA—they ". . . segregate incompatible wastes onto separate pallets in the 90-day accumulation area. Pallets holding incompatible wastes are separated by at least one pallet width (*i.e.*, the "pallet footprint") in all directions. For example, a pallet of oxidizers and a pallet of flammables cannot be placed next to, above, or below each other." [52] Another commenter suggested that drip trays, or secondary containers would be more appropriate means to segregate incompatibles accumulating in SAAs.[53] The Agency believes that either of these practices constitute "any practical means," and are allowed by the SAA regulations for separating incompatibles in SAAs.

EPA is making one additional minor revision to this section of the SAA regulations. We are removing the reference to piles, open tanks and surface impoundments. Containers are the only type of waste accumulation units allowed in SAAs. As previously noted, these regulations were copied from the interim status TSDF regulations, where these additional waste accumulation units are allowed. At the time of proposal, the Agency inadvertently overlooked this and is therefore making conforming changes as part of this rulemaking.

2. Limited Exceptions To Keeping Containers Closed at all Times in SAAs (40 CFR 262.15(a)(4))

The previous regulations for generators accumulating hazardous waste in SAAs required containers accumulating hazardous waste to be kept closed, except when it is necessary to add or remove waste (§ 262.34(c)(1)(i), which referenced the container regulations for interim status TSDFs in § 265.173(a)). We proposed to modify this provision for SAAs, now found at § 262.15, in order to allow containers of hazardous waste in SAAs to remain open under limited circumstances. These changes pertain only to containers accumulating hazardous waste in SAAs; it will not affect the requirements for container management at CAAs or interim status TSDFs. Specifically, we proposed that containers of hazardous waste in SAAs may be open when it is necessary either for the operation of equipment to which the SAA container is attached or to prevent dangerous situations, such as the build-up of extreme pressure or heat, because closing a container can be more dangerous than keeping it open temporarily in those situations. Stakeholders had identified situations where keeping SAA containers closed can interfere with the operation of equipment when the container is attached directly to the equipment via piping or tubing. Stakeholders had also identified situations in which closing a container can be more dangerous than keeping it open temporarily; for example, when the hazardous waste is very hot. Therefore, EPA proposed to modify the regulations to allow containers to be vented in such situations. In 2008, the Agency finalized these limited exceptions to the closed container requirement as part of the Academic Laboratories rule (subpart K) and thought they would benefit other generators as well.

Nearly all commenters supported this proposed change. However, some state commenters were concerned the regulatory language was not sufficiently clear that this exception to requiring closed containers was intended for temporary situations only. In the preamble to the proposed rule, we indicated that the requirement to keep the container closed applies when the danger passes (*e.g.*, the contents cool), and when the equipment is not in operation. However, these commenters thought the regulatory text should include language to make our intent clear. In response to these concerns, EPA is finalizing this provision, as proposed, with a minor addition. The regulatory language has been modified so that a container holding hazardous waste must be closed at all times during accumulation, except when adding, removing, or consolidating waste, or when *temporary* venting of a container is necessary (1) for the proper operation of equipment, or (2) to prevent dangerous situations, such as build-up of extreme pressure (emphasis added). EPA stresses it does not intend to create a loophole to the closed container requirement or to allow intentional evaporation of hazardous waste. Rather, the intent of the flexibility is to address the limited cases in which "strict adherence to the "container closure" requirements could substantially increase a risk of a hazardous waste incident rather than decrease it." [54] As with the proposed rule, the flexibility for containers to remain open in specific situations applies only to containers in SAAs because that is where hazardous waste initially accumulates. At this time, we are not extending this flexibility to containers accumulating in CAAs.

3. Clarify What Is Meant by "Three Days" (40 CFR 262.15(a)(6)(i))

The previous SAA regulations at § 262.34(c)(2) stated that a generator who accumulates either hazardous waste or acutely hazardous waste must, with respect to that amount of excess waste, comply "within three days" with paragraph (a) of that section or other applicable provisions of the chapter. Over the years, the Agency was frequently asked what was meant by "three days." As a result, the Agency proposed to amend the regulations to replace the term "three days" with "three calendar days," as opposed to "three business days" or "three working days." The Agency already clarified this term in a 2004 memo,[55] which was based on preamble discussions from the

[51] University of Nebraska-Lincoln (UNL), comment number EPA–HQ–RCRA–2012–0121–0121.

[52] Stericycle, comment number EPA–HQ–RCRA–2012–0121–0127.

[53] Pacific Northwest National Laboratory, comment number EPA–HQ–RCRA–2012–0121–0078.

[54] Minnesota Pollution Control Agency, EPA–HQ–RCRA–2012–0121–0232.

[55] Memorandum from Robert Springer, Director or EPA's Office of Solid Waste, to RCRA Regional Directors, "Frequently Asked Questions About Satellite Accumulation Areas," March 17, 2004, RCRA Online 14703.

proposed and final SAA regulations.[56] As stated in the memo, "Originally, the Agency had proposed to use 72 hours as the time limit but realized that determining when 72 hours had elapsed would have required placing both the date *and* time of day on containers. In the final rule the Agency switched to using three days so that generators only need to date containers that hold the excess of 55 gallons of non-acute hazardous waste (or 1 quart of acute hazardous waste)." The Agency was simply proposing to codify long-standing, existing policy on the issue of what "three days" meant, as it is used in the SAA regulations.

Comments on this issue were mixed, with some commenters supporting the codification of the policy, while others preferred that we allow the term "three days" to mean "three business days" or "three working days." Still others suggested that we take this opportunity to lengthen the time frame to 5, 7, or even 10 days. Although many commenters argued that we should allow "three working days," one commenter conceded that, "due to differences in business schedules, this becomes difficult to define in a rule."[57] For example, some companies shut down completely for lengthy periods around the holidays or during seasonal slowdowns. As a result, if we relied on "three working days," it would create an uneven and unfair implementation of this SAA provision. Further, it's easy to imagine a raft of implementation questions that would ensue about the definition of a "working day." Therefore, the Agency is finalizing this provision, as proposed, with one minor revision. While in the preamble to the proposed rule we used the term "three consecutive calendar days," in the proposed regulatory language, we used "three calendar days." To promote the most clarity, in the final rule, we will use "three consecutive calendar days."

4. Providing a Maximum Weight for the Accumulations of Acute Hazardous Waste in Containers at SAAs (40 CFR 262.15(a))

The SAA regulations impose maximum volumes of hazardous waste that may be accumulated in an SAA without a permit, or interim status, or complying with the central accumulation area standards for SQGs or LQGs. For non-acute hazardous waste, the maximum volume is 55 gallons. For acute hazardous waste, the maximum volume has been, until this rulemaking, 1 quart. When the SAA regulations were finalized in 1984, EPA explained that 55 gallons was selected for non-acute hazardous waste in part because it is the size of the most commonly used accumulation container.[58] EPA also explained in that final SAA rule that 1 quart was chosen for acute hazardous waste because it is the volumetric equivalent of 1 kilogram of acute hazardous waste used elsewhere in the regulations[59] and that commenters expressed opposition to using a weight measure. Since then, however, stakeholders have indicated that the 1-quart volume maximum is not a practical way to measure the accumulation of some wastes, particularly non-liquid acute hazardous wastes. Therefore, we proposed to add a weight measurement[60] to the SAA regulations for the maximum accumulation of acute hazardous wastes. Specifically, we proposed that 1 quart or 1 kilogram (2.2 pounds) of acute hazardous waste may be accumulated in an SAA. We proposed that generators that accumulate acute hazardous waste in SAAs would have the choice of whether to use 1 quart or 1 kilogram, but they would be required to identify which metric they choose. We did not propose to add a similar weight equivalent to the 55-gallon threshold for non-acute hazardous waste because stakeholders had not expressed a similar need; however, we did request comment on whether it would be useful to have a maximum weight for the accumulation of non-acute hazardous waste in SAAs.

Although some commenters did not see the need for the additional flexibility for the accumulation of acute hazardous waste in SAAs, most commenters supported the change, with a minor revision. Specifically, commenters suggested that, instead of allowing a generator to choose which unit to use, we should specify in the regulations that the 1 quart maximum for acute hazardous waste in an SAA should apply to liquids and the 1 kg maximum for acute hazardous waste in an SAA should apply to solids. We agree with these commenters and we are revising the final regulatory language for SAAs so that acute hazardous wastes that are liquids have a maximum volume of 1 quart, and acute hazardous wastes that are solids have a maximum mass of 1 kg (or 2.2 lbs). The maximum thresholds for acute hazardous wastes are not intended to be additive, so in cases where a generator has both liquid and solid acute hazardous waste accumulating in an SAA, the 1 kg or 2.2 lb limit will be applied.

In contrast, for non-acute hazardous waste, commenters indicated that the existing volumetric accumulation limit of 55 gallons for SAAs is sufficient and that it is not necessary to add a mass equivalent. Therefore, for non-acute hazardous waste, 55 gallons will remain the only unit for measuring maximum accumulation limits in SAAs. EPA continues to rely on its existing interpretation that at an SAA where more than one type of waste is accumulated, the *total* allowable accumulation is 55 gallons of hazardous waste—not 55 gallons per waste stream.[61]

One commenter asked for clarification about whether the weight of the packaging (such as fully dispensed vials that once held P-listed pharmaceuticals) would have to be included in determining the maximum mass or volume of an acute hazardous waste in an SAA. In a February 17, 2016, memo, EPA clarified that the container (*e.g.*, packaging) does not need to be included when calculating the maximum accumulation volume of acute hazardous waste in an SAA.[62] This would also be the case when calculating the maximum accumulation weight (mass) of acute hazardous waste in an SAA.

5. Modifying the Language for When the Maximum Volume or Weight Is Exceeded in an SAA (40 CFR 262.15(a)(6))

Previously, the regulation at § 262.34(c)(2) stated that, when the maximum volumes are exceeded in an SAA, a generator "must, with respect to that amount of excess waste, comply within three days with paragraph (a) of this section or other applicable provisions of this chapter." The Agency proposed to reword this regulation in order to more clearly state the generator's options for managing the materials that exceed the limit. The

[56] Proposed rule: January 3, 1983 48 FR 118; Final rule: December 20, 1984; 49 FR 49569.

[57] The Boeing Company, EPA–HQ–RCRA–2012–0121–0133.

[58] December 20, 1984; 49 FR 49569–70.

[59] Though this is only a rough equivalent, as 1 quart is an English unit and 1 kg is a metric unit. Further, as one commenter noted, whether 1 quart (or liter) is equivalent to 1 kg depends on the density of the waste (Iowa State University, EPA–HQ–RCRA–2012–0121–0099).

[60] As one commenter pointed out, 1 kg is more accurately a measurement of mass, not weight (Minnesota Pollution Control Agency, EPA–HQ–RCRA–2012–0121–0232).

[61] Memorandum from Robert Springer, Director or EPA's Office of Solid Waste, to RCRA Regional Directors, "Frequently Asked Questions About Satellite Accumulation Areas," March 17, 2004, RCRA Online 14703.

[62] Letter from Barnes Johnson, Director of EPA's Office of Resource Conservation and Recovery, to Charlotte A. Smith, PharmEcology Services, February 17, 2016, RCRA Online 14875.

proposed regulatory text stated that a generator who accumulates either non-acute hazardous waste or acute hazardous waste listed in § 261.31 or § 261.33(e) in excess of the amounts listed in paragraph (a)(1) of this section at or near any point of generation must remove the excess from the satellite accumulation area within three calendar days either to (1) a central accumulation area, (2) an on-site interim status or permitted treatment, storage, or disposal facility, or (3) an off-site designated facility. The proposed regulatory text also stated that during the three-calendar-day period, the generator must continue to comply with paragraphs (a)(1)(i) through (iv) of this section and must mark the container(s) holding the excess accumulation of hazardous waste with the date the excess amount began accumulating. The Agency did not view this as a substantive change to the SAA regulations.

We are finalizing this change, with two minor changes to address commenters' concerns. First, commenters pointed out that the proposed rewording of this section of the SAA regulations expands a generator's options for where the excess hazardous waste can be sent when the maximum volumes (or mass) are reached, but it removed the option that had originally existed to convert the SAA to a CAA and manage the hazardous waste in place. At the time of proposal, the Agency did not anticipate that generators would choose to convert SAAs into CAAs. However, one commenter pointed out that some generators do not have a CAA to move the waste to and therefore must manage the SAA as an CAA when volumes (or mass) are exceeded. In response to comments, in the final rule the Agency has amended the regulatory text to retain the option to allow generators to convert an SAA to a CAA when maximum volumes (or mass) are exceeded. Second, in this section of the SAA regulations, as well as other sections of the SAA regulations, where we mention CAAs, we have inserted the citation for the CAA regulations.

Other comments on this section of the SAA regulations were related to the phrasing of the previous SAA regulations that we did not propose to change. Specifically, the Connecticut Department of Energy and Environmental Protection (CT DEEP) "believes that the revised language should not focus on the "excess waste," but on the waste that was accumulated before the excess amount was generated. That is, the rule should require that the waste that was in storage before the generation of the "excess waste" be removed from the area, not just the "excess waste." This would prevent situations in which only the "excess waste" is removed time and time again, leaving the remaining waste behind indefinitely." [63] EPA agrees with CT DEEP and, during the development of the proposed rule, we sought to revise this aspect of the SAA regulations. We also agree with CT DEEP that "In reality, what happens in most cases is that the generator removes the older waste, and continues to accumulate the most-recently generated waste. For example, if a generator has a 55-gallon drum in an SAA and that drum becomes full, the generator might begin accumulating newly generated waste in a second 55-gallon drum." Unfortunately, during the development of the proposed rule, EPA's attempts to convey this idea through regulatory changes were unsuccessful and therefore were not included in the proposed rule. Nevertheless, we endorse CT DEEP's description as a best management practice for removing hazardous waste from an SAA. One alternative suggested by Wisconsin Department of Natural Resources (WDNR) is to "clarify that a full 55-gallon drum must be moved from the satellite accumulation area. As the proposed rule reads now, a full 55-gallon drum may be under the satellite accumulation requirements indefinitely because 40 CFR 262.15(a)(6) refers to excess amounts . . . If a satellite accumulation drum is at capacity it should be moved into the central accumulation area." [64] Again, the Agency agrees that a full 55-gallon drum should be moved to a CAA. During the development of the proposed rule, we considered rewording this section of the proposed regulations as the WDNR suggested but we declined to use this construct in the proposal out of concern that generators would be able to easily circumvent our intent by not completely filling a container before beginning to fill another container.

6. Preparedness, Prevention, and Emergency Procedures for SQGs and LQGs

EPA is adding paragraphs (a)(7) and (a)(8) to the SAA regulations in § 262.15 to clarify that the preparedness, prevention, and emergency procedures for SQGs and LQGs that are found in § 262.16(b)(8) and part 262 subpart M, respectively, extend to any SAAs on site, as well as CAAs. These specific changes to the SAA regulatory text were not proposed, although we did request comment, but are being added in the final rule in response to comments we received on the proposed addition of part 262 subpart M, which is discussed more thoroughly in section XI of this preamble.

7. Rescinding a Memo Regarding Accumulating Reactive Hazardous Waste Away From the Point of Generation

In a memo dated January 13, 1988, EPA wrote that a storage shed that is outside of a building where a reactive hazardous waste (D003) is initially generated could be considered an SAA.[65] According to the company's incoming letter to EPA, the Atlantic Research Corporation (ARC) "manufactures solid rocket propellant. In it's [sic] operations, ARC generates waste chemicals which are accumulated in containers located in storage sheds outside of the buildings generating the materials. The waste chemicals are accumulated outside of the buildings for safety reasons due to the explosive nature of the work conducted." [66]

There were no proposed regulatory changes associated with this action; however, in the preamble to the proposed rule, EPA gave notice that it was proposing to revoke this interpretation. EPA agreed with ARC that in some instances it is safer to accumulate hazardous waste away from the initial point of generation, such as hazardous wastes that are explosive. However, in the preamble to the proposed rule, EPA reasoned that, because SAAs are subject to less stringent conditions than CAAs, it is not appropriate for such dangerous hazardous wastes to be stored in SAAs. Rather, EPA stated that if a generator accumulates hazardous waste that is so dangerous it needs to be accumulated away from the point of generation, it should be accumulated under the more rigorous accumulation standards for central accumulation areas.

We received more than a dozen comments on this action. Several commenters supported the action to rescind the memo. Others, such as Pacific Northwest National Laboratory (PNNL), Utility Solid Waste Activities Group (USWAG) and Institute of Makers of Explosives (IME) supported it, but suggested that additional clarity was

[63] Comment number EPA–HQ–RCRA–2012–0121–0178.

[64] Comment number EPA–HQ–RCRA–2012–0121–0206.

[65] Letter from Marcia E. Williams, Director of EPA's Office of Solid Waste, to Michael E. Young, Atlantic Research Corporation, January 13, 1988, RCRA Online 11317.

[66] Ibid.

needed.[67] We intend to rescind the memo, as proposed, while addressing commenters' concerns. First, not only do SAAs have fewer regulations and safeguards associated with them than CAAs, but the regulations require that they must be "at or near the point of generation." EPA would not consider a shed outside a building where the waste is initially generated to be "at or near the point of generation." Nevertheless, as this term is not particularly specific, implementing regulatory agencies will retain authority in determining what they consider "at or near the point of generation."

Both PNNL and USWAG were concerned that EPA was implying that all reactive hazardous wastes (D003) were required to be accumulated away from the initial area of generation and, therefore, could not be accumulated in SAAs. Additionally, PNNL was concerned that there might be a "Catch-22 where EPA does not allow remote accumulation and OSHA or the International Fire Code does not allow them to be accumulated at the point of generation." This was not our intent. Our intent was that if, for safety reasons, which may be driven by fire codes or OSHA regulations, a reactive hazardous waste (or other hazardous waste, for that matter) needs to be accumulated away from the initial area of generation, then that accumulation area should be considered a CAA, not an SAA. EPA is not prohibiting remote accumulation; rather, we are clarifying that it is more appropriate to regulate the remote accumulation area as a CAA than an SAA. Likewise, EPA did not intend to suggest that all storage sheds would necessarily be CAAs. For example, a storage shed that is located "at or near the point of generation" could be considered an SAA.

In its comments IME said it "would have no objection to rescinding this memorandum so long as the agency allows accumulated SAA waste to be temporarily moved from the initial point of generation for purposes of complying with the regulations of other federal agencies. For example, a number of IME member companies collect hazardous waste in containers at SAAs. Regulations administered by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") require that these containers be moved to a magazine at the end of a shift . . . The containers are returned to the SAA at the start of the subsequent shift."[68] EPA's SAA and CAA regulations do not prohibit generators from moving hazardous waste from the SAA's initial point of generation to a CAA (*e.g.* magazine) and back again to the SAA for further accumulation.

8. Examples of the Meaning of "Under the Control of the Operator"

The previous SAA regulation at § 262.34(c)(1) used the term ' "under the control of the operator," as do the revised SAA regulations being finalized at § 262.15(a). EPA has not defined this term in the regulations, has not discussed it in preamble and discussed it only minimally in guidance letters.[69] However, over the years, the Agency has received inquiries about what constitutes "under the control of the operator." In an effort to assist generators to better understand this term and to foster improved compliance with the SAA provisions, the Agency provided examples in the preamble to the proposed rule. For example, EPA stated that it would consider waste to be "under the control of the operator" if the operator controlled access to an area, building, or room in which the SAA is located, such as with entry by access card, key or lock box. Another example EPA provided was if the operator accumulates waste in a locked cabinet and controlled access to the key, even if the cabinet is stored inside a room to which access is not controlled.

Commenters were concerned that EPA is imposing new requirements on SAAs. To the contrary, the Agency requested comment on this issue in the hope of developing a list of best management practices that regulators and the regulated community could rely on to fulfill this existing requirement. The Agency deliberately did not propose any regulatory text to define the term "under the control of the operator."

A number of commenters provided helpful examples of what they believe constitutes "under the control of the operator" as it pertains to the SAA regulations. For example, the Oklahoma Department of Environmental Quality "believes that the term "Under the control of the operator" has a much broader meaning than those examples in the proposed rules; *e.g.* a situation where the operator is regularly within view of the SAA during the course of their job, or a situation where the operator is expected to be able to observe any individuals that may enter or exit the SAA."[70] One state commenting as part of the Association of State and Territorial Solid Waste Management Officials (ASTSWMO) "believes as a general rule the SAAs in a manufacturing plant are not in locked cabinets or in locked rooms. They are generally in centralized locations along the assembly lines so all the employees, in several shifts, have access to them. SAA closest to the assembly line employees would be under their control and be at or near the point of generation. This state does not believe the regulated community would agree to buying several locked cabinets and placing them on the plant floor. It would be very inconvenient for the employees to run and look for the person with the keys to unlock the cabinet every time they need to place waste in the SAA. The sites have controlled access so the entire building would be under control of the operator."[71] The District of Columbia (DC) Department of Energy and Environment suggests that " 'under control of the operator' would not include situations where the waste cannot be seen unless the area is equipped with 24 hour video surveillance or 24 hour sensor surveillance. DC also suggests adding criteria such as: the area must be monitored daily by trained personnel and access to the area must be limited to prevent access by untrained personnel or visitors."[72]

In addition, one commenter referenced an EPA memo that discussed the term "under control of the operator."[73] EPA states: "The condition that wastes accumulated under the satellite provision 'be under control of the operator of the process generating the waste' is met provided the generator demonstrates that the personnel responsible for generating/or accumulating the waste have adequate control over the temporary storage of these wastes. The EPA recognizes that for many wastes, the person who first generates the waste may not be the same person responsible for the accumulation of all of these wastes; rather, another worker may have responsibility of overseeing the temporary storage of wastes." The Agency then states that "the goal is that this temporary accumulation is performed responsibly and safely, with adequate oversight and control." On a related matter, commenters asked EPA to clarify whether an "operator" must be a single

[67] Comments EPA–HQ–RCRA–2012–0121–0078, EPA–HQ–RCRA–2012–0121–0093 and EPA–HQ–RCRA–2012–0121–0126, respectively.

[68] Comment EPA–HQ–RCRA–2012–0121–0126.

[69] Letter from Sylvia K. Lowrance, Director of the Office of Solid Waste to Mr. D.B. Redington, February 23, 1993, RCRA Online 11728.

[70] Comment Number EPA–HQ–RCRA–2012–0121–0182.

[71] Comment Number EPA–HQ–RCRA–2012–0121–0217.

[72] Comment Number EPA–HQ–RCRA–2012–0121–0248.

[73] Letter from Sylvia K. Lowrance, Director of the Office of Solid Waste to Mr. D.B. Redington, February 23, 1993, RCRA Online 11728.

individual. The Agency believes that there can be more than one operator per SAA over time. For example, as employees change shifts over the course of a day, the role of the operator can be transferred from one employee to another. Likewise, the Agency believes that there can also be more than one operator per SAA at the same time. For example, multiple operators may be running laboratory equipment in the same room and share hazardous waste containers located in a single SAA.[74] However, the term operator does refer to an individual or individuals responsible for the equipment or processes generating the hazardous waste and does not refer to a company or entity as a whole.

The examples discussed in the preamble to the proposed rule and final rule are not an all-inclusive or exhaustive list of practices that may be used to meet the requirement that hazardous waste in an SAA must be "under the control of the operator." Implementing regulatory agencies may consider these examples or alternatives to meet the intent of the term, which is to ensure that someone familiar with the operations generating the hazardous waste is aware of and able to attend to the operations, if needed, while also providing some measure of controlled access.

G. Accumulation of Hazardous Waste by SQGs and LQGs on Drip Pads and in Containment Buildings

As part of its reorganization efforts to improve the user-friendliness of the hazardous waste generator regulations, the Agency proposed to consolidate the waste accumulation provisions for tanks, drip pads and containment buildings into one section. The Agency also proposed to include specific provisions for SQGs that may accumulate hazardous waste on drip pads and in containment buildings at § 262.16 (b)(4) and (5), respectively. Previously, the regulatory provisions for LQGs referred to drip pads and containment buildings, but these accumulation units were not specifically identified in the SQG provisions. Therefore, if an SQG desired to accumulate hazardous waste in these type units, they could only do so by complying with the more stringent LQG regulations. In the proposed rule, the Agency attempted to provide clarity by adding the regulations applicable to LQG drip pads and containment buildings (previously found at § 262.34 (a)(1)(iii) and (iv)) to provisions for SQGs accumulating hazardous waste in these units.

With respect to the marking and labeling provisions for hazardous waste accumulated on drip pads and in containment buildings, the Agency proposed that SQGs and LQGs mark or label its waste accumulation units with the words "Hazardous Waste" in a conspicuous place easily visible to employees, visitors, emergency responders, waste handlers, etc. We also proposed that SQGs and LQGs use inventory logs, monitoring equipment, or records to: Identify the contents of the drip pad and containment building and its associated hazards; to identify the date upon which each period of accumulation begins; and keep inventory logs or records with the above information in close proximity to the drip pad and containment building.

1. Drip Pads

*a. What is EPA finalizing?* The Agency is finalizing the regulations associated with the accumulation of hazardous waste on drip pads for SQGs and LQGs § 262.16(b)(4) and § 262.17(a)(3), respectively. This provision was previously found at § 262.34(a)(1)(iii) for LQGs only. This provision states that a generator with drip pads must comply with subpart W of 40 CFR part 265, and, consistent with existing regulations, must remove all hazardous wastes from the drip pad and associated collection system at least once every 90 days. Similarly, at closure, SQGs and LQGs must comply with § 265.445(a) and (b), but not (c). Once the hazardous wastes are removed from a drip pad, LQGs would have up to 90 days and SQGs up to 180 days to accumulate the hazardous wastes without a permit or interim status. SQGs and LQGs would also have to maintain the following records at the facility by use of inventory logs, monitoring equipment, or any other effective means: Records that describe the procedures that will be followed to ensure that all wastes are removed from the drip pad and associated collection system at least once every 90 days; and records that document each waste removal, including the quantity of waste removed from the drip pad and the sump or collection system and the date and time of removal.

These records would need to be kept on site and readily available for inspections. Ideally these records would be in close proximity to where hazardous waste is being accumulated after removal from the drip pad, such as in a control room, or other central location at the facility.

In addition, consistent with guidance previously issued by the Agency for wood treaters, that if hazardous waste is placed in a satellite accumulation area, the waste can remain there until the drum is full. Once the drum is full, it must be dated and moved to the hazardous waste storage area. Thereafter, the 90 or 180 day accumulation clock for LQGs and SQGs, respectively, begins.[75]

Additionally, consistent with this same guidance for wood preservers, EPA is clarifying in this final rule that VSQGs may accumulate hazardous waste on drip pads as long as they also comply with the technical standards of 40 CFR part 265 subpart W to ensure the drip pads are operated in an environmentally safe and responsible manner.[76]

*b. What changed since proposal?* In the process of trying to consolidate the waste accumulating provisions for tanks, drip pads and containment buildings in the proposed rule, the Agency failed to properly take notice that drip pads are very different in operation than tanks and containment buildings. The unique nature of drip pads was addressed through several earlier rulemakings. For example, on December 6, 1990, EPA promulgated several new hazardous waste listings specific to the wood preserving industry, along with unit-specific hazardous waste standards for drip pads ('subpart W') and corresponding generator accumulation provisions for persons generating hazardous waste and managing the waste on drip pads (55 FR 50450). As part of that rulemaking, EPA established a standard by which generators must remove all hazardous wastes from their drip pad at least once every 90 days, while still allowing for additional time to accumulate the hazardous waste (*e.g.,* in tanks or containers) depending on their generator status. This latter issue was clarified in subsequent guidance, but is being further clarified in this final rule. Therefore, for both LQGs and SQGs, hazardous wastes must be removed from the drip pad and associated collection system at least once every 90 days, and the Agency is retaining the regulatory text previously found at § 262.34 (a)(1)(iii). By incorporating this provision, the Agency will also address the requirements that generators

[74] Memorandum from Robert Springer, Director or EPA's Office of Solid Waste, to RCRA Regional Directors, "Frequently Asked Questions About Satellite Accumulation Areas," March 17, 2004, RCRA Online 14703.

[75] *See* U.S. Environmental Protection Agency, *Wood Preserving Resource Conservation and Recovery Act Compliance Guide: A Guide to Federal Environmental Regulation,* EPA–305–B–96–001, at section 5–17 (June 1996).

[76] Ibid., 5–8

describe the procedures to demonstrate that all wastes have been removed from the drip pad and associated collection system at least once every 90 days.

The Agency is not finalizing the provision that would require SQGs and LQGs to mark drip pads with the words "Hazardous Waste" in a conspicuous place easily visible to employees, visitors, emergency responders, waste handlers, etc. As stated by one commenter, labeling the entire drip pad with the words "Hazardous Waste" is inaccurate because not all of the materials on the drip pad are hazardous waste, such as the poles and lumber being treated on the drip pad. Finally, the drums stored on the drip pad or drum storage area that contain hazardous waste and the drum storage area would already be labeled with those words. Similarly, identifying the hazards of wastes is inappropriate because drip pads contain both wastes and components of treated wood operations.

Similarly, we have modified where inventory logs or records for drip pads must be kept. We had proposed that the information must be in close proximity to the drip pad. Commenters indicated that having records in close proximity may not always be practical or even desirable. In response to comments, we have modified the regulations so that the records must be kept on site and readily available for inspections.

c. *Major Comments.* Commenters primarily focused on explaining how drip pad operations work and identifying the mistake the Agency inadvertently made in consolidating the waste accumulation regulations for all types of units. Commenters also requested that the Agency change the waste accumulation time for SQGs from 90 days to 180 days for wastes removed from the drip pad to be consistent with other waste accumulation unit time limits. This comment is also consistent with Agency guidance issued for drip pads.[77] One commenter identified a number of problems associated with the marking and labeling of hazardous wastes on drip pads, including generators marking drip pads with the words "Hazardous Waste" in a conspicuous place easily visible to employees, visitors, emergency responders, waste handlers, etc, and identifying the hazards of wastes as being inappropriate. As discussed previously, the Agency has responded to these comments.

[77] Ibid, section 5–17.

2. Containment Buildings

a. *What is EPA finalizing?* The Agency is finalizing the regulations that were proposed in § 262.16 (b)(5) and § 262.17 (a)(4) for hazardous wastes accumulated in containment buildings by both SQGs and LQGs, respectively.[78] This provision states that an SQG or LQG accumulating hazardous waste in a containment building must comply with subpart DD of 40 CFR part 265, place its professional engineer certification that the building complies with the design standards specified in 40 CFR 265.1101 in the generator's files prior to operation of the unit, and maintain the following records by use of inventory logs, monitoring equipment, records, or any other effective means: (1) A written description of procedures to ensure that each waste volume remains in the unit for no more than 90 days, a written description of the waste generation and management practices for the site showing that they are consistent with respecting the 90 day limit, and documentation that the procedures are complied with; or (2) documentation that the unit is emptied at least once every 90 days. The Agency is also stating that these records must be readily available upon request from the implementing agency. These recordkeeping provisions were found under the marking and labeling provisions for containment buildings in the proposed rule.

The Agency is also requiring SQGs and LQGs accumulating hazardous waste in containment buildings to label their containment building with the words "Hazardous Waste" located in a conspicuous place easily visible to employees, visitors, emergency responders, waste handlers or other persons on site and also provide an indication of the hazards of the waste using one of several methods described under § 262.16(b)(6)(i)(B) and (b)(6)(ii)(B)—Labeling of containers and tanks.

b. *What changed from proposal?* Similar to the changes made for drip pads, the Agency moved the marking and labeling provisions to the waste accumulation section because these provisions more appropriately address how generators will meet the 90 day waste accumulation time limit. The Agency is also adding a provision to clarify that the records used to demonstrate that hazardous wastes have been removed within 90 days must be readily available upon request from the implementing agency.

[78] This regulatory text was originally found at § 262.34(a)(1)(iv).

c. *Major comments.* There were very few comments about this provision. One commenter did not support the provision allowing SQGs to accumulate hazardous waste in containment buildings because these are complicated units requiring a fairly high level of knowledge and expertise to properly construct and operate. While the Agency agrees with this commenter conceptually, we have no basis to prohibit such an operation, such as damage cases from generators accumulating hazardous wastes in such units. Another commenter sought clarification to differentiate between containment buildings and manufacturing process buildings. As described at subpart DD of part 265, containment buildings are specially designed and constructed buildings that address the waste accumulation of hazardous wastes. Manufacturing process buildings may or may not have similar design specifications, but if they are not generating or accumulating hazardous wastes, they need not comply with subpart DD requirements. Also, the Agency maintained the 90 day accumulation time period for any SQGs accumulating hazardous wastes in containment buildings consistent with what was proposed.

*H. Special Requirements for Ignitable and Reactive Wastes for LQGs (40 CFR 262.17(a)(1)(vi))*

Some generators, especially as those located in urban environments, have expressed their concern regarding the LQG provision requiring generators to place containers holding ignitable or reactive waste 15 meters (50 feet) from the site's property line. In some cases, it may not be physically possible to meet this standard, particularly if the width of the site is 100 feet or less or when the generator's operations have expanded such that it no longer has the ability to accumulate ignitable or reactive waste at least 15 meters (50 feet) from the site's property line. Insurance companies and local fire departments often assist hazardous waste generators in minimizing their environmental hazards and liabilities, but site dimensions may sometimes physically prevent a generator from complying with this condition.

The Agency proposed to allow LQGs to apply for a site-specific waiver from their local fire department if they are unable to meet the 15 meter ignitable and reactive hazardous waste accumulation property line condition. This proposed change would require LQGs to obtain a written approval from a local fire department and keep the written approval in their records.

Additional details are discussed in section XI of the preamble of the proposed rule (80 FR 57979).

1. What is EPA finalizing?

The Agency is finalizing the proposed regulation with a minor modification. The final regulation allows an LQG to apply for a site-specific waiver from the authority having jurisdiction (AHJ) over the fire code if the LQG is unable to meet the 15 meter ignitable and reactive hazardous waste accumulation property line condition. If an LQG wants this waiver, they are required to obtain a written approved waiver from the AHJ who has the ability to determine a safe and practical location for the facility to store ignitable or reactive waste that is within 15 meters (50 feet) of the facility's property line. LQGs are then required to keep the written approval in their records.

2. What changed since proposal?

EPA originally proposed that the facility contact their local fire department for the site-specific approval. While several commenters agreed that most fire departments are well qualified to approve this waiver, some commenters indicated that there may be some confusion as to who can approve this waiver. For example, some areas may require a designated official to interpret and enforce the fire code rather than the local fire department. In this case, the designated official will grant the approval. The Agency did not intend to restrict the ability of those who can grant this approval to only local fire departments. However, the Agency did intend that the entity or individual granting this approval has detailed knowledge of the fire code, has the ability to evaluate the site conditions to determine a safe and practical place for storing ignitable and reactive wastes, and is authorized by the state or local government to enforce the fire code.

To address these comments, the Agency changed the terminology from the "fire department" to the "authority having jurisdiction (AHJ)" over the fire code within the facility's state or locality. An AHJ may or may not be the fire marshal, fire chief, building official, or another official as designated by the state or local government. AHJ is a term developed by the National Fire Protection Association (NFPA) and has been adopted by several state and local governments. Considering the wide use of the term "AHJ" in various fire codes, the Agency believes the more general term will ensure that regardless of who has the authority (local/state), the generator will be able to apply for the site-specific waiver. Furthermore, the Agency believes that the AHJ is well qualified at finding the most appropriate place to accumulate this waste and to determine that there is a sufficient level of protection for the facility and the surrounding community prior to issuing this approval.

We requested comment on whether EPA should set conditions for the waiver, but determined from the commenters that the decision should be made on a site-specific basis dependent on the characteristics of the generator, the physical make-up of the site, and the surrounding area. EPA expects the AHJ to be sufficiently qualified to make a site-specific determination for the waiver and consider relevant factors when making that decision, such as the length of time the hazardous waste can be accumulated, the amount of hazardous waste that can be accumulated, and any physical or technical controls. The AHJ should also consider any potential off-site conditions, such as the proximity to populated public areas (schools, hospitals, or playgrounds), off-site sources of ignition, and the proximity to an adjacent property's storage area of ignitable or reactive waste.

3. Major Comments

A few commenters recommended that EPA directly allow deference to locally applicable fire codes rather than requiring the generator to obtain an approval. EPA proposed a rule in 1984 that is similar to the commenters' recommendation. It would have amended the buffer zone requirements and adopted NFPA fire codes but the rule was never finalized.[79] However, the 1984 proposal shows that adopting the fire code appears to be more complicated than the commenters realize due to the differences in terms and definitions. Furthermore, fire codes differ from locality to locality and some rural areas have no fire code or fire department. While EPA agrees that this recommendation would be easier to implement for the generator since it removes the approval process, at this time, the Agency cannot defer to local fire codes because the complexity involved may increase confusion and in some cases it may present a danger for the community or for the facility itself. However, the Agency may reevaluate this topic in future rulemakings.

The Agency took comment on whether owners and operators of permitted and interim TSDFs should also be able to apply for this approval. While several commenters agreed that TSDFs should be included, EPA determined that TSDFs already go through an existing permit process, including public notice and comment, to determine site-specific conditions that include identifying locations for accumulating hazardous waste.[80] Considering that parts of the permit process may be bypassed if owners/operators of TSDFs were allowed to apply for this waiver, EPA concludes that it is not appropriate to include TSDFs in this waiver.

*Effect of the Reorganization:* This section is affected by the reorganization. The special requirements for ignitable and reactive waste were found at 40 CFR 265.176.

*I. LQG Closure Regulations (40 CFR 262.17(a)(8))*

In an effort to improve the clarity and understanding of the closure regulations for LQGs, as well as to strengthen M. he closure regulations to improve environmental protection, the Agency proposed three changes to the closure provisions for LQGs previously found at § 262.34(a)(1)(iv)(B).

First, EPA proposed to consolidate the closure regulations for LQGs accumulating hazardous waste at § 262.17(a)(8). EPA believed the organization of the closure regulations previously found at § 262.34(a)(1)(iv)(B) (which referred to various closure requirements in part 265) was confusing and difficult to follow. The proposed consolidation included both the facility-wide general performance requirements found at §§ 265.111 and 265.114 for hazardous wastes accumulated in containers, tanks, drip pads, and containment buildings, and the unit-specific requirements found at § 265.197 for tanks, § 265.445 for drip pads and § 265.1102 for containment buildings.

Second, EPA proposed to strengthen the closure regulations for LQGs accumulating hazardous waste in containers in central accumulation areas that plan to stop hazardous waste accumulation by requiring them to meet the same type of closure regulations that apply to tanks, drip pads and containment buildings, including those situations where a generator is not able to demonstrate that its hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products can be practicably removed or decontaminated (*i.e.*, cannot "clean close"). The Agency demonstrated the need for closure requirements to apply to LQGs accumulating hazardous waste in containers as discussed in detail in the

[79] 49 FR 23290, June 5, 1984.

[80] 40 CFR part 270.

preamble to the proposed rule at 80 FR 57955 and provided in the docket a list of Superfund damage cases to the environment caused by generators who accumulated hazardous wastes in containers and abandoned these facilities.

Third, EPA proposed to require an LQG to notify EPA or the authorized state using EPA Form 8700–12 at least 30 days prior to closing the generator's facility or when the generator closes a unit accumulating hazardous waste. Additionally, EPA proposed that an LQG notify EPA or its authorized state within 90 days after closing the facility or the unit accumulating the hazardous waste. This notification would state the LQG had clean closed or failed to clean close and therefore, must close as a landfill.

1. What is EPA finalizing?

Based on review and evaluation of comments, the Agency is finalizing the following provisions associated with the closure regulations for LQGs. First, we are consolidating the closure regulations at § 262.17(a)(8). These regulations consist of two components: Closure of a waste accumulation unit, such as a tank system and container accumulation area, and closure of a generator's facility.

When closing a waste accumulation unit at § 262.17(a)(8), a generator may either elect to place a notice in its operating record that identifies the unit they are closing and not conduct the formal closure performance standards of § 262.17(a)(8)(iii) in the case of a container, tank or containment accumulation unit, or § 262.17(a)(8)(iv) in the case of a drip pad unit, until the facility closes, or they can formally perform the closure provisions in § 262.17(a)(8)(ii)(B) through § 262.17(a)(8)(iv) including clean closure performance standards and notification to EPA that the facility has closed that accumulation unit within 90 days of closing the unit.

When closing the facility, the generator would be required to meet the notification standards of § 262.17(a)(8)(ii) and performance standards of § 262.17(a)(8)(iii) for container, tank and containment building units, and § 262.17(a)(8) (iv) for drip pad units. The performance standards of § 262.17(a)(8)(iii) include four paragraphs. The first two paragraphs incorporate the closure performance requirements at §§ 265.111 and 265.114 when an LQG's waste accumulation unit or facility closes. The third paragraph addresses what must be done with any hazardous wastes generated as a result of an LQG clean closing its waste accumulation areas. The fourth paragraph addresses the situation when an LQG that has accumulated hazardous waste in a container, tank or containment building waste accumulation area cannot meet the closure performance standards or clean close (*i.e.*, situations where contaminated soils and wastes cannot be practicably removed or decontaminated).

In addition, LQGs with drip pads must continue to comply with the unit-specific closure performance standards found at § 265.445(a) and (b)[81] and the general closure requirements now found at § 262.17(a)(8)(iii)(A)(*1*) and (*3*). In the proposed rule, the Agency consolidated drip pad closure requirements with tanks and containment buildings and in the process, incorrectly modified the closure requirements. In this final rule, § 262.17(a)(8)(iv) has been added to specifically address the closure requirements for drip pads and correct the modification.

As mentioned previously, LQGs need to notify EPA or their authorized state using the Site ID form (EPA Form 8700–12) when they are closing their facility. Specifically, LQGs must notify EPA or the authorized state using the Site ID form (EPA Form 8700–12) at least 30 days prior to closing their facility, and also notify EPA or the authorized state within 90 days after closing the facility. This second notification using form 8700–12 would state that the LQG has either met the closure performance standards of § 262.17(a)(8)(iii) or failed to meet such standards, in which case they must notify that they are closing as a landfill. In the case of LQGs with drip pads, they would either notify using form 8700–12 they had met the closure performance standards of § 265.445(a), or if they failed to meet those standards, notify that they must close in comply with the requirements of § 265.445(b). In response to comments, the Agency is allowing LQGs to request additional time to clean close at § 262.17(a)(8)(ii)(C). However, the LQG must notify EPA using form 8700–12 or its authorized state within 75 days after closing their site to request an extension and provide an explanation as to why the additional time is required.

Third, the Agency is clarifying that closure requirements do not apply to satellite accumulation areas at § 262.17(a)(8)(v). While the Agency did not receive any specific comments on the scope of closure requirements, we are clarifying that the closure requirements do not apply to satellite accumulation areas.

2. What changed since proposal?

The Agency simplified and clarified the closure process. First, EPA is providing LQGs a choice for when they close a hazardous waste accumulation unit (*i.e.*, CAA, tank, containment building, drip pad): (1) Put a notice in the operating record stating they closed the accumulation unit, or (2) follow the closure procedures in § 262.17(a)(8)(ii)–(iv). The Agency is making this change in the final rule based on information from commenters who described normal operating situations where accumulation units close and reopen, or are relocated to another part of the site. The Agency did not want the accumulation unit closure provisions to interfere with facility operations and the generation and accumulation of hazardous wastes, especially as the Agency is aware of situations where hazardous wastes are placed in containers that are mobile storage devices. However, when closing their overall facility, generators must ensure all remaining hazardous wastes they have generated and accumulated are removed from their facility and clean close per § 262.17(a)(8)(iii) (*i.e.*, minimize the need for further maintenance by controlling, minimizing, or eliminating the post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products to the ground or surface waters or to the atmosphere to the extent necessary to protect human health and the environment).

Second, rather than have LQGs notify EPA or an authorized state every time they close a waste accumulation unit, they must now notify only when they are closing their facility. The Agency received many comments that providing a notification every time a waste accumulation unit is closing, particularly for container waste accumulation units, is impractical. Commenters noted that opening, closing and reopening waste accumulation units, even temporarily, occurs periodically and the Agency does not want to interfere with the operations of the facility.

Third, in finalizing the closure performance standards § 262.17(a)(8)(iii), the Agency has reverted back to the existing regulatory text previously found at § 265.197(a) for closure of tanks and § 265.1102(a) for closure of containment buildings for purposes of consistency, and because one of the primary purposes of this

[81] See Generator Closure Requirements, RCRA/Superfund Hotline Monthly Report, December 1998, EPA530–R–98–005.

section is to consolidate the closure regulations found in different parts of the program.

Finally, the Agency separated the closure performance requirements for drip pads because they are different than those of containers, tanks and containment buildings.

3. Major Comments

Many commenters supported the consolidation of closure requirements to make them more user-friendly and easier to comply with. Many commenters did not support EPA's proposal to require notification every time a waste accumulation area was closing and requiring LQGs to clean close every time a waste accumulation area closed. In both cases, commenters stated the proposed changes were inefficient, impractical and/or unnecessary. One commenter, representing several generator organizations, did not believe closure standards should be identified as conditions for exemption. However, EPA notes that closure standards are a condition for exemption under the existing RCRA program. See section IX.A for a more detailed discussion of the distinction between conditions for exemption and independent requirements. This commenter also recommended that the concept proposed in § 262.17(a)(8)(ii)(A)(*1*) that closure should be undertaken "to the extent necessary to protect human health and the environment," should be moved up to the introductory paragraph since this is an important risk-based concept applicable to all of the requirements in § 262.17(a)(8)(ii)(A), not just to subparagraph (*1*). The Agency believes the regulations being finalized already take into account a risk-based concept because "minimizing the need for further maintenance by controlling, minimizing, or eliminating, to the extent necessary to protect human health and the environment" is a risk-based standard. Hence, we have not finalized this change.

This same commenter expressed serious concerns that this proposal was a major departure from existing regulations regarding the clean closure of container central accumulation areas and specifically, the requirement that if the facility could not clean close, then the generator must close as a landfill with all the associated requirements (*e.g.*, installing groundwater monitoring wells upgradient and downgradient from the container area; installing monitoring wells for 30 years or longer during a post-closure care groundwater monitoring program, etc.)

The Agency agrees that this is a new provision. However, as discussed in the proposal (80 FR 57955), many Superfund removal actions over the years have resulted from generators who failed to clean close their hazardous waste container accumulation areas. The EPA believes that facilities accumulating hazardous wastes in containers should have to close as a landfill if they cannot clean close like all other LQGs accumulating hazardous waste. The inability to clean close would indicate major environmental problems have occurred at the generator's facility. If so, the responsibility falls on the generator to address the potential contamination just as a generator would address any problems that resulted from its accumulated hazardous wastes in tanks, drip pads, or containment buildings. Whether a generator would actually have to meet all the requirements of closing as a landfill would be a site-specific decision, made in conjunction with EPA or the authorized state., Generally, if a LQG has been managing its hazardous waste in accordance with the LQG provisions including proper accumulation standards and spill clean-up, then clean closure will consist of removing the containers from the accumulation area. EPA anticipates this will be the case in most situations for container central accumulation areas. The Agency has determined that clean closure requirements should apply equally to all hazardous waste accumulation areas.

Finally, one commenter pointed out that the proposal to consolidate the closure standards for drip pads with tanks and containment buildings would modify existing drip pad closure requirements. The Agency acknowledges this was an inadvertent mistake and has reverted back to the existing subpart W requirements of part 265. However, for purposes of consolidation and consistency, LQGs that accumulate hazardous waste on drip pads and that are closing their facility must still comply with the notification and waste management provisions found at § 262.17(a)(8)(ii) and (a)(8)(iii)(A)(*3*), as well as 40 CFR part 265 subpart W.

*Effect of the Reorganization:* This section is affected by the reorganization. The closure requirements were previously found in § 262.34(a)(1)(iv)(B). The reorganization is discussed in section VI of the preamble.

### *J. Documentation of Inspections of Waste Accumulation Units*

As part of the of the proposed Hazardous Waste Generator Improvements rule, the Agency at 80 FR 57952–53 requested comment on requiring generators to document the results of their container, tank and drip pad inspections. More specifically, the Agency requested comment on whether to require the following: (1) Both SQGs and LQGs document the results of their required "at least weekly" container inspections; (2) SQGs accumulating hazardous waste in tank systems document the results of their tank inspections; and (3) both SQGs and LQGs accumulating hazardous waste on drip pads document the results of their drip pad inspections.

The Agency requested comment on modifying these provisions to require documentation of inspections for these waste accumulation units to emphasize the importance of these inspections in preventing releases into the environment and to provide a measure of accountability that a generator's inspection of its containers, tanks or drip pads actually took place when required. Currently, the only way an inspector can determine whether the required inspections actually occurred is to inspect a generator site at the same time that the inspection is supposed to occur, or conduct an inspection within one week of the first inspection—assuming the inspector knew when the first inspection actually occurred. Both situations have low probabilities of occurring.

As part of the proposed rule, the Agency noted that many states already require generators accumulating hazardous waste in waste accumulation units to maintain records of their inspections. Many of these states provide templates for generators to use to assist them in recording the results of their inspections. Similarly, EPA stated the burden imposed upon generators to record the results of its inspections would not be significant, particularly if generators use a template to document the results of inspections.

The Agency also stated that documenting the results of these inspections is an important best management practice for generators to use not only to prevent any releases, but also to identify situations, such as damaged containers, tanks or drip pads that could lead to a potential release to the environment.

1. What is EPA finalizing?

The Agency is not moving forward at this time to require SQGs and LQGs to

document those situations identified earlier where documentation of inspections is currently not required. At this time, the Agency believes further analysis and evaluation is required before a final decision can be made. However, as already noted, the Agency believes this is a best management practice that serves to protect generators from possible releases and cleanup and which also bolsters the preventive aspects of the RCRA program. EPA encourages generators to examine the feasibility of adopting this practice as part of their standard operating procedures.

2. Major Comments

Commenters were mixed on the need to require SQGs and LQGs to document the results of their inspections associated with containers, tanks and drip pads. Among the reasons commenters cited for supporting documentation of inspections included: Such a process acts as a reminder to ensure there are no problems; the requirement is not unduly burdensome; companies are already in the habit of preparing and maintaining these types of records; the records are useful in tracking containers within the accumulation areas and corrective actions needed and taken, and in documenting that no releases occurred within the unit; and documentation will result in greater protection against hazardous waste releases into the environment.

Commenters who opposed this requirement stated that adding additional recordkeeping requirements shifts the focus away from actual storage practices to secondary recordkeeping practices; there is not sufficient justification for imposing this requirement; there is no added benefit because accumulation units in poor condition have obviously not been regularly inspected; and the Agency would be better served by increasing outreach to small generators to increase awareness of the inspection requirement.

*K. Allowing VSQGs To Send Hazardous Waste to LQGs Under the Control of the Same Person (40 CFR 262.14(a)(5)(viii) and 262.17(f))*

EPA is finalizing the proposed provision to allow VSQGs to send their hazardous waste to an LQG that is under the control of the same person, as defined at § 260.10, provided both the VSQG and LQG comply with specified conditions.

1. Introduction

Before the revisions in this rulemaking, under the regulations at § 261.5(f)(3) for acute hazardous waste, and § 261.5(g)(3) for non-acute hazardous waste, a VSQG was allowed to either treat or dispose of its hazardous waste in an on-site facility or ensure delivery to an off-site treatment, storage, or disposal facility, which included RCRA-permitted hazardous waste facilities, interim status hazardous waste facilities, municipal solid waste facilities, non-municipal non-hazardous waste facilities, recycling facilities, and universal waste handlers. The previous VSQG regulations did not allow a generator to send its hazardous waste off site to another generator unless the receiving generator had a storage permit or was otherwise one of the types of facilities cited previously. Thus, persons looking to reduce their overall environmental liability across multiple facilities were prohibited from managing their VSQG hazardous waste at one or more of their LQG facilities without first obtaining a permit or complying with the interim status standards.

EPA determined that providing the option for VSQGs to send their hazardous waste to an LQG that is under the control of the same person will improve the management of that hazardous waste for the following reasons. First, LQGs are subject to more stringent management conditions compared to VSQGs, such as accumulation time, labeling, training, emergency planning, and containment standards. In addition, LQGs may only transport (using a hazardous waste manifest) hazardous waste to RCRA-permitted or interim status hazardous waste TSDFs, which in turn, are subject to more stringent management standards than the municipal or non-municipal solid waste facilities that VSQGs are allowed to use. Therefore, allowing hazardous waste generated by a VSQG to be sent to an LQG under the control of the same person will improve overall tracking, oversight and management of the hazardous waste and enable more effective environmental protection.

Furthermore, a company, because of economies of scale, may reduce its overall waste management costs, as well as its potential financial liabilities for hazardous waste it generates at VSQG facilities, as it would be handled under the more comprehensive LQG and TSDF regulatory programs. Consolidation by an LQG of hazardous waste generated by several VSQGs under its control may also increase potential opportunities for hazardous waste recycling by the LQG.

In addition, whereas LQGs have up to 90 days to accumulate hazardous waste in compliance with all the LQG conditions for exemption without having to obtain a RCRA storage permit or comply with all the other standards otherwise applicable, VSQGs may accumulate up to 1,000 kilograms of non-acute hazardous waste or up to 1 kilogram of acute hazardous waste or up to 100 kilograms of residues from the cleanup of a spill of acute hazardous waste without any time constraint. Even though the amount of hazardous waste allowed on site by VSQGs at any one time is limited, the longer that hazardous waste is accumulated on site, the greater the risk of adverse impacts to human health and the environment. Allowing VSQGs to send their hazardous waste to an LQG under the control of the same person will likely reduce the overall time that the VSQG accumulates hazardous waste on site, which would further reduce the potential risk to human health and the environment.

Finally, this new provision will give companies flexibility in allocating labor and resources required to manage the company's total quantity of hazardous waste generated, as the company is now allowed to consolidate its hazardous waste from VSQG facilities at its LQG facilities.

EPA has received requests over the years from industry to amend the regulations to allow VSQGs to send their hazardous waste to LQGs for consolidation. Many of the commenters, including state agencies, the generator industry, and the waste management industry, supported adding this option to the regulations. Commenters expressed their support for consolidation, stating that it will ease the financial and administrative burden for VSQGs and encourage responsible waste management, treatment, and disposal. Specifically, some commenters stated that consolidation at an LQG would ensure greater safety and environmental protection because LQG staff are generally more knowledgeable than those at a VSQG. In addition, the Minnesota Pollution Control Agency confirmed with direct observation that allowing a VSQG to send its hazardous waste to another site where proper and safe management is available at a reasonable financial and management price, such as is provided by a VSQG collection site, does consistently reduce the average time that VSQGs accumulate waste on site, reducing on-site health and safety risks and also lowering the potential for both accidental releases

and the temptation for improper disposal of larger amounts.[82]

Adding the consolidation option in the regulations will enable generators to employ greater control over the management of their hazardous waste, thereby resulting in improved efficiency and reduced liability for the generator. Commenters noted numerous examples where VSQGs and LQGs under the same ownership may take advantage of the new consolidation provision. For example, Army National Guard and Reserve units that may be VSQGs can send their hazardous waste to an active Army base that is an LQG. The same situation applies to Air Force, Navy, and Marine Corps reserve units as well. Additionally, many universities commented that they supported this provision. Often, individual laboratory buildings qualify as VSQGs. Allowing different laboratory buildings within a university or industrial environment that are VSQGs to send their hazardous waste to another university or industrial entity that is an LQG under the same control will provide both economic and environmental benefits. Furthermore, utilities, retailers, and remote oil and gas production facilities also represent examples of industrial sectors that indicated they expect to benefit from the intra-company transfer of hazardous waste from VSQGs to LQGs.

2. What is EPA finalizing?

The Agency is finalizing the provision that allows a VSQG to send its hazardous waste to an LQG that is under the control of the same person, provided specified conditions are met.

a. *Scope.* EPA is finalizing its proposal to amend the regulations under the previous regulatory framework at § 261.5(f)(3) and (g)(3) to allow VSQGs to send hazardous waste to an LQG under the control of the same person. "Person" is defined in § 260.10 to mean an individual, trust, firm, joint stock company, federal agency, corporation (including a government corporation), partnership, association, state, municipality, commission, political subdivision of a state or any interstate body. For the purposes of this section, "control" means the power to direct the policies of the generator, whether by the ownership of stock, voting rights, or otherwise, except that contractors who operate as generators on behalf of a different person shall not be deemed to "control" such generators. EPA notes that these are the same key terms used in the exclusion from the definition of solid waste for hazardous secondary materials that are generated and legitimately reclaimed under the control of the generator (40 CFR 261.4(a)(23)), which was promulgated on October 30, 2008, (73 FR 64668) and revised on January 13, 2015 (80 FR 57918). Consistent with the October 30, 2008, final rule, companies within the same corporate structure would be considered "under the control of the same person" if they meet the definition of same "person" and "control" as outlined above.

Limiting transfers to facilities under control of the same person is appropriate because it ensures common control is maintained over both facilities and takes advantage of strong liability incentives to ensure the hazardous waste is safely managed. Additionally, if a VSQG sends hazardous waste to an LQG under the control of the same person, the LQG is likely to be more familiar with the type of hazardous waste generated by the VSQG. Furthermore, questions regarding liability and responsibility for such hazardous waste are clearer than is the case with facilities from unrelated companies. The majority of commenters, including most of the states, supported limiting the VSQG consolidation option to facilities under the control of the same person at this time for similar reasons.

EPA is also finalizing the proposed requirements for certain labeling and marking standards for VSQG waste being transferred to LQGs under the control of the same person under this provision. Note that aside from these conditions, the same standards for management of VSQG waste apply to materials going to an LQG under this provision as to other VSQG waste, including the exemption from the requirement to ship using a hazardous waste manifest. However, DOT shipping requirements do still apply as appropriate.

b. Conditions for Exemption

Condition for Exemption for VSQGs

As part of this provision, VSQGs are required to meet the following conditions for exemption, found at § 262.14(a)(5)(viii).

*Under control of the same person.* As described previously, the VSQG and the LQG must be under control of the same person, according to the definition in § 260.10.

*Labeling and marking of containers.* The Agency is requiring that a VSQG transferring waste to an LQG under the control of the same person label its containers with (1) the words "Hazardous waste" and (2) an indication of the hazards of the contents of the container (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the DOT requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration (OSHA) Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association (NFPA) code 704). This condition is also consistent with the revisions for labeling and marking of containers found in 40 CFR parts 262, 263, and 268 and discussed in section IX.E.1 of this preamble.

Conditions for Exemption for LQGs

EPA is finalizing the following conditions for exemption for LQGs receiving hazardous waste from VSQGs under the control of the same person, all found at § 262.17(f).

*Notification.* LQGs receiving hazardous waste from VSQGs under the control of the same person must submit a notification to EPA or their authorized state using EPA Form 8700–12 (*i.e.,* the Site Identification (Site ID) form) at least 30 days prior to receiving the first shipment of hazardous waste from the VSQG. LQGs are required to identify on the Site ID form the name(s), site address(es), and contact information for the VSQG(s) that will be transferring hazardous waste to the LQG. LQGs are also required to submit an updated Site ID form within 30 days should the name or site address for the VSQG change. Since the process to update the Site ID form to reflect this final rule will not be completed by the time some facilities are required to notify, EPA will create an interim procedure for submitting notifications for the regulated community to aid their compliance efforts with the new consolidation provision and publish it on the EPA Web site.

Notification in this instance serves to inform the regulatory authorities of which LQGs are receiving hazardous waste from which VSQGs under the control of the same person. The Agency has determined notification is necessary in order to communicate to inspectors the origin of the hazardous waste received by the LQG and to ensure the received shipment is managed in compliance with the conditions of the provision. EPA also believes notification by the LQG, rather than notification by the VSQG, is more efficient and less

[82] Minnesota Pollution Control Agency (MPCA), Comment Number: EPA–HQ–RCRA–2012–0121–0232.

burdensome, because LQGs are already required to submit Site ID forms as part of obtaining a RCRA Identification Number and as part of the biennial reporting process. Additionally, it is more efficient for one LQG to notify on behalf of numerous VSQGs.

EPA has recently made available an electronic interface for states and the regulated community to use to submit Site ID forms electronically, which will further reduce burden on LQGs. Facilities should check with their states regarding whether and when their state will use EPA's electronic submittal process.

*Recordkeeping.* LQGs are required to maintain records for three years from the date the hazardous waste was received from the VSQG with the following information:

—The name, site address, and contact information for each VSQG; and
—A description of each waste shipment received from the VSQG, including the quantity and the date the hazardous waste was received.

Recordkeeping is necessary to ensure the VSQG and LQGs operating under the consolidation provision are meeting the conditions of the provision, including that the VSQG and LQG are under control of the same person. Records can also be used to ensure that the hazardous waste from the VSQG is managed according to the other conditions for exemption of this provision, such as the requirement that LQGs are receiving shipments of hazardous waste from VSQGs in quantities commensurate with the VSQG's generator category. This recordkeeping condition can be fulfilled through routine business records, such as a bill of lading, and will not present an undue burden to the LQG. Additionally, the LQG can then use this information to report the hazardous waste from the VSQG on its biennial report forms.

*Labeling and marking of containers.* The Agency is requiring that LQGs comply with the same labeling and marking conditions for exemption under § 262.17(a)(5), including the date accumulation started (*i.e.*, the date the hazardous waste was received from the VSQG). (Note: These are the same standards that VSQGs must comply with in labeling and marking containers that they send to LQGs, as discussed previously, with the exception of the accumulation start date.) If the LQG is consolidating incoming hazardous waste from a VSQG with either its own hazardous waste or with hazardous waste from another VSQG, the LQG must mark each container with the

earliest date any hazardous waste in the container was accumulated on site. This will prevent an LQG from starting the accumulation clock over again, which could lead to an endless loop of accumulation.

Because the LQG must manage the hazardous waste it receives from VSQGs according to the LQG regulations, EPA has determined the same labeling and marking requirements should apply to both its own hazardous waste and hazardous waste received from a VSQG. EPA believes that it is important that employees, transporters, downstream handlers, emergency personnel, EPA, and the states know as much as possible about the potential hazards of the contents in containers that LQGs accumulate, transport, and manage.

*Waste management.* Under the finalized consolidation provision, an LQG is required to manage all incoming hazardous waste from a VSQG in compliance with the regulations applicable to its LQG generator category. In other words, there will be no difference in how the hazardous waste from a VSQG is managed relative to the management of the LQG's own hazardous waste, although hazardous waste from a VSQG is not eligible for management under the satellite accumulation regulations (§ 262.15) (That is, VSQG waste must be placed in a central accumulation area or immediately shipped off site from the LQG.)

*Biennial Reporting.* An LQG must also report the hazardous waste it receives from VSQGs on its biennial report, as required under § 262.41. EPA will include a new source code in the biennial report instructions that LQGs will use to identify the hazardous waste received from a VSQG (to differentiate from hazardous waste the LQG generates on site). Generators are required to report hazardous waste they receive from VSQGs by type of hazardous waste. In other words, if an LQG receives the same type of hazardous waste from multiple VSQGs, it only need report the total quantity of that hazardous waste received from all VSQGs. This will enable states and EPA to better understand the additional volumes and types of hazardous wastes managed at an LQG, which will assist in prioritizing compliance assistance.

*c. No maximum limit of hazardous waste LQGs receive from VSQGs.* Because LQGs currently have no maximum limit on the amount of hazardous waste they can accumulate, and because the regulations that are applicable to LQGs are protective, the Agency has determined there is no need to establish a maximum limit on the

amount or types of hazardous waste that an LQG can receive from VSQGs. In fact, we believe the more hazardous waste that is shipped to LQGs, the greater potential for better management, since these hazardous wastes will be managed under the more comprehensive hazardous waste regulations, as opposed to potentially being sent to non-hazardous waste disposal facilities. In addition, the LQG will need to move the VSQG waste off site in a timely manner since the 90-day accumulation limit for the exemption from permitting will still apply.

*d. Enforcement.* The conditions in this final rule that allow VSQGs to send their hazardous waste to an LQG under the control of the same person are necessary to ensure protection of human health and the environment. Failure to meet one or more of the conditions could lead to potential mismanagement of the hazardous waste, potentially resulting in a release of hazardous waste or hazardous waste constituents to the environment. Persons taking advantage of the consolidation provision who fail to meet one or more of the conditions for exemption would lose their exemption from a permit, interim status, and operating requirements and be subject to an enforcement action under RCRA section 3008 for violations of the applicable requirements in part 264 through 268, 270, and the notification requirements of section 3010 of RCRA. EPA and authorized states also have the authority to cease specific transfers of hazardous waste from VSQGs to an LQG in the context of an enforcement action. EPA also notes that failure on the part of the LQG to meet one of the conditions for exemption would not mean that the VSQG is subject to a permit, interim status, and operating requirements, provided that the VSQG met its conditions for exemption and vice versa.

*e. Interstate shipments.* Under RCRA, authorized state programs may be more stringent than the federal program and thus states may choose not to adopt the finalized consolidation provision allowing VSQGs to send their hazardous waste to an LQG under the control of the same person. In the case of interstate shipments where a VSQG wants to transfer its waste to an LQG located in a different state than the VSQG, the VSQG must ensure that both states have adopted the provision (including the exemption from the requirement to ship using a hazardous waste manifest). Additionally, if a VSQG wants to transit its waste through states that have not adopted the consolidation provision, EPA recommends that generators contact any transit states through which

the hazardous waste will be shipped to ascertain their policy about such shipments.

2. What changed since proposal?

*a. Labeling and Marking of Containers.* EPA proposed that the VSQG would label its containers with the words "Very small quantity generator hazardous waste." However, several commenters stated that having two "systems" of labeling was confusing and discussed other ways to distinguish the VSQG waste from the LQG's own waste when it is consolidated. Specifically, the records that an LQG are required to keep should be sufficient to distinguish VSQG waste from the LQG's own waste. In addition, there will likely be situations where an LQG supplies the labels to the VSQG, so using one common label is reasonable. EPA has determined that using a different label would not improve management of the hazardous waste at either generator. Therefore, EPA has decided that labeling the VSQG's waste to be consolidated with the words "Hazardous Waste" (along with the other labeling requirements) are sufficient under the consolidation provision.

In addition, we are not requiring the following marking and labeling: (1) Other words that identify the contents of the containers and (2) the applicable hazardous waste number(s) (EPA hazardous waste code). First, we are not requiring "the contents" of the container to be consistent with the finalized marking and labeling requirements for all generators as discussed in section IX.E.1. In addition, we are not requiring the applicable hazardous waste number(s) be included on the label because we have determined that it is not necessary at this point in the management of the VSQG waste. Due to the fact that LQGs do not need to add the hazardous waste codes until the waste is ready to be shipped off site to a designated RCRA facility for subsequent management, we determined that was also the best option for the VSQG waste being consolidated at an LQG. Therefore, the VSQG waste only needs to be labeled with the words "Hazardous Waste" and an indication of the hazards of the contents when it is sent for consolidation at an LQG under the same control. Once at the LQG, the date the accumulation starts (*i.e.*, the date the hazardous waste was received from the VSQG) must be added to the label. Of course, if the VSQG wants to include words that identify the contents of the containers and/or the applicable EPA hazardous waste number(s) (hazardous waste codes), that is encouraged as discussed in the general marking and labeling provisions in this preamble (section IX.E.1). Due to the fact that the VSQG and the LQG are under the control of the same person, EPA assumes that the two parties will consult and determine the most appropriate labeling for the safe management of their hazardous waste that meets the minimum requirements laid out in the regulations.

*b. LQG notification.* EPA proposed that LQGs notify using an updated Site ID form 8700–12 within 30 days of a change in the site name, site address, or contact information for a VSQG sending their hazardous waste for consolidation at the LQG. Several commenters recommended only requiring notification of changes to the site name and/or address of the VSQG. EPA agrees that if the site name and address remains the same, it is not necessary for the LQG to notify again simply because the contact information for the VSQG changes. Due to the fact that the VSQG consolidation provision is limited to facilities under the control of the same person, the LQG would likely have knowledge of any change in contact information and could provide that to the implementing agencies if necessary.

3. Major Comments

*a. Expanding scope of the provision.* EPA also requested comment on whether to establish a process that would allow a generator (whether VSQG or LQG) to request approval from its EPA Regional Administrator or the authorized state to transfer hazardous waste from VSQGs to LQGs that are not under the control of the same person. Additionally, the Agency also requested comment on a variation that would allow LQGs to consolidate VSQG hazardous waste from VSQGs that are not under the control of the same person by submitting a request for approval. The difference under this variation was that after 60 days, the generator could start consolidating regardless of whether it had heard back from the implementing agency.

After consideration of the comments received, EPA has decided not to finalize an inter-company consolidation provision at this time. There was not enough support in the public comments and significant implementation issues were identified. It is likely that additional safeguards would need to be put in place to allow VSQG consolidation at an LQG that is not under the control of the same person. After a sufficient number of states adopt the intra-company consolidation provision, the Agency plans to evaluate how the consolidation option is working. EPA will then consider possible expansion of the provision in the future, including whether to allow VSQG consolidation at SQGs under the same control and/or LQGs under the control of a different person.

*b. Effect on existing state programs.* EPA received comments from the retail sector suggesting that, under the existing RCRA regulations, VSQG hazardous waste can be consolidated at any intermediate location, as long as the VSQG ensures ultimate delivery to an acceptable facility listed under the regulations. However, EPA does not agree with that characterization of the existing regulations and has expressed that in writing as far back as 1987.[83] As explained in the guidance, a VSQG must either treat or dispose of its hazardous waste in an on-site facility or ensure delivery to an off-site facility listed in previous § 261.5(f)(3) and now found at § 262.14(a)(4).

In addition, other commenters noted that certain states already operate consolidation programs that go beyond what EPA is finalizing in this document. For example, Minnesota operates a VSQG collection program (VSQGCP) where non-affiliated LQGs apply and are individually reviewed and approved by the state to receive hazardous waste from any VSQG at their discretion. Currently, Minnesota has approved 31 such VSQGCPs, providing relatively convenient safe disposal for VSQGs across the state.[84] The Utility Solid Waste Activities Group also expressed their concern that EPA has not acknowledged many state practices that facilitate the removal of small hazardous waste streams from remote, unmanned locations.[85]

It is not EPA's intention to interfere with existing state consolidation programs. If a state has authorized a facility to manage hazardous waste or has permitted, licensed, or registered a facility to manage municipal solid waste or non-municipal, non-hazardous waste, EPA would consider that to be a facility allowed to receive VSQG waste under § 262.14(a)(5). In addition, EPA notes that states can be more stringent and thus, can adopt the VSQG consolidation provision finalized in this rule and add other requirements as they deem necessary and allowable under state law.

[83] See RCRA Hotline Monthly Report Question, April, 1987, RCRA Online 12894.

[84] Minnesota Pollution Control Agency (MPCA), Comment Number: EPA–HQ–RCRA–2012–0121–0232.

[85] The Utility Solid Waste Activities Group, Comment Number: EPA–HQ–RCRA–2012–0121–0093.

Federal Register / Vol. 81, No. 228 / Monday, November 28, 2016 / Rules and Regulations 85777

*Effect of the Reorganization:* This section is affected by the reorganization. The reorganization of the generator regulations moved the conditions for VSQGs from § 261.5 to § 262.14 and the conditions for LQGs from § 262.34 to § 262.17. The reorganization is discussed in section VI of this preamble.

*L. EPA Identification Numbers and Re-notification for SQGs and LQGs (40 CFR 262.18)*

Under existing RCRA regulations, SQGs and LQGs are required to notify EPA using form 8700–12 (Site ID form) in order to obtain an EPA identification number. The Site ID form contains such information as the name and address of the generator, the industrial sector in which it belongs (*i.e.,* NAICS code), name of a facility contact, what type of waste activities take place at the facility, etc. Without such an identification number, a generator cannot treat, store, dispose of, or transport its hazardous waste. Subsequent to obtaining an EPA ID, there is no federal regulation requiring SQGs or LQGs to re-notify EPA to update their site information or confirm the information remains accurate. However, LQGs do update their site information every two years as part of the biennial report, as the Site ID form is part of the biennial report submission.

The lack of a re-notification requirement, especially for SQGs at the federal level, greatly impairs EPA's and the states' ability to use the information for compliance monitoring and programmatic purposes. This is because a one-time notification provides no assurance that the information collected in EPA's and the states' databases over time will accurately reflect which facilities are generating hazardous waste.

To address these issues, the Agency proposed several changes to the RCRA SQG and LQG site-identification and re-notification processes. First, we proposed to add an independent requirement for LQGs that reflects existing processes by which LQGs already submit Site ID forms as part of the biennial reporting process. Second, we proposed that SQGs must re-notify EPA using the Site ID form prior to February 1 of each even-numbered year, similar to the biennial report with the SQG re-notifications occurring one month prior. EPA took comment on alternative time frames for SQG re-notification such as every four years, alternate cycles from the biennial report, and rolling re-notifications. Finally, EPA took comment on whether a better approach would be for EPA to require an SQG or LQG to re-notify only in the event of a change to certain information, such as change in ownership or generator category.

1. What is EPA finalizing?

The Agency is finalizing the requirement for SQGs to re-notify EPA (or an authorized state program) beginning in 2021 and every four years thereafter using EPA Form 8700–12. While still several years away, states must become authorized for this provision. In the meantime, the Agency will work with the states and the regulated community to develop the necessary software and instructions to effectively implement this new requirement. This re-notification requirement will also occur in years in which federal biennial reporting is not required. This form must be submitted by September 1st of each year in which re-notifications are required.

In addition, EPA is finalizing in § 262.18(d)(2) the formalization of LQGs re-notifying using EPA Form 8700–12, the RCRA Site Identification form, as part of the LQG's biennial report required under § 262.41.

Note that the changes to the regulatory text for § 262.18 in this action take into account the revisions being made as a part of the "Hazardous Waste Export-Import Revisions" Final Rule (Docket ID EPA–HQ–RCRA–2015–0147; FRL–9947–74–OLEM), including the reference in § 262.18(e) for recognized traders.

2. What changed since proposal?

The Agency, in response to comments, increased the interval for SQG re-notifying from every two years to every four years. A number of commenters responded to our requests for alternative timing for SQG notification. Significantly, we heard from a number of states as well as the RCRAInfo Expert Group (a group of EPA and state RCRAInfo data experts), that keeping the SQG notifications on the same cycle as the biennial report is too burdensome and not practical given the large volume of data they receive for the biennial report. These commenters suggested that we reduce the frequency of SQG notifications from two years to every four years and stagger it from the timing of the biennial report. The EPA agrees with these experts and, as described previously, is finalizing the SQG re-notification requirement with these changes as recommended.

There was varied support from commenters on alterative timing for SQG notification. Some commenters supported keeping the timing to every two years both on the biennial report cycle and off. EPA agrees there is general awareness in the generator population of when the biennial report is due, which could make it easier for SQGs to comply with this new requirement. Also, the Agency understands that for companies or facilities that may have multiple sites that are LQGs and SQGs, it may be difficult to keep track of one schedule for LQGs and the biennial report and another for the SQG re-notification. However, the Agency decided to defer to the comments regarding how keeping SQG re-notification timing on the same cycle as the biennial report would overwhelm state and EPA workload capacity to keep up with the data submissions. In order for the data to be usable and the collection effort worthwhile, the Agency must be able to ensure it is entered into our system correctly and we believe the four year cycle alternating with the biennial report will best address capacity issues.

Both state and industry commenters pointed out that many states already require annual re-notification by LQGs and some for SQGs as well. Most asked that EPA clarify that this collected state data can be used to satisfy the federal SQG re-notification requirement. We are clarifying that as long as the more frequently state-collected data is transferred into the national RCRA information management system or RCRAInfo by the state on the timetable EPA is finalizing in this rulemaking for SQG re-notification, these existing state regulations would meet the requirement.

Two concepts were raised by commenters that EPA intends to investigate for possible changes to the Site ID form in the future. First, commenters asked for the ability to check a box certifying that their site ID information had not changed rather than have to fill out the entire Site ID form each time they re-notify. By increasing the time interval for SQG re-notification to every four years, EPA believes there will be reduced burden, but understands this option would increase efficiency for the regulated community and implementers. We intend to work with our national data experts to explore a possible form change to accommodate this idea. Second, commenters asked for a check box or another mechanism to inactivate a RCRA Site ID number. EPA intended for the SQG re-notification process to provide a mechanism for EPA and the states to deactivate RCRA identification numbers when no activity occurred for long periods of time. The Agency intends to work with our state partners in exploring whether the Site ID form or data system changes can be made, or

guidance issued, to allow this action to occur.

Some in industry questioned the need for such information. Commenters suggested that alternative information collection mechanisms already exist, such as using the Biennial Report submission for LQGs and manifest data. First, the existing one-time notification for SQGs provides no assurance that the information collected by EPA and many states, over time, will accurately reflect which facilities are generating hazardous waste and whether they still are SQGs. EPA agrees that the Biennial Report required by LQGs does provide a mechanism by which LQGs regularly re-notify, and we are simply codifying that process in this final rule. While TSDFs report hazardous waste received by SQGs in their Waste Received (WR) form, they do not identify the generator category of the facility they are receiving waste from, only the RCRA identification number. From experience, the Agency has found there is no guarantee that cross walking the RCRA identification number of a facility reported in the WR form with the information found in an existing RCRA Site Identification form will guarantee that the regulatory category of the generator is correct. Therefore, the Agency believes periodic re-notification is required.

With respect to using manifest data, currently manifest data is owned by the states and not required to be sent EPA. This is changing with the e-Manifest system under development, in that the e-manifest data will be available to EPA and the states. However, as the system is being designed, specifications do not include a generator category data element, nor is including this data element possible without a regulatory change. However, the Agency will continue to investigate the feasibility of using e-Manifest data to identify active SQGs and LQGs.

A number of commenters supported the idea that SQG re-notification be required when a specified event occurs. Technically, generators already have this capability. The existing instructions for completing EPA Form 8700–12 include the statement, "You must use this form to submit a subsequent notification if your site already has an EPA Identification Number *and you wish to change information* (*e.g.,* generator status, new site contact person, new owner, new mailing address, new regulated waste activity, etc.)." [86]

While the Agency took comment on this option, we believe that having EPA and states conduct a census re-notification process every four years is a more cost effective process guaranteeing a greater response rate than requiring a self-initiation process on the part of generators (*i.e.,* from past experience, EPA and the states have had to remind many generators they failed to re-notify). In fact, the Minnesota Pollution Control Agency comments strongly cautioned EPA to not adopt this approach and to learn from Minnesota's negative experience requiring re-notification when events occur. EPA and the states also have experience regarding how to implement a census re-notification process via the Biennial Reporting process for LQGs that they can apply to the new SQG re-notification process.

The retail sector also requested that the Agency limit the periodic re-notification requirement for their stores, and provide a streamlined process for large retail chains (*e.g.,* allowing a consolidated update that identifies only key changes).[87] The Agency understands the retailers' concerns, which are among the reasons we are not finalizing re-notification based on specified events. EPA continues to explore the various approaches to the retail sector as they, similar to laboratories, tend to operate very differently than typical hazardous waste generators and face unique issues with the RCRA regulations.

Finally, EPA is clarifying that when an SQG or LQG changes location, it is required to notify EPA because a new RCRA identification number will be needed as these numbers are tied to a physical site. EPA and the states will work with the generator to inactivate the previous RCRA identification number held by the generator while also assigning a new RCRA Identification number. Also, while not required, EPA recommends that generators who change ownership re-notify and alert EPA or their state that a new owner is responsible for the management of hazardous waste at the facility.

Overall, this provision of the final rule provides a balanced approach between the re-notification needs of EPA, the states, and SQGs. We will work with all parties to ensure its effective implementation.

*Effect of Reorganization:* This section is affected by the reorganization. The reorganization of the generator regulations moved the requirements for EPA identification numbers from § 262.12 to § 262.18. The reorganization is discussed in section VI of this preamble.

*M. Provision Prohibiting Generators From Disposing of Liquids in Landfills (40 CFR 262.14(b) and 262.35)*

RCRA section 3004(c) prohibits the disposal of bulk or non-containerized liquid hazardous waste or free liquids contained in hazardous waste in any landfill. This prohibition is necessary because the disposal of liquids in landfills can be a significant source of leachate generation. Restricting the introduction of liquids into landfills would minimize the leachate generation potential of landfills and reduce the risk of liner failure and subsequent contamination of the ground water.[88] The Agency codified this prohibition for municipal solid waste landfills (MSWLFs) at § 258.28, and at § 264.314 and § 265.314 for permitted and interim status hazardous waste landfills. This prohibition is not a new provision and has been in place for almost 25 years. However, the Agency believes it is important to emphasize that the responsibility for complying with this statutory provision resides not only with municipal and hazardous waste haulers and landfill operators, but also with hazardous waste generators. Additional information can be found in the preamble of the proposed rule (80 FR 57971).

1. What is EPA finalizing?

The Agency is finalizing the proposed regulatory language prohibiting hazardous waste generators from disposing of liquid hazardous wastes in landfills. The final regulatory language is located at § 262.14(b) for VSQGs and at § 262.35 for SQGs and LQGs. As explained in the proposal, EPA is clarifying existing language to emphasize that hazardous waste generators are also responsible for complying with this provision. Also, the Agency is adding references to § 264.314 and § 265.314 in the SQG and LQG regulation (§ 262.35). Liquid waste disposed in a hazardous waste landfill must meet the additional requirements in § 264.314 and § 265.314, notably the requirement that the sorbents be nonbiodegradable. EPA is adding these references to § 262.35 in response to comments about sorbed hazardous waste liquids and to clarify the requirements that must be met prior to disposal in a hazardous waste landfill.

[86] See 2015 Biennial Report Instructions, page 11–12 at *https://www.epa.gov/sites/production/files/2015-11/documents/2015_hwr_instructions_forms.pdf.*

[87] See Comments of the Retail Associations in Response to EPA's proposal, Docket ID NO. EPA–HQ–RCRA–2012–0121, December 23, 2015.

[88] October 9, 1991, 56 FR 51055.

2. Major Comments

Several commenters expressed concern that the proposed regulatory language would cause confusion and force generators to alter their current practices for disposal of liquids. This was not the intent of this proposed regulation; EPA simply wanted to make generators more aware of this prohibition. Because the statutory prohibition was codified in the TSDF regulations and not in the generator regulations, some generators may have been unaware of the prohibition against the disposal of liquids in landfills. EPA disagrees with the commenter's suggestion to alter the proposed regulatory language for generators. EPA concludes that the proposed regulatory language prohibiting liquids in landfills is appropriate because the language was adopted directly from the statute and the same language is found in other parts of the regulations which applies to generators. It would be confusing to have slightly varying versions of this prohibition for each generator category and TSDFs.

A few commenters had concerns over the phrase "whether or not sorbents have been added" in the proposed regulatory text. The Agency is clarifying that this phrase does not restrict the use of sorbents as treatment prior to disposing in a landfill. If sorbents have been used but free liquids are still present, then the waste is prohibited from disposal in all landfills. However, if there are no free liquids as defined in § 260.10 after the use of sorbents, then the waste may be disposed in the correct corresponding landfill.

EPA would like to clarify how current practices that remove free liquids prior to disposal in a landfill will not be altered by this proposed regulatory language, although commenters believed otherwise. These current practices will not be altered by this regulation and most generators should be able to continue operating as they have prior to this rule unless their waste contains free liquids when disposed in landfills. If there are free liquids, they are already out of compliance with the current requirements even before this rule takes effect. Methods that remove or solidify free liquids, such as mixing in sorbents until no free liquids are present, must continue to be utilized by all generators prior to disposal in any landfill. However, sorbed hazardous waste liquids by an SQG and LQG must meet additional criteria specified in § 264.314 and § 265.314 prior to disposal in a hazardous waste landfill.[89] [90] For example, one criterion, as some commenters pointed out, is that the sorbent must be non-biodegradable if disposed in a hazardous waste landfill. In instances where biodegradable sorbents are used, such as prior to incineration or energy recovery, then SQGs and LQGs must ensure that these wastes are not disposed in a hazardous waste landfill. VSQGs are not required to follow the additional criteria in § 264.314 and § 265.314 if they are disposing their waste in a MSWLF, but they must still ensure that their waste contains no free liquids prior to disposal in any landfill.

Some generators commented that they have agreements where a TSDF is stabilizing all or some of their liquid hazardous waste. These generators are concerned that this regulation will end these agreements. EPA would like to clarify that this practice is not restricted by this regulation and generators may continue to ship their liquid waste to TSDFs for stabilization.

*Effect of the Reorganization:* This section is not affected by the reorganization. Regulatory language regarding the prohibition of liquids in landfills was duplicated from § 258.28, and at § 264.314 and § 265.314.

*N. Clarification of Biennial Reporting Requirements (40 CFR 262.41, 264.75 and 265.75)*

The Agency proposed changes to biennial reporting requirements at § 262.41, § 264.75 and § 265.75. For purposes of convenience and efficiency, a discussion of proposed changes being finalized in this rulemaking are consolidated here.

The biennial report provides EPA and the states with important information from all LQGs and RCRA treatment, storage and disposal facilities associated with hazardous waste generation and management. For LQGs, this information includes, for each hazardous waste generated, the quantity generated and the hazardous waste composition, as well as how and where this waste is managed. For TSDFs, this information includes hazardous wastes received from not only LQGs but also SQGs and VSQGs. This information is used to support various EPA and state program management and compliance monitoring functions.

The regulations associated with biennial reporting by both generators and TSDFs have been in existence for approximately thirty years with very little change over this time period. From experience through years of implementing this program, the Agency identified areas where clarifications and changes to these regulations could improve both program efficiency and effectiveness. The Agency proposed such changes as part of this rulemaking. A discussion of the proposed changes being finalized follows.

EPA proposed to modify the biennial reporting regulations for generators found at 40 CFR 262.41 in order to make the regulations consistent with Agency guidance, including its biennial report instructions and forms. More specifically, the Agency proposed the following revisions: (1) Only LQGs need to submit biennial reports; (2) LQGs must report all of the hazardous waste they generate for the entire reporting year, not just the month(s) the generator was an LQG; (3) LQGs completing a biennial report must report all hazardous wastes they generated in the reporting year, regardless of whether they transferred the waste off site during the reporting year; and (4) a reference to the biennial report form (EPA Form 8700–13) at § 262.41 rather than the list of specific data elements in currently at that citation.

Additionally, EPA proposed to modify the title of part 262 subpart D from "Recordkeeping and Reporting" to "Recordkeeping and Reporting Applicable to Small and Large Quantity Generators" in order to highlight which entities need to comply with this subpart.

With respect to permitted and interim status TSDFs at § 264.75 and § 265.75, EPA proposed to modify the regulations at §§ 264.75 and 265.75 to eliminate the list of specific data elements and to require the completion and submission of all data elements in the biennial report form (EPA Form 8700–13).

1. Standards Applicable for LQGs (40 CFR 262.41)

*a. What is EPA finalizing for LQGs?* First, only LQGs need to complete and submit biennial reports. The previous regulatory text was unclear as to which generators had to submit a biennial report. Previous regulatory text also did not include the word "complete" which now has been added. However, the Agency is modifying the regulatory text per a comment to clarify that information is to be reported for every odd-numbered year and that the actual Biennial Report must be completed and submitted using EPA Form 8700–13 A/B to the Regional Administrator by March 1 of the following even-

[89] November 18, 1992, 57 FR 54452.

[90] RCRA Online 11798, November 17, 1993.

numbered year.[91] The states may have more frequent or additional data reporting requirements over and above EPA's and may use a different, but equivalent, form to collect federal data and satisfy their own program data reporting needs.

Second, LQGs must report all of the hazardous waste they generate for the entire reporting year, not just the month(s) the generator was an LQG. Almost all states require their LQGs to perform this function already since the Biennial Report instructions require such reporting. This change simply creates consistency between the instruction and regulations. This change also provides EPA and the states with a much more reliable estimate of hazardous waste generated annually. As stated in the preamble to the proposed rule, LQGs should have this information available through their hazardous waste manifests and other counting processes.

Third, rather than citing specific data elements to be reported in § 262.41, as proposed, the Agency is simply referencing the Biennial Report form (EPA Form 8700–13 A/B) at § 262.41(a) and (b) in this final rule. Through the years, the Agency has modified what data elements it was collecting in the biennial report through changes in biennial report instructions but not updating the regulations. Therefore this change formalizes this process. Several commenters had concerns about this process as discussed in this section.

The Agency is also not finalizing a commenter's suggestion that an LQG be allowed to report a solid waste that was generated at the end of a reporting year, but which was not determined to be hazardous until the beginning of the next, or non-reporting, year. With the Agency maintaining the existing regulatory framework for what must be reported (*i.e.*, hazardous waste generated and also sent off site in the reporting year, this situation no longer matters.

*b. What changed since proposal?* In the proposed rule, the Agency modified the regulatory text at § 262.41(a) to require all LQGs to complete and submit a biennial report for all hazardous wastes generated in the reporting year. This change altered what hazardous waste has to be reported, particularly for LQGs that manage their waste off site. Under the previous biennial reporting regulations, an LQG had to report all hazardous wastes both generated and shipped off site to a TSDF within the United States. Not included were hazardous wastes generated in the reporting year but not yet shipped off site because LQGs have up to 90 days to accumulate hazardous wastes prior to either managing the material on site or shipping it off site to a TSDF. Hence, the possibility existed that EPA and the states were not obtaining a reliable estimate of how much hazardous wastes was generated annually by LQGs.

Several commenters were concerned that such a change would dramatically alter the existing processes and procedures long established by LQGs, and by TSDFs who support LQGs in completing the Biennial Report. Others pointed out that EPA was obtaining a reliable estimate of hazardous wastes generated by LQGs, although not necessarily in a clear cut manner. A closer examination of existing biennial reporting instructions revealed that the amount reported included: (1) Hazardous waste generated and accumulated on site and subsequently managed on site or shipped off site in the reporting year; or (2) hazardous waste generated and accumulated on site in the reporting year but not managed on site or shipped off site until the following year; or (3) hazardous waste generated and accumulated on site prior to the reporting year but either managed on site or shipped off site in the reporting year. In other words, an estimate of hazardous waste generated by LQGs is already being captured and reported for a 12 month period, but not necessarily only in the reporting year.

Based on these comments, EPA is not finalizing the proposed § 262.41(a) changes and will instead revert back to the previous language found in § 262.41(a).

*c. Major comments..* Many of the comments submitted by individuals and organizations concerned these issues. However, a number of commenters expressed concern regarding the Agency's process of involving the public in making changes to the Biennial Report forms now that the regulatory language will cite the form and no longer identify the required data to be submitted. Specifically, commenters mistakenly believed that EPA may impose additional substantive reporting requirements by simply changing the form, rather than through a rulemaking to change § 262.41. However, the Agency has been following the Administrative Procedures Act (APA) and will continue to do so. Commenters may not have been aware but changes to EPA Form 8700–13A/B are subject to the Paperwork Reduction Act (PRA), which requires an amendment to the Information Collection Request (ICR), which is approved by the Office of Management and Budget (OMB). Before amending the ICR, EPA publishes a notice in the **Federal Register** informing the public that the ICR is to be amended, and takes comment on the draft form, which is available in the docket. Moreover, there is a follow-up notice in the **Federal Register** informing the public when the ICR amendment has been submitted to OMB for approval. In the future, in order to ensure more transparency, the Agency also will post a copy of the draft form along with a discussion of any proposed changes, including the need for such changes, as part of the **Federal Register** notice. As part of this process, the Agency also will inform stakeholders of this **Federal Register** notice on the RCRAInfo Web page at *https://rcrainfo.epa.gov/rcrainfoweb/*.

One state commenter also disagreed that LQGs had to submit hazardous waste generation information for the months they were either an SQG or VSQG. The Agency believes generators should not find it difficult to submit this information because they will have maintained hazardous waste manifest records which identify the quantity of hazardous waste generated over a particular time period. Likewise, if the generator is an SQG or VSQG for eleven months of the year they may be able to take advantage of the new episodic event regulations being finalized at § 262.230. As already discussed, almost all states already require this information as part of their biennial reporting requirements, and it has long been included in the BR instructions.

Another commenter mentioned that it may be difficult for generators to determine in a precise way the amounts of waste that were generated at the beginning and end of each reporting year, particularly for wastes that are generated in small amounts at a time or that are initially stored in satellite accumulation areas, since they typically do not keep the records necessary to produce this information—especially by the time the reports are due, which could be a year or more after the fact. Generators are responsible for calculating the amount of hazardous waste they generate monthly to determine their generator category. Therefore, generators should have the requisite processes in place to accomplish this function.

One state expressed concerns that any changes to EPA Form 8700–13 A/B would also involve changes to the Biennial Report instructions and forms, as well as the RCRAInfo database, and wanted to ensure state input in this process. The Agency wants to assure all stakeholders that we will work with our

[91] See comments from the staff of the Hazardous Waste Section in the Hawaii Department of Health, Docket No. EPA–HQ–RCRA–2012–0121–0082.

state partners in developing any changes to Biennial Report forms and instructions, as well as any changes to the RCRAInfo database, through established processes and procedures.

Note that the changes to the regulatory text for § 262.41 in this action take into account the revisions being made as a part of the "Hazardous Waste Export-Import Revisions" Final Rule (Docket ID EPA–HQ–RCRA–2015–0147; FRL–9947–74–OLEM), including changing the reference to "§ 262.56" that used to be in § 262.41(b) to a reference to "§ 262.83(g)" in § 262.41(c).

2. Standards Applicable for TSDFs (40 CFR 264.75 and 265.75)

*a. What is EPA finalizing?* The Agency is also finalizing the provision that requires permitted and interim status TSDFs at § 264.75 and § 265.75, respectively to complete and submit EPA Form 8700–13 A/B to the Regional Administrator by March 1 of each even numbered year for facility activities during the previous calendar year. This change is similar to those proposed for LQGs at § 262.41.

*b. Major comments.* Comments received were very similar to those discussed under § 262.41 where concern was expressed with the process EPA would use to notify stakeholders that changes to EPA Form 8700–13 A/B were being proposed. Commenters were concerned that EPA might impose substantive reporting requirements merely by reference to a form that can be changed at the Agency's whim which would violate the notice and comment provisions of the APA. As previously described, the Agency will ensure that it follows a transparent process with respect to any proposed changes and that stakeholders will continue to have an opportunity to comment on any proposed form or reporting element changes.

*Effect of the Reorganization:* This provision is not affected by the reorganization of the generator regulations.

*O. Extending Time Limit for Accumulation Under Alternative Requirements for Laboratories Owned by Eligible Academic Entities (40 CFR part 262 Subpart K)*

Under 40 CFR part 262 subpart K, eligible academic entities have the choice of operating their laboratories under the alternative subpart K standards instead of the satellite accumulation area regulations at 40 CFR 262.15. When subpart K was initially promulgated, if the eligible academic entity chose to operate its laboratories under subpart K, the entity had to remove the unwanted material from each laboratory under the following two timetables: (1) every 6 months; or (2) within 10 calendar days, if the laboratory accumulates more than 55 gallons of unwanted material or 1 quart of reactive acutely hazardous unwanted material.

Operating under the SAA regulations, an eligible academic entity has no time limit for accumulation. Therefore, for smaller eligible academic entities that do not accumulate 55 gallons in a laboratory, subpart K's six-month accumulation time limit can mean a shorter, more stringent, accumulation time than they have under the satellite accumulation area regulations. Eligible academic entities have cited this shorter accumulation time as a disincentive for opting into the alternative standards in subpart K. The Agency, therefore, proposed to increase the accumulation time limit in an eligible academic entity's laboratory to 12 months.

1. What is EPA finalizing?

We are finalizing the increased accumulation time limit, as proposed. Therefore, laboratories at eligible academic entities that have opted into subpart K will be required to remove the unwanted material from each laboratory under the following timetables: (1) Every 12 months; or (2) within 10 calendar days, if the laboratory accumulates more than 55 gallons of unwanted material or 1 quart of reactive acutely hazardous unwanted material. EPA proposed a number of other changes to subpart K, but they were all conforming changes, meaning they were necessary to make the terminology and citations consistent with the new generator regulations (*e.g.*, changing the term "conditionally exempt small quantity generator" to "very small quantity generator"). These conforming changes will also be finalized as proposed.

2. Major Comments

Although we received approximately 60 comments from academic institutions, very few commented on this specific proposed change. All that did comment on this proposed change, were in favor of the longer accumulation time.

The remainder of the comments received from academic institutions were outside the scope of the narrow and specific change that we proposed to subpart K. Although we are not legally obligated to respond to comments outside the scope of the proposal, in this case we are choosing to respond to certain comments in order for EPA to better explain the existing subpart K regulations and some common misunderstandings about them.

Many academic institutions indicated that they are not able to opt into subpart K because they are in states that have not adopted subpart K. Since subpart K was finalized in 2008, EPA has made an effort to track which states have adopted the rule. At this point, subpart K is effective in approximately 22 states.[92] Additional states have told EPA they are in the process of adoption. Some of the states that have not adopted subpart K have told EPA it is because the colleges and universities in their state have not expressed an interest in opting into the rule, so they didn't see the need to go through the process of adopting and becoming authorized for this regulation. Few, if any, states have expressed an outright opposition to adopting subpart K. EPA strongly encourages the states that have not adopted subpart K to do so; however, we do not have the authority to mandate or compel them to adopt this rule, as it was not deemed more stringent than the standard generator regulations.

Another common theme from the commenters was that subpart K, which was designed for laboratory operations, should apply across the academic institution, and not just to laboratories. Commenters argue that opting into subpart K obligates the institution to operate under more than one set of RCRA regulations at the same institution. However, EPA maintains that academic institutions most likely have been operating under more than one set of RCRA regulations for some time, including used oil regulations for the maintenance of their motor vehicle fleets, and universal waste for their fluorescent bulbs. Furthermore, EPA's engagement with academia over the past 25 years has always been limited to the management of hazardous waste from laboratories. This includes the Laboratories eXcellence and Leadership program (XL Project), as well as the pilot project led by the Howard Hughes Medical Institute (HHMI) to develop and implement a performance-based approach to the management of laboratory waste at ten colleges and universities. These efforts regarding hazardous waste were targeted at laboratories because of the way in which hazardous wastes are generated in laboratories: There are a large number of waste streams that vary over time and the wastes are often generated by students, who lack the training and accountability of a professional

[92] *http://www.epa.gov/hwgenerators/where-managing-hazardous-waste-academic-laboratories-rule-effect.*

workforce. For that reason, at no point in developing subpart K did EPA ever indicate it was considering a hazardous waste regulation that would apply to the entire academic institution.

Finally, in its comments, the Campus Safety Health and Environmental Management Association (CSHEMA) offered to lead a dialogue with EPA about how to make subpart K more useful to the academic sector.[93] EPA spent considerable time and resources addressing the needs of the academic community when it developed subpart K. EPA believes that before we enter into additional dialogue on this regulation, more states need to adopt it and more colleges and universities need to opt into it so that data on the rule and its effects are available.

*Effect of the Reorganization:* This section is not affected by the reorganization.

*P. Deletion of Performance Track and Project XL Regulations*

EPA launched the National Environmental Performance Track in 2000 to provide regulatory and administrative benefits to Performance Track members. Performance Track was a public-private partnership that encouraged continuous environmental improvement through use of environmental management systems, community outreach, and measurable results. In order to provide regulatory benefits to members, EPA made changes to the RCRA hazardous waste regulations, among others, that specifically referenced members of Performance Track.

EPA terminated the Performance Track program in 2009. Therefore, EPA is removing obsolete references to Performance Track in the RCRA hazardous waste regulations as a part of this rulemaking. In some cases, a whole paragraph of regulation will be removed and in other instances we will remove just the part of the paragraph that references Performance Track. The deleted paragraphs will be reserved to reduce the possibility of confusion by replacing them with other regulations. The following references are being removed:

- § 260.10: definition of Performance Track member facility;
- § 262.34(j), (k), and (l): regulations for accumulation of hazardous waste by LQGs in Performance Track;
- § 262.211(c): two parenthetical references to § 262.34 (j) and (k) in the regulations for academic labs in subpart K of part 262;
- §§ 264.15(b)(4) and 265.15(b)(4): references to the requirements for inspection of areas of the facility subject to spills in §§ 264.15(b)(5) and 265.15(b)(5), respectively;
- §§ 264.15(b)(5) and 265.15(b)(5): requirements for Performance Track member facilities that reduce inspection frequency for areas subject to spills;
- §§ 264.174 and 265.174: references to Performance Track requirements for inspections of areas where containers are stored;
- §§ 264.195(e), 265.195(d), and 265.201(e): requirements for Performance Track member facilities for inspections of tank systems;
- §§ 264.1101(c)(4) and 265.1101(c)(4): requirements for Performance Track member facilities for reduced inspections of containment buildings;
- § 270.42(l): procedures for permit modifications for Performance Track member facilities; and
- Appendix 1 to § 270.42—Classification of Permit Modification, Section O.1: Indication that a permit modification for reduced inspections for a Performance Track member facility is a Class 1 permit modification.

These provisions were added to the regulations in the National Environmental Performance Track Program final rule, dated April 22, 2004 (69 FR 21737), the Resource Conservation and Recovery Act Burden Reduction Initiative final rule, dated April 4, 2006 (71 FR 16862), and the Academic Laboratories final rule, dated December 1, 2008 (73 FR 72912).

EPA is also removing references to Project XL programs that have been discontinued. These include the New York State Public Utilities Project XL program at subpart I of 40 CFR part 262 and the Laboratories Project XL program at subpart J of 40 CFR part 262. The New York State Public Utilities Project XL piloted a program to allow public utilities located in New York State to consolidate at central collection facilities hazardous wastes generated at remote locations. The Laboratory XL Project was created for Boston College, the University of Massachusetts, and the University of Vermont, and was finalized in the **Federal Register** on September 28, 1999 (64 FR 53292). The Laboratories Project XL piloted an alternate hazardous waste management system for college and university laboratories. Originally, the program was to expire on September 30, 2003. On June 21, 2006, EPA extended the program to April 15, 2009 (71 FR 35550). Now that the program has now expired, EPA is removing paragraph (j) from § 262.10, as well as part 262 subpart J. We have also removed and reserved the reference at § 262.10(j) to the University Laboratories Project XL.

*Effect of the Reorganization:* This section is not affected by the reorganization.

## X. Addition to 40 CFR Part 262 for Generators That Temporarily Change Generator Category as a Result of an Episodic Event

*A. Introduction*

EPA is finalizing the revisions to the generator regulations that allow a VSQG or an SQG to maintain its existing generator category if, as a result of a planned or unplanned episodic event, the generator would generate a quantity of hazardous waste in a calendar month sufficient to cause the facility to move into a more stringent generator category (*i.e.,* VSQG to either an SQG or an LQG; or an SQG to an LQG). This revision allows a VSQG or an SQG to generate additional quantities of hazardous waste—exceeding its normal generator category limits temporarily—and still maintain its existing generator category, provided it complies with the specified conditions. Because these events are considered to be temporary and episodic in nature, the hazardous waste generator may only use this provision once every calendar year, unless there is a second event for which the generator receives approval from EPA to manage as an additional episodic event.[94]

Under the RCRA regulatory framework for hazardous waste generators, a generator's category is determined by the quantity of hazardous waste it generates in a calendar month. As described in the proposed rulemaking at 80 FR 57972, at issue is when the generator generates an additional quantity of hazardous waste in a calendar month as a result of an episodic event—planned or unplanned—only to revert back to its normal waste generation quantities in the following month. For example, one such event would be if a VSQG plans a short-term demolition project that generates an additional 500 kilograms of hazardous waste in the calendar month, resulting in the VSQG becoming an SQG for that calendar month. However, once the demolition project has been completed, the generator's waste generation drops such that it again qualifies as a VSQG. Other examples of planned episodic events include tank cleanouts, short-term construction projects, short-term site remediation,

[93] EPA–HQ–RCRA–2012–0121–0158.

[94] Note that when a state begins implementing this provision as part of its authorized RCRA program, all petitions and approvals are managed by the authorized state rather than EPA.

equipment maintenance during plant shutdowns, and removal of excess chemical inventories. Unplanned episodic events, which EPA expects would be less frequent, include production process upsets, product recalls, accidental spills, or "acts of nature," such as a tornado, hurricane, or flood.

EPA has determined that requiring a VSQG to comply with the additional SQG or LQG regulations or an SQG to comply with the LQG regulations for the month its hazardous waste exceeded the quantity limits based on an episodic event (planned or unplanned) is unnecessary to protect human health and the environment. Instead, the Agency is finalizing the more practical approach laid out in the proposed rule to ease compliance for episodic generators and still protect human health and the environment, with some minor changes. By complying with the specified conditions, the generator would be able to maintain its current generator category and would not be required to comply with the more stringent site-wide regulations applicable to the higher generator category. EPA currently estimates that approximately 1,270 to 2,540 generators may take advantage of this provision once it is adopted by the authorized states.[95]

### *B. What is EPA finalizing?*

Under the final rule, a VSQG or an SQG generating an increased quantity of hazardous waste because of an episodic event that results in a temporary change in a generator's category would be able to maintain its existing generator category, provided specified conditions are met. EPA has determined that these conditions will be sufficient to ensure these additional hazardous wastes are managed in an environmentally sound manner. Like the general framework of the regulations for generators, should a VSQG fail to meet the specified conditions, it loses the VSQG exemption and becomes the operator of a non-exempt storage facility unless it also immediately complies with all of the conditions for exemption for an SQG or LQG. If an SQG fails to meet any specified condition for exemption, it loses its exemption and becomes the operator of a non-exempt storage facility unless it immediately complies with all of the conditions for an exemption for an LQG.

For both VSQGs and SQGs taking advantage of this provision, the following conditions must be met: (1) Episodic events are limited to one per calendar year; (2) the generator must notify EPA at least 30 calendar days prior to initiating a planned episodic event or within 72 hours after an unplanned episodic event; the generator must identify the start and end dates of the episodic event, which may be no more than 60 days apart, as well as other information about the event; and identify a facility contact and/or emergency coordinator with 24-hour telephone access to discuss notification submittal or respond to an emergency related to the episodic event; (3) the generator must obtain an EPA ID number (VSQGs); (4) the generator must comply with specified hazardous waste management conditions as the waste is accumulated on site; (5) the generator must use a hazardous waste manifest and hazardous waste transporter to ship the waste generated by the episodic event to a RCRA-designated facility within 60 calendar days from the start of the episodic event; and (6) the generator must complete and maintain specified records.

EPA is also finalizing a petition process at § 262.233 to allow hazardous waste generators to request from EPA one additional episodic event within the same calendar year to cover the possibility that a generator could face an unplanned episodic event in the same year it is conducting a planned event. The regulations for episodic generators are found in a new part 262 subpart L, §§ 262.230–262.233.

#### 1. Number of Episodic Events per Calendar Year

Under the episodic generator provisions in subpart L, a VSQG or an SQG may exceed its generator category limits only once per calendar year without affecting its generator category, with the opportunity to petition EPA for a second event. EPA has several reasons for this restriction. First, if a VSQG or SQG exceeds its generator category limits more frequently than once per calendar year, EPA is concerned that these generators are more likely to be routinely generating greater amounts of hazardous waste and thus it is more appropriate for the generator to comply with the regulations applicable to the higher generator category, at least for the months they exceed the quantity limits for their generator category.

Second, EPA believes most hazardous waste generators experience an episodic event infrequently, such as once every few years, and these events are typically planned maintenance projects. Third, the Agency is not limiting an episodic event to a single project within the generator's facility. In fact, a generator could start and complete multiple projects (*e.g.*, a small demolition project, a tank cleanout, and removal of excess chemicals) at different dates within the 60-day time limit, so long as all projects are completed within the 60-day start and end dates identified on the notification form. Under that scenario, all hazardous waste generated would be considered part of the same episodic event.

#### 2. Notification

A VSQG or an SQG must notify EPA no later than 30 days prior to initiating a planned episodic event using EPA Form 8700–12 (Site ID form). Subsequent to the publication of this final rule, EPA will be revising form 8700–12 to account for the new rule provisions, but in the meantime, we will issue guidance on how to use the form in its current state to make this notification. The hazardous waste generator must identify the dates the episodic event will begin and end—a time frame not to exceed 60 calendar days—as well as describe the reason for the event and the types and estimated quantities of hazardous wastes that would be generated during the event.

For a generator's first event in a calendar year, the episodic event begins on the date identified on its form 8700–12. The date identified on the notification form as the start date for the episodic event is assumed to be the date of the release or the date the generator initiates physical action in generating and accumulating the hazardous waste. Whether such action actually occurs on that date or after by the generator will have no impact in changing the end date of the episodic event identified on the notification form. The end date must be no later than 60 calendar days from the date identified on the notification form as the start date of the episodic event.

If the generator does not know the exact day the event will end at the time of notification, it can notify using an end date that is 60 calendar days from the start of the event as long as it ensures that all hazardous waste from the episodic event is shipped off site by that date.

Should an unplanned event occur, the generator must notify EPA within 72 hours via phone or email, and subsequently submit EPA Form 8700–12 (Site ID form) with the same information laid out above for a planned event. In the case of spills of hazardous materials, a 72-hour time frame for reporting the spill to the authorities is common and allows the facility some time to evaluate

[95] See the docket for the Regulatory Impact Assessment of the Potential costs, Benefits, and Other Impacts of the Final Hazardous Waste Generator Improvements Rule.

the situation before requesting the episodic event. A facility would have to wait for EPA to respond to the petition for a second event, but this should not impact the initial steps that the generator has to take to appropriately manage the hazardous waste since those standards still apply.

3. EPA ID Number

A VSQG generating and accumulating quantities of hazardous waste using the episodic event provisions to manage hazardous waste must obtain an EPA ID number using EPA Form 8700–12 if one has not previously been assigned. A generator cannot initiate a hazardous waste shipment to a RCRA-designated facility without an EPA ID number. (SQGs are already required to obtain an EPA ID number.)

4. Waste Management Standards

a. *Accumulation standards for VSQGs.* Under the standard generator regulations, a VSQG must not accumulate more than 1,000 kilograms of non-acute hazardous waste at any one time, but otherwise does not have any on-site waste management standards when accumulating hazardous waste, primarily because the quantities generated every month are so small. However, EPA is finalizing that a VSQG generating episodic hazardous waste that would otherwise cause the VSQG to exceed its generator category limit for the calendar month must comply with the following accumulation standards for containers and tanks that manage the episodic wastes. EPA believes these standards are necessary because the quantity of hazardous waste that is accumulated during this episodic period requires standards for safe management in order to adequately protect human health and the environment.

When accumulating hazardous waste in containers, the VSQG would be required to mark or label its containers with the following: (1) The words "Episodic Hazardous Waste" and (2) an indication of the hazards of the contents of the container—examples of hazards include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic). In the case of hazardous wastes ultimately treated and disposed of off site, the generator could use hazard communication consistent with the DOT requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding), use a hazard statement or pictogram consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200, or use a chemical hazard label consistent with the NFPA code 704. These marking standards are the same as those for LQGs and SQGs accumulating hazardous wastes in containers in the course of normal business operations and are necessary to protect human health and the environment. In addition to these, the VSQG must mark the date that the episodic event began clearly on each container.

For tanks, the VSQG must mark or label the tank containing hazardous waste accumulated during the event with the words "Episodic Hazardous Waste" and would be required to use inventory logs, monitoring equipment, or other records to identify the associated hazards and to identify the date that the episodic event began. The records containing this information must be on site and available for inspection.

In addition, the generator must manage the hazardous waste in a manner that minimizes the possibility of an accident or release. Management standards are critical to ensure the hazardous waste does not pose a risk to human health and the environment. A VSQG may use best management practices to comply with this condition. In practice, this includes managing the hazardous waste in containers that are in good condition and chemically compatible with any hazardous waste accumulated therein and keeping the containers closed except to add or remove waste. Complying with the standards in part 265 subpart I would satisfy this condition.

If a VSQG is managing episodic hazardous waste in tanks, the following standards must be followed: (1) Having procedures in place to prevent overflow (*e.g.,* the tank is equipped with a means to stop inflow with a system such as a waste feed cutoff system or bypass system to a standby tank when hazardous waste is continuously fed into the tank); (2) inspecting the tank(s) at least once each operating day during the episodic event to ensure all applicable discharge control equipment, such as waste feed cutoff systems, bypass systems, and drainage systems, are in good working order and (3) using appropriate controls and practices to prevent spills and overflows from tank or secondary containment systems including, at a minimum, spill prevention controls (*e.g.,* check valves, dry disconnect couplings); overfill prevention controls (*e.g.,* level sensing devices, high level alarms, automatic feed cutoff, or bypass to a standby tank); and maintenance of sufficient freeboard in uncovered tanks to prevent overtopping by wave or wind action or by precipitation. For tank management, such practices are necessary to prevent the release of the hazardous waste or hazardous constituents to air, soil, or water, which could threaten human health and the environment.

As mentioned already, an emergency coordinator (in compliance with § 262.16(b)(9)(i)) must be identified for the duration of the episodic event on the notification form. An emergency coordinator is needed because the VSQG will be generating greater amounts of hazardous waste than normal and, should an accident occur, the emergency coordinator would need to be prepared to handle the situation.

Under the management standards for VSQGs, the generator may not treat hazardous waste generated on site, except in an on-site elementary neutralization unit.[96] After considering the comments on treatment by VSQGs managing hazardous waste under an episodic event, EPA has determined that the same standards should apply and VSQGs may not treat hazardous waste on site under an episodic event. Although VSQGs must meet some additional waste management requirements for an episodic event, the provisions allowing treatment by SQGs and LQGs in containers and tanks were based on those containers meeting the more extensive standards that containers and tanks at TSDFs must meet in subparts I and J of parts 264 and 265.[97] These same standards still apply to SQGs and LQGs, though they have been copied into part 262 as a part of the reorganization in this final rule. However, under the episodic generation provisions, VSQGs holding an episodic event do not have to meet these same standards for waste management—they must meet a performance standard instead. EPA believes that the performance standard is appropriate for accumulating that waste on site for 60 days or less until it is sent off site for treatment or disposal, but is not appropriate for treatment on site by the VSQG. Several commenters argued that VSQGs are sophisticated facilities with the capability to safely treat, but EPA must design the regulations to be protective and not based solely on the

[96] Elementary neutralization units, as defined in § 260.10, are exempt from RCRA treatment, storage, and disposal standards and permitting requirements. The elementary neutralization unit exclusion does not preclude a VSQG from treating waste in the exempt unit as long as the generator meets the criteria outlined in §§ 264.1(g)(6), 265.1(c)(10), and 270.1(c)(2)(v). Specifically, the elementary neutralization unit must meet the definition of a container, tank, tank system, transport vehicle, or vessel, and must be used for neutralizing wastes that are hazardous only because of the corrosivity characteristic. RCRA Hotline Q & A, February 1996, RCRA Online 13778.

[97] 51 FR 10168, March 24, 1986.

most sophisticated actors. If a sophisticated VSQG wants to perform generator treatment, it can choose to operate as an SQG and meet the standards that apply to that category.

b. *Manifest use by VSQGs and management at a RCRA-designated facility.* When holding an episodic event and operating under the provisions of subpart L, VSQGs must manifest the hazardous waste generated from the episodic event and send it to a RCRA-designated facility. Generally, VSQGs are not required to manifest their hazardous waste to a RCRA-designated facility, but can ship them without a manifest to one of eight types of facilities listed in § 262.14(a)(5). However, because the VSQG will be generating quantities of hazardous waste that exceed its normal generator category thresholds, the Agency has determined that the use of a hazardous waste manifest and the shipment of the hazardous waste to a RCRA-designated facility is most protective of human health and the environment.

However, the condition to manifest the hazardous waste and send it off site to a RCRA-designated facility only applies to the hazardous waste generated as a result of the episodic event. The condition does not apply to other hazardous waste generated at the same time as, but separately from, the episodic event. However, if the VSQG desires to ship all hazardous waste generated and accumulated on site to a RCRA-designated facility at once, for economic or logistical reasons, then it can be sent off site together. This applies whether the hazardous waste was generated as a result of the episodic event, independent of the episodic event, or prior to the event.

c. *Accumulation standards for SQGs.* For containers and tanks, EPA is finalizing accumulation standards as conditions for managing waste under the episodic generation provisions. When accumulating hazardous waste generated as a result of an episodic event in containers, the SQG must mark its containers with the following: (1) The words "Episodic Hazardous Waste"; (2) an indication of the hazards of the contents of the container—examples of hazards include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic), hazard communication consistent with the DOT requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding), a hazard statement or pictogram consistent with the OSHA Hazard Communication Standard at 29 CFR 1910.1200, or a chemical hazard label consistent with the NFPA code 704. These standards are the same as those for SQGs accumulating hazardous wastes in containers in the course of normal business operations and are necessary to protect human health and the environment. In addition to these standards, the SQG is required to mark the date that the episodic event began clearly on each container.

For tanks, the SQG must mark or label the tank containing hazardous waste accumulated during the event with the words "Episodic Hazardous Waste" and is required to use inventory logs, monitoring equipment, or other records to identify the hazards of the contents and to identify the date that the episodic event began and ended. The generator must have records containing this information on site and available for inspection.

EPA is also finalizing its proposal that SQGs may not take advantage of the episodic generation provision for wastes accumulated on drip pads or in containment buildings. EPA has determined that it is most appropriate that hazardous waste that is being accumulated and managed on drip pads and in containment buildings be managed under the specific requirements in part 265 subpart W and subpart DD for those units. If a generator experiences an episodic event in an area of the facility that is separate from its accumulation in these units, it can use subpart L for those hazardous wastes.

In addition, the SQG must comply with all the conditions of the exemption in § 262.16—for example, the waste accumulation, waste management, employee training, and emergency preparedness and prevention conditions.

d. *Manifest use by SQGs.* SQGs must manifest the hazardous waste generated from an episodic event and send it to a RCRA-designated facility, unless the waste is managed on site. The Agency has determined that the use of a hazardous waste manifest and shipment of the hazardous waste to a RCRA-designated facility is necessary to protect human health and the environment. Note that, unlike VSQGs, the use of the hazardous waste manifest applies not only to the wastes generated from the episodic event, but to all other hazardous wastes the SQG generates.

5. Duration of the Episodic Event

VSQGs and SQGs have 60 calendar days to initiate and complete an episodic event, which includes generation, accumulation, and management (*e.g.*, recycling, treatment and disposal—either on site, such as waste neutralization in a container, or off site at a RCRA-designated facility) of all hazardous waste resulting from the episodic event. After considering the comments on the proposal to allow 45 days, the Agency has determined 60 days is a more appropriate time limit and is sufficient time for a generator to complete the episodic event, arrange for treatment or disposal, and complete management of the hazardous waste.

In the case of planned events, EPA believes that in most cases, hazardous waste is likely to be characterized before the event begins and any contracts required for waste removal and disposal can also be arranged before the event. However, in the case of an unplanned event, waste may have to be characterized and contracts for disposal bid and negotiated. In order to maintain a parallel structure for planned and unplanned episodic events, EPA is finalizing a 60-day time frame. In the case of a planned event, the 60 days start on the first day of any activities affiliated with the event and in the case of a storm or spill, the 60 days start on the day of the storm. All hazardous waste generated from the episodic event must be removed, transported by hazardous waste transporter with a hazardous waste manifest, and sent to a RCRA-designated facility by the end date of the event, no more than 60 days from its start. In addition, the Agency sees no reason to preclude a generator from taking advantage of this provision to also dispose of other hazardous wastes generated during the time of the episodic event.

EPA has determined that events requiring more than 60 days to complete are not episodic generation of hazardous waste and the generator should be operating in a higher generator category to accumulate and manage that hazardous waste.

As a result of this longer time frame, EPA is not finalizing the proposed provision regarding a petition for an extension to an episodic event.

6. Recordkeeping

Generators must keep the following information in their records: (1) Beginning and end dates of the episodic event; (2) a description of the episodic event; (3) a description of the types and quantities of hazardous wastes generated during the episodic event; (4) a description of how the hazardous waste was managed, as well as the name of the RCRA-designated facility that received the hazardous waste; (5) name(s) of hazardous waste transporters, as appropriate; and (6) an approval letter from EPA, if the generator successfully petitioned to conduct an additional episodic event during the calendar year.

The information required to be maintained in items (1) through (3) above is the same information that must be identified on the generator's notification to EPA about the episodic event. Maintaining records of the name of the RCRA-designated facility that received the waste and the ultimate management of that waste as well as the name of any hazardous waste transporters fulfills the RCRA requirement for the generator to be responsible for its hazardous waste from cradle to grave. In addition, a record of any approval letters from EPA for a second event are critical for generators to be able to show that they were in compliance with subpart L when conducting that second episodic event.

These records must be maintained on site by the generator for three years from the completion date of each episodic event. The recordkeeping condition is critical to enable effective and credible oversight. We also have determined that the required items represent the minimum information necessary to determine that any hazardous waste generated during the episodic event is managed properly.

7. Petition To Request One Additional Episodic Event

While the Agency believes that most generators will experience an episodic event infrequently, we also recognize that there may be situations, often unexpected, where a hazardous waste generator may have more than one episodic event within a calendar year, such as an unexpected product recall, a major spill, or an act of nature. Therefore, the Agency is finalizing a provision to allow VSQGs and SQGs to petition EPA for permission to manage one additional planned or unplanned episodic event per year without impacting the hazardous waste generator category (provided that they do not have two of the same type of event within the same calendar year).

EPA proposed that VSQGs and SQGs could petition EPA for permission regarding an additional episodic event per year, either planned or unplanned. However, in response to some of the comments received on the proposed rule from the states that implement the RCRA program, EPA has determined that it is most appropriate to allow only one event of each type per year and to require the generator to petition EPA for the second event and be approved. That is, if a generator holds a planned event early in the year, it can petition the EPA Regional Administrator for an unplanned event later in the year if needed.[98]

In parallel fashion, if the generator has an unplanned event early in the year, it can still petition EPA to hold a planned event later in the year. In both cases, EPA must approve the petition for a second event. EPA wants to allow for the case of a second event, in cases where the generator is legitimately having episodic events, but has determined that not allowing a generator to hold two planned events in a year ensures that the provision is being used for true cases of episodic generation and not as a way for generators to regularly avoid managing hazardous waste at higher generator categories. Similarly, EPA has determined that not allowing the generator to hold two unplanned events in one year will ensure that the episodic generation provision is not used in a way that creates an incentive for irresponsible management of hazardous waste.

Because a petition for a second event distinguishes between an unplanned event and a planned event, EPA is adding definitions of planned episodic event and unplanned episodic event to the regulations in subpart L. A planned episodic event is an episodic event that the generator planned and prepared for, including regular maintenance, tank cleanouts, short-term projects, and removal of excess chemical inventory. An unplanned episodic event is an episodic event that the generator did not plan nor expect to occur, including, but not limited to, production process upsets, product recalls, accidental spills, or "acts of nature," such as a tornado, hurricane, or flood. Some of these events are more sudden than others, but they would all be unanticipated by the generator. EPA is not including excess inventory in the definition of an unplanned event because a case of excess inventory is, more than the others, a result of decisions made by the generator in the regular course of business and is not, therefore, an unplanned episodic event.

Consistent with the notification requirements, the generator must petition EPA for the second event. For a planned event, the generator must submit a petition for a second event and indicate that this is a petition for a second event. For an unplanned event, the petition must be in the form of a notification to EPA within 72 hours of the start of the event by phone, email, or fax and subsequent submittal of a complete petition with the relevant information for the event.

The petition must include (1) the reason why an additional episodic event is needed and the nature of the episodic event; (2) the estimated amount of hazardous waste to be managed from the event; (3) how the hazardous waste is to be managed; (4) the estimated length of time needed to complete management of the hazardous waste generated from the episodic event—not to exceed 60 days; and (5) information regarding previous episodic event(s) managed by the generator and how it complied with the conditions. EPA would then evaluate this and other site-specific information to determine whether a generator should be allowed to complete the episodic event under the alternative standards.

In the case of a planned second episodic event, a generator may not manage the hazardous waste from the event under the episodic generation conditions in subpart L until it has approval from the implementing agency for that second event. There is no mandatory time frame for submitting a petition for a second planned event, but the generator should allow enough time for the implementing agency to review the petition so that they can begin the event on time.

EPA has determined that in the case of a petition for an unplanned second event, the generator may manage hazardous waste for the additional unplanned episodic event under the episodic event standards until written approval by EPA has been received. SQGs requesting a second event will be managing the hazardous waste under the same technical standards in § 262.16 in both situations. It would be impractical for a VSQG requesting a second episodic event to meet § 262.16 accumulation standards while waiting for approval to no longer have to meet them. Therefore, the VSQGs would be required to meet the performance standards outlined in § 262.232(a)(4)(iii). These subpart L accumulation standards for VSQGs are designed to minimize the possibility of a fire, explosion, or release and containers and tanks must be in good condition and compatible with the hazardous waste they contain.

If EPA approves the petition for a second event, the generator must retain the written approval in its records for three years from the date the episodic event ended. If EPA rejects a generator's petition for a second event, the generator must then start managing the hazardous waste from the episodic event and all other hazardous waste at its facility under the standards for the

[98] Authorized states will develop their own procedures for petitions under this provision.

applicable more stringent generator category.

EPA is not promulgating criteria for evaluating petitions for a second unplanned episodic event, but recommends that the implementing agency base its decision on factors including the validity of the proposed episodic event, the generator's enforcement history and evidence of the generator's ability to responsibly manage the waste.

8. Tracking and Accounting for Hazardous Waste Generation and Accumulation as a Result of an Episodic Event Along With Normal Production Operations

In practice, a VSQG or SQG taking advantage of this rule must track and monitor the start and end dates of the episodic event in conjunction with the date the calendar month ends to ensure compliance with all RCRA regulatory provisions associated with hazardous waste generation and management.

The following example demonstrates how this provision of the rule will work. A VSQG could have a number of facility operations (*e.g.*, tank cleanouts, disposal of off-spec products it cannot sell or reclaim, and/or repair work involving the removal of lead paint chips) that would result in a temporary change in its regulatory category. The VSQG decides to notify EPA two months prior (as well as identifying a point of contact and emergency coordinator) that it will initiate the planned episodic event on July 20 and take advantage of the full 60 days allowed to conduct the event and, therefore, end on September 17. Beginning on July 20, the generator must comply with all of the conditions of subpart L to maintain its exemption as a VSQG. Under this example, if the generator complies with subpart L, it can generate more than 1,000 kilograms of hazardous waste as a result of the events it identified in the identification until September 17.

On or before September 17, the generator must remove and dispose of all the hazardous wastes it generated over the course of the previous 60 days from the episodic event. Provided the generator meets that deadline, that waste does not count when determining the generator's category.

In this example, the generator could choose to also dispose of waste generated from its normal operations in the same shipment. However, in this case, any waste generated from production or events that were not identified in the notification to EPA about the episodic event (or in the petition for a second event) must be counted for the purposes of determining the generator's category for any months impacted by the episodic event. Specifically as an example, the quantity of hazardous waste the VSQG generates outside the episodic event from September 1 through September 17 would be added the amount of hazardous waste generated for the remainder of September (starting on September 18 until the end of the month) to determine the generator's category for that month.

The same approach applies to the accumulation limit for hazardous waste at a VSQG. If the VSQG exceeds 1,000 kg of hazardous waste on site as a part of its episodic event, that waste can be managed under the provisions of subpart L until September 17. If, however, the hazardous waste has not been shipped off site by September 18, the generator must manage the waste as LQG waste. In addition, the generator would be in violation of the conditions of the episodic generation provision.

In summary, if a generator's waste is to be considered part of the episodic event and not be counted toward monthly generator category, then the waste must be part of the episodic event identified in the generator's notification. EPA has determined that this will prevent generators from using the time frame of an episodic event as a free-for-all for generation of all types of waste, regardless of whether it is identified in the notification of the event. EPA has revised this interpretation of how the episodic generation provision will work from the preamble discussion in the proposed rule in reaction to concerns from commenters that the episodic generation provision would provide excessive relief from the hazardous waste regulations for generators.

*C. What changed since proposal?*

EPA is finalizing the episodic generation provisions in subpart L mostly as they were proposed on September 25, 2015, but with several important revisions: (1) Lengthening the time allowed for an episodic event from 45 days to 60 days and removing the option for a petition to extend an event; (2) revising the situations in which a generator can petition for a second event to ensure that a generator holds no more than one planned and one unplanned episodic event in a calendar year; (3) revising the notification requirements for unplanned events to allow 72 hours for notification; and (4) revising the labeling requirements to remain parallel with the labeling requirements for all generators being revised in the final rule (see section IX.E for more details on marking and labeling revisions).

1. Allowing 60 Days To Complete an Episodic Event

Most of the comments EPA received on the episodic generation provision in the proposal revolved around how long each episodic event could be and the number of events allowed per year. EPA's goal is to find a balance between a time frame that would be useful and workable for industry and not making episodic generation a loophole for generators to use to circumvent the regulations by holding episodic events over a large part of the year. The first part of achieving this balance is determining how long an event should be.

EPA proposed a 45-day limit for an episodic event with an option to petition for a 30-day extension, for a potential total of 75 days. EPA proposed 45 days because it believed that 45 days allowed enough time for an event to be initiated and completed and for the waste to be removed. The petition option was meant to account for any unexpected problems that the generator might have with transporting the waste off site. EPA did not want to extend the episodic event for so long that it might represent a large portion of the year. EPA determined that if the episodic event provision were too expansive, it would be more likely to allow generators that are more permanently generating in a higher category to try to use the provision as a way to avoid those requirements.

However, many commenters on this aspect of the provision argued that the 45-day limit was too restrictive and one stated that the limit "undermines the benefits to operators of the episodic event rule."[99] However, it should be noted that there was also some support for the 45-day time frame in the comments, as well as at least one commenter who argued that 45 days is too long for an episodic event because most truly episodic events are very short-term spikes.[100]

One of the main reasons that commenters argued that 45 days is too restrictive a time period for episodic events was the time needed for waste disposal contracts to be competitively bid and the time needed for generators to classify waste and prepare and schedule shipments. Other commenters also pointed out that events themselves may take place over several weeks and that some remote facilities may have special circumstances that require longer time frames to resolve. Other

[99] Alyeska Pipeline Service, EPA–HQ–RCRA–2012–0121–0088

[100] Minnesota Pollution Control Agency, EPA–HQ–RCRA–2012–0121–0232

commenters argued that some events may be special projects or demolition or remediation projects that would take longer than 45 days.

Many commenters suggested a 90-day time frame, to match up with the requirements for large quantity generators, and some suggested a 60-day time frame. Other commenters suggested time frames as long as 180 days.

EPA was persuaded by the commenters who stated that a longer time frame was appropriate for an episodic event, particularly because of the arguments surrounding the planning needed to remove waste from the generator site in the case of an unplanned event. For planned events, it should be a matter of course for the generator to have characterized waste as hazardous or not and made arrangements for shipment off site in advance. However, in the case of an unplanned event, the generator might not know if the material that must be disposed qualifies as a hazardous waste and may not have a waste hauler available for a pick up. If the generator has to competitively bid for the service, as some of the commenters on the rule argued that they must, the process of getting the waste off site will take longer.

However, EPA was not persuaded by the commenters who argued that some events themselves will take longer than the time allowed, such as long-term demolition or remediation projects. Rather, these bigger long-term projects do not appear to be the kind of event that EPA would consider an "episodic" event and warrant the facility shifting into the larger waste category for the duration of the increased waste generation to properly manage the site and the hazardous waste itself.

Therefore, EPA is finalizing a longer time frame than proposed to account for some of the challenges in managing waste from an unplanned episodic event. EPA has determined that 60 days is an effective balance between allowing time for the generators to use the provision without making the time frame so long that it becomes something generators can abuse. A 90-day time frame, suggested by many of the commenters, struck EPA as being excessively long, as it would mean that a generator could consider the waste being generated during a full quarter of the year as waste from an episodic event. Shortening the event time and allowing a full 90 days of accumulation time also went counter to the Agency's goal of encouraging these generators that are generating above their normal category to arrange for the shipment of the waste to a RCRA-designated facility as soon as possible.

As part of our decision to lengthen the time frame for an episodic event, EPA also determined that a petition for a 30-day extension to an episodic event is no longer necessary. The longer time frame of 60 days should mean that extensions are not necessary in many cases. In addition, EPA received comments from the authorized states that they are concerned about the potential volume of petitions they might receive from the proposed episodic generation provisions and eliminating the option to petition for an extension is responsive to their concerns about the effect of the new provision on their resources. Accordingly, if a generator operating under the episodic generator conditions finds itself at the end of the 60-day time period and is unable to remove the waste from its site before the deadline, its generator category will change to SQG or LQG once the deadline has passed and the hazardous waste must be managed under the appropriate generator standards.

2. Petition for a Second Event

EPA proposed that a generator could petition EPA for a second episodic event, planned or unplanned. The proposal was based on the idea that in some cases a generator may want to hold a second event, but EPA did not want to simply allow two episodic events per year for all generators without a petition because of the potential abuse of the provision by generators that are not truly generating higher volumes of waste episodically, but should be operating in the larger generator category. EPA also wanted the petition to operate as a check that an implementing agency could use if it thought that a generator might be abusing the provisions.

The comments EPA received on this aspect of the proposal argued for a wide variety of options. Some commenters suggested that two events per year should be allowed, some suggested allowing a petition for a third, and one commenter supported allowing up to three episodic events in a year provided the generator has a standing agreement with a facility to accept the waste. However, several of the states supported limiting the episodic generation provision to one event per calendar year with no possibility for a second event while others argued that the proposed one event and a petition was appropriate. One state also suggested that the implementing agency should examine the causes of each event at each generator and determine if the episodic event could be held.

After considering the comments, EPA has determined that it is appropriate to allow a facility to petition for a second event in a calendar year, but only if the generator is only holding one planned and one unplanned event in that calendar year. For instance, if the generator has already held a planned episodic event in a year, a planned second 60-day event in the course of the year could indicate that the generator should be operating at a higher generator category. However, a generator that is truly a VSQG or SQG could have an occasion where it has performed a clean out or system shut down already during the year and then an act of nature or other truly unplanned event occurs. EPA would not expect this to be a regular occurrence for generators and will depend on the implementing agencies operating the RCRA programs to take note and act accordingly if a generator is regularly requesting a second episodic event.

At the same time, a generator may be planning to conduct an episodic event such as a tank clean out or maintenance project late in the year when it gets struck with a hurricane that can be managed as an unplanned episodic event for hazardous waste. In this case, the generator can hold an episodic event to respond to the storm and then petition EPA for a second event for the cleanout, while explaining that it needs the second event because of the occurrence of the storm earlier in the year.

EPA also believes that limiting the type of event that a generator can petition for will reduce the numbers of petitions submitted as a part of this provision, which is responsive to some of the comments received by states concerned about increased workload.

3. Notification

EPA proposed notification requirements for episodic events to ensure that the authorized state or EPA is informed of when a generator is holding an event that would otherwise cause that generator to be operating in a higher generator category. The proposed requirement was that in the case of a planned event, the generator must notify EPA no later than 30 days before the event begins. For notification in the case of an unplanned event, EPA proposed that the generator notify within 24 hours or as soon as possible by phone or email and then follow up with a full notification using EPA Form 8700–12 (the Site ID form).

Many of the comments on the notification provision singled out the notification for an unplanned episodic event as difficult to meet. Most of these

Federal Register / Vol. 81, No. 228 / Monday, November 28, 2016 / Rules and Regulations 85789

commenters stated that 24 hours is an insufficient time frame and did not mention EPA's addition of the phrase "or as soon as possible" in the proposal. Commenters noted that in the case of an unplanned event, the generator may not know if the waste is hazardous or if there is enough hazardous waste to make an episodic event necessary. Commenters suggested alternative approaches that included allowing longer time frames for notification, including 72 hours, 7 days or 30 days or simply "as soon as possible." Another suggested approach was to require notification 24 hours after a waste determination was made. EPA also heard that having a specific time frame in which the notification must be made is critical for making the requirement enforceable by the states.

EPA understands that in the case of an unplanned episodic event, a generator will have competing priorities, particularly if a spill has occurred. However, the notification requirement for the episodic generation provision is critical in maintaining the appropriate levels of oversight for the generators taking advantage of this provision. EPA determined that it would not be appropriate to base the time frame for notification on when a waste determination is made, as that would not be parallel to any other area of the generator program and would be difficult to enforce. In addition, EPA found that the suggestions for the notification time limit to be lengthened to 7 or 30 days would result in excessive delays between the start of an episodic event and notification to EPA, compromising the ability to provide adequate oversight.

EPA has determined that it is reasonable, however, to adjust the time frame for initial notification to EPA of an unplanned episodic event by phone, email, or fax within 72 hours from when the event begins. EPA believes that this adjustment provides the generator with some additional time in case there is a necessary delay in contacting EPA due to emergency conditions, but does think that a timely notification to the Agency is important in the case of unplanned events at the generator to ensure proper oversight. A 72-hour limit ensures that timely notification.

If a generator finds that it notifies of an event and then it turns out that the material in question is not hazardous waste or does not in fact top the limit for the generator's category, the generator can work with EPA by explaining that the event was not necessary after all. Under the previous regulations, that generator would have to manage the excess generated material as hazardous waste until it is determined not to be, which would have included a notification of a higher generator category, so the requirement being finalized is not an additional burden.

4. VSQGs Notifying Local Fire Department

EPA proposed that a VSQG would be required to notify its local fire department that it was taking advantage of an episodic event. The notice would need to include the start and end dates and identify the types and quantities of hazardous wastes that would be generated. EPA stated that the purpose of the notification was to inform regulatory authorities of the facility's activities in order to enable adequate compliance monitoring of the facility with the conditions of the alternative standards.

EPA did not receive support in the public comments for this proposal. The commenters stated that the notification requirement was excessive and would be an unnecessary burden to both the VSQGs and to the fire departments that would have received the notifications. Commenters on this provision included both industry stakeholders and state agencies. Therefore, EPA is not finalizing this notification requirement as part of subpart L.

5. Labeling

EPA proposed a labeling requirement as part of episodic generation that paralleled the labeling and marking being proposed throughout the generator program. The proposed requirement was for episodic generators to label their waste as "episodic hazardous waste," to label the container with the contents of the container and the hazards of the contents and to mark the start date of the episodic event as well. The requirements for tanks would have allowed the relevant information about the contents, hazards, and episodic event to be recorded in a log book instead of on the container.

In this final rule, EPA has revised the marking and labeling requirements throughout the generator program to remove the requirement that the contents of the container or tank be noted. The provision focuses instead on the hazards of the contents, as that requirement tracks more directly to the needs of responders in an emergency. EPA does expect that many facilities already label containers with the contents and will continue to do so to ensure that the correct information is available for manifesting when it comes time to ship the materials off site or for proper treatment on site.

The marking and labeling requirements in subpart L for episodic generation have likewise been revised to remain parallel with the requirements in the other parts of the generator program. (See section IX.E for a complete discussion of the marking and labeling revisions.)

6. Management of Other Hazardous Waste Generated During Episodic Event

In EPA's proposal, the preamble included an interpretation of the proposed provision for episodic generation that discussed allowing a generator to include hazardous waste that was generated outside an episodic event to be managed with the hazardous waste from the episodic event. This interpretation included both physical management of the waste and shipment off site, as well as not counting that other hazardous waste toward the generator's category.

Some of the comments that EPA received from the states on this episodic generation provision argued that it would provide excessive relief from the generator regulations and, therefore, that it would not be appropriate to allow this relief. As discussed elsewhere, EPA carefully considered what parts of this proposal could be revised to ensure that the episodic generation provisions are used just for the management of waste that is episodically generated and not be used to allow a generator to avoid managing waste in a larger generator category that it is operating in more regularly. EPA identified this discussion as an area where the interpretation of the final provision should be revised to clearly state that only the waste from the identified episodic event is exempt from being counted toward a generator's category. EPA has therefore revised this discussion for this final preamble.

*D. Major Comments*

1. Labeling Waste as "Episodic Hazardous Waste"

EPA received several comments stating that the proposed requirement to label hazardous waste from an episodic event as "episodic hazardous waste" rather than "hazardous waste" is an unneeded distinction. The commenters stated that it would be a burden to get and use a label that is different than the standard "hazardous waste" label.

EPA disagrees with the commenters on the usefulness of the "episodic hazardous waste" label. EPA is retaining this requirement because it will be important for generators holding episodic events to be able to distinguish hazardous wastes generated during those events from other hazardous

wastes generated on site. Although both types of hazardous waste can be managed and shipped off site together, if convenient, hazardous waste that was generated before the episodic event began retains its original time frame for being treated or shipped off site whereas hazardous waste from an episodic event must be treated or shipped off site within the 60-day period for the event.

If there is no distinction on the labels for hazardous waste from an episodic event, it would be difficult for a generator or an inspector to be able to determine which hazardous waste is a part of the episodic event with the 60-day limit and which hazardous waste has an alternate schedule for treatment and shipment. EPA does note, however, that the generator does not have to use a specific "episodic hazardous waste" label that would have to be purchased separately and, if practicable, can simply add the word "episodic" to the labeling with a self-designed label or with a large permanent marker.

2. Notification of Episodic Events

EPA also received several comments that notification of episodic events to EPA is an unneeded burden to the generators and will decrease the likelihood of generators using this provision.

EPA disagrees that there is little to be gained from notification and, instead, has determined that it is critical to the enforceability of this provision and for the states to oversee the hazardous waste activity under their authority. Without a notification requirement for episodic waste, a generator could potentially operate as if under an episodic event at all times, changing the starting date, so that during any given inspection, it appears as though there is an episodic event on site. EPA does not expect that many generators would manage hazardous waste in this way, but the regulations must include checks and balances to prevent such abuse and the notification requirement is one way to allow the implementing agencies to follow up in person if such action is warranted.

3. VSQGs Exceeding Generation Limit During Normal Operations

EPA received some comments stating that a VSQG that does not discover until the end of the month that it has exceeded its threshold for generation of hazardous waste as a VSQG would have difficulty complying with the episodic generation provision because of the notification requirements.

EPA would not consider the situation described by the commenters to be a case of an episodic event because the VSQG in this case is exceeding its generation limit in the course of normal operations. An episodic event is an activity that does not occur within normal operations that causes the generator to exceed its normal limit.

## XI. Detailed Discussion of Preparedness, Prevention, and Emergency Procedures Provisions for SQGs (40 CFR 262.16) and LQGs (40 CFR 262.17 and 40 CFR part 262 Subpart M)

*A. Introduction*

EPA is finalizing a number of proposed modifications to the conditions for exemption for both SQGs and LQGs regarding preparedness, prevention and emergency procedures, as described in the proposed rulemaking (80 FR 57972). Proposed conditions for SQGs were found at § 262.16(b)(8)–(9) and for LQGs at § 262.17(a)(6)–(7), which reference part 262 subpart M. The preamble to the proposed rulemaking discussed in detail the rationale for making several revisions to existing regulations, as well as specifically taking comment on certain proposed revisions and on other potential changes that were not reflected in revisions to existing regulations.

In discussing these modifications in the proposed rule, EPA provided examples of catastrophic chemical accidents in the United States to highlight the need for continued improvement in a number of areas related to chemical facility safety. EPA also noted that, to address these concerns, the President issued Executive Order 13650—Improving Chemical Facility Safety and Security (EO) on August 1, 2013, which directed the EPA and other federal agencies to identify ways to improve operational coordination with state, local, tribal, and territorial partners; enhance federal agency coordination and information sharing; modernize policies, regulations, and standards to enhance safety and security in chemical facilities; and work with stakeholders to identify best practices to reduce safety and security risks in the production and storage of potentially harmful chemicals. EPA explained that several of these modifications are aligned with EO-related efforts in that they will facilitate collection and analysis of chemical information from local facilities, as well as development of local emergency response plans to mitigate or prevent a devastating chemical disaster. EPA further explained that these modifications will also update the regulations to make them compatible with the current infrastructure of emergency planning and response, as well as provide a more usable contingency plan to emergency responders en route to a time-sensitive emergency at a facility that generates hazardous waste. Proposed or potential modifications, as well as key comments received on each, are discussed in this section in terms of the extent to which they are being incorporated into this final rulemaking.

*B. What is EPA finalizing as proposed?*

1. Changes to Contingency Plan Regulations for Large Quantity Generators: Eliminating Employee Personal Information in Contingency Plans

The condition for exemption for LQGs at § 262.17(a)(6)–(7) references 40 CFR part 262 subpart M, which includes requirements associated with contingency plan content at § 262.261. EPA proposed to modify the language to allow an LQG the flexibility to eliminate unnecessary employee personal information in the contingency plan in order to protect those individuals' privacy while still providing necessary information to address emergencies. Specifically, while retaining the name of persons qualified to act as emergency coordinators, the Agency proposed to remove references to addresses and changed the reference to home and office telephone numbers to "emergency telephone number." EPA also proposed to add language stating that, in situations where the generator site has an emergency coordinator continuously on duty because it operates 24 hours per day and every day of the year, the plan may list the staffed position (*e.g.*, operations manager, shift coordinator, shift operations supervisor, or some other similar position) as well as an emergency telephone number that can be guaranteed to be answered at all times. The Agency requested comment on this proposed modification.

The majority of commenters supported EPA's proposal to remove addresses and home phone numbers for personnel and to allow listing of staffed positions. A few commenters suggested extending this provision to cover SQGs, even though they are not required to have contingency plans, and TSDFs. EPA has decided it is appropriate at this time to focus on changes for LQGs only because they pose the greatest concern in matters of emergency preparedness; consequently, the Agency is finalizing § 262.261(d) as proposed. Although EPA is not extending these requirements to other generator categories or to TSDFs, the Agency would encourage facilities

to adopt these changes as a best management practice.

2. Technical Changes Applicable to Both Small Quantity Generators and Large Quantity Generators

EPA proposed clarifications and modifications to preparedness and prevention procedures dealing with the location of required equipment and access to communications or alarm systems based on 30 years of experience with these rules, feedback from stakeholders as part of the Agency's November 2004 Hazardous Waste Generator Regulatory Program Evaluation (Docket ID No. RCRA–2003–0014), and other discussions with stakeholders. These revisions are discussed below.

*a. Proposed technical changes to introductory paragraph on required equipment.* EPA noted that existing regulations are unclear regarding whether the required emergency response equipment must be placed in those areas of operation where hazardous waste is generated and accumulated or other parts of the facility where hazardous waste is not generated or accumulated. The Agency added that it may not always be appropriate or safe to store equipment in the actual waste generation or accumulation area—even though the requirement itself applies only to the generation and accumulation (and treatment, as appropriate) of hazardous waste. Therefore, the generator should have the flexibility to store this equipment in other areas of the facility in situations where it is infeasible or inappropriate for safety reasons to have the equipment located immediately next to hazardous waste generation and accumulation areas. EPA proposed to clarify that, while the equipment provision applies to only those areas where hazardous waste is either being generated or accumulated, the generator may determine the most appropriate locations within its facility to locate equipment necessary to prepare for and respond to emergencies. EPA requested comment on this proposal.

Commenters generally supported EPA's proposed clarification as it provides flexibility in determining the most appropriate locations of emergency response equipment, although several commenters suggested various changes/clarifications related to the location and accessibility of emergency equipment. EPA does not believe these other changes/clarifications are necessary and is finalizing § 262.16(b)(8)(ii) and § 262.252 as proposed.

*b. The meaning of "immediate access."* Preparedness and prevention provisions include the condition that, whenever hazardous waste is being poured, mixed, spread, or otherwise handled, all personnel involved in the operation must have immediate access to an internal alarm or emergency communication device, either directly or through visual or voice contact with another employee, *unless* such a device is not required. At issue is whether the phrase "immediate access" is clearly understood or whether additional clarity is necessary. EPA proposed to modify this language to include the parenthetical "(*e.g.,* direct or unimpeded access)" after the phrase "immediate access." EPA requested comment on the usefulness of modifying this language.

The majority of commenters supported this modification, although one commenter expressed concern regarding what would constitute immediate or unimpeded access. Another commenter requested clarification as to whether access to a cell phone satisfies the requirement for immediate access to an alarm or communication device. EPA believes that, although cell phones are a useful means of communication, they should not be relied upon solely to satisfy this requirement. The Agency is therefore finalizing § 262.16(b)(8)(iv) and § 262.254 as proposed.

3. Technical Changes Applicable to Small Quantity Generators

Based on experience and feedback received from the regulatory community and other stakeholders, EPA proposed revisions that address two of the four provisions regarding emergency procedures for those areas where SQG hazardous waste is generated and accumulated. These revisions are as follows.

*a. Require certain information be posted "next to the telephone."* In the proposed rule, EPA explained that existing regulations were unclear where required information (*i.e.,* name/telephone number of the emergency coordinator, the location of fire extinguishers, spill control material, fire alarms and, as necessary, telephone number of the fire department) should be posted in the facility. The Agency stated that a facility may have many operations and components that have no relationship with the generation and accumulation of hazardous waste. EPA noted that stakeholders have recommended deletion of this particular provision because, in this age of near-universal 911 availability, it is not important from a regulatory standpoint to have emergency telephone numbers, including the number (and name) of the emergency coordinator, and have also asserted that locations of the equipment in question should be conveyed to relevant employees and displayed in a worker break area rather than the facility office. EPA disagreed with eliminating this provision since making such information readily available is important for workers and others so that they would know what to do and where to go in the case of an emergency. However, the Agency nevertheless believed the regulation should be modified, adding that it is unclear whether the telephone number for the emergency coordinator refers to a home or business phone. With cell phones and other means of instant communication now prevalent, EPA proposed to modify this language to state that the SQG must post the name and emergency telephone number of the emergency coordinator next to telephones or in areas directly involved in the generation and accumulation of hazardous waste. EPA requested comment on this proposed change.

Commenters generally expressed support for this proposed change, although certain commenters questioned the posting of emergency information where hazardous waste is generated or accumulated. Some commenters requested the option of keeping emergency information on cell phones, while another commenter cautioned that cell phone reliability could be compromised during a widespread emergency. EPA understands that cell phone use may be compromised but also realizes that cell phones are widely used and that the inability to use cell phones for communication purposes would not prevent an employee from accessing stored information, such as land line telephone numbers (*e.g.,* home or business phone). The Agency is finalizing § 262.16(b)(9)(ii) as proposed in order to accord flexibility in complying with this SQG requirement.

*b. Allow containment and cleanup to be conducted by a contractor.* EPA's understanding was that most SQGs would hire a spill cleanup contractor to perform containment and cleanup of hazardous waste in the event of a spill rather than train employees to perform the response. Although EPA agreed that allowing an SQG to hire a contractor trained to address hazardous waste spills would be appropriate, the Agency indicated that regulations in place arguably do not provide this flexibility. EPA proposed to modify this language to allow containment and cleanup to either be conducted either by the SQG or by a contractor on behalf of the SQG. EPA requested comment on this

proposed change, including whether any unintended consequences could arise from providing SQGs with this flexibility.

Nearly all of the commenters supported EPA's proposed modification, although some commenters opined that existing language already allows for contractors to perform this work. Other commenters mentioned that the generator is ultimately responsible for ensuring proper response and cleanup and a few suggested adding language clarifying contractor liability in performing cleanups. EPA is finalizing § 262.16(b)(9)(iv)(B) as proposed.

### *C. What is EPA finalizing with changes to proposed rule language?*

#### 1. Areas Subject to Preparedness, Contingency Planning, and Emergency Procedures Regulations

EPA stated in the proposal that current preparedness and emergency procedures regulations do not clearly state whether they are applicable to the entire facility or only to areas where hazardous waste is generated and accumulated on site or where allowable treatment may occur in accumulation units (*i.e.,* in containers and tanks per EPA guidance) and when transported off site for subsequent treatment, storage, and disposal. Therefore, EPA proposed that regulations for preparedness and prevention and for contingency planning and emergency procedures apply only to those areas where hazardous waste is generated and accumulated and, where applicable, to those areas where allowable treatment may occur in accumulation units. For this reason, EPA proposed to explicitly state that the RCRA preparedness and emergency procedures regulations are limited strictly to these areas.

EPA acknowledged that previous Agency guidance indicated RCRA preparedness and emergency procedures regulations, including development of contingency plans by LQGs, would only apply to 90-day accumulation units, otherwise known as CAAs. In this guidance, the Agency states that, when developing a contingency plan, LQGs would only need to include those 90-day accumulation units involved in the on-site management of hazardous waste.[101] At that time, Agency expressed a desire to limit the applicability of these regulations only to these areas because several other statutes already address the development and implementation of contingency plans associated with other areas of a generator facility, such as the storage of chemical materials and substances other than hazardous wastes. The Agency also noted that considerable overlap exists in the requirements in the various statutes and, since 1997, the federal government has encouraged facilities to develop integrated contingency plans. Examples include EO 13650 and the Agency's aforementioned One Plan guidance.

EPA proposed that subpart M apply only to those areas of an LQG where hazardous waste is generated and accumulated on site in accordance with the conditions in § 262.17. This proposal included a parallel change for the emergency procedures regulations for SQGs in § 262.16.

Although the primary objective of these changes was to ensure that preparedness and planning regulations under RCRA did not apply to the entire facility, EPA received several comments on whether SAAs and points of generation should or should not be included. Comments were roughly split on whether areas besides CAAs, such as SAAs and points of generation, should be included within the scope of preparedness and planning regulations. Notwithstanding existing guidance, EPA continues to believe there are benefits to addressing areas besides CAAs. Throughout a facility, there may be many points of generation and associated SAAs from which hazardous wastes are routinely moved to CAAs; therefore, the potential for spills exists during the accumulation and management process. For this reason, EPA has determined it is appropriate to address these additional areas, consistent with the objectives of EO 13650, in order to ensure protection of human health and the environment, as part of preparedness and planning regulations.

With respect to allowable treatment, EPA believes that locations of such treatment would be covered as part of the overall accumulation and management process within a facility. Although EPA has not specifically defined allowable treatment in the regulations, the Agency has determined at this time to continue to address allowable treatment at generator facilities within the framework of existing guidance.[102]

EPA is, therefore, finalizing regulations making it clear that points of generation and SAAs, in addition to CAAs, fall within the scope of regulations for preparedness and planning in § 262.16(b)(8) for SQGs and 40 CFR part 262 subpart M for LQGs. This includes adding clarifying language in § 262.15(a)(7) and (8) regarding the conditions for exemption for both SQGs and LQGs that specifically relate to SAAs.

#### 2. Making and Documenting Arrangements With the Local Emergency Planning Committees

EPA noted in the proposal that RCRA generator regulations, which were finalized in 1980, have not been updated to reflect significant changes to the national, state and local infrastructure for emergency planning and response, one of which was passage of the Emergency Planning and Community Right-To-Know Act (EPCRA) in 1986. The Agency also discussed EPCRA in terms of emergency planning and notification requirements, as related to preparedness, prevention and emergency procedures established by hazardous waste management regulations. This included the roles and responsibilities of Local Emergency Planning Committees (LEPCs) under EPCRA. EPA explained that facilities covered under EPCRA are required to report chemical information to LEPCs, as well as other entities, and that LEPCs are required to prepare a comprehensive emergency response plan. Facilities covered by EPCRA planning provisions are required to cooperate in emergency plan preparation and designate a facility emergency coordinator to participate in this process.

For this reason, EPA proposed revisions to require that SQGs and LQGs must first attempt to enter into arrangements with their LEPCs. EPA also proposed regulatory text that describes procedures for how a facility that is not able to make arrangements with the LEPC would make such arrangements with the fire department and other local emergency services. The Agency requested comment on its proposal to require an SQG or LQG to enter into arrangements with its LEPC unless there is no LEPC, the LEPC does not respond, or the LEPC determines that it is not the appropriate organization to make arrangements with, in which case the SQG or LQG

---

[101] Memorandum from Matt Hale, Director of EPA's Office of Solid Waste, to RCRA Division Directors, November 7, 2006, RCRA Online 14758.

[102] On March 24, 1986, EPA finalized regulations applicable to generators of between 100 kg and 1000 kg of hazardous waste in a calendar month (51 FR 10146) in which the Agency indicated that these generators could treat such waste in accumulation tanks or containers without a permit provided that treatment conformed to established management standards for tanks and containers. An example of subsequent guidance regarding allowable treatment at both SQGs and LQGs is a memorandum from Elizabeth Cotsworth, Director of EPA's Office of Solid Waste, to RCRA Senior Policy Advisors, August 16, 2002, RCRA Online 14618.

would enter into an arrangement with its local emergency responders.

Due to the fact that some SQGs and LQGs may already coordinate with their LEPCs annually as part of their EPCRA requirements, EPA opined that it would be unnecessary to include time frames for updating in this rule. The Agency, nevertheless, requested comments on whether the regulations should mandate how frequently a generator must communicate with its LEPC or local fire department if it has not otherwise communicated with them.

EPA also proposed to modify existing regulations to state that the generator shall maintain records documenting the arrangements with the LEPC or, if appropriate, with the local fire department, as well as any other organization necessary to respond to an emergency. The Agency asked for comment on this proposed change to documentation, in particular, whether local ordinances already require generators to have documentation of arrangements with local emergency response organizations.

Finally, the Agency asked for comment on the feasibility of providing a waiver from requiring either an SQG or LQG to enter into arrangements with an LEPC or, if appropriate, other local authorities when they have 24-hour on-site emergency response capabilities, and particularly under what circumstances a waiver would be granted.

The majority of commenters indicated that local emergency responders, as opposed to LEPCs, should serve as the initial point-of-contact for LQGs, citing concerns about an emphasis on LEPCs, which usually are not involved in actual responses to emergencies. Regarding the extent to which SQGs and LQGs should document efforts to enter into arrangements with local authorities/first responders, some commenters stated the generator cannot be held responsible for making arrangements with a party over which it has no control and noted that a mandated arrangement differs greatly from being required only to make an "attempt." There were also questions on what would constitute appropriate documentation. Although there was some opinion to the contrary, the majority of commenters believed that large facilities with internal emergency response capability should be given a waiver or allowed to seek a waiver from entering into arrangements with local authorities.

Based on the comments received, EPA is not finalizing the proposed references to LEPCs as the primary contact identified at § 262.16(b)(8)(vi) and § 262.256 for SQGs and LQGs, respectively. EPA is also not finalizing proposed language indicating that generators must make arrangements with local responders and is clarifying that generators must simply attempt to make arrangements with local responders and document either the attempts or, if successful, the final arrangements. Some commenters provided feedback in terms of what constitutes sufficient "documentation" that best efforts were made to enter into arrangements. In considering these comments, EPA is revising the proposed language at §§ 262.16(b)(8)(vi)(B) and 262.256(b) to remove the term "certified letter" in recognition of the fact that there are various means of confirming that arrangements actively exist, or were sought but not obtained, including, but by no means limited to, a certified letter, fax and electronic mail. Additionally, based on these comments, EPA is revising proposed language to insert the phrase "in the operating record," which would include the contingency plan, to provide additional flexibility regarding where such documentation can be retained. Finally, during implementation of the final rule, as part of coordinating with stakeholders and conducting associated outreach activities, EPA intends to address the issue of what constitutes reasonable efforts or sufficient attempts by SQGs and LQGs to make and document arrangements with local authorities.

With respect to large facilities possessing internal emergency response capability, EPA is adding language at §§ 262.16(b)(8)(vi)(C) and § 262.256(c) that allows these facilities to obtain a waiver from the authority having jurisdiction (AHJ) over the fire code within the facility's state or locality in terms of entering into arrangements with local authorities provided the waiver is documented in the operating record. As previously stated in the final rule preamble, an AHJ may or may not be the fire marshal, fire chief, building official, or another official as designated by the state or local government. EPA believes that, practically speaking, the AHJ would be in the best position to evaluate whether a particular facility, in fact, possesses 24-hour response capabilities. This is consistent with the Agency's rationale when discussing waivers from the 15 meter property line condition in the case of ignitable or reactive hazardous waste accumulation. The Agency is similarly allowing flexibility regarding how the generator documents that a waiver has been obtained.

3. Changes to Contingency Plan Regulations for Large Quantity Generators: Submitting a Contingency Plan Executive Summary to Emergency Management Authorities

In the preamble to the proposed rule, EPA noted that RCRA regulations on contingency planning and emergency procedures address the purpose of the contingency plan, what it must contain, who receives copies, how to amend the contingency plan, and responsibilities of the facility's emergency coordinator and emergency procedures. The Agency also noted that the owner or operator of the facility can develop one contingency plan that meets all the regulatory standards for the various statutory and regulatory provisions associated with contingency planning, which were specifically identified in the proposed rule preamble. In doing this, the Agency recommended that generators base their contingency plan on the National Response Team's Integrated Contingency Plan Guidance One Plan (June 5, 1996: 61 FR 28642).

EPA's discussions with emergency management professionals indicated that the length of the facility contingency plans may prevent first responders from being able to fully review these documents when responding to an emergency and what first responders really need is readily available information describing what they will immediately confront upon arrival at the scene. EPA recognized that, once the incident is under control, first responders will be able to review the contingency plan to determine whether longer-term responses are necessary. However, the Agency also indicated that a shorter document, such as an executive summary of the contingency plan, would allow a more effective initial response to an incident at a facility.

Based on a review of information required as part of a RCRA contingency plan, as well as information required by the local fire department, EPA identified certain components that would be useful in an executive summary. In particular, EPA proposed to require that the following information be included in an executive summary to assist emergency responders in the event of an incident: (1) The types/names of hazardous wastes in layman's terms and the associated hazard associated with each waste present at any one time (*e.g.*, toxic paint wastes, spent ignitable solvent, corrosive acid); (2) the estimated maximum amount of each waste that may be present at any one time; (3) the identification of any hazardous wastes where exposure

would require a unique or special treatment by medical or hospital staff; (4) a map of the site showing where hazardous wastes are generated and accumulated and routes for accessing these wastes; (5) a street map of the facility in relation to surrounding businesses, schools, and residential areas to understand how best to get to the facility and also evacuate citizens and workers; (6) the locations of water supply (*e.g.,* fire hydrant and its flow rate, drafting locations); (7) the identification of on-site notification systems (*e.g.,* a fire alarm that rings off site, smoke alarms); and (8) the name of the emergency coordinator and 24/7 emergency telephone number.

Because of the usefulness of a shorter document for emergency responders, EPA proposed to require that a new LQG, as of the effective date of the rule, submit an executive summary of its contingency plan, in addition to the full contingency plan, to the emergency management authorities; in particular, LEPCs. Although EPA believed the eight elements previously discussed should be included as part of an executive summary, the Agency asked for comment on the appropriateness of this information.

Roughly twice as many commenters supported the requirement for an executive summary for LQGs than opposed it, arguing that EPA's proposal to require a contingency plan executive summary would improve the ability of emergency response teams to respond to an incident at an LQG's facility. These commenters generally favored including at least some of the eight elements as part of contingency plan executive summary, although some commenters stated a preference for excluding certain elements or suggested others for inclusion. Other commenters suggested a document format, such as a table of contents or index that allows the reader to quickly access needed information. Some commenters disagreed with making submission of the executive summary a mandatory requirement, while others advocated flexibility in terms of content and submission. One commenter requested clarification as to the meaning of "new LQG." Commenters who objected to this proposal believed that it was unnecessarily prescriptive and duplicative.

The Agency subsequently decided to modify language at § 262.262(b)(8) to account for situations where an emergency coordinator is continuously on duty in order to ensure consistency with final regulatory text at § 262.261(d). Otherwise, the Agency believes these elements provide key information for use in the event of an emergency, which will be beneficial to workers and the public in general. EPA is also requiring new LQGs (*i.e.,* facilities that become LQGs after the effective date of this regulation) to develop and submit an executive summary of their contingency plan to emergency authorities in addition to a full contingency plan. As EPA expressed in the proposal and states again in this final rule, developing the executive summary during the initial writing of the contingency plan will not be a significant extra step. As discussed subsequently, EPA is finalizing changes regarding the name of this document (*i.e.,* changing from "executive summary" to "quick reference guide") and clarifying how existing LQGs are covered by this requirement. Additionally, as noted elsewhere in this preamble, EPA is not finalizing proposed references to LEPCs in terms of making arrangements with local authorities at § 262.16(b)(8)(vi) and § 262.256 for SQGs and LQGs, respectively, or submitting a quick reference guide to local emergency responders at § 262.262(a) for LQGs.

4. Technical Changes on Personnel Training Applicable to Large Quantity Generators

EPA has acknowledged that, since promulgation of personnel training regulations in the 1980s, use of computerized training has become a common practice for generators to teach their workers about the management of hazardous waste. Due to the fact that many generators already use this method for training workers, a modification that reflects use of online computer training would simply bring the hazardous waste personnel training regulations up to date with existing industry practices. Therefore, EPA proposed to also allow a generator to use online computer training, in addition to classroom instruction and on-the-job training, to complete the personnel training requirements. EPA requested comment on this proposed modification.

The vast majority of commenters supported EPA's proposal to clarify that online training is acceptable to meet hazardous waste generator training requirements. However, some commenters suggested replacing the word "online" with "computer-based" or "electronic training" or identifying additional training options. EPA has considered these comments and is modifying proposed § 262.17(a)(7)(i)(A) by inserting language that takes into account computer-based and/or electronic training options.

5. Executive Summary Submission for Existing Large Quantity Generators

As previously stated, EPA believes that a shorter document, such as an executive summary of the contingency plan, which will be referred to as a quick reference guide, will allow more effective response to an incident at a facility. EPA is requiring new LQGs, in addition to a full contingency plan, to develop and submit an executive summary of their contingency plan to local emergency responders identified at § 262.262(a). With respect to existing LQGs, which have already developed and submitted a contingency plan to local emergency responders, EPA proposed not to require these facilities to develop an executive summary because of the additional burden. However, the Agency recommend that existing LQGs may want to submit an executive summary when conducting a periodic update on their contingency plans to ensure that the emergency responders have the appropriate information on hand in the event of an emergency. EPA took comment on whether existing LQGs that have already provided a full contingency plan should also be required to submit an executive summary to the LEPC or, if appropriate, the fire department or other emergency responders.

Comments received indicated a very strong preference for requiring an existing LQGs to submit an executive summary. However, certain commenters suggested that submission should occur when existing LQGs update their contingency plans to reflect, for example, personnel changes, facility updates, waste relocations, emergency equipment upgrades, and other operational or physical alterations. Other commenters suggested that submission occur after a specified period of time has elapsed.

In the final rule, EPA is clarifying in new language at § 262.262(b) regarding existing and new LQGs with respect to preparation and submission of a quick reference guide. EPA is also adding new language at § 262.262(c) to require that all LQGs update their quick reference guides, if necessary, whenever the contingency plan is amended. EPA does not consider that the changes to the final regulations in this rule would automatically require amendments to an existing LQG's contingency plan under the requirements in § 262.263(a).

In response to certain comments, EPA is also replacing the term "executive summary" with the term "quick reference guide" in order to more closely mirror the intended purpose of this document. The Agency believes this

wording better conveys the fact that this document should be prepared in a format enabling first responders to quickly access key information in the event of an emergency. Lastly, as previously stated, EPA is not finalizing references to LEPCs as the primary contact identified at § 262.16(b)(8)(vi) and § 262.256 for SQGs and LQGs, respectively. Instead, LQGs are directed to submit the quick reference guide to local emergency responders identified at § 262.262(a).

6. Other Changes

EPA proposed to replace the word "facility" in these regulations regarding emergency preparedness and prevention with the word "site" because "facility" is defined in § 260.10 as specific to TSDFs. Certain commenters discussed EPA's proposal. One commenter noted that "site" is too general and could be misinterpreted, while another commenter noted that, although the term "facility" has a defined meaning in RCRA, "site" does not. As a result of these comments, EPA has reconsidered its proposal and decided not to change existing regulations; consequently, the Agency is replacing the word "site" where it appeared in this context in the proposal with the word "facility" throughout final rule language. EPA has concluded that use of the word "facility" in these regulations would also be more consistent with the word "facility," which is used and defined in EPCRA emergency planning and notification regulations at 40 CFR part 355, as well as in Spill Prevention, Control and Countermeasures (SPCC) plan regulations at 40 CFR part 112.

EPA also proposed incorporating a minor revision associated with a "comment" in existing regulatory text into the final rule at § 262.264 because the **Federal Register** style no longer permits this kind of comment in new regulations. One commenter noted that certain text in the comment in question, "Applicable responsibilities for the emergency coordinator vary, depending on factors such as type and variety of waste(s) handled by the facility, and type and complexity of the facility" was not incorporated and suggested that this regulatory text be retained to give some flexibility to those who must perform certain emergency response duties. EPA will incorporate the suggested text into § 262.264.

*D. What is EPA not including in the final rule?*

EPA asked for comment on certain potential revisions to existing regulations that the Agency has subsequently decided not to address as part of this final rule. Each is discussed in turn as follows.

1. Changes to Contingency Plan Regulations for LQGs: Including Alternative Evacuation Routes in the Contingency Plan

EPA identified a potential issue regarding whether a contingency plan must contain information about alternative evacuation routes or whether a different approach for addressing alternative evacuation routes would be more effective. This issue resulted from stakeholder discussions regarding the Agency's November 2004 Hazardous Waste Generator Regulatory Program Evaluation (Docket ID No. RCRA–2003–0014). EPA received a comment stating that it does not make sense to include in the contingency plan hundreds of possible evacuation routes that may be present at a facility, depending on its configuration, along with a suggestion that, although regulations should be modified to require that evacuation routes be posted and drills be conducted, regulations should not require the routes to be in the contingency plan.

EPA indicated that, although the Agency did not believe regulations require all potential evacuation routes be identified, emergency responders may need this type of information in order to determine the most efficient and timely approach to reach the facility. Therefore, EPA requested comment on the necessity of modifying the condition on alternative evacuation routes in a contingency plan. EPA also asked for comment on whether requirements to post evacuation routes and hold annual evacuation training/drills would be an effective substitute to maintaining alternative evacuation routes in the contingency plan and whether regulations should discuss shelter-in-place as part of the contingency plan.

Slightly more commenters disagreed than agreed with requiring alternate evacuation routes in contingency plans. Some commenters noted that, while alternative evacuation routes should be considered, they may not exist or may not be practical in certain instances. Another commenter believed that the decision to require alternative evacuation routes should rest with the LEPC. Commenters also offered suggestions such as requiring identification of employee muster locations or including a map with possible exists marked, with another commenter stating that including evacuation routes only in the contingency plan is not useful. EPA did not receive many comments regarding either posting evacuation routes and holding annual evacuation training/drills or discussing shelter-in-place, although the comments received indicated support for these approaches.

EPA understands that it may not always be possible to identify alternate evaluation routes and likewise realizes that immediate evacuation may not always be advisable due to the nature of the emergency. Nevertheless, the Agency believes that, in the majority of instances, evacuation will be the selected course of action and that it will be possible to identify an alternate evacuation route. EPA also believes comments on the proposed rule regarding this issue should be considered by facilities when developing or amending contingency plans. This would include posting evacuation routes, as well as muster and shelter-in-place locations, within the facility (and/or making such information available on cell phones) and conducting periodic training/drills. These efforts would be undertaken, as necessary, in consultation with local emergency responders. Due to the varying types/varieties of wastes handled by facilities and differing physical settings in which facilities are located, however, the regulations should allow flexibility on the part of the LQG. Therefore, EPA is not making any changes to § 262.261(f), as proposed.

2. Changes to Contingency Plan Regulations for LQGs: A Potential Electronic RCRA Contingency Planning Application

EPA requested comment on whether contingency plans should be submitted electronically to emergency responders to enhance their ability to respond safely and effectively to an emergency at an LQG, including what EPA's role should be in electronic submittals. In making this request, EPA noted that the Agency currently makes numerous electronic databases and tools available for helping first responders with emergency management. A specific example cited was a suite of software applications (Computer-Aided Management of Emergency Operations), which is used to assist with data management requirements under EPCRA. EPA asked whether an additional tool to manage contingency plans under RCRA would be a useful addition to this software suite and whether it would assist LEPCs by integrating the contingency plan with their existing data on facilities, thereby making the information available to the first responders in the most usable way. EPA also inquired as to the feasibility/effectiveness of private sector parties or

non-profit or governmental entities in developing software that LQGs could use to provide important information to emergency responders during an emergency.

The majority of comments received supported electronic submission of contingency plans to emergency responders, including five commenters who suggested incorporating submissions of contingency plan information into existing software applications—two of who preferred this to direct submission of the plan—consistent with EPCRA requirements. Some commenters cautioned against making electronic submission mandatory and a few others indicated that electronic submission of a contingency plan would preclude the need for submission of an executive summary. Commenters opposed to this approach cited reasons such as unnecessary burden and potential lack of availability during a power outage. Few comments directly addressed the question of software development, beyond mentioning existing software applications, although limited feedback did not indicate support for this additional effort.

Proposed regulations did not specify the format in which the contingency plan must be provided nor did they discuss software applications. EPA strongly encourages LQGs to work with first responders to determine whether electronic submission of contingency plans, including incorporating contingency plan information into existing software applications, is an acceptable approach either in lieu of or in addition to a hard copy submission. However, EPA believes regulations must be sufficiently flexible to allow these decisions to be made on a facility-by-facility basis; therefore, the Agency is not making any changes to proposed regulations at § 262.262(a) regarding transmission of the contingency plan.

3. Additional Information for Contingency Plan Executive Summary

EPA took comment on certain aspects of the contingency plan executive summary, which the Agency is renaming as a quick reference guide, related to element #1. This element discusses the types/names of hazardous wastes in layman's terms and the associated hazard associated with each waste present at any one time. EPA asked whether providing information regarding identification of hazardous waste is sufficient for ensuring that first responders will be able to identify the appropriate actions to take during emergency responses. EPA also asked whether referencing material in the North American Emergency Response Guide, where appropriate, would be useful (*i.e.,* likely reduce the time it takes to get the necessary information for managing the situation) to first responders and whether generators can easily access this information to add to their contingency plans. EPA received few comments related to element #1, although limited comments received seemed to indicate support for including additional information. Given the relative lack of comments received and to avoid being overly prescriptive, EPA will not make it a requirement to include this additional information. The Agency is not making any changes to what was proposed at § 262.262(b)(1).

EPA also took comment regarding whether element #3 of the contingency plan executive summary, which discusses identification of any hazardous wastes where exposure would require a unique or special treatment by medical or hospital staff, should also include a requirement that the generator provide medical-related information for exposure to hazardous wastes requiring special treatment; specifically, whether this information is readily available to the generator for inclusion in the executive summary of the contingency plan and whether first responders would find this additional information useful for responses. EPA received few comments related to element #3; as such, there was no meaningful basis for justifying any additional regulatory changes. Although EPA would encourage the generator, in consultation with first responders, to include medical-related information associated with exposure to certain hazardous wastes, the Agency is not making any changes to what was proposed at § 262.262(b)(3).

4. Contingency Plan Executive Summary for SQGs

Another aspect of the contingency plan executive summary on which EPA took comment involved whether an SQG should be required to develop an executive summary of a contingency plan. In posing this question, EPA noted that the major differences between the preparedness, prevention, and emergency procedures regulations applicable to SQGs and those applicable to LQGs are the development and implementation of a contingency plan and more rigorous responsibilities for the LQG emergency coordinator.

Although SQGs are not required to develop contingency plans under RCRA, EPA noted that many SQGs may already have developed contingency plans to comply with other statutory and regulatory requirements and that many of the elements of an executive summary may already be available. For these reasons, EPA thought that the requirement for SQGs to provide an executive summary of a contingency plan to first responders could provide information that is critical during emergencies with little extra effort being expended by the SQGs.

Although a few commenters supported creation of an executive summary for SQGs, the majority did not. Reasons provided included the fact that a contingency plan is not required under RCRA and the belief that this decision should be made by individual states, as well as the potential for unnecessary burden and possibly duplication of effort. Other commenters, while seeming not to support creation of an executive summary, nonetheless suggested that EPA specify information that would be included in the case of SQGs.

As previously noted, SQGs may have already developed emergency plans to comply with other statutory and regulatory requirements, such as SPCC or EPCRA. Moreover, under existing RCRA regulations, SQGs are required to attempt to make arrangements, as appropriate, with local authorities regarding the types of wastes handled at their facilities. Therefore, it is possible that these facilities have incorporated information regarding hazardous waste management into these emergency plans. EPA also recognizes that there exist a large number of SQGs operating under RCRA, as compared to LQGs. For instance, as noted elsewhere in this rulemaking, EPA estimates the number of SQGs to range from approximately 49,900 to 64,300 while the number of LQGs is estimated to be approximately 20,800.[103] EPA is not making any changes to existing regulations. However, given the prevalence of SQGs and the associated potential for adverse impacts to human health and the environment, the Agency strongly encourages these facilities, as a best management practice, to develop a quick reference guide (*i.e.,* new term for the document referred to as an "executive summary" in the proposed rule) and share this information with local emergency responders.

5. Revisions to Applicability of Personnel Training

EPA asked for comment on whether the regulations should specifically identify positions at LQGs for which

[103] See "Regulatory Impact Assessment of the Potential Costs, Benefits, and Other Impacts of the Final Hazardous Waste Generator Improvements Rule." A copy of the analysis is available in the docket for this action.

hazardous waste training would be required and for which a written job description is necessary, as well as what those job duties should be. Although current EPA guidance excludes staff working in SAAs from the training requirements, the Agency expressed a belief that such personnel have a similar need to know the risks associated with hazardous wastes as personnel working in central accumulation areas. Therefore, EPA also asked for comment on whether personnel involved in handling or managing hazardous wastes in SAAs should be required to undergo hazardous waste training.

EPA noted that, besides the statement indicating that personnel must be able to respond effectively to emergencies by familiarizing them with emergency procedures, emergency equipment, and emergency systems, existing regulations are not specific about which personnel at an LQG must complete the hazardous waste training. At issue is the scope of these training standards, the applicability of the training provision to employees who are not assigned to work in the CAAs (*e.g.,* personnel working at SAAs), and whether to require training and a written job description for specific types of employees working in areas of hazardous waste management related to central accumulation areas.

With the assistance of staff from certain states (*e.g.,* Connecticut, New York and Vermont), EPA previously identified the following areas of hazardous waste management for which personnel training and a written job description should be required: (1) Completes and/or signs the hazardous waste manifest; (2) manages hazardous waste in areas where hazardous wastes are accumulated; (3) maintains hazardous waste inventory; (4) conducts daily or weekly inspections of areas where hazardous wastes are accumulated and (5) plans or responds to emergencies that involve hazardous wastes. EPA believed this clarification would have the benefit of assisting LQGs in determining more readily the scope of their hazardous waste training program. Nevertheless, in the proposal, the Agency requested feedback on this issue and others before making a final decision.

Commenters were generally evenly divided on whether or not the regulations should specifically identify positions at LQGs where hazardous waste training and a written job description is necessary. Supporters who agreed with the areas of hazardous waste management identified by EPA also identified additional job functions, including those not directly involved in handling hazardous waste that effectively expanded the areas of waste management, while others believed training should apply to employees who are handling hazardous waste on a daily basis. Commenters who did not support specifying positions and including written job descriptions expressed concern that proposed revisions could, in practice, have the opposite of the intended beneficial effect envisioned by the Agency. Certain commenters also stated that LQGs would be in the best position to identify employee training needs, while others recommended removing the requirement for written job descriptions as they believe such information does not benefit the facility or inspectors.

Comments were roughly split on whether EPA should require hazardous waste training for personnel who work at SAAs. Taking into account the differing opinions of commenters, the existence of EPA guidance on this point and the desire to maintain flexibility, the Agency has decided not to revise § 262.17(a)(7) to identify areas of hazardous waste management for which personnel training and a written job description are required or to specifically require training for staff at SAAs. However, EPA would encourage all generators to take appropriate steps to ensure that all employees who work at areas where hazardous waste is accumulated, including at SAAs, or are otherwise involved in hazardous waste management receive sufficient training to ensure that they are familiar with proper handling and emergency procedures.

6. Revising Frequency of Communication With Emergency Response Agencies

During discussions related to making and documenting arrangements with the LEPCs, EPA noted that existing regulations do not specify how frequently hazardous waste generators must make arrangements with local authorities. Considering that some SQGs and LQGs may already coordinate with their LEPCs annually as part of their EPCRA requirements, EPA opined that it would not be necessary to include time frames as part of this rule. The Agency, nevertheless, requested comments on whether the regulations should mandate how frequently a generator must communicate with its LEPC or local fire department if it has not otherwise communicated with them.

With the exception of one commenter who suggested that arrangements should be updated annually, at a minimum, and more frequently if modification is needed based on changes such as the type/amount of waste generated, comments received did not indicate support for revising existing regulations to specify time frames. These commenters felt that the provisions necessary for LQGs to communicate with local emergency response personnel are already in place or that communication should only occur in the event that the facility has a major change in its operations. Another commenter indicated that mandating how frequently a generator must communicate with its LEPC or local fire department would only work if corresponding changes were also made to EPCRA requirements. EPA agrees with the majority of commenters and continues to believe that it is unnecessary to mandate how frequently a generator should communicate with its emergency response agency. Therefore, the Agency is not making any changes to what was proposed at § 262.16(b)(8)(vi) for SQGs or to § 262.256 for LQGs.

7. Applying Emergency Planning and Procedures Revisions to Parts 264 and 265

Although revisions to emergency planning and procedure regulations pertain only to generators (language in an expanded 40 CFR part 262), many of these provisions were taken from part 265 with only slight revisions. Therefore, EPA asked whether it would be appropriate/helpful if proposed revisions to part 262 were also be made in the applicable paragraphs of parts 264 (permitted facilities) and/or 265 (facilities operating under interim status) to ensure consistency or whether the regulations should remain unchanged despite the result that generators and TSDFs would be left with some regulations that are very similar but not exactly the same.

Although the majority of those who commented supported making changes to TSDF regulations, EPA is not making changes as part of this rulemaking because the Agency believes that emergency planning and procedure requirements at TSDFs can best be addressed on a facility-specific basis through the permitting process.

**XII. Technical Corrections and Conforming Changes to 40 CFR Parts 257, 258, 260 Through 265, 270, 273, and 279**

The proposed rule included 23 technical corrections and conforming changes to various paragraphs in parts of 257, 258, 260 through 265, 270, 273, and 279 discussed at 80 FR 57984. These changes eliminate the regulatory text for discontinued programs, identify areas where conforming changes are

necessary, update existing regulatory text to account for new programs, improve the readability of certain paragraphs, and correct typographical errors. As an example, we proposed to revise § 260.3, which currently reads, "As used in parts 260 through 265 and 268 of this chapter." However, this text fails to account for additional parts of the regulations that were promulgated after 1986, such as parts 266, 267, and 270 through 273. Therefore, the Agency proposed to revise this paragraph to correct this oversight to read, "As used in parts 260 through 273 of this chapter."

*A. What is EPA finalizing?*

The Agency is finalizing 20 of the 23 proposed technical corrections. The three proposed technical corrections not being finalized in this action are also discussed. In addition, EPA is finalizing conforming changes throughout the text to account for the reorganization and the changes in defined terms. Also note that EPA is making a conforming change to § 266.80(a) in this action to take into account the revisions being made as a part of the "Hazardous Waste Export-Import Revisions" Final Rule (Docket ID EPA–HQ–RCRA–2015–0147; FRL–9947–74–OLEM).

The technical corrections the Agency is finalizing are:

(1) Revise § 260.3, which previously read, "As used in parts 260 through 265 and 268 of this chapter" to currently read "As used in parts 260 through 273 of this chapter" to account for additional parts of the regulations that were promulgated after 1986, such as parts 266, 267, and 270 through 273.

(2) Modify the definitions of "Treatability Study," "Universal Waste Handler," "Universal Waste Transporter" in § 260.10 to only capitalize the first word (*e.g.*, "Universal") in order to match the formatting in the rest of this section.

(3) Remove the closed parenthesis after "(*e.g.*,)" from § 261.1(c)(6).

(4) Improve the readability of § 261.4(a)(7), which previously read, "Spent sulfuric acid used to produce virgin sulfuric acid, unless it is accumulated speculatively as defined in § 261.1(c) of this chapter" to currently read "Spent sulfuric acid used to produce virgin sulfuric acid provided it is not accumulated speculatively as defined in § 261.1(c) of this chapter."

(5) Make conforming changes to citations that reference § 261.5 to reflect the reorganization of these regulations. The citations where references to § 261.5 are revised include all the following: §§ 262.10(b), 262.10(l)(2), 262.201(b), 262.204(a), 262.210(b)(3), 262.210(d)(2), 262.211(e)(3), 262.213(a)(2), 262.213(a)(3), 262.213(b)(2), 262.216(b), 264.1(g)(1), 268.1(e)(1), 270.1(c)(2)(iii), and 279.10(b)(3). In § 261.33(e) and (f), EPA is removing the references to §§ 261.5(e) and 261.5(a) and (g), respectively, because the quantity limits for hazardous wastes are contained in EPA's definitions for very small quantity generator, small quantity generator, and large quantity generator. (Note: The comments at the end of § 261.33(e) and (f) remain.)

(6) Replace the word "waste" with "water" in previous § 261.5(e)(2), which read, "A total of 100 kg of any residue or contaminated soil, waste, or other debris resulting from the clean-up of a spill, into or on any land or water . . . ." Prior to 1985, the word "waste" was "water" and the Agency was not able to determine why this change occurred so we are reverting back to the original regulatory language. (In the reorganization, this language is moved to § 260.10 and is contained in the definitions of large quantity generator, small quantity generator and very small quantity generator.)

(7) Revise § 261.420 to clarify that the requirement in § 261.411(c) that all employees be familiar with proper waste handling and emergency procedures relevant to their responsibilities applies to facilities that generate or accumulate more than 6,000 kg of hazardous materials as well as to facilities that generate or accumulate less than that amount.

(8) Remove Notes 1 and 2 from § 262.10. Note 1 previously stated that the provisions of § 262.34 are applicable to the on-site accumulation of hazardous waste by generators. Therefore, the provisions of § 262.34 only apply to owners or operators who are shipping hazardous waste which they generated at that facility. Note 2 previously stated that a generator who treats, stores, or disposes of hazardous waste on site must comply with the applicable standards and permit requirements set forth in 40 CFR parts 264, 265, 266, 268, and 270. These notes are no longer necessary because the Agency replaced § 262.34 with a new reorganization of the regulations that address Note 1 and in § 262.10 that address Note 2.

(9) Remove the extra period in the last line of the paragraph at § 262.10(l).

(10) Made conforming changes to sections that reference § 262.34 to reflect EPA's move of these regulations. The citations where references to § 262.34 are revised include the following: §§ 262.10(l)(1), 262.201(a), 262.201(a), 262.216(a), 264.1(g)(3), 264.71(c), 264.1030(b)(2), 264.1050(b)(2), 265.1(c)(7), 265.71(c), 265.1030(b)(2) and (b)(3), 268.7(a)(5) and 270.1(c)(2)(i).

(11) Correct the statutory citation at § 262.43 that referred to sections 2002(a) and 3002(6) of the Act. The reference to 3002(6) should be to 3002(a)(6). Additionally, the word "he" was removed in order to be gender neutral.

(12) Make two conforming changes to the definition of "central accumulation area" previously found in § 262.200 in subpart K. We moved this definition from this location to § 260.10 with the following revisions. First, because of the reorganization of the regulations in 40 CFR part 262, we changed the references to the applicable regulations for the central accumulation areas that are used in the definition of central accumulation area in § 262.200. For LQGs, the reference to § 262.34(a) has been changed to § 262.17 and for SQGs, the reference to § 262.34(d) through (f) has been changed to § 262.16.

Second, we removed the reference to Performance Track in the definition of "central accumulation area" in § 262.200 of subpart K because the Performance Track program was terminated (74 FR 22741; May 14, 2009). Both of these conforming changes are reflected in the definition of "central accumulation area" that has been added in § 260.10.

(13) Make conforming changes to citations that previously used the term "conditionally exempt small quantity generator" to reflect EPA's change to the term "very small quantity generator." The citations where "conditionally exempt small quantity generator" was replaced with "very small quantity generator" include: §§ 262.200, 262.201(b), 262.202(b), 262.203(a), 262.203(b)(2), 262.204(a), 262.209(b), 262.210(d)(2), 262.213(a)(3), 268.1(e)(1), 270.1(c)(2)(iii), 273.8, 273.8(a)(2), 273.81(b), and 279.10(b)(3). EPA also made this conforming change in 40 CFR parts 257 and 258 as well. Although EPA had not explicitly specified these parts as affected citations in the proposal, EPA had explained clearly in the preamble to the proposal that we would need to replace the term "CESQG" with the new term "VSQG" throughout the entire EPA regulations.

(14) Improve the readability of § 264.170, which previously read, "The regulations in this subpart apply to owners and operators of all hazardous waste facilities that store containers of hazardous waste . . . ." The Agency revised this language to currently read, "The regulations in this subpart apply to owners and operators of all hazardous waste facilities that store hazardous waste in containers . . . ."

(15) Improve the readability of the first sentence in § 264.191(a), which previously read, "For each existing tank system . . . the owner or operator must determine that the tank system is not leaking or is unfit for use." The Agency revised this language to currently read, "For each existing tank system . . . the owner or operator must determine that the tank system is not leaking or is fit for use."

(16) Make conforming changes to and improve the readability of § 265.1(c)(7), which previously read, "A generator accumulating waste on-site in compliance with § 262.34 of this chapter, except to the extent the requirements are included in § 262.34 of this chapter." The Agency revised this sentence to currently read, "A generator accumulating waste on site in compliance with applicable conditions for exemption in § 262.14 though § 262.17 and subparts K and L of part 262, except to the extent the requirements of this part are included in those section and subparts." The new references to the conditions for exemption in 262.14 and 262.15, and subparts K and L provide the locations of the existing conditions for exemption from part 265 for VSQGs, satellite accumulation, and academic entities; and the new conditions for exemption for episodic generation.

(17) Correct the list of **Federal Register** notices in § 265.54 to be consistent with the list of references in § 264.54. The reference to 53 FR 37935, September 28, 1988, was missing from § 265.54.

(18) Make a conforming change that removed and reserved § 265.201 (Special requirements for generators of between 100 and 1,000 kg/mo that accumulate hazardous waste in tanks). EPA moved this section to § 262.16.

(19) Add a missing reference to 40 CFR part 268 in § 270.1(a)(3), which previously read, "The RCRA permit program . . . in 40 CFR parts 264, 266, and 267" to read, "The RCRA permit program . . . in 40 CFR parts 264, 266, 267, and 268."

*B. What changed since proposal?*

The Agency is not finalizing three technical corrections. First, we are not finalizing the conforming change to remove and reserve § 262.40(c) that was proposed to be moved to § 262.11. One commenter pointed out that other parts of the regulations reference § 262.40(c). In addition, the title of § 262.40 is Recordkeeping and it is located in subpart D, titled "Recordkeeping and Reporting." EPA has determined that it is appropriate to retain a reference to this recordkeeping requirement for generators in this section. Therefore, we are including a reference from § 262.40(c) to the recordkeeping requirement in § 262.11(f) as part of this final rule.

Second, the Agency is not finalizing the two proposed technical corrections that would have added § 265.445, applicable to drip pads, to § 265.111(c) and § 265.114, respectively. As pointed out by one commenter, this change is not necessary because and § 262.17 already references § 265.445 as part of LQGs having to comply with part 265 subpart W drip pad regulations.

*C. Major Comments*

Except for the comments associated with the proposed changes to § 262.40(c), § 265.111(c) and § 265.114, as well as two commenters pointing out the inadvertent mistakes at § 261.33(e) and (f), commenters were either in support of the proposed technical corrections or had no comments associated with these changes.

**XIII. Electronic Tools To Streamline Hazardous Waste Reporting and Recordkeeping Requirements**

This section summarizes the comments the Agency received regarding the feasibility of using electronic tools to support increases in RCRA program efficiency and effectiveness. More specifically, in the proposed rule, the Agency requested comment on the use of electronic tools in three program areas. In section VIII.B.9 of the proposed rule (80 FR 57946), the Agency requested comment on the feasibility of developing an electronic decision tool to assist generators in making accurate hazardous waste determinations. As part of that discussion, the Agency requested comment on the feasibility of the private sector developing electronic application software (apps) and whether there is a market for such an app and what EPA could do to facilitate software development. In section VIII.H.3 of the proposed rule (80 FR 57961), the Agency requested comment on the feasibility of developing an electronic application containing information from the executive summaries (now referred to as a "quick reference guide") of contingency plans that emergency responders could use in responding to an emergency. Also, in section XV (80 FR 57985), the Agency explored with stakeholders the feasibility of using electronic tools to streamline hazardous waste reporting and recordkeeping requirements.

In broad terms, and as discussed in preamble to the proposed rule, the use of electronic tools may be able to help hazardous waste generators improve and maintain compliance with the RCRA regulations, thereby reducing violations and increasing environmental benefits. Similarly, the use of electronic tools may reduce the costs to EPA, the states and regulated community for records required to be kept on file, or documents required to be reported that currently are submitted on paper.

From an efficiency standpoint, when information is submitted to EPA or the states on paper, this requires government staff or contractors to manually enter the data into federal and state data systems. These processes can be time-consuming, leading sometimes to important information going unnoticed, potential errors introduced through manual data entry requiring time-consuming correction processes by both regulated entities and the government. As an example, when the Toxics Release inventory switched from paper reporting to e-reporting, costs of managing the data went down by 99 percent and accuracy of submissions also was increased. Better use of information technology may be an important step to improving program efficiency, and as a result, program effectiveness as well. However, at this time, the Agency is not finalizing any electronic tools, but will continue to evaluate the comments received and explore the feasibility in the future.

*A. Waste Determination Tools*

Many commenters expressed concerns about the feasibility of developing a waste determination decision tool. Three related areas of concern frequently stood out in their comments. First, developing a decision tool with some measure of reliability would involve a complex undertaking. To be effective and helpful, the decision tool would need to account of all of the different factors associated with generating a waste, including industrial sectors, materials of production, chemical processes, and more. Incorporating these many factors into a reliable decision tool may not be feasible. Second, because of the complexity and time involved, development costs would be expensive, and, as several commenters mentioned, costs to maintain the decision tool would be expensive as well. As expressed by at least one commenter, if there were a viable market for such a tool, the private sector would have stepped in by now and developed it. Hence, the viability of such a tool being developed by the private sector seems remote. Third, if a tool was developed, and if a generator used the tool as the basis of its waste determination and it

was found to be wrong, a difficult question over liability may arise. More than one commenter stated that developing a decision tool with 100 percent accuracy was impossible.

However, others did see merit in such a tool, if carefully scoped out and developed. More than one commenter suggested that EPA consider developing a decision tool that focused on common or "simple" waste streams that could help VSQGs and SQGs in making waste determinations.

In line with this thought, one commenter recommended that the decision tool include 'filtering' questions such as "Does the waste vary per batch? Is the waste associated with a particular type of manufacturing? Do you know what is in the waste?" Depending on the answers, the generator could proceed or stop since the decision tool would not be useful. One commenter went even further by describing an analytical approach by having the tool first determine if the waste is listed or characteristically hazardous, and then determine if it is eligible for one of the exemptions identified in the regulations. By performing the determination this way, the generator would be aware that the waste could potentially be hazardous if it is managed in a way that does not qualify it for an exemption. This commenter also suggested that the tool should provide the user with some sort of output that documents the characterization process, including the generator's answers to the key questions that produced the end result. That way inspectors and others attempting to verify the determination would be able to clearly see the basis for it. Finally, more than one commenter suggested EPA focus on the generic process of making a hazardous waste determination rather than a waste-specific approach.

*B. Emergency Response Executive Summary App*

Interestingly, most commenters did not respond directly to the request for comment concerning the viability of developing an emergency response executive summary app. For those commenters that did respond, comments received were mixed with some favoring development and others opposed either because such tools already exist or are under development, or because they do not see the need. For example, one commenter mentioned that their fire departments were already using CAMEO (Computer-Aided Management of Emergency Operations) in such a way that some form of integration between the existing CAMEO interface and the RCRA contingency planning information would make the most practical sense.

However, several commenters did see the need for electronic submittal of contingency plans to make them more accessible and useful, although one commenter pointed out that electronic submittal could prove problematic during an emergency when power and communications may be lost or disrupted.

*C. Recordkeeping and Reporting Tools*

Commenters were generally supportive of EPA pursuing the development of electronic recordkeeping and reporting tools to improve compliance, but in some cases, not mandating their use. One commenter, a state, supports the use of electronic tools for managing and reporting environmental data, an example being the submittal of groundwater monitoring data by municipal solid waste landfill facilities. Conversely, another state commenter did not support the development of electronic tools that require additional submittals by the regulated community, such as submittal of training or inspection records. Another state commenter encouraged the use of any electronic tools ("e-tools") for notices or reporting required by regulations that would result in a reduction of manual data entry by states.

*D. Analysis of Comments*

A review and analysis of comments regarding the feasibility of using electronic tools to support increases in RCRA program efficiency and effectiveness suggest commenters generally support use of electronic tools that reduce costs, have wide applicability, and improve program effectiveness. Where those criteria cannot be met, support usually was not forthcoming. Hence, many of the commenters did not see the cost-effectiveness of developing a waste determination decision tool unless properly scoped out to address common or simple wastes where the costs of development could be manageable—also realizing that using any potential tool developed would be a guide to assist generators in making a waste determination and not a definitive decision tool that guaranteed an accurate answer.

As many know, the Agency has already developed an electronic tool to enter site identification information on EPA Form 8700–12 as well as biennial report information on EPA Form 8700–13 A/B. Similarly, the Agency is in the process of developing e-Manifest to increase the efficiency and effectiveness of hazardous waste shipments. Based on comments, the Agency will continue to review existing RCRA reporting and recordkeeping regulatory requirements to identify cost-effective areas of opportunity to either use electronic tools or allow for submittal of information, such as RCRA contingency plans.

## XIV. Enforceability

Persons that generate hazardous waste must comply with all the applicable independent requirements of the RCRA hazardous waste regulations, unless they obtain a conditional exemption from those requirements, provided by § 262.14, or by § 262.15, 262.16, or 262.17, or by § 262.70. Each generator category's independent requirements are listed in § 262.10 of this final rule. If a person violates independent requirements, EPA may bring an enforcement action under section 3008 of RCRA for violations of the independent requirements. Where a generator does not comply with conditions for an exemption and is therefore no longer exempt, the enforcement action will allege violations of those requirements for hazardous waste storage facilities from which the generator was attempting to remain exempt. States may choose to enforce against violations of state hazardous waste requirements under state authorities.

As with any violation, EPA and authorized states have numerous enforcement mechanisms available that range in severity. These include notices of violation, orders for compliance, orders for operations to cease, or assessment of penalties as appropriate. In addition, EPA and authorized states have flexibility in applying these mechanisms to the various responsible parties as appropriate to the specific circumstances. This rule does not affect the availability of any of these mechanisms, or EPA's or states' choice as to which type of enforcement approach to pursue against violators. The rule does distinguish between independent requirements and conditions from exemption in the generator regulations: It makes clear that a generator's violation of a condition of exemption results in the generator losing that exemption, resulting in a violation of the hazardous waste storage requirement from which the generator was seeking an exemption.

## XV. State Authorization

### *A. Applicability of Rules in Authorized States*

Under section 3006 of RCRA, EPA may authorize states to administer the RCRA Subtitle C hazardous waste program. Following authorization, the authorized state program operates in lieu of the federal regulations. EPA retains authority to enforce the authorized state Subtitle C program, although authorized states have primary enforcement authority. EPA also retains its authority under RCRA sections 3007, 3008, 3013, and 7003. The standards and requirements for state authorization are found at 40 CFR part 271.

Prior to enactment of the Hazardous and Solid Waste Amendments of 1984 (HSWA), a state with final RCRA authorization administered its hazardous waste program entirely in lieu of EPA administering the federal program in that state. EPA did not issue permits for any facilities in that state, since the state was now authorized to issue RCRA permits. When new, more stringent federal requirements were promulgated, the state was obligated to enact equivalent authorities within specified time frames. However, the new requirements did not take effect in an authorized state until the state adopted the equivalent state requirements.

In contrast, under RCRA section 3006(g) (42 U.S.C. 6926(g)), which was added by HSWA, new requirements and prohibitions imposed under HSWA authority take effect in authorized states at the same time that they take effect in unauthorized states. While states must still adopt HSWA-related provisions as state law to retain authorization, EPA implements the HSWA provisions in authorized states, including the issuance of any permits pertaining to HSWA requirements, until the state is granted authorization to do so.

Authorized states are required to modify their programs only when EPA promulgates federal requirements that are more stringent or broader in scope than existing federal requirements.[104] RCRA section 3009 allows the states to impose standards more stringent than those in the federal program (see 40 CFR 271.1). Therefore, authorized states may, but are not required to, adopt federal regulations, both HSWA and non-HSWA, that are considered less stringent than previous federal regulations.

### *B. Effect on State Authorization of Final Rule*

This document finalizes regulations that amend certain sections of the hazardous waste generator regulations in 40 CFR parts 260 through 265, 268, 270, 273, and 279. These regulations were promulgated under the authority of sections 2002, 3001, 3002, 3003, 3004, 3007, and 3010 of RCRA). These changes are promulgated under non-HSWA authority.

Thus, the standards will be applicable on the effective date only in those states that do not have final authorization of their base RCRA programs. Moreover, authorized states are required to modify their programs only when EPA promulgates federal regulations that are more stringent or broader in scope than the authorized state regulations. For those changes that are less stringent, states are not required to modify their programs.

Several of the revisions to the hazardous waste generator regulations are more stringent than those promulgated earlier. These include the following: (1) Requiring SQGs, LQGs and transfer facilities to better define the risks of hazardous wastes accumulated in tanks, containers, drip pads, and containment buildings, as well as when hazardous waste is accumulated in satellite accumulation areas (section IX.E. of this preamble); (2) requiring LQGs to notify EPA or their authorized state when they plan to close their facilities (section IX.I of this preamble); (3) requiring SQGs to re-notify every four years (section IX.L of this preamble); (4) requiring LQGs to submit a biennial report that identifies all of the hazardous wastes generated in the calendar year, not just for the months the facility was an LQG (sections IX.N of this preamble); (5) requiring LQGs updating their contingency plans to prepare a quick reference guide for their contingency plans to assist responders in an emergency (section XI of this preamble); and (6) requiring facilities that recycle hazardous waste without storing the waste to prepare and submit a Biennial Report. Therefore, states that have adopted the base RCRA program will be required to modify their hazardous waste programs to incorporate equivalent provisions if these standards are finalized.

On the other hand, three of the final revisions are less stringent than the current hazardous waste regulations. These revisions include the following: (1) Allowing VSQGs to voluntarily send hazardous waste to LQGs under the control of the same person (section IX.K of this preamble); (2) allowing LQGs to apply for a waiver from their local fire department to accumulate ignitable and reactive wastes within the 50 foot facility boundary (section IX.H of this preamble); and (3) allowing VSQGs and SQGs to voluntarily maintain their existing regulatory status if they have an episodic event that generates additional amounts of hazardous waste which would have resulted in them moving into a higher generator category for a short period of time, so long as they comply with specified conditions (section X of this preamble). Thus, authorized states may, but are not required to, adopt these changes.

This final rule also includes several revisions that are neither more nor less stringent, such as (1) reorganizing the hazardous waste generator regulations to make them more user-friendly (section VI of this preamble); (2) defining central accumulation area and the generator categories (section VII of this preamble); (3) mixing a non-hazardous waste with a hazardous waste (section IX.C of this preamble); (4) repeating the prohibition for generators from sending hazardous liquids to landfills (section IX.M of this preamble); (5) replacing the list of specific data elements with a requirement to complete and submit all data elements required in the Biennial Report form (section IX.N of this preamble); (6) deleting the performance track and laboratories XL regulations (section IX.P of this preamble); and (7) technical corrections and conforming changes to various parts of the RCRA regulations (section XII of this preamble). Thus, authorized states may, but are not required to, adopt these changes.

## XVI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### *A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. This action is a "significant regulatory action" in that it may raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. Any changes made in response to OMB recommendations have been documented in the docket.

In addition, EPA prepared an analysis of the potential costs and benefits associated with this action. This

[104] EPA notes that decisions regarding whether a state rule is more stringent or broader in scope than the federal program are made when the Agency authorizes a state program for a particular rule.

analysis is contained in EPA's Regulatory Impact Analysis (RIA) document titled "Regulatory Impact Assessment of the Potential Costs, Benefits, and Other Impacts of the Final Hazardous Waste Generator Improvements Rule." A copy of the analysis is available in the docket for this action and the analysis is briefly summarized here.

EPA estimates the future annualized cost to industry to comply with the requirements of this action at between $5.9 and $13.3 million at 7% discount rate. Similarly, the annualized cost savings or benefits for facilities opting to take advantage of two voluntary programs in the rule (*e.g.*, consolidation of VSQG waste by large quantity generators under the same ownership, and generators who would not be required to change generator status as a result of an episodic event) in combination with the less stringent requirements for SQGs accumulating waste on drip pads or in containment buildings is between $8.3 and $14.4 million at 7% discount rate. This results in a net annualized benefit for the whole rule of $2.4 million for the low-end estimate and $1.1 million for the high-end estimate at a 7% discount rate.

*B. Paperwork Reduction Act (PRA)*

The information collection activities in this rule have been submitted for approval to the Office of Management and Budget (OMB) under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2513.02. You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here. The information collection requirements are not enforceable until OMB approves them.

This rule is necessary for EPA and authorized states to oversee the generation and management of hazardous waste. EPA is promulgating the establishment of these information collection requirements under the authority of RCRA Subtitle C. Several provisions in this rule will require respondents to either submit information to EPA or their authorized state, or maintain records at their facility. For example, generators will have to notify EPA or their authorized state they plan to take advantage of two voluntary provisions that will provide greater flexibility in how they manage they hazardous waste (*i.e.*, VSQG consolidation of their hazardous waste by a LQG under control of the same person or company; and episodic generation of hazardous waste resulting in a temporary change in regulatory status).

Similarly, SQGs will have to re-notify EPA or their authorized state every four years that they have not changed their regulatory category to support effective inspections and program management activities. New LQGs and LQGs that have to update their emergency response plan will be required to develop and submit a quick reference guide of their emergency response plan to their local emergency responders or, as appropriate, the Local Emergency Planning Committee to effectively assist these parties in responding to an emergency.

EPA and state agencies will use the collected information to ensure that hazardous wastes are managed in a cost-effective manner that minimizes risks to human health and the environment. Local emergency response organizations will also use the collected information to prepare contingency plans to reduce risks to emergency responders and bystanders. EPA does not expect confidentiality to be an issue in generators either providing information to EPA or an authorized state or in maintaining the necessary records required by the rule. The statutory authority to collect this information is found at RCRA 3002 (42 U.S.C. 6922) and RCRA 3003 (42 U.S.C. 6923).

*Respondents/affected entities:* Private sector and state and local authorities.

*Respondent's obligation to respond:* Mandatory.

*Estimated number of respondents:* 167,346.

*Frequency of response:* On occasion, annually, and biennially depending on the requirement.

*Total estimated burden:* 260,366 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $14,184,000 (per year), includes $2,526,000 in annualized capital or operation & maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations in 40 CFR are listed in 40 CFR part 9. When OMB approves this ICR, the Agency will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in this final rule.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, the impact of concern is any significant adverse economic impact on small entities. An agency may certify that a rule will not have a significant economic impact on a substantial number of small entities if the rule relieves regulatory burden, has no net burden or otherwise has a positive economic effect on the small entities subject to the rule.

The small entities directly regulated by this final rule include entities that generate hazardous waste across various industries, including, but not limited to, pesticide end-users and application services; industrial chemical manufacturers; wood preservation; pharmaceutical and other chemical and chemical product manufacturers; dry cleaners and industrial launderers; funeral services and crematories; photography; textile manufacturing; vehicle maintenance; metal manufacturing; construction; printing; professional cleaning services; hospitals; and wholesale paints and chemicals. The RIA estimated that the compliance costs of the final rule represent less than 1 percent of average annual revenues for small entities in the affected universe. The RIA used the Economic Census and Census of Agriculture data to calculate the average annual revenues of small entities in the affected universe. The average annualized costs of the rule are estimated to be between $112 and $209 on a per facility basis for small entities in the affected universe (using a 7 percent discount rate). At most, the RIA estimates the costs of the final rule represent between 0.08 and 0.15 percent of annual revenues for small entities in the affected universe. Therefore, we have concluded that this action is not expected to have a significant impact to a substantial number of small entities.

*D. Unfunded Mandates Reform Act*

This action does not contain an unfunded mandate of $100 million as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The RIA estimates that the state, local, and tribal government share of future average annualized direct costs for the final rule requirements to range between $0.2 million and $0.4 million per year (using a 7 percent discount rate). Thus, this final rule is not subject to the requirements of sections 202 or 205 of UMRA.

This final rule is also not subject to the requirements of section 203 of UMRA because it contains no regulatory requirements that might significantly or uniquely affect small governments. The rulemaking finalizes clarifications and

modifications to the hazardous waste generator regulations, which impacts only those entities that generate hazardous waste. Small governments would only be subject to the changes in the final rule if they generated hazardous waste subject to the RCRA hazardous waste requirements.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action may have tribal implications. However, it will neither impose substantial direct compliance costs on tribal governments, nor preempt tribal law. Under the RCRA statute, the federal government implements hazardous waste regulations directly in Indian Country. Thus, the final changes to the hazardous waste regulations would not impose any direct costs on tribal governments.

The EPA consulted with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development. A summary of that consultation is provided in the docket for this action.

As required by section 7(a), the EPA's Tribal Consultation Official has certified that the requirements of the executive order have been met in a meaningful and timely manner. A copy of the certification is included in the docket for this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045 because it is not economically significant as defined in Executive Order 12866, and because the Agency does not believe the environmental health or safety risks addressed by this action present a disproportionate risk to children. The Agency does not believe that this action presents risks to the public. In fact, there are several components to this final rule that modify the existing hazardous waste generator regulations to enhance environmental protection in the local community, which includes protection of children. Examples include (1) requiring LQGs and SQGs to provide more detailed marking and labeling information for containers, tanks, drip pads, and containment buildings accumulating hazardous wastes; (2) requiring LQGs to notify EPA or an authorized state when they plan to close either a hazardous waste accumulation unit or their site; (3) requiring LQGs and SQGs to re-notify EPA or the authorized state on a periodic basis of their hazardous waste generator activities; and (4) improving emergency preparedness and response regulations on the part of SQGs and LQGs.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution or Use*

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. This final rule does not involve the supply, distribution, or use of energy.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environment effects on minority, low-income and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994). The final rule aims to improve human health and environmental protection in a variety of ways. For example, there are several components to this final rule that modify the existing hazardous waste generator regulations to assist generators in understanding and facilitating improved compliance with the hazardous waste regulations. Examples include clarifying regulations regarding the mixing of non-hazardous waste with a hazardous waste by a generator, and better explaining the process by which generators determine under what level of regulation that they must manage their hazardous waste (*i.e.*, determining if they are VSQG, SQG, or LQG). Additionally, EPA is reorganizing the hazardous waste generator rules to make them more user-friendly and therefore assist generators in understanding their responsibilities in managing the hazardous waste they generate safely.

Still other components of this final rule enhance protection of the local community, and therefore foster improved human health and environmental protection, including for minority and low-income populations. These components include, for example, (1) requiring LQGs and SQGs to provide more comprehensive marking and labeling information for containers, tanks, drip pads, and containment buildings accumulating hazardous wastes; (2) requiring LQGs to notify EPA or an authorized state when they plan to close either a hazardous waste unit or their site; (3) requiring LQGs and SQGs to re-notify EPA or the authorized state on a periodic basis of their hazardous waste generator activities; and (4) improving emergency preparedness and response regulations on the part of SQGs and LQGs.

Furthermore, EPA is allowing VSQGs to ship their hazardous waste to an LQG under the control of the same person. As described in section IX.K of the preamble, this may increase environmental protection in the local community because hazardous waste generated by VSQGs would be subject to more stringent requirements upon receipt by the LQG, including ultimate management by a RCRA permitted TSDF (as opposed to being managed possibly in a municipal solid waste landfill). Although this change could result in an increase in traffic for certain communities, EPA believes the increase would not be significant given that VSQGs currently may send their hazardous waste to a number of destinations, including municipal and non-municipal solid waste management facilities.

Last, EPA is finalizing alternative standards for VSQGs and SQGs that would allow these entities to maintain their generator category if they generate hazardous waste during an episodic event. Although these generators will be allowed to temporarily manage a greater amount of hazardous waste than their current generator category allows, EPA is finalizing conditions under which the hazardous waste generated from an episodic event must be managed in order to maintain protection of human health and the environment. Therefore, EPA does not anticipate disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous populations from these alternative standards.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United

States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

**List of Subjects**

*40 CFR Part 257*

Environmental protection, Waste treatment and disposal.

*40 CFR Part 258*

Environmental protection, Reporting and recordkeeping requirements, Waste treatment and disposal, Water pollution control.

*40 CFR Part 260*

Environmental protection, Administrative practice and procedure, Confidential business information, Hazardous waste, Incorporation by reference, Reporting and recordkeeping requirements.

*40 CFR Part 261*

Environmental protection, Hazardous waste, Recycling, Reporting and recordkeeping requirements.

*40 CFR Part 262*

Environmental protection, Exports, Hazardous materials transportation, Hazardous waste, Imports, Incorporation by reference, Labeling, Packaging and containers, Reporting and recordkeeping requirements.

*40 CFR Part 263*

Environmental protection, Hazardous materials transportation, Hazardous waste, Reporting and recordkeeping requirements.

*40 CFR Part 264*

Environmental protection, Air pollution control, Hazardous waste, Insurance, Packaging and containers, Reporting and recordkeeping requirements, Security measures, Surety bonds.

*40 CFR Part 265*

Environmental protection, Air pollution control, Hazardous waste, Incorporation by reference, Insurance, Packaging and containers, Reporting and recordkeeping requirements, Security measures, Surety bonds, Water supply.

*40 CFR Part 266*

Environmental protection, Energy, Hazardous waste, Recycling, Reporting and recordkeeping requirements.

*40 CFR Part 267*

Environmental protection, Hazardous waste, Reporting and recordkeeping requirements.

*40 CFR Part 268*

Environmental protection, Hazardous waste, Reporting and recordkeeping requirements.

*40 CFR Part 270*

Environmental protection, Administrative practice and procedure, Confidential business information, Hazardous materials transportation, Hazardous waste, Reporting and recordkeeping requirements, Water pollution control, Water supply.

*40 CFR Part 271*

Environmental protection, Administrative practice and procedure, Confidential business information, Hazardous materials transportation, Hazardous waste, Indians-lands, Intergovernmental relations, Penalties, Reporting and recordkeeping requirements, Water pollution control, Water supply.

*40 CFR Part 273*

Environmental protection, Hazardous materials transportation, Hazardous waste.

*40 CFR Part 279*

Environmental protection, Petroleum, Recycling, Reporting and recordkeeping requirements.

Dated: October 28, 2016.

**Gina McCarthy,**

*Administrator.*

For the reasons set out in the preamble, title 40, chapter I of the Code of Federal Regulations is amended as follows:

## PART 257—CRITERIA FOR CLASSIFICATION OF SOLID WASTE DISPOSAL FACILITIES AND PRACTICES

■ 1. The authority citation for part 257 continues to read as follows:

**Authority:** 42 U.S.C. 6907(a)(3), 6912(a)(1), 6944(a), and 6949a(c); 33 U.S.C. 1345(d) and (e).

■ 2. Section 257.1 is amended by revising paragraph (a) introductory text to read as follows:

**§ 257.1 Scope and purpose.**

(a) Unless otherwise provided, the criteria in §§ 257.1 through 257.4 are adopted for determining which solid waste disposal facilities and practices pose a reasonable probability of adverse effects on health or the environment under sections 1008(a)(3) and 4004(a) of the Resource Conservation and Recovery Act (The Act). Unless otherwise provided, the criteria in §§ 257.5 through 257.30 are adopted for purposes of ensuring that non-municipal non-hazardous waste disposal units that receive very small quantity generator (VSQG) waste do not present risks to human health and the environment taking into account the practicable capability of such units in accordance with section 4010(c) of the Act. Unless otherwise provided, the criteria in §§ 257.50 through 257.107 are adopted for determining which CCR landfills and CCR surface impoundments pose a reasonable probability of adverse effects on health or the environment under sections 1008(a)(3) and 4004(a) of the Act.

* * * * *

■ 3. Section 257.2 is amended by revising the definition for *Construction and demolition (C&D) landfill* to read as follows:

**§ 257.2 Definitions.**

* * * * *

*Construction and demolition (C&D) landfill* means a solid waste disposal facility subject to the requirements of subparts A or B of this part that receives construction and demolition waste and does not receive hazardous waste (defined in § 261.3 of this chapter) or industrial solid waste (defined in § 258.2 of this chapter). Only a C&D landfill that meets the requirements of subpart B of this part may receive very small quantity generator waste (defined in § 260.10 of this chapter). A C&D landfill typically receives any one or more of the following types of solid wastes: Roadwork material, excavated material, demolition waste, construction/renovation waste, and site clearance waste.

* * * * *

■ 4. Part 257 is amended by revising the heading for Subpart B to read as follows:

### Subpart B—Disposal Standards for the Receipt of Very Small Quantity Generator (VSQG) Wastes at Non-Municipal Non-Hazardous Waste Disposal Units

■ 5. Section 257.5 is amended by revising its section heading; paragraph (a); and the paragraph (b) definitions of "Existing unit" and "New unit" to read as follows:

**§ 257.5 Disposal standards for owners/operators of non-municipal non-hazardous waste disposal units that receive Very Small Quantity Generator (VSQG) waste.**

(a) *Applicability.* (1) The requirements in this section apply to owners/operators of any non-municipal non-hazardous waste disposal unit that receives VSQG hazardous waste, as defined in 40 CFR 260.10. Non-

municipal non-hazardous waste disposal units that meet the requirements of this section may receive VSQG wastes. Any owner/operator of a non-municipal non-hazardous waste disposal unit that receives VSQG hazardous waste continues to be subject to the requirements in §§ 257.3–2, 257.3–3, 257.3–5, 257.3–6, 257.3–7, and 257.3–8(a), (b), and (d).

(2) Any non-municipal non-hazardous waste disposal unit that is receiving VSQG hazardous waste as of January 1, 1998, must be in compliance with the requirements in §§ 257.7 through 257.13 and § 257.30 by January 1, 1998, and the requirements in §§ 257.21 through 257.28 by July 1, 1998.

(3) Any non-municipal non-hazardous waste disposal unit that does not meet the requirements in this section may not receive VSQG wastes.

(4) Any non-municipal non-hazardous waste disposal unit that is not receiving VSQG Hazardous waste as of January 1, 1998, continues to be subject to the requirements in §§ 257.1 through 257.4.

(5) Any non-municipal non-hazardous waste disposal unit that first receives VSQG hazardous waste after January 1, 1998, must be in compliance with §§ 257.7 through 257.30 prior to the receipt of VSQG hazardous waste.

(b) * * *

*Existing unit* means any non-municipal non-hazardous waste disposal unit that is receiving VSQG hazardous waste as of January 1, 1998.

* * * * *

*New unit* means any non-municipal non-hazardous waste disposal unit that has not received VSQG hazardous waste prior to January 1, 1998.

* * * * *

**§ 257.13 [Amended]**

■ 6. Amend § 257.13 by removing the text "CESQG" and adding the text "VSQG" in its place.

■ 7. Section 257.21 is amended by revising paragraph (h) introductory text to read as follows:

**§ 257.21 Applicability.**

* * * * *

(h) Directors of approved States can use the flexibility in paragraph (i) of this section for any non-municipal non-hazardous waste disposal unit that receives VSQG waste, if the non-municipal non-hazardous waste disposal unit:

* * * * *

## PART 258—CRITERIA FOR MUNICIPAL SOLID WASTE LANDFILLS

■ 8. The authority citation for part 258 continues to read as follows:

**Authority:** 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

■ 9. Section 258.2 is amended by revising the definitions for "Construction and demolition (C&D) landfill" and "Municipal solid waste landfill (MSWLF)" to read as follows:

**§ 258.2 Definitions.**

* * * * *

*Construction and demolition (C&D) landfill* means a solid waste disposal facility subject to the requirements in part 257, subparts A or B of this chapter that receives construction and demolition waste and does not receive hazardous waste (defined in § 261.3 of this chapter) or industrial solid waste (defined in this section). Only a C&D landfill that meets the requirements of 40 CFR part 257, subpart B may receive very small quantity generator waste (defined in § 260.10 of this chapter). A C&D landfill typically receives any one or more of the following types of solid wastes: Roadwork material, excavated material, demolition waste, construction/renovation waste, and site clearance waste.

* * * * *

*Municipal solid waste landfill (MSWLF) unit* means a discrete area of land or an excavation that receives household waste, and that is not a land application unit, surface impoundment, injection well, or waste pile, as those terms are defined under § 257.2 of this chapter. A MSWLF unit also may receive other types of RCRA Subtitle D wastes, such as commercial solid waste, nonhazardous sludge, very small quantity generator waste and industrial solid waste. Such a landfill may be publicly or privately owned. A MSWLF unit may be a new MSWLF unit, an existing MSWLF unit or a lateral expansion. A construction and demolition landfill that receives residential lead-based paint waste and does not receive any other household waste is not a MSWLF unit.

* * * * *

■ 10. Section 258.20 is amended by revising paragraph (b) to read as follows:

**§ 258.20 Procedures for excluding the receipt of hazardous waste.**

* * * * *

(b) For purposes of this section, *regulated hazardous waste* means a solid waste that is a hazardous waste, as defined in 40 CFR 261.3, that is not excluded from regulation as a hazardous waste under 40 CFR 261.4(b) or was not generated by a very small quantity generator as defined in § 260.10 of this chapter.

## PART 260—HAZARDOUS WASTE MANAGEMENT SYSTEM: GENERAL

■ 11. The authority citation for part 260 continues to read as follows:

**Authority:** 42 U.S.C. 6905, 6912(a), 6921–6927, 6930, 6934, 6935, 6937, 6938, 6939, and 6974.

■ 12. Section 260.3 is amended by revising the introductory text to read as follows:

**§ 260.3 Use of number and gender.**

As used in parts 260 through 273 of this chapter:

* * * * *

■ 13. Amend § 260.10 by:

■ a. Adding in alphabetical order the definitions of "Acute hazardous waste", "Central accumulation area", "Large quantity generator", and "Non-acute hazardous waste";

■ b. Removing the definition for "Performance Track member facility";

■ c. Revising the definition of "Small quantity generator";

■ d. Revising the heading of the definition "Treatability Study" to read "Treatability study";

■ e. Revising the heading of the definition "Universal Waste Handler" to read "Universal waste handler";

■ f. Revising the heading of the definition "Universal Waste Transporter" to read "Universal waste transporter"; and

■ g. Adding in alphabetical order the definition of "Very small quantity generator".

The revisions and additions read as follows:

**§ 260.10 Definitions.**

* * * * *

*Acute hazardous waste* means hazardous wastes that meet the listing criteria in § 261.11(a)(2) and therefore are either listed in § 261.31 of this chapter with the assigned hazard code of (H) or are listed in § 261.33(e) of this chapter.

* * * * *

*Central accumulation area* means any on-site hazardous waste accumulation area with hazardous waste accumulating in units subject to either § 262.16 (for small quantity generators) or § 262.17 of this chapter (for large quantity generators). A central accumulation area at an eligible academic entity that chooses to operate under 40 CFR part 262 subpart K is also subject to § 262.211 when accumulating unwanted material and/or hazardous waste.

* * * * *

*Large quantity generator* is a generator who generates any of the following amounts in a calendar month:

(1) Greater than or equal to 1,000 kilograms (2200 lbs) of non-acute hazardous waste; or

(2) Greater than 1 kilogram (2.2 lbs) of acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter; or

(3) Greater than 100 kilograms (220 lbs) of any residue or contaminated soil, water, or other debris resulting from the cleanup of a spill, into or on any land or water, of any acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter.

* * * * *

*Non-acute hazardous waste* means all hazardous wastes that are not acute hazardous waste, as defined in this section.

* * * * *

*Small quantity generator* is a generator who generates the following amounts in a calendar month:

(1) Greater than 100 kilograms (220 lbs) but less than 1,000 kilograms (2200 lbs) of non-acute hazardous waste; and

(2) Less than or equal to 1 kilogram (2.2 lbs) of acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter; and

(3) Less than or equal to 100 kilograms (220 lbs) of any residue or contaminated soil, water, or other debris resulting from the cleanup of a spill, into or on any land or water, of any acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter.

* * * * *

*Very small quantity generator* is a generator who generates less than or equal to the following amounts in a calendar month:

(1) 100 kilograms (220 lbs) of non-acute hazardous waste; and

(2) 1 kilogram (2.2 lbs) of acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter; and

(3) 100 kilograms (220 lbs) of any residue or contaminated soil, water, or other debris resulting from the cleanup of a spill, into or on any land or water, of any acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter.

* * * * *

■ 14. Section 260.11 is amended by revising the section heading and paragraph (d)(1) to read as follows:

**§ 260.11 Incorporation by reference.**

* * * * *

(d) * * *

(1) "Flammable and Combustible Liquids Code" (NFPA 30), 1977 or 1981, IBR approved for §§ 262.16(b), 264.198(b), 265.198(b), 267.202(b).

* * * * *

## PART 261—IDENTIFICATION AND LISTING OF HAZARDOUS WASTE

■ 15. The authority citation for part 261 continues to read as follows:

**Authority:** 42 U.S.C. 6905, 6912(a), 6921, 6922, 6924(y), and 6938.

■ 16. Section 261.1 is amended by revising paragraphs (a)(1) and (c)(6) to read as follows:

**§ 261.1 Purpose and scope.**

(a) * * *

(1) Subpart A defines the terms "solid waste" and "hazardous waste", identifies those wastes which are excluded from regulation under parts 262 through 266, 268 and 270 of this chapter and establishes special management requirements for hazardous waste produced by very small quantity generators and hazardous waste which is recycled.

* * * * *

(c) * * *

(6) "Scrap metal" is bits and pieces of metal parts (*e.g.,* bars, turnings, rods, sheets, wire) or metal pieces that may be combined together with bolts or soldering (*e.g.,* radiators, scrap automobiles, railroad box cars), which when worn or superfluous can be recycled.

* * * * *

■ 17. Section 261.4 is amended by revising paragraph (a)(7) to read as follows:

**§ 261.4 Exclusions.**

(a) * * *

(7) Spent sulfuric acid used to produce virgin sulfuric acid provided it is not accumulated speculatively as defined in § 261.1(c) of this chapter.

* * * * *

**§ 261.5 [Removed and reserved]**

■ 18. Remove and reserve § 261.5.

■ 19. Section 261.6 is amended by adding paragraph (c)(2)(iv) to read as follows:

**§ 261.6 Requirements for recyclable materials.**

* * * * *

(c) * * *

(2) * * *

(iv) Section 265.75 of this chapter (biennial reporting requirements).

* * * * *

■ 20. Section 261.33 is amended by revising paragraphs (e) introductory text and (f) introductory text to read as follows:

**§ 261.33 Discarded commercial chemical products, off-specification species, container residues, and spill residues thereof.**

* * * * *

(e) The commercial chemical products, manufacturing chemical intermediates or off-specification commercial chemical products or manufacturing chemical intermediates referred to in paragraphs (a) through (d) of this section, are identified as acute hazardous wastes (H).

* * * * *

(f) The commercial chemical products, manufacturing chemical intermediates, or off-specification commercial chemical products referred to in paragraphs (a) through (d) of this section, are identified as toxic wastes (T) unless otherwise designated.

* * * * *

■ 21. Section 261.420 is amended by adding paragraph (g) to read as follows:

**§ 261.420 Contingency planning and emergency procedures for facilities generating or accumulating more than 6000 kg of hazardous secondary material.**

* * * * *

(g) *Personnel training.* All employees must be thoroughly familiar with proper waste handling and emergency procedures relevant to their responsibilities during normal facility operations and emergencies.

## PART 262—STANDARDS APPLICABLE TO GENERATORS OF HAZARDOUS WASTE

■ 22. The authority citation for part 262 continues to read as follows:

**Authority:** 42 U.S.C. 6906, 6912, 6922–6925, 6937, and 6938.

### Subpart A—General

■ 23. Section 262.1 is added to subpart A to read as follows:

**§ 262.1 Terms used in this part.**

As used in this part:

*Condition for exemption* means any requirement in §§ 262.14, 262.15, 262.16, 262.17, 262.70, or subpart K or subpart L of this part that states an event, action, or standard that must occur or be met in order to obtain an exemption from any applicable requirement in parts 124, 264 through 268, and 270 of this chapter, or from any requirement for notification under section 3010 of RCRA.

*Independent requirement* means a requirement of part 262 that states an event, action, or standard that must occur or be met; and that applies without relation to, or irrespective of, the purpose of obtaining a conditional

exemption from storage facility permit, interim status, and operating requirements under §§ 262.14, 262.15, 262.16, 262.17, or subpart K or subpart L of this part.

■ 24. Section 262.10 is amended by:
■ a. Revising paragraphs (a) and (b);
■ b. Removing and reserving paragraph (c);
■ c. Revising paragraph (d);
■ d. Revising paragraph (g);
■ e. Removing and reserving paragraph (j); and
■ f. Revising paragraph (l).

The revisions read as follows:

**§ 262.10 Purpose, scope, and applicability.**

(a) The regulations in this part establish standards for generators of hazardous waste as defined by 40 CFR 260.10.

(1) A person who generates a hazardous waste as defined by 40 CFR part 261 is subject to all the applicable independent requirements in the subparts and sections listed below:

(i) *Independent requirements of a very small quantity generator.* (A) Section 262.11(a) through (d) Hazardous waste determination and recordkeeping; and

(B) Section 262.13 Generator category determination.

(ii) *Independent requirements of a small quantity generator.* (A) Section 262.11 Hazardous waste determination and recordkeeping;

(B) Section 262.13 Generator category determination;

(C) Section 262.18 EPA identification numbers and re-notification for small quantity generators and large quantity generators;

(D) Part 262 subpart B—Manifest requirements applicable to small and large quantity generators;

(E) Part 262 subpart C—Pre-transport requirements applicable to small and large quantity generators;

(F) Section 262.40 Recordkeeping;

(G) Section 262.44 Recordkeeping for small quantity generators; and

(H) Part 262 subpart H—Transboundary movements of hazardous waste for recovery or disposal.

(iii) *Independent requirements of a large quantity generator.* (A) Section 262.11 Hazardous waste determination and recordkeeping;

(B) Section 262.13 Generator category determination;

(C) Section 262.18 EPA identification numbers and re-notification for small quantity generators and large quantity generators;

(D) Part 262 subpart B—Manifest requirements applicable to small and large quantity generators;

(E) Part 262 subpart C—Pre-transport requirements applicable to small and large quantity generators;

(F) Part 262 subpart D—Recordkeeping and reporting applicable to small and large quantity generators, except § 262.44; and

(G) Part 262 subpart H—Transboundary movements of hazardous waste for recovery or disposal.

(2) A generator that accumulates hazardous waste on site is a person that stores hazardous waste; such generator is subject to the applicable requirements of parts 124, 264 through 267, and 270 of this chapter and section 3010 of RCRA, unless it is one of the following:

(i) A very small quantity generator that meets the conditions for exemption in § 262.14;

(ii) A small quantity generator that meets the conditions for exemption in §§ 262.15 and 262.16; or

(iii) A large quantity generator that meets the conditions for exemption in §§ 262.15 and 262.17.

(3) A generator shall not transport, offer its hazardous waste for transport, or otherwise cause its hazardous waste to be sent to a facility that is not a designated facility, as defined in § 260.10 of this chapter, or not otherwise authorized to receive the generator's hazardous waste.

(b) *Determining generator category.* A generator must use § 262.13 to determine which provisions of this part are applicable to the generator based on the quantity of hazardous waste generated per calendar month.

* * * * *

(d) Any person who exports or imports hazardous wastes must comply with § 262.18 and subpart H of this part.

* * * * *

(g)(1) A generator's violation of an independent requirement is subject to penalty and injunctive relief under section 3008 of RCRA.

(2) A generator's noncompliance with a condition for exemption in this part is not subject to penalty or injunctive relief under section 3008 of RCRA as a violation of a 40 CFR part 262 condition for exemption. Noncompliance by any generator with an applicable condition for exemption from storage permit and operations requirements means that the facility is a storage facility operating without an exemption from the permit, interim status, and operations requirements in 40 CFR parts 124, 264 through 267, and 270 of this chapter, and the notification requirements of section 3010 of RCRA. Without an exemption, any violations of such storage requirements are subject to penalty and injunctive relief under section 3008 of RCRA.

* * * * *

(l) The laboratories owned by an eligible academic entity that chooses to be subject to the requirements of subpart K of this part are not subject to (for purposes of this paragraph, the terms "laboratory" and "eligible academic entity" shall have the meaning as defined in § 262.200):

(1) The independent requirements of § 262.11 or the regulations in § 262.15 for large quantity generators and small quantity generators, except as provided in subpart K, and

(2) The conditions of § 262.14, for very small quantity generators, except as provided in subpart K.

* * * * *

■ 25. Revise § 262.11 to read as follows:

**§ 262.11 Hazardous waste determination and recordkeeping.**

A person who generates a solid waste, as defined in 40 CFR 261.2, must make an accurate determination as to whether that waste is a hazardous waste in order to ensure wastes are properly managed according to applicable RCRA regulations. A hazardous waste determination is made using the following steps:

(a) The hazardous waste determination for each solid waste must be made at the point of waste generation, before any dilution, mixing, or other alteration of the waste occurs, and at any time in the course of its management that it has, or may have, changed its properties as a result of exposure to the environment or other factors that may change the properties of the waste such that the RCRA classification of the waste may change.

(b) A person must determine whether the solid waste is excluded from regulation under 40 CFR 261.4.

(c) If the waste is not excluded under 40 CFR 261.4, the person must then use knowledge of the waste to determine whether the waste meets any of the listing descriptions under subpart D of 40 CFR part 261. Acceptable knowledge that may be used in making an accurate determination as to whether the waste is listed may include waste origin, composition, the process producing the waste, feedstock, and other reliable and relevant information. If the waste is listed, the person may file a delisting petition under 40 CFR 260.20 and 260.22 to demonstrate to the Administrator that the waste from this particular site or operation is not a hazardous waste.

(d) The person then must also determine whether the waste exhibits one or more hazardous characteristics as

identified in subpart C of 40 CFR part 261 by following the procedures in paragraph (d)(1) or (2) of this section, or a combination of both.

(1) The person must apply knowledge of the hazard characteristic of the waste in light of the materials or the processes used to generate the waste. Acceptable knowledge may include process knowledge (*e.g.,* information about chemical feedstocks and other inputs to the production process); knowledge of products, by-products, and intermediates produced by the manufacturing process; chemical or physical characterization of wastes; information on the chemical and physical properties of the chemicals used or produced by the process or otherwise contained in the waste; testing that illustrates the properties of the waste; or other reliable and relevant information about the properties of the waste or its constituents. A test other than a test method set forth in subpart C of 40 CFR part 261, or an equivalent test method approved by the Administrator under 40 CFR 260.21, may be used as part of a person's knowledge to determine whether a solid waste exhibits a characteristic of hazardous waste. However, such tests do not, by themselves, provide definitive results. Persons testing their waste must obtain a representative sample of the waste for the testing, as defined at 40 CFR 260.10.

(2) When available knowledge is inadequate to make an accurate determination, the person must test the waste according to the applicable methods set forth in subpart C of 40 CFR part 261 or according to an equivalent method approved by the Administrator under 40 CFR 260.21 and in accordance with the following:

(i) Persons testing their waste must obtain a representative sample of the waste for the testing, as defined at 40 CFR 260.10.

(ii) Where a test method is specified in subpart C of 40 CFR part 261, the results of the regulatory test, when properly performed, are definitive for determining the regulatory status of the waste.

(e) If the waste is determined to be hazardous, the generator must refer to parts 261, 264, 265, 266, 267, 268, and 273 of this chapter for other possible exclusions or restrictions pertaining to management of the specific waste.

(f) *Recordkeeping for small and large quantity generators.* A small or large quantity generator must maintain records supporting its hazardous waste determinations, including records that identify whether a solid waste is a hazardous waste, as defined by 40 CFR 261.3. Records must be maintained for at least three years from the date that the waste was last sent to on-site or off-site treatment, storage, or disposal. These records must comprise the generator's knowledge of the waste and support the generator's determination, as described at paragraphs (c) and (d) of this section. The records must include, but are not limited to, the following types of information: The results of any tests, sampling, waste analyses, or other determinations made in accordance with this section; records documenting the tests, sampling, and analytical methods used to demonstrate the validity and relevance of such tests; records consulted in order to determine the process by which the waste was generated, the composition of the waste, and the properties of the waste; and records which explain the knowledge basis for the generator's determination, as described at paragraph (d)(1) of this section. The periods of record retention referred to in this section are extended automatically during the course of any unresolved enforcement action regarding the regulated activity or as requested by the Administrator.

(g) *Identifying hazardous waste numbers for small and large quantity generators.* If the waste is determined to be hazardous, small quantity generators and large quantity generators must identify all applicable EPA hazardous waste numbers (EPA hazardous waste codes) in subparts C and D of part 261 of this chapter. Prior to shipping the waste off site, the generator also must mark its containers with all applicable EPA hazardous waste numbers (EPA hazardous waste codes) according to § 262.32.

**§ 262.12 [Removed and reserved]**

■ 26. Remove and reserve § 262.12.

■ 27. Subpart A of part 262 is amended by adding §§ 262.13 through 262.18 to read as follows:

## Subpart A—General

* * * * *

Sec.

262.13 Generator category determination.
262.14 Conditions for exemption for a very small quantity generator.
262.15 Satellite accumulation area regulations for small and large quantity generators.
262.16 Conditions for exemption for a small quantity generator that accumulates hazardous waste.
262.17 Conditions for exemption for a large quantity generator that accumulates hazardous waste.
262.18 EPA identification numbers and re-notification for small quantity generators and large quantity generators.

* * * * *

**§ 262.13 Generator category determination.**

A generator must determine its generator category. A generator's category is based on the amount of hazardous waste generated each month and may change from month to month. This section sets forth procedures to determine whether a generator is a very small quantity generator, a small quantity generator, or a large quantity generator for a particular month, as defined in § 260.10 of this chapter.

(a) *Generators of either acute hazardous waste or non-acute hazardous waste.* A generator who either generates acute hazardous waste or non-acute hazardous waste in a calendar month shall determine its generator category for that month by doing the following:

(1) Counting the total amount of hazardous waste generated in the calendar month;

(2) Subtracting from the total any amounts of waste exempt from counting as described in paragraphs (c) and (d) of this section; and

(3) Determining the resulting generator category for the hazardous waste generated using Table 1 of this section.

(b) *Generators of both acute and non-acute hazardous wastes.* A generator who generates both acute hazardous waste and non-acute hazardous waste in the same calendar month shall determine its generator category for that month by doing the following:

(1) Counting separately the total amount of acute hazardous waste and the total amount of non-acute hazardous waste generated in the calendar month;

(2) Subtracting from each total any amounts of waste exempt from counting as described in paragraphs (c) and (d) of this section;

(3) Determining separately the resulting generator categories for the quantities of acute and non-acute hazardous waste generated using Table 1 of this section; and

(4) Comparing the resulting generator categories from paragraph (b)(3) of this section and applying the more stringent generator category to the accumulation and management of both non-acute hazardous waste and acute hazardous waste generated for that month.

TABLE 1 TO § 262.13—GENERATOR CATEGORIES BASED ON QUANTITY OF WASTE GENERATED IN A CALENDAR MONTH

| Quantity of acute hazardous waste generated in a calendar month | Quantity of non-acute hazardous waste generated in a calendar month | Quantity of residues from a clean-up of acute hazardous waste generated in a calendar month | Generator category |
|---|---|---|---|
| > 1 kg | Any amount | Any amount | Large quantity generator. |
| Any amount | ≥ 1,000 kg | Any amount | Large quantity generator. |
| Any amount | Any amount | > 100 kg | Large quantity generator. |
| ≤ 1 kg | > 100 kg and < 1,000 kg | ≤ 100 kg | Small quantity generator. |
| ≤ 1 kg | ≤ 100 kg | ≤ 100 kg | Very small quantity generator. |

(c) When making the monthly quantity-based determinations required by this part, the generator must include all hazardous waste that it generates, except hazardous waste that:

(1) Is exempt from regulation under 40 CFR 261.4(c) through (f), 261.6(a)(3), 261.7(a)(1), or 261.8;

(2) Is managed immediately upon generation only in on-site elementary neutralization units, wastewater treatment units, or totally enclosed treatment facilities as defined in 40 CFR 260.10;

(3) Is recycled, without prior storage or accumulation, only in an on-site process subject to regulation under 40 CFR 261.6(c)(2);

(4) Is used oil managed under the requirements of 40 CFR 261.6(a)(4) and 40 CFR part 279;

(5) Is spent lead-acid batteries managed under the requirements of 40 CFR part 266 subpart G;

(6) Is universal waste managed under 40 CFR 261.9 and 40 CFR part 273;

(7) Is a hazardous waste that is an unused commercial chemical product (listed in 40 CFR part 261 subpart D or exhibiting one or more characteristics in 40 CFR part 261 subpart C) that is generated solely as a result of a laboratory clean-out conducted at an eligible academic entity pursuant to § 262.213. For purposes of this provision, the term eligible academic entity shall have the meaning as defined in § 262.200; or

(8) Is managed as part of an episodic event in compliance with the conditions of subpart L of this part.

(d) In determining the quantity of hazardous waste generated in a calendar month, a generator need not include:

(1) Hazardous waste when it is removed from on-site accumulation, so long as the hazardous waste was previously counted once;

(2) Hazardous waste generated by on-site treatment (including reclamation) of the generator's hazardous waste, so long as the hazardous waste that is treated was previously counted once; and

(3) Hazardous waste spent materials that are generated, reclaimed, and subsequently reused on site, so long as such spent materials have been previously counted once.

(e) Based on the generator category as determined under this section, the generator must meet the applicable independent requirements listed in § 262.10. A generator's category also determines which of the provisions of §§ 262.14, 262.15, 262.16 or 262.17 must be met to obtain an exemption from the storage facility permit, interim status, and operating requirements when accumulating hazardous waste.

(f) *Mixing hazardous wastes with solid wastes*—(1) *Very small quantity generator wastes.* (i) Hazardous wastes generated by a very small quantity generator may be mixed with solid wastes. Very small quantity generators may mix a portion or all of its hazardous waste with solid waste and remain subject to § 262.14 even though the resultant mixture exceeds the quantity limits identified in the definition of very small quantity generator at § 260.10 of this chapter, unless the mixture exhibits one or more of the characteristics of hazardous waste identified in part 261 subpart C of this chapter.

(ii) If the resulting mixture exhibits a characteristic of hazardous waste, this resultant mixture is a newly-generated hazardous waste. The very small quantity generator must count both the resultant mixture amount plus the other hazardous waste generated in the calendar month to determine whether the total quantity exceeds the very small quantity generator calendar month quantity limits identified in the definition of generator categories found in § 260.10 of this chapter. If so, to remain exempt from the permitting, interim status, and operating standards, the very small quantity generator must meet the conditions for exemption applicable to either a small quantity generator or a large quantity generator. The very small quantity generator must also comply with the applicable independent requirements for either a small quantity generator or a large quantity generator.

(iii) If a very small quantity generator's wastes are mixed with used oil, the mixture is subject to 40 CFR part 279. Any material produced from such a mixture by processing, blending, or other treatment is also regulated under 40 CFR part 279.

(2) *Small quantity generator and large quantity generator wastes.* (i) Hazardous wastes generated by a small quantity generator or large quantity generator may be mixed with solid waste. These mixtures are subject to the following: the mixture rule in §§ 261.3(a)(2)(iv), (b)(2) and (3), and (g)(2)(i); the prohibition of dilution rule at § 268.3(a); the land disposal restriction requirements of § 268.40 if a characteristic hazardous waste is mixed with a solid waste so that it no longer exhibits the hazardous characteristic; and the hazardous waste determination requirement at § 262.11.

(ii) If the resulting mixture is found to be a hazardous waste, this resultant mixture is a newly-generated hazardous waste. A small quantity generator must count both the resultant mixture amount plus the other hazardous waste generated in the calendar month to determine whether the total quantity exceeds the small quantity generator calendar monthly quantity limits identified in the definition of generator categories found in § 260.10 of this chapter. If so, to remain exempt from the permitting, interim status, and operating standards, the small quantity generator must meet the conditions for exemption applicable to a large quantity generator. The small quantity generator must also comply with the applicable independent requirements for a large quantity generator.

**§ 262.14 Conditions for exemption for a very small quantity generator.**

(a) Provided that the very small quantity generator meets all the conditions for exemption listed in this section, hazardous waste generated by the very small quantity generator is not subject to the requirements of parts 124, 262 (except §§ 262.10–262.14) through 268, and 270 of this chapter, and the notification requirements of section 3010 of RCRA and the very small quantity generator may accumulate hazardous waste on site without

complying with such requirements. The conditions for exemption are as follows:

(1) In a calendar month the very small quantity generator generates less than or equal to the amounts specified in the definition of "very small quantity generator" in § 260.10 of this chapter;

(2) The very small quantity generator complies with § 262.11(a) through (d);

(3) If the very small quantity generator accumulates at any time greater than 1 kilogram (2.2 lbs) of acute hazardous waste or 100 kilograms (220 lbs) of any residue or contaminated soil, water, or other debris resulting from the cleanup of a spill, into or on any land or water, of any acute hazardous waste listed in §§ 261.31 or 261.33(e) of this chapter, all quantities of that acute hazardous waste are subject to the following additional conditions for exemption:

(i) Such waste is held on site for no more than 90 days beginning on the date when the accumulated wastes exceed the amounts provided above; and

(ii) The conditions for exemption in § 262.17(a) through (g).

(4) If the very small quantity generator accumulates at any time 1,000 kilograms (2,200 lbs) or greater of non-acute hazardous waste, all quantities of that hazardous waste are subject to the following additional conditions for exemption:

(i) Such waste is held on site for no more than 180 days, or 270 days, if applicable, beginning on the date when the accumulated waste exceed the amounts provided above;

(ii) The quantity of waste accumulated on site never exceeds 6,000 kilograms (13,200 lbs); and

(iii) The conditions for exemption in § 262.16(b)(2) through (f).

(5) A very small quantity generator that accumulates hazardous waste in amounts less than or equal to the limits in paragraphs (a)(3) and (4) of this section must either treat or dispose of its hazardous waste in an on-site facility or ensure delivery to an off-site treatment, storage, or disposal facility, either of which, if located in the U.S., is:

(i) Permitted under part 270 of this chapter;

(ii) In interim status under parts 265 and 270 of this chapter;

(iii) Authorized to manage hazardous waste by a state with a hazardous waste management program approved under part 271 of this chapter;

(iv) Permitted, licensed, or registered by a state to manage municipal solid waste and, if managed in a municipal solid waste landfill is subject to part 258 of this chapter;

(v) Permitted, licensed, or registered by a state to manage non-municipal non-hazardous waste and, if managed in a non-municipal non-hazardous waste disposal unit, is subject to the requirements in §§ 257.5 through 257.30 of this chapter;

(vi) A facility which:

(A) Beneficially uses or reuses, or legitimately recycles or reclaims its waste; or

(B) Treats its waste prior to beneficial use or reuse, or legitimate recycling or reclamation;

(vii) For universal waste managed under part 273 of this chapter, a universal waste handler or destination facility subject to the requirements of part 273 of this chapter;

(viii) A large quantity generator under the control of the same person as the very small quantity generator, provided the following conditions are met:

(A) The very small quantity generator and the large quantity generator are under the control of the same person as defined in § 260.10 of this chapter. "Control," for the purposes of this section, means the power to direct the policies of the generator, whether by the ownership of stock, voting rights, or otherwise, except that contractors who operate generator facilities on behalf of a different person as defined in § 260.10 of this chapter shall not be deemed to "control" such generators.

(B) The very small quantity generator marks its container(s) of hazardous waste with:

(*1*) The words "Hazardous Waste" and

(*2*) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704).

(b) The placement of bulk or non-containerized liquid hazardous waste or hazardous waste containing free liquids (whether or not sorbents have been added) in any landfill is prohibited.

(c) A very small quantity generator experiencing an episodic event may generate and accumulate hazardous waste in accordance with subpart L of this part in lieu of §§ 262.15, 262.16, and 262.17.

**§ 262.15 Satellite accumulation area regulations for small and large quantity generators.**

(a) A generator may accumulate as much as 55 gallons of non-acute hazardous waste and/or either one quart of liquid acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter or 1 kg (2.2 lbs) of solid acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter in containers at or near any point of generation where wastes initially accumulate which is under the control of the operator of the process generating the waste, without a permit or interim status and without complying with the requirements of parts 124, 264 through 267, and 270 of this chapter, provided that all of the conditions for exemption in this section are met. A generator may comply with the conditions for exemption in this section instead of complying with the conditions for exemption in § 262.16(b) or § 262.17(a), except as required in § 262.15(a)(7) and (8). The conditions for exemption for satellite accumulation are:

(1) If a container holding hazardous waste is not in good condition, or if it begins to leak, the generator must immediately transfer the hazardous waste from this container to a container that is in good condition and does not leak, or immediately transfer and manage the waste in a central accumulation area operated in compliance with § 262.16(b) or § 262.17(a).

(2) The generator must use a container made of or lined with materials that will not react with, and are otherwise compatible with, the hazardous waste to be accumulated, so that the ability of the container to contain the waste is not impaired.

(3) Special standards for incompatible wastes.

(i) Incompatible wastes, or incompatible wastes and materials, (see appendix V of part 265 for examples) must not be placed in the same container, unless § 265.17(b) of this chapter is complied with.

(ii) Hazardous waste must not be placed in an unwashed container that previously held an incompatible waste or material (see appendix V of part 265 for examples), unless § 265.17(b) of this chapter is complied with.

(iii) A container holding a hazardous waste that is incompatible with any waste or other materials accumulated nearby in other containers must be separated from the other materials or protected from them by any practical means.

(4) A container holding hazardous waste must be closed at all times during accumulation, except:

(i) When adding, removing, or consolidating waste; or

(ii) When temporary venting of a container is necessary

(A) For the proper operation of equipment, or

(B) To prevent dangerous situations, such as build-up of extreme pressure.

(5) A generator must mark or label its container with the following:

(i) The words "Hazardous Waste" and

(ii) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704).

(6) A generator who accumulates either acute hazardous waste listed in § 261.31 or § 261.33(e) of this chapter or non-acute hazardous waste in excess of the amounts listed in paragraph (a) of this section at or near any point of generation must do the following:

(i) Comply within three consecutive calendar days with the applicable central accumulation area regulations in § 262.16(b) or § 262.17(a), or

(ii) Remove the excess from the satellite accumulation area within three consecutive calendar days to either:

(A) A central accumulation area operated in accordance with the applicable regulations in § 262.16(b) or § 262.17(a);

(B) An on-site interim status or permitted treatment, storage, or disposal facility, or

(C) An off-site designated facility; and

(iii) During the three-consecutive-calendar-day period the generator must continue to comply with paragraphs (a)(1) through (5) of this section. The generator must mark or label the container(s) holding the excess accumulation of hazardous waste with the date the excess amount began accumulating.

(7) All satellite accumulation areas operated by a small quantity generator must meet the preparedness and prevention regulations of § 262.16(b)(8) and emergency procedures at § 262.16(b)(9).

(8) All satellite accumulation areas operated by a large quantity generator

must meet the Preparedness, Prevention and Emergency Procedures in subpart M of this part.

(b) [Reserved]

**§ 262.16   Conditions for exemption for a small quantity generator that accumulates hazardous waste.**

A small quantity generator may accumulate hazardous waste on site without a permit or interim status, and without complying with the requirements of parts 124, 264 through 267, and 270 of this chapter, or the notification requirements of section 3010 of RCRA, provided that all the conditions for exemption listed in this section are met:

(a) *Generation.* The generator generates in a calendar month no more than the amounts specified in the definition of "small quantity generator" in § 260.10 of this chapter.

(b) *Accumulation.* The generator accumulates hazardous waste on site for no more than 180 days, unless in compliance with the conditions for exemption for longer accumulation in paragraphs (d) and (e) of this section. The following accumulation conditions also apply:

(1) *Accumulation limit.* The quantity of hazardous waste accumulated on site never exceeds 6,000 kilograms (13,200 pounds);

(2) *Accumulation of hazardous waste in containers*—(i) *Condition of containers.* If a container holding hazardous waste is not in good condition, or if it begins to leak, the small quantity generator must immediately transfer the hazardous waste from this container to a container that is in good condition, or immediately manage the waste in some other way that complies with the conditions for exemption of this section.

(ii) *Compatibility of waste with container.* The small quantity generator must use a container made of or lined with materials that will not react with, and are otherwise compatible with, the hazardous waste to be accumulated, so that the ability of the container to contain the waste is not impaired.

(iii) *Management of containers.* (A) A container holding hazardous waste must always be closed during accumulation, except when it is necessary to add or remove waste.

(B) A container holding hazardous waste must not be opened, handled, or accumulated in a manner that may rupture the container or cause it to leak.

(iv) *Inspections.* At least weekly, the small quantity generator must inspect central accumulation areas. The small quantity generator must look for leaking containers and for deterioration of

containers caused by corrosion or other factors. See paragraph (b)(2)(i) of this section for remedial action required if deterioration or leaks are detected.

(v) *Special conditions for accumulation of incompatible wastes.* (A) Incompatible wastes, or incompatible wastes and materials, (see appendix V of part 265 for examples) must not be placed in the same container, unless § 265.17(b) of this chapter is complied with.

(B) Hazardous waste must not be placed in an unwashed container that previously held an incompatible waste or material (see appendix V of part 265 for examples), unless § 265.17(b) of this chapter is complied with.

(C) A container accumulating hazardous waste that is incompatible with any waste or other materials accumulated or stored nearby in other containers, piles, open tanks, or surface impoundments must be separated from the other materials or protected from them by means of a dike, berm, wall, or other device.

(3) *Accumulation of hazardous waste in tanks.*

(i) [Reserved]

(ii) A small quantity generator of hazardous waste must comply with the following general operating conditions:

(A) Treatment or accumulation of hazardous waste in tanks must comply with § 265.17(b) of this chapter.

(B) Hazardous wastes or treatment reagents must not be placed in a tank if they could cause the tank or its inner liner to rupture, leak, corrode, or otherwise fail before the end of its intended life.

(C) Uncovered tanks must be operated to ensure at least 60 centimeters (2 feet) of freeboard, unless the tank is equipped with a containment structure (*e.g.*, dike or trench), a drainage control system, or a diversion structure (*e.g.*, standby tank) with a capacity that equals or exceeds the volume of the top 60 centimeters (2 feet) of the tank.

(D) Where hazardous waste is continuously fed into a tank, the tank must be equipped with a means to stop this inflow (*e.g.*, waste feed cutoff system or by-pass system to a stand-by tank).

(iii) Except as noted in paragraph (b)(3)(iv) of this section, a small quantity generator that accumulates hazardous waste in tanks must inspect, where present:

(A) Discharge control equipment (*e.g.*, waste feed cutoff systems, by-pass systems, and drainage systems) at least once each operating day, to ensure that it is in good working order;

(B) Data gathered from monitoring equipment (*e.g.*, pressure and

85812 Federal Register / Vol. 81, No. 228 / Monday, November 28, 2016 / Rules and Regulations

temperature gauges) at least once each operating day to ensure that the tank is being operated according to its design;

(C) The level of waste in the tank at least once each operating day to ensure compliance with paragraph (b)(3)(ii)(C) of this section;

(D) The construction materials of the tank at least weekly to detect corrosion or leaking of fixtures or seams; and

(E) The construction materials of, and the area immediately surrounding, discharge confinement structures (*e.g.*, dikes) at least weekly to detect erosion or obvious signs of leakage (*e.g.*, wet spots or dead vegetation). The generator must remedy any deterioration or malfunction of equipment or structures which the inspection reveals on a schedule which ensures that the problem does not lead to an environmental or human health hazard. Where a hazard is imminent or has already occurred, remedial action must be taken immediately.

(iv) A small quantity generator accumulating hazardous waste in tanks or tank systems that have full secondary containment and that either use leak detection equipment to alert personnel to leaks, or implement established workplace practices to ensure leaks are promptly identified, must inspect at least weekly, where applicable, the areas identified in paragraphs (b)(3)(iii)(A) through (E) of this section. Use of the alternate inspection schedule must be documented in the generator's operating record. This documentation must include a description of the established workplace practices at the generator.

(v) [Reserved]

(vi) A small quantity generator accumulating hazardous waste in tanks must, upon closure of the facility, remove all hazardous waste from tanks, discharge control equipment, and discharge confinement structures. At closure, as throughout the operating period, unless the small quantity generator can demonstrate, in accordance with § 261.3(c) or (d) of this chapter, that any solid waste removed from its tank is not a hazardous waste, then it must manage such waste in accordance with all applicable provisions of parts 262, 263, 265 and 268 of this chapter.

(vii) A small quantity generator must comply with the following special conditions for accumulation of ignitable or reactive waste:

(A) Ignitable or reactive waste must not be placed in a tank, unless:

(*1*) The waste is treated, rendered, or mixed before or immediately after placement in a tank so that the resulting waste, mixture, or dissolution of material no longer meets the definition of ignitable or reactive waste under § 261.21 or § 261.23 of this chapter and § 265.17(b) of this chapter is complied with; or

(*2*) The waste is accumulated or treated in such a way that it is protected from any material or conditions that may cause the waste to ignite or react; or

(*3*) The tank is used solely for emergencies.

(B) A small quantity generator which treats or accumulates ignitable or reactive waste in covered tanks must comply with the buffer zone requirements for tanks contained in Tables 2–1 through 2–6 of the National Fire Protection Association's "Flammable and Combustible Liquids Code" (1977 or 1981) (incorporated by reference, see § 260.11).

(C) A small quantity generator must comply with the following special conditions for incompatible wastes:

(*1*) Incompatible wastes, or incompatible wastes and materials, (see part 265 appendix V for examples) must not be placed in the same tank, unless § 265.17(b) of this chapter is complied with.

(*2*) Hazardous waste must not be placed in an unwashed tank that previously held an incompatible waste or material, unless § 265.17(b) of this chapter is complied with.

(4) *Accumulation of hazardous waste on drip pads.* If the waste is placed on drip pads, the small quantity generator must comply with the following:

(i) Subpart W of 40 CFR part 265 (except § 265.445 (c));

(ii) The small quantity generator must remove all wastes from the drip pad at least once every 90 days. Any hazardous wastes that are removed from the drip pad at least once every 90 days are then subject to the 180-day accumulation limit in paragraph (b) of this section and § 262.15 if hazardous wastes are being managed in satellite accumulation areas prior to being moved to the central accumulation area; and

(iii) The small quantity generator must maintain on site at the facility the following records readily available for inspection:

(A) A written description of procedures that are followed to ensure that all wastes are removed from the drip pad and associated collection system at least once every 90 days; and

(B) Documentation of each waste removal, including the quantity of waste removed from the drip pad and the sump or collection system and the date and time of removal.

(5) *Accumulation of hazardous waste in containment buildings.* If the waste is placed in containment buildings, the small quantity generator must comply with of 40 CFR part 265 subpart DD. The generator must label its containment buildings with the words "Hazardous Waste" in a conspicuous place easily visible to employees, visitors, emergency responders, waste handlers, or other persons on site and also in a conspicuous place provide an indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704).The generator must also maintain:

(i) The professional engineer certification that the building complies with the design standards specified in 40 CFR 265.1101. This certification must be in the generator's files prior to operation of the unit; and

(ii) The following records by use of inventory logs, monitoring equipment, or any other effective means:

(A) A written description of procedures to ensure that each waste volume remains in the unit for no more than 90 days, a written description of the waste generation and management practices for the facility showing that the generator is consistent with maintaining the 90 day limit, and documentation that the procedures are complied with; or

(B) Documentation that the unit is emptied at least once every 90 days.

(C) Inventory logs or records with the above information must be maintained on site and readily available for inspection.

(6) *Labeling and marking of containers and tanks*—. (i) *Containers.* A small quantity generator must mark or label its containers with the following:

(A) The words "Hazardous Waste";

(B) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard

Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704); and

(C) The date upon which each period of accumulation begins clearly visible for inspection on each container.

(ii) *Tanks.* A small quantity generator accumulating hazardous waste in tanks must do the following:

(A) Mark or label its tanks with the words "Hazardous Waste";

(B) Mark or label its tanks with an indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704);

(C) Use inventory logs, monitoring equipment, or other records to demonstrate that hazardous waste has been emptied within 180 days of first entering the tank if using a batch process, or in the case of a tank with a continuous flow process, demonstrate that estimated volumes of hazardous waste entering the tank daily exit the tank within 180 days of first entering; and

(D) Keep inventory logs or records with the above information on site and readily available for inspection.

(7) *Land disposal restrictions.* A small quantity generator must comply with all the applicable requirements under 40 CFR part 268.

(8) *Preparedness and prevention*—(i) *Maintenance and operation of facility.* A small quantity generator must maintain and operate its facility to minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment.

(ii) *Required equipment.* All areas where hazardous waste is either generated or accumulated must be equipped with the items in paragraphs (b)(8)(ii)(A) through (D) of this section (*unless* none of the hazards posed by waste handled at the facility could require a particular kind of equipment specified below or the actual waste generation or accumulation area does not lend itself for safety reasons to have a particular kind of equipment specified below). A small quantity generator may determine the most appropriate locations to locate equipment necessary to prepare for and respond to emergencies.

(A) An internal communications or alarm system capable of providing immediate emergency instruction (voice or signal) to facility personnel;

(B) A device, such as a telephone (immediately available at the scene of operations) or a hand-held two-way radio, capable of summoning emergency assistance from local police departments, fire departments, or State or local emergency response teams;

(C) Portable fire extinguishers, fire control equipment (including special extinguishing equipment, such as that using foam, inert gas, or dry chemicals), spill control equipment, and decontamination equipment; and

(D) Water at adequate volume and pressure to supply water hose streams, or foam producing equipment, or automatic sprinklers, or water spray systems.

(iii) *Testing and maintenance of equipment.* All communications or alarm systems, fire protection equipment, spill control equipment, and decontamination equipment, where required, must be tested and maintained as necessary to assure its proper operation in time of emergency.

(iv) *Access to communications or alarm system.* (A) Whenever hazardous waste is being poured, mixed, spread, or otherwise handled, all personnel involved in the operation must have immediate access (*e.g.*, direct or unimpeded access) to an internal alarm or emergency communication device, either directly or through visual or voice contact with another employee, *unless* such a device is not required under paragraph (a)(8)(ii) of this section.

(B) In the event there is just one employee on the premises while the facility is operating, the employee must have immediate access (*e.g.*, direct or unimpeded access) to a device, such as a telephone (immediately available at the scene of operation) or a hand-held two-way radio, capable of summoning external emergency assistance, *unless* such a device is not required under paragraph (a)(8)(ii) of this section.

(v) *Required aisle space.* The small quantity generator must maintain aisle space to allow the unobstructed movement of personnel, fire protection equipment, spill control equipment, and decontamination equipment to any area of facility operation in an emergency, unless aisle space is not needed for any of these purposes.

(vi) *Arrangements with local authorities.* (A) The small quantity generator must attempt to make arrangements with the local police department, fire department, other emergency response teams, emergency response contractors, equipment suppliers and local hospitals, taking into account the types and quantities of hazardous wastes handled at the facility. Arrangements may be made with the Local Emergency Planning Committee, if it is determined to be the appropriate organization with which to make arrangements.

(*1*) A small quantity generator attempting to make arrangements with its local fire department must determine the potential need for the services of the local police department, other emergency response teams, emergency response contractors, equipment suppliers and local hospitals.

(*2*) As part of this coordination, the small quantity generator shall attempt to make arrangements, as necessary, to familiarize the above organizations with the layout of the facility, the properties of hazardous waste handled at the facility and associated hazards, places where facility personnel would normally be working, entrances to roads inside the facility, and possible evacuation routes as well as the types of injuries or illnesses that could result from fires, explosions, or releases at the facility.

(*3*) Where more than one police or fire department might respond to an emergency, the small quantity generator shall attempt to make arrangements designating primary emergency authority to a specific fire or police department, and arrangements with any others to provide support to the primary emergency authority.

(B) A small quantity generator shall maintain records documenting the arrangements with the local fire department as well as any other organization necessary to respond to an emergency. This documentation must include documentation in the operating record that either confirms such arrangements actively exist or, in cases where no arrangements exist, confirms that attempts to make such arrangements were made.

(C) A facility possessing 24-hour response capabilities may seek a waiver from the authority having jurisdiction (AHJ) over the fire code within the facility's state or locality as far as needing to make arrangements with the local fire department as well as any other organization necessary to respond to an emergency, provided that the waiver is documented in the operating record.

(9) *Emergency procedures.* The small quantity generator complies with the following conditions for those areas of the generator facility where hazardous waste is generated and accumulated:

(i) At all times there must be at least one employee either on the premises or on call (*i.e.*, available to respond to an emergency by reaching the facility within a short period of time) with the responsibility for coordinating all emergency response measures specified in paragraph (b)(9)(iv) of this section. This employee is the emergency coordinator.

(ii) The small quantity generator must post the following information next to telephones or in areas directly involved in the generation and accumulation of hazardous waste:

(A) The name and emergency telephone number of the emergency coordinator;

(B) Location of fire extinguishers and spill control material, and, if present, fire alarm; and

(C) The telephone number of the fire department, unless the facility has a direct alarm.

(iii) The small quantity generator must ensure that all employees are thoroughly familiar with proper waste handling and emergency procedures, relevant to their responsibilities during normal facility operations and emergencies;

(iv) The emergency coordinator or his designee must respond to any emergencies that arise. The applicable responses are as follows:

(A) In the event of a fire, call the fire department or attempt to extinguish it using a fire extinguisher;

(B) In the event of a spill, the small quantity generator is responsible for containing the flow of hazardous waste to the extent possible, and as soon as is practicable, cleaning up the hazardous waste and any contaminated materials or soil. Such containment and cleanup can be conducted either by the small quantity generator or by a contractor on behalf of the small quantity generator;

(C) In the event of a fire, explosion, or other release that could threaten human health outside the facility or when the small quantity generator has knowledge that a spill has reached surface water, the small quantity generator must immediately notify the National Response Center (using their 24-hour toll free number 800/424–8802). The report must include the following information:

(*1*) The name, address, and U.S. EPA identification number of the small quantity generator;

(*2*) Date, time, and type of incident (*e.g.*, spill or fire);

(*3*) Quantity and type of hazardous waste involved in the incident;

(*4*) Extent of injuries, if any; and

(*5*) Estimated quantity and disposition of recovered materials, if any.

(c) *Transporting over 200 miles.* A small quantity generator who must transport its waste, or offer its waste for transportation, over a distance of 200 miles or more for off-site treatment, storage or disposal may accumulate hazardous waste on site for 270 days or less without a permit or without having interim status provided that the generator complies with the conditions of paragraph (b) of this section.

(d) *Accumulation time limit extension.* A small quantity generator who accumulates hazardous waste for more than 180 days (or for more than 270 days if it must transport its waste, or offer its waste for transportation, over a distance of 200 miles or more) is subject to the requirements of 40 CFR parts 264, 265, 267, 268, and 270 of this chapter unless it has been granted an extension to the 180-day (or 270-day if applicable) period. Such extension may be granted by EPA if hazardous wastes must remain on site for longer than 180 days (or 270 days if applicable) due to unforeseen, temporary, and uncontrollable circumstances. An extension of up to 30 days may be granted at the discretion of the Regional Administrator on a case-by-case basis.

(e) *Rejected load.* A small quantity generator who sends a shipment of hazardous waste to a designated facility with the understanding that the designated facility can accept and manage the waste and later receives that shipment back as a rejected load or residue in accordance with the manifest discrepancy provisions of § 264.72 or § 265.72 of this chapter may accumulate the returned waste on site in accordance with paragraphs (a)–(d) of this section. Upon receipt of the returned shipment, the generator must:

(*1*) Sign Item 18c of the manifest, if the transporter returned the shipment using the original manifest; or

(*2*) Sign Item 20 of the manifest, if the transporter returned the shipment using a new manifest.

(f) A small quantity generator experiencing an episodic event may accumulate hazardous waste in accordance with subpart L of this part in lieu of § 262.17.

**§ 262.17 Conditions for exemption for a large quantity generator that accumulates hazardous waste.**

A large quantity generator may accumulate hazardous waste on site without a permit or interim status, and without complying with the requirements of parts 124, 264 through 267, and 270 of this chapter, or the notification requirements of section 3010 of RCRA, provided that all of the following conditions for exemption are met:

(a) *Accumulation.* A large quantity generator accumulates hazardous waste on site for no more than 90 days, unless in compliance with the accumulation time limit extension or F006 accumulation conditions for exemption in paragraphs (b) through (e) of this section. The following accumulation conditions also apply:

(1) *Accumulation of hazardous waste in containers.* If the hazardous waste is placed in containers, the large quantity generator must comply with the following:

(i) *Air emission standards.* The applicable requirements of subparts AA, BB, and CC of 40 CFR part 265;

(ii) *Condition of containers.* If a container holding hazardous waste is not in good condition, or if it begins to leak, the large quantity generator must immediately transfer the hazardous waste from this container to a container that is in good condition, or immediately manage the waste in some other way that complies with the conditions for exemption of this section;

(iii) *Compatibility of waste with container.* The large quantity generator must use a container made of or lined with materials that will not react with, and are otherwise compatible with, the hazardous waste to be stored, so that the ability of the container to contain the waste is not impaired;

(iv) *Management of containers.* (A) A container holding hazardous waste must always be closed during accumulation, except when it is necessary to add or remove waste.

(B) A container holding hazardous waste must not be opened, handled, or stored in a manner that may rupture the container or cause it to leak.

(v) *Inspections.* At least weekly, the large quantity generator must inspect central accumulation areas. The large quantity generator must look for leaking containers and for deterioration of containers caused by corrosion or other factors. See paragraph (a)(1)(ii) of this section for remedial action required if deterioration or leaks are detected.

(vi) *Special conditions for accumulation of ignitable and reactive wastes.* (A) Containers holding ignitable or reactive waste must be located at least 15 meters (50 feet) from the facility's property line unless a written approval is obtained from the authority having jurisdiction over the local fire code allowing hazardous waste accumulation to occur within this

restricted area. A record of the written approval must be maintained as long as ignitable or reactive hazardous waste is accumulated in this area.

(B) The large quantity generator must take precautions to prevent accidental ignition or reaction of ignitable or reactive waste. This waste must be separated and protected from sources of ignition or reaction including but not limited to the following: Open flames, smoking, cutting and welding, hot surfaces, frictional heat, sparks (static, electrical, or mechanical), spontaneous ignition (*e.g.,* from heat-producing chemical reactions), and radiant heat. While ignitable or reactive waste is being handled, the large quantity generator must confine smoking and open flame to specially designated locations. "No Smoking" signs must be conspicuously placed wherever there is a hazard from ignitable or reactive waste.

(vii) *Special conditions for accumulation of incompatible wastes.* (A) Incompatible wastes, or incompatible wastes and materials, (see appendix V of part 265 for examples) must not be placed in the same container, unless § 265.17(b) of this chapter is complied with.

(B) Hazardous waste must not be placed in an unwashed container that previously held an incompatible waste or material (see appendix V of part 265 for examples), unless § 265.17(b) of this chapter is complied with.

(C) A container holding a hazardous waste that is incompatible with any waste or other materials accumulated or stored nearby in other containers, piles, open tanks, or surface impoundments must be separated from the other materials or protected from them by means of a dike, berm, wall, or other device.

(2) *Accumulation of hazardous waste in tanks.* If the waste is placed in tanks, the large quantity generator must comply with the applicable requirements of subparts J, except § 265.197(c) of Closure and post-closure care and § 265.200—Waste analysis and trial tests, as well as the applicable requirements of AA, BB, and CC of 40 CFR part 265.

(3) *Accumulation of hazardous waste on drip pads.* If the hazardous waste is placed on drip pads, the large quantity generator must comply with the following:

(i) Subpart W of 40 CFR part 265;

(ii) The large quantity generator must remove all wastes from the drip pad at least once every 90 days. Any hazardous wastes that are removed from the drip pad are then subject to the 90-day accumulation limit in paragraph (a) of this section and § 262.15, if the hazardous wastes are being managed in satellite accumulation areas prior to being moved to a central accumulation area; and

(iii) The large quantity generator must maintain on site at the facility the following records readily available for inspection:

(A) A written description of procedures that are followed to ensure that all wastes are removed from the drip pad and associated collection system at least once every 90 days; and

(B) Documentation of each waste removal, including the quantity of waste removed from the drip pad and the sump or collection system and the date and time of removal.

(4) *Accumulation of hazardous waste in containment buildings.* If the waste is placed in containment buildings, the large quantity generator must comply with of 40 CFR part 265 subpart DD. The generator must label its containment building with the words "Hazardous Waste" in a conspicuous place easily visible to employees, visitors, emergency responders, waste handlers, or other persons on site, and also in a conspicuous place provide an indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704). The generator must also maintain:

(i) The professional engineer certification that the building complies with the design standards specified in 40 CFR 265.1101. This certification must be in the generator's files prior to operation of the unit; and

(ii) The following records by use of inventory logs, monitoring equipment, or any other effective means:

(A) A written description of procedures to ensure that each waste volume remains in the unit for no more than 90 days, a written description of the waste generation and management practices for the facility showing that the generator is consistent with respecting the 90 day limit, and documentation that the procedures are complied with; or

(B) Documentation that the unit is emptied at least once every 90 days.

(C) Inventory logs or records with the above information must be maintained on site and readily available for inspection.

(5) *Labeling and marking of containers and tanks*—(i) *Containers.* A large quantity generator must mark or label its containers with the following:

(A) The words "Hazardous Waste";

(B) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704); and

(C) The date upon which each period of accumulation begins clearly visible for inspection on each container.

(ii) *Tanks.* A large quantity generator accumulating hazardous waste in tanks must do the following:

(A) Mark or label its tanks with the words "Hazardous Waste";

(B) Mark or label its tanks with an indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704);

(C) Use inventory logs, monitoring equipment or other records to demonstrate that hazardous waste has been emptied within 90 days of first entering the tank if using a batch process, or in the case of a tank with a continuous flow process, demonstrate that estimated volumes of hazardous waste entering the tank daily exit the tank within 90 days of first entering; and

(D) Keep inventory logs or records with the above information on site and readily available for inspection.

(6) *Emergency procedures.* The large quantity generator complies with the standards in subpart M of this part, Preparedness, Prevention and

Emergency Procedures for Large Quantity Generators.

(7) *Personnel training.* (i)(A) Facility personnel must successfully complete a program of classroom instruction, online training (*e.g.*, computer-based or electronic), or on-the-job training that teaches them to perform their duties in a way that ensures compliance with this part. The large quantity generator must ensure that this program includes all the elements described in the document required under paragraph (a)(7)(iv) of this section.

(B) This program must be directed by a person trained in hazardous waste management procedures, and must include instruction which teaches facility personnel hazardous waste management procedures (including contingency plan implementation) relevant to the positions in which they are employed.

(C) At a minimum, the training program must be designed to ensure that facility personnel are able to respond effectively to emergencies by familiarizing them with emergency procedures, emergency equipment, and emergency systems, including where applicable:

(*1*) Procedures for using, inspecting, repairing, and replacing facility emergency and monitoring equipment;

(*2*) Key parameters for automatic waste feed cut-off systems;

(*3*) Communications or alarm systems;

(*4*) Response to fires or explosions;

(*5*) Response to ground-water contamination incidents; and

(*6*) Shutdown of operations.

(D) For facility employees that receive emergency response training pursuant to Occupational Safety and Health Administration regulations 29 CFR 1910.120(p)(8) and 1910.120(q), the large quantity generator is not required to provide separate emergency response training pursuant to this section, provided that the overall facility training meets all the conditions of exemption in this section.

(ii) Facility personnel must successfully complete the program required in paragraph (a)(7)(i) of this section within six months after the date of their employment or assignment to the facility, or to a new position at the facility, whichever is later. Employees must not work in unsupervised positions until they have completed the training standards of paragraph (a)(7)(i) of this section.

(iii) Facility personnel must take part in an annual review of the initial training required in paragraph (a)(7)(i) of this section.

(iv) The large quantity generator must maintain the following documents and records at the facility:

(A) The job title for each position at the facility related to hazardous waste management, and the name of the employee filling each job;

(B) A written job description for each position listed under paragraph (a)(7)(iv)(A) of this section. This description may be consistent in its degree of specificity with descriptions for other similar positions in the same company location or bargaining unit, but must include the requisite skill, education, or other qualifications, and duties of facility personnel assigned to each position;

(C) A written description of the type and amount of both introductory and continuing training that will be given to each person filling a position listed under paragraph (a)(7)(iv)(A) of this section;

(D) Records that document that the training or job experience, required under paragraphs (a)(7)(i), (ii), and (iii) of this section, has been given to, and completed by, facility personnel.

(v) Training records on current personnel must be kept until closure of the facility. Training records on former employees must be kept for at least three years from the date the employee last worked at the facility. Personnel training records may accompany personnel transferred within the same company.

(8) *Closure.* A large quantity generator accumulating hazardous wastes in containers, tanks, drip pads, and containment buildings, prior to closing a unit at the facility, or prior to closing the facility, must meet the following conditions:

(i) *Notification for closure of a waste accumulation unit.* A large quantity generator must perform one of the following when closing a waste accumulation unit:

(A) Place a notice in the operating record within 30 days after closure identifying the location of the unit within the facility; or

(B) Meet the closure performance standards of paragraph (a)(8)(iii) of this section for container, tank, and containment building waste accumulation units or paragraph (a)(8)(iv) of this section for drip pads and notify EPA following the procedures in paragraph (a)(8)(ii)(B) of this section for the waste accumulation unit. If the waste accumulation unit is subsequently reopened, the generator may remove the notice from the operating record.

(ii) *Notification for closure of the facility.* (A) Notify EPA using form 8700–12 no later than 30 days prior to closing the facility.

(B) Notify EPA using form 8700–12 within 90 days after closing the facility that it has complied with the closure performance standards of paragraph (a)(8)(iii) or (iv) of this section. If the facility cannot meet the closure performance standards of paragraph (a)(8)(iii) or (iv) of this section, notify EPA using form 8700–12 that it will close as a landfill under § 265.310 of this chapter in the case of a container, tank or containment building unit(s), or for a facility with drip pads, notify using form 8700–12 that it will close under the standards of § 265.445(b).

(C) A large quantity generator may request additional time to clean close, but it must notify EPA using form 8700–12 within 75 days after the date provided in paragraph (a)(8)(ii)(A) of this section to request an extension and provide an explanation as to why the additional time is required.

(iii) *Closure performance standards for container, tank systems, and containment building waste accumulation units.* (A) At closure, the generator must close the waste accumulation unit or facility in a manner that:

(*1*) Minimizes the need for further maintenance by controlling, minimizing, or eliminating, to the extent necessary to protect human health and the environment, the post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products to the ground or surface waters or to the atmosphere,

(*2*) Removes or decontaminates all contaminated equipment, structures and soil and any remaining hazardous waste residues from waste accumulation units including containment system components (pads, liners, etc.), contaminated soils and subsoils, bases, and structures and equipment contaminated with waste, unless § 261.3(d) of this chapter applies.

(*3*) Any hazardous waste generated in the process of closing either the generator's facility or unit(s) accumulating hazardous waste must be managed in accordance with all applicable standards of parts 262, 263, 265 and 268 of this chapter, including removing any hazardous waste contained in these units within 90 days of generating it and managing these wastes in a RCRA Subtitle C hazardous waste permitted treatment, storage and disposal facility or interim status facility.

(*4*) If the generator demonstrates that any contaminated soils and wastes cannot be practicably removed or

decontaminated as required in paragraph (a)(8)(ii)(A)(*2*) of this section, then the waste accumulation unit is considered to be a landfill and the generator must close the waste accumulation unit and perform post-closure care in accordance with the closure and post-closure care requirements that apply to landfills (§ 265.310 of this chapter). In addition, for the purposes of closure, post-closure, and financial responsibility, such a waste accumulation unit is then considered to be a landfill, and the generator must meet all of the requirements for landfills specified in subparts G and H of part 265 of this chapter.

(iv) *Closure performance standards for drip pad waste accumulation units.* At closure, the generator must comply with the closure requirements of paragraphs (a)(8)(ii) and (a)(8)(iii)(A)(*1*) and (*3*) of this section, and § 265.445(a) and (b) of this chapter.

(v) The closure requirements of paragraph (a)(8) of this section do not apply to satellite accumulation areas.

(9) *Land disposal restrictions.* The large quantity generator complies with all applicable requirements under 40 CFR part 268.

(b) *Accumulation time limit extension.* A large quantity generator who accumulates hazardous waste for more than 90 days is subject to the requirements of 40 CFR parts 124, 264 through 268, and part 270 of this chapter, and the notification requirements of section 3010 of RCRA, unless it has been granted an extension to the 90-day period. Such extension may be granted by EPA if hazardous wastes must remain on site for longer than 90 days due to unforeseen, temporary, and uncontrollable circumstances. An extension of up to 30 days may be granted at the discretion of the Regional Administrator on a case-by-case basis.

(c) *Accumulation of F006.* A large quantity generator who also generates wastewater treatment sludges from electroplating operations that meet the listing description for the EPA hazardous waste number F006, may accumulate F006 waste on site for more than 90 days, but not more than 180 days without being subject to parts 124, 264 through 267 and 270 of this chapter, and the notification requirements of section 3010 of RCRA, provided that it complies with all of the following additional conditions for exemption:

(1) The large quantity generator has implemented pollution prevention practices that reduce the amount of any hazardous substances, pollutants, or contaminants entering F006 or

otherwise released to the environment prior to its recycling;

(2) The F006 waste is legitimately recycled through metals recovery;

(3) No more than 20,000 kilograms of F006 waste is accumulated on site at any one time; and

(4) The F006 waste is managed in accordance with the following:

(i)(A) If the F006 waste is placed in containers, the large quantity generator must comply with the applicable conditions for exemption in paragraph (a)(1) of this section; and/or

(B) If the F006 is placed in tanks, the large quantity generator must comply with the applicable conditions for exemption of paragraph (a)(2) of this section; and/or

(C) If the F006 is placed in containment buildings, the large quantity generator must comply with subpart DD of 40 CFR part 265, and has placed its professional engineer certification that the building complies with the design standards specified in 40 CFR 265.1101 in the facility's files prior to operation of the unit. The large quantity generator must maintain the following records:

(*1*) A written description of procedures to ensure that the F006 waste remains in the unit for no more than 180 days, a written description of the waste generation and management practices for the facility showing that they are consistent with the 180-day limit, and documentation that the large quantity generator is complying with the procedures; or

(*2*) Documentation that the unit is emptied at least once every 180 days.

(ii) The large quantity generator is exempt from all the requirements in subparts G and H of 40 CFR part 265, except for those referenced in paragraph (a)(8) of this section.

(iii) The date upon which each period of accumulation begins is clearly marked and must be clearly visible for inspection on each container;

(iv) While being accumulated on site, each container and tank is labeled or marked clearly with:

(A) The words "Hazardous Waste"; and

(B) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR

1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704).

(v) The large quantity generator complies with the requirements in paragraphs(a)(6) and (7) of this section.

(d) *F006 transported over 200 miles.* A large quantity generator who also generates wastewater treatment sludges from electroplating operations that meet the listing description for the EPA hazardous waste number F006, and who must transport this waste, or offer this waste for transportation, over a distance of 200 miles or more for off-site metals recovery, may accumulate F006 waste on site for more than 90 days, but not more than 270 days without being subject to parts 124, 264 through 267, 270, and the notification requirements of section 3010 of RCRA, if the large quantity generator complies with all of the conditions for exemption of paragraphs (c)(1) through (4) of this section.

(e) *F006 accumulation time extension.* A large quantity generator accumulating F006 in accordance with paragraphs (c) and (d) of this section who accumulates F006 waste on site for more than 180 days (or for more than 270 days if the generator must transport this waste, or offer this waste for transportation, over a distance of 200 miles or more), or who accumulates more than 20,000 kilograms of F006 waste on site is an operator of a storage facility and is subject to the requirements of 40 CFR parts 124, 264, 265, 267, and 270 of this chapter, and the notification requirements of section 3010 of RCRA, unless the generator has been granted an extension to the 180-day (or 270-day if applicable) period or an exception to the 20,000 kilogram accumulation limit. Such extensions and exceptions may be granted by EPA if F006 waste must remain on site for longer than 180 days (or 270 days if applicable) or if more than 20,000 kilograms of F006 waste must remain on site due to unforeseen, temporary, and uncontrollable circumstances. An extension of up to 30 days or an exception to the accumulation limit may be granted at the discretion of the Regional Administrator on a case-by-case basis.

(f) *Consolidation of hazardous waste received from very small quantity generators.* Large quantity generators may accumulate on site hazardous waste received from very small quantity generators under control of the same person (as defined in § 260.10 of this chapter), without a storage permit or interim status and without complying with the requirements of parts 124, 264 through 268, and 270 of this chapter, and the notification requirements of

section 3010 of RCRA, provided that they comply with the following conditions. "Control," for the purposes of this section, means the power to direct the policies of the generator, whether by the ownership of stock, voting rights, or otherwise, except that contractors who operate generator facilities on behalf of a different person shall not be deemed to "control" such generators.

(1) The large quantity generator notifies EPA at least thirty (30) days prior to receiving the first shipment from a very small quantity generator(s) using EPA Form 8700–12; and

(i) Identifies on the form the name(s) and site address(es) for the very small quantity generator(s) as well as the name and business telephone number for a contact person for the very small quantity generator(s); and

(ii) Submits an updated Site ID form (EPA Form 8700–12) within 30 days after a change in the name or site address for the very small quantity generator.

(2) The large quantity generator maintains records of shipments for three years from the date the hazardous waste was received from the very small quantity generator. These records must identify the name, site address, and contact information for the very small quantity generator and include a description of the hazardous waste received, including the quantity and the date the waste was received.

(3) The large quantity generator complies with the independent requirements identified in § 262.10(a)(1)(iii) and the conditions for exemption in this section for all hazardous waste received from a very small quantity generator. For purposes of the labeling and marking regulations in paragraph (a)(5) of this section, the large quantity generator must label the container or unit with the date accumulation started (*i.e.*, the date the hazardous waste was received from the very small quantity generator). If the large quantity generator is consolidating incoming hazardous waste from a very small quantity generator with either its own hazardous waste or with hazardous waste from other very small quantity generators, the large quantity generator must label each container or unit with the earliest date any hazardous waste in the container was accumulated on site.

(g) *Rejected load.* A large quantity generator who sends a shipment of hazardous waste to a designated facility with the understanding that the designated facility can accept and manage the waste and later receives that shipment back as a rejected load or residue in accordance with the manifest discrepancy provisions of § 264.72 or § 265.72 of this chapter may accumulate the returned waste on site in accordance with paragraphs (a) and (b) of this section. Upon receipt of the returned shipment, the generator must:

(1) Sign Item 18c of the manifest, if the transporter returned the shipment using the original manifest; or

(2) Sign Item 20 of the manifest, if the transporter returned the shipment using a new manifest.

**§ 262.18 EPA identification numbers and re-notification for small quantity generators and large quantity generators.**

(a) A generator must not treat, store, dispose of, transport, or offer for transportation, hazardous waste without having received an EPA identification number from the Administrator.

(b) A generator who has not received an EPA identification number must obtain one by applying to the Administrator using EPA Form 8700–12. Upon receiving the request the Administrator will assign an EPA identification number to the generator.

(c) A generator must not offer its hazardous waste to transporters or to treatment, storage, or disposal facilities that have not received an EPA identification number.

(d) *Re-notification.* (1) A small quantity generator must re-notify EPA starting in 2021 and every four years thereafter using EPA Form 8700–12. This re-notification must be submitted by September 1st of each year in which re-notifications are required.

(2) A large quantity generator must re-notify EPA by March 1 of each even-numbered year thereafter using EPA Form 8700–12. A large quantity generator may submit this re-notification as part of its Biennial Report required under § 262.41.

(e) A recognized trader must not arrange for import or export of hazardous waste without having received an EPA identification number from the Administrator.

■ 28. Revise the heading for subpart B to read as follows:

## Subpart B—Manifest Requirements Applicable to Small and Large Quantity Generators

■ 29. Revise the heading for subpart C to read as follows:

## Subpart C—Pre-Transport Requirements Applicable to Small and Large Quantity Generators

■ 30. Section 262.32 is amended by revising paragraph (b) and adding paragraphs (c) and (d) to read as follows:

**§ 262.32 Marking.**

* * * * *

(b) Before transporting hazardous waste or offering hazardous waste for transportation off site, a generator must mark each container of 119 gallons or less used in such transportation with the following words and information in accordance with the requirements of 49 CFR 172.304:

(1) HAZARDOUS WASTE—Federal Law Prohibits Improper Disposal. If found, contact the nearest police or public safety authority or the U.S. Environmental Protection Agency.

(2) Generator's Name and Address ________.

(3) Generator's EPA Identification Number ________.

(4) Manifest Tracking Number ________.

(5) EPA Hazardous Waste Number(s) ________.

(c) A generator may use a nationally recognized electronic system, such as bar coding, to identify the EPA Hazardous Waste Number(s), as required by paragraph (b)(5) or paragraph (d).

(d) Lab packs that will be incinerated in compliance with § 268.42(c) are not required to be marked with EPA Hazardous Waste Number(s), except D004, D005, D006, D007, D008, D010, and D011, where applicable.

**§ 262.34 [Removed and reserved]**

■ 31. Remove and reserve § 262.34.

■ 32. Add § 262.35 to subpart C read as follows:

**§ 262.35 Liquids in landfills prohibition.**

The placement of bulk or non-containerized liquid hazardous waste or hazardous waste containing free liquids (whether or not sorbents have been added) in any landfill is prohibited. Prior to disposal in a hazardous waste landfill, liquids must meet additional requirements as specified in §§ 264.314 and 265.314.

■ 33. Revise the heading for subpart D to read as follows:

## Subpart D—Recordkeeping and Reporting Applicable to Small and Large Quantity Generators

■ 34. Section 262.40 is amended by revising paragraph (c) to read as follows:

**§ 262.40 Recordkeeping.**

* * * * *

(c) See § 262.11(f) for recordkeeping requirements for documenting hazardous waste determinations.

* * * * *

■ 35. Section 262.41 is revised to read as follows:

**§ 262.41 Biennial report for large quantity generators.**

(a) A generator who is a large quantity generator for at least one month of an odd-numbered year (reporting year) who ships any hazardous waste off-site to a treatment, storage or disposal facility within the United States must complete and submit EPA Form 8700–13 A/B to the Regional Administrator by March 1 of the following even-numbered year and must cover generator activities during the previous year.

(b) Any generator who is a large quantity generator for at least one month of an odd-numbered year (reporting year) who treats, stores, or disposes of hazardous waste on site must complete and submit EPA Form 8700–13 A/B to the Regional Administrator by March 1 of the following even-numbered year covering those wastes in accordance with the provisions of 40 CFR parts 264, 265, 266, 267 and 270. This requirement also applies to large quantity generators that receive hazardous waste from very small quantity generators pursuant to § 262.17(f).

(c) Exports of hazardous waste to foreign countries are not required to be reported on the Biennial Report form. A separate annual report requirement is set forth at § 262.83(g) for hazardous waste exporters.

■ 36. Section 262.43 is revised to read as follows:

**§ 262.43 Additional reporting.**

The Administrator, as deemed necessary under sections 2002(a) and 3002(a)(6) of the Act, may require generators to furnish additional reports concerning the quantities and disposition of wastes identified or listed in 40 CFR part 261.

■ 37. Section 262.44 is amended by revising the section heading and the introductory text to read as follows:

**§ 262.44 Recordkeeping for small quantity generators.**

A small quantity generator is subject only to the following independent requirements in this subpart:

* * * * *

## Subparts I and J [Removed and Reserved]

■ 38. Remove and reserve subparts I and J.

## Subpart K—Alternative Requirements for Hazardous Waste Determination and Accumulation of Unwanted Material for Laboratories Owned by Eligible Academic Entities

■ 39. Section 262.200 is amended by removing the definition of "Central accumulation area" and revising the definition of "Trained professional" to read as follows:

**§ 262.200 Definitions for this subpart.**

* * * * *

*Trained professional* means a person who has completed the applicable RCRA training requirements of § 262.17 for large quantity generators, or is knowledgeable about normal operations and emergencies in accordance with § 262.16 for small quantity generators and very small quantity generators. A trained professional may be an employee of the eligible academic entity or may be a contractor or vendor who meets the requisite training requirements.

* * * * *

■ 40. Section 262.201 is revised to read as follows:

**§ 262.201 Applicability of this subpart.**

(a) *Large quantity generators and small quantity generators.* This subpart provides alternative requirements to the requirements in §§ 262.11 and 262.15 for the hazardous waste determination and accumulation of hazardous waste in laboratories owned by eligible academic entities that choose to be subject to this subpart, provided that they complete the notification requirements of § 262.203.

(b) *Very small quantity generators.* This subpart provides alternative requirements to the conditional exemption in § 262.14 for the accumulation of hazardous waste in laboratories owned by eligible academic entities that choose to be subject to this subpart, provided that they complete the notification requirements of § 262.203.

■ 41. Section 262.202 is revised to read as follows:

**§ 262.202 This subpart is optional.**

(a) *Large quantity generators and small quantity generators.* Eligible academic entities have the option of complying with this subpart with respect to its laboratories, as an alternative to complying with the requirements of §§ 262.11 and 262.15.

(b) *Very small quantity generators.* Eligible academic entities have the option of complying with this subpart with respect to laboratories, as an alternative to complying with the conditional exemption of § 262.14.

■ 42. Section 262.203 is amended by revising paragraphs (a) and (b)(2) to read as follows:

**§ 262.203 How an eligible academic entity indicates it will be subject to the requirements of this subpart.**

(a) An eligible academic entity must notify the appropriate EPA Regional Administrator in writing, using the RCRA Subtitle C Site Identification Form (EPA Form 8700–12), that it is electing to be subject to the requirements of this subpart for all the laboratories owned by the eligible academic entity under the same EPA identification number. An eligible academic entity that is a very small quantity generator and does not have an EPA identification number must notify that it is electing to be subject to the requirements of this subpart for all the laboratories owned by the eligible academic entity that are on site, as defined by § 260.10 of this chapter. An eligible academic entity must submit a separate notification (Site Identification Form) for each EPA identification number (or site, for very small quantity generators) that is electing to be subject to the requirements of this subpart, and must submit the Site Identification Form before it begins operating under this subpart.

(b) * * *

(2) Site EPA identification number (except for very small quantity generators).

* * * * *

■ 43. Section 262.204 is amended by revising paragraph (a) to read as follows:

**§ 262.204 How an eligible academic entity indicates it will withdraw from the requirements of this subpart.**

(a) An eligible academic entity must notify the appropriate EPA Regional Administrator in writing, using the RCRA Subtitle C Site Identification Form (EPA Form 8700–12), that it is electing to no longer be subject to the requirements of this subpart for all the laboratories owned by the eligible academic entity under the same EPA identification number and that it will comply with the requirements of §§ 262.11 and 262.15 for small quantity generators and large quantity generators. An eligible academic entity that is a very small quantity generator and does not have an EPA identification number must notify that it is withdrawing from the requirements of this subpart for all the laboratories owned by the eligible academic entity that are on site and that it will comply with the conditional exemption in § 262.14. An eligible academic entity must submit a separate notification (Site Identification Form) for each EPA identification number (or site, for very small quantity generators) that is withdrawing from the requirements of this subpart and must

submit the Site Identification Form before it begins operating under the standards in §§ 262.11 and 262.15 for small quantity generators and large quantity generators or § 262.14 for very small quantity generators.

* * * * *

**§ 262.206 [Amended]**

■ 44. Amend § 262.206 in paragraph (b)(3)(iii) by removing the period at the end of the sentence and adding a colon in its place.

■ 45. Section 262.207 is amended by revising paragraph (d)(2) to read as follows:

**§ 262.207 Training.**

* * * * *

(d) * * *

(2) Make the hazardous waste determination, pursuant to § 262.11(a) through (d), for unwanted material.

■ 46. Section 262.208 is amended by revising paragraphs (a)(1) and (2), and (d)(2) to read as follows:

**§ 262.208 Removing containers of unwanted material from the laboratory.**

(a) * * *

(1) Remove all containers of unwanted material from each laboratory on a regular interval, not to exceed 12 months; or

(2) Remove containers of unwanted material from each laboratory within 12 months of each container's accumulation start date.

* * * * *

(d) * * *

(2) If a laboratory accumulates more than 1 quart of liquid reactive acutely hazardous unwanted material or more than 1 kg (2.2 pounds) of solid reactive acutely hazardous unwanted material before the regularly scheduled removal, then the eligible academic entity must ensure that all containers of reactive acutely hazardous unwanted material:

(i) Are marked on the label that is associated with the container (or on the label that is affixed or attached to the container, if that is preferred) with the date that 1 quart or 1 kg is exceeded; and

(ii) Are removed from the laboratory within 10 calendar days of the date that 1 quart or 1 kg was exceeded, or at the next regularly scheduled removal, whichever comes first.

■ 47. Section 262.209 is amended by revising paragraph (b) to read as follows:

**§ 262.209 Where and when to make the hazardous waste determination and where to send containers of unwanted material upon removal from the laboratory.**

* * * * *

(b) *Very small quantity generators.* An eligible academic entity must ensure that a trained professional makes a hazardous waste determination, pursuant to § 262.11(a) through (d), for unwanted material in the laboratory before the unwanted material is removed from the laboratory, in accordance with § 262.210.

■ 48. Section 262.210 is amended by revising paragraphs (a), (b)(3), and (d)(2) to read as follows:

**§ 262.210 Making the hazardous waste determination in the laboratory before the unwanted material is removed from the laboratory.**

* * * * *

(a) A trained professional must make the hazardous waste determination, pursuant to § 262.11(a) through (d), before the unwanted material is removed from the laboratory.

(b) * * *

(3) Count the hazardous waste toward the eligible academic entity's generator category, pursuant to § 262.13, in the calendar month that the hazardous waste determination was made.

* * * * *

(d) * * *

(2) Very small quantity generators must ensure it is taken directly from the laboratory(ies) to any of the types of facilities listed in § 262.14.

* * * * *

■ 49. Section 262.211 is amended by revising paragraphs (c), (d), and (e)(3) to read as follows:

**§ 262.211 Making the hazardous waste determination at an on-site central accumulation area.**

* * * * *

(c) The unwanted material becomes subject to the generator accumulation regulations of § 262.16 for small quantity generators or § 262.17 for large quantity generators as soon as it arrives in the central accumulation area, except for the "hazardous waste" labeling conditions of § 262.16(b)(6) and § 262.17(a)(5).

(d) A trained professional must determine, pursuant to § 262.11(a) through (d), if the unwanted material is a hazardous waste within 4 calendar days of the unwanted materials' arrival at the on-site central accumulation area.

(e) * * *

(3) Count the hazardous waste toward the eligible academic entity's generator category, pursuant to § 262.13 in the calendar month that the hazardous waste determination was made, and

* * * * *

■ 50. Section 262.212 is amended by revising paragraph (d) to read as follows:

**§ 262.212 Making the hazardous waste determination at an on-site interim status or permitted treatment, storage, or disposal facility.**

* * * * *

(d) A trained professional must determine, pursuant to § 262.11(a) through (d), if the unwanted material is a hazardous waste within 4 calendar days of the unwanted materials' arrival at an on-site interim status or permitted treatment, storage, or disposal facility.

* * * * *

■ 51. Section 262.213 is amended by revising paragraphs (a)(1), (2) and (3) and (b)(2) to read as follows:

**§ 262.213 Laboratory clean-outs.**

(a) * * *

(1) If the volume of unwanted material in the laboratory exceeds 55 gallons (or 1 quart of liquid reactive acutely hazardous unwanted material or 1 kg of solid reactive acutely hazardous unwanted material), the eligible academic entity is not required to remove all unwanted materials from the laboratory within 10 calendar days of exceeding 55 gallons (or 1 quart of liquid reactive acutely hazardous unwanted material or 1 kg or solid reactive acutely hazardous unwanted material), as required by § 262.208. Instead, the eligible academic entity must remove all unwanted materials from the laboratory within 30 calendar days from the start of the laboratory clean-out; and

(2) For the purposes of on-site accumulation, an eligible academic entity is not required to count a hazardous waste that is an unused commercial chemical product (listed in 40 CFR part 261, subpart D or exhibiting one or more characteristics in 40 CFR part 261, subpart C) generated solely during the laboratory clean-out toward its hazardous waste generator category, pursuant to § 262.13. An unwanted material that is generated prior to the beginning of the laboratory clean-out and is still in the laboratory at the time the laboratory clean-out commences must be counted toward hazardous waste generator category, pursuant to § 262.13, if it is determined to be hazardous waste; and

(3) For the purposes of off-site management, an eligible academic entity must count all its hazardous waste, regardless of whether the hazardous waste was counted toward generator category under paragraph (a)(2) of this section, and if it generates more than 1 kg/month of acute hazardous waste or more than 100 kg/month of non-acute hazardous waste (*i.e.*, the very small quantity generator limits as defined in § 260.10 of this

Federal Register / Vol. 81, No. 228 / Monday, November 28, 2016 / Rules and Regulations 85821

chapter), the hazardous waste is subject to all applicable hazardous waste regulations when it is transported off site; and

* * * * *

(b) * * *

(2) The requirement to count all hazardous waste, including unused hazardous waste, generated during the laboratory clean-out toward its hazardous waste generator category, pursuant to § 262.13.

■ 52. Section 262.214 is amended by revising paragraph (b)(5) to read as follows:

**§ 262.214 Laboratory management plan.**

* * * * *

(b) * * *

(5) Describe its intended best practices for making hazardous waste determinations, including specifying the duties of the individuals involved in the process (see the required standards at § 262.11(a) through (d) and §§ 262.209 through 262.212).

* * * * *

■ 53. Section 262.216 is amended by revising paragraphs (a) and (b) to read as follows:

**§ 262.216 Non-laboratory hazardous waste generated at an eligible academic entity.**

* * * * *

(a) Remains subject to the generator requirements of §§ 262.11 and 262.15 for large quantity generators and small quantity generators (if the hazardous waste is managed in a satellite accumulation area), and all other applicable generator requirements of 40 CFR part 262, with respect to that hazardous waste; or

(b) Remains subject to the conditional exemption of § 262.14 for very small quantity generators, with respect to that hazardous waste.

■ 54. Subpart L is added to read as follows:

**Subpart L— Alternative Standards for Episodic Generation**

Sec.
262.230 Applicability.
262.231 Definitions for this subpart.
262.232 Conditions for a generator managing hazardous waste from an episodic event.
262.233 Petition to manage one additional episodic event per calendar year.

## Subpart L—Alternative Standards for Episodic Generation

**§ 262.230 Applicability.**

This subpart is applicable to very small quantity generators and small quantity generators as defined in § 260.10 of this chapter.

**§ 262.231 Definitions for this subpart.**

*Episodic event* means an activity or activities, either planned or unplanned, that does not normally occur during generator operations, resulting in an increase in the generation of hazardous wastes that exceeds the calendar month quantity limits for the generator's usual category.

*Planned episodic event* means an episodic event that the generator planned and prepared for, including regular maintenance, tank cleanouts, short-term projects, and removal of excess chemical inventory

*Unplanned episodic event* means an episodic event that the generator did not plan or reasonably did not expect to occur, including production process upsets, product recalls, accidental spills, or "acts of nature," such as tornado, hurricane, or flood.

**§ 262.232 Conditions for a generator managing hazardous waste from an episodic event.**

(a) *Very small quantity generator.* A very small quantity generator may maintain its existing generator category for hazardous waste generated during an episodic event provided that the generator complies with the following conditions:

(1) The very small quantity generator is limited to one episodic event per calendar year, unless a petition is granted under § 262.233;

(2) *Notification.* The very small quantity generator must notify EPA no later than thirty (30) calendar days prior to initiating a planned episodic event using EPA Form 8700–12. In the event of an unplanned episodic event, the generator must notify EPA within 72 hours of the unplanned event via phone, email, or fax and subsequently submit EPA Form 8700–12. The generator shall include the start date and end date of the episodic event, the reason(s) for the event, types and estimated quantities of hazardous waste expected to be generated as a result of the episodic event, and shall identify a facility contact and emergency coordinator with 24-hour telephone access to discuss the notification submittal or respond to an emergency in compliance with § 262.16(b)(9)(i);

(3) *EPA ID Number.* The very small quantity generator must have an EPA identification number or obtain an EPA identification number using EPA Form 8700–12;

(4) *Accumulation.* A very small quantity generator is prohibited from accumulating hazardous waste generated from an episodic event on drip pads and in containment buildings. When accumulating hazardous waste in containers and tanks the following conditions apply:

(i) *Containers.* A very small quantity generator accumulating in containers must mark or label its containers with the following:

(A) The words "Episodic Hazardous Waste";

(B) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704); and

(C) The date upon which the episodic event began, clearly visible for inspection on each container.

(ii) *Tanks.* A very small quantity generator accumulating episodic hazardous waste in tanks must do the following:

(A) Mark or label the tank with the words "Episodic Hazardous Waste";

(B) Mark or label its tanks with an indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704);

(C) Use inventory logs, monitoring equipment or other records to identify the date upon which each episodic event begins; and

(D) Keep inventory logs or records with the above information on site and readily available for inspection.

(iii) Hazardous waste must be managed in a manner that minimizes the possibility of a fire, explosion, or release of hazardous waste or hazardous waste constituents to the air, soil, or water;

(A) Containers must be in good condition and compatible with the hazardous waste being accumulated therein. Containers must be kept closed except to add or remove waste; and.

(B) Tanks must be in good condition and compatible with the hazardous waste accumulated therein. Tanks must have procedures in place to prevent the overflow (*e.g.*, be equipped with a means to stop inflow with systems such as a waste feed cutoff system or bypass system to a standby tank when hazardous waste is continuously fed into the tank). Tanks must be inspected at least once each operating day to ensure all applicable discharge control equipment, such as waste feed cutoff systems, bypass systems, and drainage systems are in good working order and to ensure the tank is operated according to its design by reviewing the data gathered from monitoring equipment such as pressure and temperature gauges from the inspection.

(5) The very small quantity generator must comply with the hazardous waste manifest provisions of subpart B of this part when it sends its episodic event hazardous waste off site to a designated facility, as defined in § 260.10 of this chapter.

(6) The very small quantity generator has up to sixty (60) calendar days from the start of the episodic event to manifest and send its hazardous waste generated from the episodic event to a designated facility, as defined in § 260.10 of this chapter.

(7) Very small quantity generators must maintain the following records for three (3) years from the end date of the episodic event:

(i) Beginning and end dates of the episodic event;

(ii) A description of the episodic event;

(iii) A description of the types and quantities of hazardous wastes generated during the event;

(iv) A description of how the hazardous waste was managed as well as the name of the RCRA-designated facility that received the hazardous waste;

(v) Name(s) of hazardous waste transporters; and

(vi) An approval letter from EPA if the generator petitioned to conduct one additional episodic event per calendar year.

(b) *Small quantity generators.* A small quantity generator may maintain its existing generator category during an episodic event provided that the generator complies with the following conditions:

(1) The small quantity generator is limited to one episodic event per calendar year unless a petition is granted under § 262.233;

(2) *Notification.* The small quantity generator must notify EPA no later than thirty (30) calendar days prior to

initiating a planned episodic event using EPA Form 8700–12. In the event of an unplanned episodic event, the small quantity generator must notify EPA within 72 hours of the unplanned event via phone, email, or fax, and subsequently submit EPA Form 8700–12. The small quantity generator shall include the start date and end date of the episodic event and the reason(s) for the event, types and estimated quantities of hazardous wastes expected to be generated as a result of the episodic event, and identify a facility contact and emergency coordinator with 24-hour telephone access to discuss the notification submittal or respond to emergency;

(3) *EPA ID Number.* The small quantity generator must have an EPA identification number or obtain an EPA identification number using EPA Form 8700–12; and

(4) *Accumulation by small quantity generators.* A small quantity generator is prohibited from accumulating hazardous wastes generated from an episodic event waste on drip pads and in containment buildings. When accumulating hazardous waste generated from an episodic event in containers and tanks, the following conditions apply:

(i) *Containers.* A small quantity generator accumulating episodic hazardous waste in containers must meet the standards at § 262.16(b)(2) of this chapter and must mark or label its containers with the following:

(A) The words "Episodic Hazardous Waste";

(B) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704); and

(C) The date upon which the episodic event began, clearly visible for inspection on each container.

(ii) *Tanks.* A small quantity generator accumulating episodic hazardous waste in tanks must meet the standards at § 262.16(b)(3) and must do the following:

(A) Mark or label its tank with the words "Episodic Hazardous Waste";

(B) Mark or label its tanks with an indication of the hazards of the contents

(examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.*, ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704);

(C) Use inventory logs, monitoring equipment or other records to identify the date upon which each period of accumulation begins and ends; and

(D) Keep inventory logs or records with the above information on site and available for inspection.

(5) The small quantity generator must treat hazardous waste generated from an episodic event on site or manifest and ship such hazardous waste off site to a designated facility (as defined by § 260.10 of this chapter) within sixty (60) calendar days from the start of the episodic event.

(6) The small quantity generator must maintain the following records for three (3) years from the end date of the episodic event:

(i) Beginning and end dates of the episodic event;

(ii) A description of the episodic event;

(iii) A description of the types and quantities of hazardous wastes generated during the event;

(iv) A description of how the hazardous waste was managed as well as the name of the designated facility (as defined by § 260.10 of this chapter) that received the hazardous waste;

(v) Name(s) of hazardous waste transporters; and

(vi) An approval letter from EPA if the generator petitioned to conduct one additional episodic event per calendar year.

**§ 262.233  Petition to manage one additional episodic event per calendar year.**

(a) A generator may petition the Regional Administrator for a second episodic event in a calendar year without impacting its generator category under the following conditions:

(1) If a very small quantity generator or small quantity generator has already held a planned episodic event in a calendar year, the generator may petition EPA for an additional unplanned episodic event in that calendar year within 72 hours of the unplanned event.

(2) If a very small quantity generator or small quantity generator has already

Federal Register / Vol. 81, No. 228 / Monday, November 28, 2016 / Rules and Regulations 85823

held an unplanned episodic event in a calendar year, the generator may petition EPA for an additional planned episodic event in that calendar year.

(b) The petition must include the following:

(1) The reason(s) why an additional episodic event is needed and the nature of the episodic event;

(2) The estimated amount of hazardous waste to be managed from the event;

(3) How the hazardous waste is to be managed;

(4) The estimated length of time needed to complete management of the hazardous waste generated from the episodic event—not to exceed sixty (60) days; and

(5) Information regarding the previous episodic event managed by the generator, including the nature of the event, whether it was a planned or unplanned event, and how the generator complied with the conditions.

(c) The petition must be made to the Regional Administrator in writing, either on paper or electronically.

(d) The generator must retain written approval in its records for three (3) years from the date the episodic event ended.

■ 55. Subpart M is added to read as follows:

**Subpart M—Preparedness, Prevention, and Emergency Procedures for Large Quantity Generators**

Sec.
262.250 Applicability.
262.251 Maintenance and operation of facility.
262.252 Required equipment.
262.253 Testing and maintenance of equipment.
262.254 Access to communications or alarm system.
262.255 Required aisle space.
262.256 Arrangements with local authorities.
262.260 Purpose and implementation of contingency plan.
262.261 Content of contingency plan.
262.262 Copies of contingency plan.
262.263 Amendment of contingency plan.
262.264 Emergency coordinator.
262.265 Emergency procedures.

## Subpart M—Preparedness, Prevention, and Emergency Procedures for Large Quantity Generators

### § 262.250 Applicability.

The regulations of this subpart apply to those areas of a large quantity generator where hazardous waste is generated or accumulated on site.

### § 262.251 Maintenance and operation of facility.

A large quantity generator must maintain and operate its facility to minimize the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment.

### § 262.252 Required equipment.

All areas deemed applicable by § 262.250 must be equipped with the items in paragraphs (a) through (d) of this section (unless none of the hazards posed by waste handled at the facility could require a particular kind of equipment specified below or the actual hazardous waste generation or accumulation area does not lend itself for safety reasons to have a particular kind of equipment specified below). A large quantity generator may determine the most appropriate locations within its facility to locate equipment necessary to prepare for and respond to emergencies:

(a) An internal communications or alarm system capable of providing immediate emergency instruction (voice or signal) to facility personnel;

(b) A device, such as a telephone (immediately available at the scene of operations) or a hand-held two-way radio, capable of summoning emergency assistance from local police departments, fire departments, or state or local emergency response teams;

(c) Portable fire extinguishers, fire control equipment (including special extinguishing equipment, such as that using foam, inert gas, or dry chemicals), spill control equipment, and decontamination equipment; and

(d) Water at adequate volume and pressure to supply water hose streams, or foam producing equipment, or automatic sprinklers, or water spray systems.

### § 262.253 Testing and maintenance of equipment.

All communications or alarm systems, fire protection equipment, spill control equipment, and decontamination equipment, where required, must be tested and maintained as necessary to assure its proper operation in time of emergency.

### § 262.254 Access to communications or alarm system.

(a) Whenever hazardous waste is being poured, mixed, spread, or otherwise handled, all personnel involved in the operation must have immediate access (*e.g.*, direct or unimpeded access) to an internal alarm or emergency communication device, either directly or through visual or voice contact with another employee, *unless* such a device is not required under § 262.252.

(b) In the event there is just one employee on the premises while the facility is operating, the employee must have immediate access (*e.g.*, direct or unimpeded access) to a device, such as a telephone (immediately available at the scene of operation) or a hand-held two-way radio, capable of summoning external emergency assistance, *unless* such a device is not required under § 262.252.

### § 262.255 Required aisle space.

The large quantity generator must maintain aisle space to allow the unobstructed movement of personnel, fire protection equipment, spill control equipment, and decontamination equipment to any area of facility operation in an emergency, unless aisle space is not needed for any of these purposes.

### § 262.256 Arrangements with local authorities.

(a) The large quantity generator must attempt to make arrangements with the local police department, fire department, other emergency response teams, emergency response contractors, equipment suppliers, and local hospitals, taking into account the types and quantities of hazardous wastes handled at the facility. Arrangements may be made with the Local Emergency Planning Committee, if it is determined to be the appropriate organization with which to make arrangements.

(1) A large quantity generator attempting to make arrangements with its local fire department must determine the potential need for the services of the local police department, other emergency response teams, emergency response contractors, equipment suppliers and local hospitals.

(2) As part of this coordination, the large quantity generator shall attempt to make arrangements, as necessary, to familiarize the above organizations with the layout of the facility, the properties of the hazardous waste handled at the facility and associated hazards, places where personnel would normally be working, entrances to roads inside the facility, and possible evacuation routes as well as the types of injuries or illnesses which could result from fires, explosions, or releases at the facility.

(3) Where more than one police or fire department might respond to an emergency, the large quantity generator shall attempt to make arrangements designating primary emergency authority to a specific fire or police department, and arrangements with any others to provide support to the primary emergency authority.

(b) The large quantity generator shall maintain records documenting the arrangements with the local fire department as well as any other organization necessary to respond to an emergency. This documentation must include documentation in the operating record that either confirms such arrangements actively exist or, in cases where no arrangements exist, confirms that attempts to make such arrangements were made.

(c) A facility possessing 24-hour response capabilities may seek a waiver from the authority having jurisdiction (AHJ) over the fire code within the facility's state or locality as far as needing to make arrangements with the local fire department as well as any other organization necessary to respond to an emergency, provided that the waiver is documented in the operating record.

**§ 262.260 Purpose and implementation of contingency plan.**

(a) A large quantity generator must have a contingency plan for the facility. The contingency plan must be designed to minimize hazards to human health or the environment from fires, explosions, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water.

(b) The provisions of the plan must be carried out immediately whenever there is a fire, explosion, or release of hazardous waste or hazardous waste constituents which could threaten human health or the environment.

**§ 262.261 Content of contingency plan.**

(a) The contingency plan must describe the actions facility personnel must take to comply with §§ 262.260 and 262.265 in response to fires, explosions, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water at the facility.

(b) If the generator has already prepared a Spill Prevention, Control, and Countermeasures (SPCC) Plan in accordance with part 112 of this chapter, or some other emergency or contingency plan, it need only amend that plan to incorporate hazardous waste management provisions that are sufficient to comply with the standards of this part. The generator may develop one contingency plan that meets all regulatory standards. EPA recommends that the plan be based on the National Response Team's Integrated Contingency Plan Guidance ("One Plan").

(c) The plan must describe arrangements agreed to with the local police department, fire department, other emergency response teams, emergency response contractors, equipment suppliers, local hospitals or, if applicable, the Local Emergency Planning Committee, pursuant to § 262.256.

(d) The plan must list names and emergency telephone numbers of all persons qualified to act as emergency coordinator (see § 262.264), and this list must be kept up to date. Where more than one person is listed, one must be named as primary emergency coordinator and others must be listed in the order in which they will assume responsibility as alternates. In situations where the generator facility has an emergency coordinator continuously on duty because it operates 24 hours per day, every day of the year, the plan may list the staffed position (*e.g.*, operations manager, shift coordinator, shift operations supervisor) as well as an emergency telephone number that can be guaranteed to be answered at all times.

(e) The plan must include a list of all emergency equipment at the facility (such as fire extinguishing systems, spill control equipment, communications and alarm systems (internal and external), and decontamination equipment), where this equipment is required. This list must be kept up to date. In addition, the plan must include the location and a physical description of each item on the list, and a brief outline of its capabilities.

(f) The plan must include an evacuation plan for generator personnel where there is a possibility that evacuation could be necessary. This plan must describe signal(s) to be used to begin evacuation, evacuation routes, and alternate evacuation routes (in cases where the primary routes could be blocked by releases of hazardous waste or fires).

**§ 262.262 Copies of contingency plan.**

A copy of the contingency plan and all revisions to the plan must be maintained at the large quantity generator and—

(a) The large quantity generator must submit a copy of the contingency plan and all revisions to all local emergency responders (*i.e.*, police departments, fire departments, hospitals and State and local emergency response teams that may be called upon to provide emergency services). This document may also be submitted to the Local Emergency Planning Committee, as appropriate.

(b) A large quantity generator that first becomes subject to these provisions after May 30, 2017 or a large quantity generator that is otherwise amending its contingency plan must at that time submit a quick reference guide of the contingency plan to the local emergency responders identified at paragraph (a) of this section or, as appropriate, the Local Emergency Planning Committee. The quick reference guide must include the following elements:

(1) The types/names of hazardous wastes in layman's terms and the associated hazard associated with each hazardous waste present at any one time (*e.g.*, toxic paint wastes, spent ignitable solvent, corrosive acid);

(2) The estimated maximum amount of each hazardous waste that may be present at any one time;

(3) The identification of any hazardous wastes where exposure would require unique or special treatment by medical or hospital staff;

(4) A map of the facility showing where hazardous wastes are generated, accumulated and treated and routes for accessing these wastes;

(5) A street map of the facility in relation to surrounding businesses, schools and residential areas to understand how best to get to the facility and also evacuate citizens and workers;

(6) The locations of water supply (*e.g.*, fire hydrant and its flow rate);

(7) The identification of on-site notification systems (*e.g.*, a fire alarm that rings off site, smoke alarms); and

(8) The name of the emergency coordinator(s) and 7/24-hour emergency telephone number(s) or, in the case of a facility where an emergency coordinator is continuously on duty, the emergency telephone number for the emergency coordinator.

(c) Generators must update, if necessary, their quick reference guides, whenever the contingency plan is amended and submit these documents to the local emergency responders identified at paragraph (a) of this section or, as appropriate, the Local Emergency Planning Committee.

**§ 262.263 Amendment of contingency plan.**

The contingency plan must be reviewed, and immediately amended, if necessary, whenever:

(a) Applicable regulations are revised;

(b) The plan fails in an emergency;

(c) The generator facility changes—in its design, construction, operation, maintenance, or other circumstances—in a way that materially increases the potential for fires, explosions, or releases of hazardous waste or hazardous waste constituents, or changes the response necessary in an emergency;

(d) The list of emergency coordinators changes; or

(e) The list of emergency equipment changes.

**§ 262.264 Emergency coordinator.**

At all times, there must be at least one employee either on the generator's premises or on call (*i.e.*, available to respond to an emergency by reaching the facility within a short period of time) with the responsibility for coordinating all emergency response measures and implementing the necessary emergency procedures outlined in § 262.265. Although responsibilities may vary depending on factors such as type and variety of hazardous waste(s) handled by the facility, as well as type and complexity of the facility, this emergency coordinator must be thoroughly familiar with all aspects of the generator's contingency plan, all operations and activities at the facility, the location and characteristics of hazardous waste handled, the location of all records within the facility, and the facility's layout. In addition, this person must have the authority to commit the resources needed to carry out the contingency plan.

**§ 262.265 Emergency procedures.**

(a) Whenever there is an imminent or actual emergency situation, the emergency coordinator (or his designee when the emergency coordinator is on call) must immediately:

(1) Activate internal facility alarms or communication systems, where applicable, to notify all facility personnel; and

(2) Notify appropriate state or local agencies with designated response roles if their help is needed.

(b) Whenever there is a release, fire, or explosion, the emergency coordinator must immediately identify the character, exact source, amount, and areal extent of any released materials. The emergency coordinator may do this by observation or review of the facility records or manifests and, if necessary, by chemical analysis.

(c) Concurrently, the emergency coordinator must assess possible hazards to human health or the environment that may result from the release, fire, or explosion. This assessment must consider both direct and indirect effects of the release, fire, or explosion (*e.g.*, the effects of any toxic, irritating, or asphyxiating gases that are generated, or the effects of any hazardous surface water run-offs from water or chemical agents used to control fire and heat-induced explosions).

(d) If the emergency coordinator determines that the facility has had a release, fire, or explosion which could threaten human health, or the environment, outside the facility, the emergency coordinator must report the findings as follows:

(1) If the assessment indicates that evacuation of local areas may be advisable, the emergency coordinator must immediately notify appropriate local authorities. The emergency coordinator must be available to help appropriate officials decide whether local areas should be evacuated; and

(2) The emergency coordinator must immediately notify either the government official designated as the on-scene coordinator for that geographical area, or the National Response Center (using their 24-hour toll free number 800/424–8802). The report must include:

(i) Name and telephone number of reporter;

(ii) Name and address of the generator;

(iii) Time and type of incident (*e.g.*, release, fire);

(iv) Name and quantity of material(s) involved, to the extent known;

(v) The extent of injuries, if any; and

(vi) The possible hazards to human health, or the environment, outside the facility.

(e) During an emergency, the emergency coordinator must take all reasonable measures necessary to ensure that fires, explosions, and releases do not occur, recur, or spread to other hazardous waste at the generator's facility. These measures must include, where applicable, stopping processes and operations, collecting and containing released hazardous waste, and removing or isolating containers.

(f) If the generator stops operations in response to a fire, explosion or release, the emergency coordinator must monitor for leaks, pressure buildup, gas generation, or ruptures in valves, pipes, or other equipment, wherever this is appropriate.

(g) Immediately after an emergency, the emergency coordinator must provide for treating, storing, or disposing of recovered waste, contaminated soil or surface water, or any other material that results from a release, fire, or explosion at the facility. Unless the generator can demonstrate, in accordance with § 261.3(c) or (d) of this chapter, that the recovered material is not a hazardous waste, then it is a newly generated hazardous waste that must be managed in accordance with all the applicable requirements and conditions for exemption in parts 262, 263, and 265 of this chapter.

(h) The emergency coordinator must ensure that, in the affected area(s) of the facility:

(1) No hazardous waste that may be incompatible with the released material is treated, stored, or disposed of until cleanup procedures are completed; and

(2) All emergency equipment listed in the contingency plan is cleaned and fit for its intended use before operations are resumed.

(i) The generator must note in the operating record the time, date, and details of any incident that requires implementing the contingency plan. Within 15 days after the incident, the generator must submit a written report on the incident to the Regional Administrator. The report must include:

(1) Name, address, and telephone number of the generator;

(2) Date, time, and type of incident (*e.g.*, fire, explosion);

(3) Name and quantity of material(s) involved;

(4) The extent of injuries, if any;

(5) An assessment of actual or potential hazards to human health or the environment, where this is applicable; and

(6) Estimated quantity and disposition of recovered material that resulted from the incident.

## PART 263—STANDARDS APPLICABLE TO TRANSPORTERS OF HAZARDOUS WASTE

■ 56. The authority citation for part 263 continues to read as follows:

**Authority:** 42 U.S.C. 6906, 6912, 6922–6925, 6937, and 6938.

■ 57. Section 263.12 is revised to read as follows:

**§ 263.12 Transfer facility requirements.**

(a) A transporter who stores manifested shipments of hazardous waste in containers meeting the independent requirements of § 262.30 of this chapter at a transfer facility for a period of ten (10) days or less is not subject to regulation under parts 264, 265, 267, 268, and 270 of this chapter with respect to the storage of those wastes.

(b) When consolidating the contents of two or more containers with the same hazardous waste into a new container, or when combining and consolidating two different hazardous wastes that are compatible with each other, the transporter must mark its containers of 119 gallons or less with the following information:

(1) The words "Hazardous Waste" and

(2) The applicable EPA hazardous waste number(s) (EPA hazardous waste

codes) in subparts C and D of part 261 of this chapter, or in compliance with § 262.32(c).

## PART 264—STANDARDS FOR OWNERS AND OPERATORS OF HAZARDOUS WASTE TREATMENT, STORAGE, AND DISPOSAL FACILITIES

■ 58. The authority citation for part 264 continues to read as follows:

**Authority:** 42 U.S.C. 6905, 6912(a), 6924, and 6925.

■ 59. Section 264.1 is amended by revising paragraphs (g)(1) and (3) to read as follows:

### § 264.1 Purpose, scope and applicability.

* * * * *

(g) * * *

(1) The owner or operator of a facility permitted, licensed, or registered by a state to manage municipal or industrial solid waste, if the only hazardous waste the facility treats, stores, or disposes of is excluded from regulation under this part by § 262.14 of this chapter;

* * * * *

(3) A generator accumulating waste on site in compliance with §§ 262.14, 262.15, 262.16, or 262.17 of this chapter.

* * * * *

■ 60. Section 264.15 is amended by revising paragraph (b)(4) and removing the comment to paragraph (b)(4) to read as follows:

### § 264.15 General inspection requirements.

* * * * *

(b) * * *

(4) The frequency of inspection may vary for the items on the schedule. However, the frequency should be based on the rate of deterioration of the equipment and the probability of an environmental or human health incident if the deterioration, malfunction, or operator error goes undetected between inspections. Areas subject to spills, such as loading and unloading areas, must be inspected daily when in use. At a minimum, the inspection schedule must include the items and frequencies called for in §§ 264.174, 264.193, 264.195, 264.226, 264.254, 264.278, 264.303, 264.347, 264.602, 264.1033, 264.1052, 264.1053, 264.1058, and 264.1083 through 264.1089, where applicable. Part 270 of this chapter requires the inspection schedule to be submitted with part B of the permit application. EPA will evaluate the schedule along with the rest of the application to ensure that it adequately protects human health and the environment. As part of this review, EPA may modify or amend the schedule as may be necessary.

* * * * *

■ 61. Section 264.71 is amended by revising paragraph (c) and removing the comment to paragraph (c) to read as follows:

### § 264.71 Use of manifest system.

* * * * *

(c) Whenever a shipment of hazardous waste is initiated from a facility, the owner or operator of that facility must comply with the requirements of part 262 of this chapter. The provisions of §§ 262.15, 262.16, and 262.17 of this chapter are applicable to the on-site accumulation of hazardous wastes by generators. Therefore, the provisions of §§ 262.15, 262.16, and 262.17 of this chapter only apply to owners or operators who are shipping hazardous waste which they generated at that facility or operating as a large quantity generator consolidating hazardous waste from very small quantity generators under § 262.17(f).

* * * * *

■ 62. Section 264.75 is revised to read as follows:

### § 264.75 Biennial report.

The owner or operator must complete and submit EPA Form 8700–13 A/B to the Regional Administrator by March 1 of the following even numbered year and must cover activities during the previous year.

■ 63. Section 264.170 is revised to read as follows:

### § 264.170 Applicability.

The regulations in this subpart apply to owners and operators of all hazardous waste facilities that store hazardous waste in containers, except as § 264.1 provides otherwise.

[*Comment:* Under § 261.7 and § 261.33(c) of this chapter, if a hazardous waste is emptied from a container the residue remaining in the container is not considered a hazardous waste if the container is "empty" as defined in § 261.7. In that event, management of the container is exempt from the requirements of this subpart.]

■ 64. Section 264.174 is revised to read as follows:

### § 264.174 Inspections.

At least weekly, the owner or operator must inspect areas where containers are stored. The owner or operator must look for leaking containers and for deterioration of containers and the containment system cause by corrosion or other factors. See §§ 264.15(c) and 264.171 for remedial action required if deterioration or leaks are detected.

■ 65. Section 264.191 is amended by revising paragraph (a) to read as follows:

### § 264.191 Assessment of existing tank system's integrity.

(a) For each existing tank system that does not have secondary containment meeting the requirements of § 264.193, the owner or operator must determine that the tank system is not leaking or is fit for use. Except as provided in paragraph (c) of this section, the owner or operator must obtain and keep on file at the facility a written assessment reviewed and certified by a qualified Professional Engineer, in accordance with § 270.11(d) of this chapter, that attests to the tank system's integrity by January 12, 1988.

* * * * *

### § 264.195 [Amended]

■ 66. Section 264.195 is amended by removing and reserving paragraph (e).

■ 67. Section 264.1030 is amended by revising paragraph (b)(2) to read as follows:

### § 264.1030 Applicability.

* * * * *

(b) * * *

(2) A unit (including a hazardous waste recycling unit) that is not exempt from permitting under the provisions of 40 CFR 262.17 (*i.e.,* a hazardous waste recycling unit that is not a 90-day tank or container) and that is located at a hazardous waste management facility otherwise subject to the permitting requirements of 40 CFR part 270; or

* * * * *

■ 68. Section 264.1050 is amended by revising paragraph (b)(3) to read as follows:

### § 264.1050 Applicability.

* * * * *

(b) * * *

(3) A unit that is exempt from permitting under the provisions of 40 CFR 262.17 (*i.e.,* a "90-day" tank or container) and is not a recycling unit under the provisions of 40 CFR 261.6.

* * * * *

■ 69. Section 264.1101 is amended by revising paragraph (c)(4) to read as follows:

### § 264.1101 Design and operating standards.

* * * * *

(c) * * *

(4) Inspect and record in the facility operating record, at least once every seven days, data gathered from monitoring and leak detection equipment as well as the containment building and the area immediately surrounding the containment building

to detect signs of releases of hazardous waste.

* * * * *

## PART 265—INTERIM STATUS STANDARDS FOR OWNERS AND OPERATORS OF HAZARDOUS WASTE TREATMENT, STORAGE, AND DISPOSAL FACILITIES

■ 70. The authority citation for part 265 continues to read as follows:

**Authority:** 42 U.S.C. 6905, 6906, 6912, 6922, 6923, 6924, 6925, 6935, 6936, and 6937.

■ 71. Section 265.1 is amended by revising paragraphs (c)(5) and (7) to read as follows:

**§ 265.1 Purpose, scope, and applicability.**

* * * * *

(c) * * *

(5) The owner or operator of a facility permitted, licensed, or registered by a State to manage municipal or industrial solid waste, if the only hazardous waste the facility treats, stores, or disposes of is excluded from regulation under this part by § 262.14 of this chapter;

* * * * *

(7) A generator accumulating waste on site in compliance with applicable conditions for exemption in §§ 262.14 through 262.17 and subparts K and L of part 262 of this chapter, except to the extent the requirements of this part are included in those sections and subparts;

* * * * *

■ 72. Section 265.15 is amended by revising paragraph (b)(4) and removing paragraph (b)(5).

The revision reads as follows:

**§ 265.15 General inspection requirements.**

* * * * *

(b) * * *

(4) The frequency of inspection may vary for the items on the schedule. However, the frequency should be based on the rate of deterioration of the equipment and the probability of an environmental or human health incident if the deterioration, malfunction, or operator error goes undetected between inspections. Areas subject to spills, such as loading and unloading areas, must be inspected daily when in use. At a minimum, the inspection schedule must include the items and frequencies called for in §§ 265.174, 265.193, 265.195, 265.226, 265.260, 265.278, 265.304, 265.347, 265.377, 265.403, 265.1033, 265.1052, 265.1053, 265.1058, and 265.1084 through 265.1090, where applicable.

* * * * *

■ 73. Section 265.71 is amended by revising paragraph (c) to read as follows:

**§ 265.71 Use of manifest system.**

* * * * *

(c) Whenever a shipment of hazardous waste is initiated from a facility, the owner or operator of that facility must comply with the requirements of part 262 of this chapter. The provisions of §§ 262.15, 262.16, and 262.17 of this chapter are applicable to the on-site accumulation of hazardous wastes by generators. Therefore, the provisions of §§ 262.15, 262.16, and 262.17 only apply to owners or operators who are shipping hazardous waste which they generated at that facility or operating as a large quantity generator consolidating hazardous waste from very small quantity generators under § 262.17(f).

* * * * *

■ 74. Section 265.75 is revised to read as follows:

**§ 265.75 Biennial report.**

The owner or operator must complete and submit EPA Form 8700–13 A/B to the Regional Administrator by March 1 of the following even numbered year and must cover activities during the previous year.

■ 75. Section 265.174 is revised to read as follows:

**§ 265.174 Inspections.**

At least weekly, the owner or operator must inspect areas where containers are stored. The owner or operator must look for leaking containers and for deterioration of containers caused by corrosion or other factors. See § 265.171 for remedial action required if deterioration or leaks are detected.

**§ 265.195 [Amended]**

■ 76. Section 265.195 is amended by removing and reserving paragraph (d).

**§ 265.201 [Removed and reserved]**

■ 77. Remove and reserve § 265.201.

■ 78. Section 265.1030 is amended by revising paragraphs (b)(2) and (3) to read as follows:

**§ 265.1030 Applicability.**

* * * * *

(b) * * *

(2) A unit (including a hazardous waste recycling unit) that is not exempt from permitting under the provisions of 40 CFR 262.17 (*i.e.,* a hazardous waste recycling unit that is not a 90-day tank or container) and that is located at a hazardous waste management facility otherwise subject to the permitting requirements of 40 CFR part 270, or

(3) A unit that is exempt from permitting under the provisions of 40 CFR 262.17 (*i.e.,* a "90-day" tank or container) and is not a recycling unit under the requirements of 40 CFR 261.6.

* * * * *

**§ 265.1050 [Amended]**

■ 79. Amend § 265.1050 by removing the text "40 CFR 262.34(a)" wherever it appears and adding in its place the text "40 CFR 262.17".

■ 80. Section 265.1101 is amended by revising paragraph (c)(4) to read as follows:

**§ 265.1101 Design and operating standards.**

* * * * *

(c) * * *

(4) Inspect and record in the facility's operating record at least once every seven days data gathered from monitoring and leak detection equipment as well as the containment building and the area immediately surrounding the containment building to detect signs of releases of hazardous waste.

* * * * *

## PART 266—STANDARDS FOR THE MANAGEMENT OF SPECIFIC HAZARDOUS WASTES AND SPECIFIC TYPES OF HAZARDOUS WASTE MANAGEMENT FACILTIES

■ 81. The authority citation for part 266 continues to read as follows:

**Authority:** 42 U.S.C. 1006, 2002(a), 3001–3009, 3014, 3017, 6905, 6906, 6912, 6921, 6922, 6924–6927, 6934, and 6937.

**§ 266.80 [Amended]**

■ 82. Amend § 266.80(a) by removing the text "§ 262.12" and adding the text "§ 262.18" in its place, seven times.

**§ 266.255 [Amended]**

■ 83. Amend § 266.255(a) by removing the text "40 CFR 262.34" and adding the text "40 CFR 262.16 or 262.17" in its place.

## PART 267—STANDARDS FOR OWNERS AND OPERATORS OF FACILITIES OPERATING UNDER A STANDARDIZED PERMIT

■ 84. The authority citation for part 267 continues to read as follows:

**Authority:** 42 U.S.C. 6902, 6912(a), 6924–6926, and 6930.

**§ 267.71 [Amended]**

■ 85. Amend § 267.71(c) by removing the text "§ 262.34" wherever it appears and adding in its place the text "§ 262.16 or 262.17".

## PART 268—LAND DISPOSAL RESTRICTIONS

■ 86. The authority citation for part 268 continues to read as follows:

**Authority:** 42 U.S.C. 6905, 6912(a), 6921, and 6924.

■ 87. Section 268.1 is amended by revising paragraph (e)(1) to read as follows:

**§ 268.1 Purpose, scope, and applicability.**

* * * * *

(e) * * *

(1) Waste generated by very small quantity generators, as defined in § 260.10 of this chapter;

* * * * *

■ 88. Section 268.7 is amended by revising paragraph (a)(5) introductory paragraph to read as follows:

**§ 268.7 Testing, tracking, and recordkeeping requirements for generators, treaters, and disposal facilities.**

(a) * * *

(5) If a generator is managing and treating prohibited waste or contaminated soil in tanks, containers, or containment buildings regulated under 40 CFR 262.15, 262.16, and 262.17 to meet applicable LDR treatment standards found at § 268.40, the generator must develop and follow a written waste analysis plan which describes the procedures they will carry out to comply with the treatment standards. (Generators treating hazardous debris under the alternative treatment standards of Table 1 to § 268.45, however, are not subject to these waste analysis requirements.) The plan must be kept on site in the generator's records, and the following requirements must be met:

* * * * *

■ 89. Section 268.50 is amended by revising paragraph (a)(1) and (a)(2)(i) to read as follows:

**§ 268.50 Prohibitions on storage of restricted wastes.**

(a) * * *

(1) A generator stores such wastes in tanks, containers, or containment buildings on-site solely for the purpose of the accumulation of such quantities of hazardous waste as necessary to facilitate proper recovery, treatment, or disposal and the generator complies with the requirements in §§ 262.16 and 262.17 and parts 264 and 265 of this chapter.

(2) * * *

(i) Each container is clearly marked to identify its contents and with:

(A) The words "Hazardous Waste";

(B) The applicable EPA hazardous waste number(s) (EPA hazardous waste codes) in subparts C and D of part 261 of this chapter; or use a nationally recognized electronic system, such as bar coding, to identify the EPA hazardous waste number(s);

(C) An indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (*i.e.,* ignitable, corrosive, reactive, toxic); hazard communication consistent with the Department of Transportation requirements at 49 CFR part 172 subpart E (labeling) or subpart F (placarding); a hazard statement or pictogram consistent with the Occupational Safety and Health Administration Hazard Communication Standard at 29 CFR 1910.1200; or a chemical hazard label consistent with the National Fire Protection Association code 704); and

(D) The date each period of accumulation begins.

* * * * *

## PART 270—EPA ADMINISTERED PERMIT PROGRAMS: THE HAZARDOUS WASTE PERMIT PROGRAM

■ 90. The authority citation for part 270 continues to read as follows:

**Authority:** 42 U.S.C. 6905, 6912, 6924, 6925, 6927, 6939, and 6974.

■ 91. Section 270.1 is amended by revising paragraphs (a)(3), (c)(2) introductory text, (c)(2)(i), and (c)(2)(iii) to read as follows:

**§ 270.1 Purpose and scope of these regulations.**

(a) * * *

(3) *Technical regulations.* The RCRA permit program has separate additional regulations that contain technical requirements. These separate regulations are used by permit issuing authorities to determine what requirements must be placed in permits if they are issued. These separate regulations are located in 40 CFR parts 264, 266, 267, and 268.

* * * * *

(c) * * *

(2) *Specific exclusions and exemptions.* The following persons are among those who are not required to obtain a RCRA permit:

(i) Generators who accumulate hazardous waste on site in compliance with all of the conditions for exemption provided in 40 CFR 262.14, 262.15, 262.16, and 262.17.

* * * * *

(iii) Persons who own or operate facilities solely for the treatment, storage, or disposal of hazardous waste excluded from regulations under this part by 40 CFR 261.4 or 262.14 (very small quantity generator exemption).

* * * * *

**§ 270.42 [Amended]**

■ 92. Section 270.42 is amended by removing and reserving paragraph (l) and the entries under O.1. in the table of appendix I to § 270.42.

## PART 271—REQUIREMENTS FOR AUTHORIZATION OF STATE HAZARDOUS WASTE PROGRAMS

■ 93. The authority citation for part 271 continues to read as follows:

**Authority:** 42 U.S.C. 6905, 6912(a), and 6926.

**§ 271.10 [Amended]**

■ 94. Amend § 271.10(c) by removing the text " 262.34" and adding in its place the text "262.16 or 262.17".

## PART 273—STANDARDS FOR UNIVERSAL WASTE MANAGEMENT

■ 95. The authority citation for part 273 continues to read as follows:

**Authority:** 42 U.S.C. 6922, 6923, 6924, 6925, 6930, and 6937.

■ 96. Section 273.8 is amended by revising the section heading and paragraph (a)(2) to read as follows:

**§ 273.8 Applicability—household and very small quantity generator waste.**

(a) * * *

(2) Very small quantity generator wastes that are exempt under § 262.14 of this chapter and are also of the same type as the universal wastes defined at § 273.9.

* * * * *

■ 97. Section 273.81 is amended by revising paragraph (b) to read as follows:

**§ 273.81 Factors for petitions to include other wastes under 40 CFR part 273.**

* * * * *

(b) The waste or category of waste is not exclusive to a specific industry or group of industries, is commonly generated by a wide variety of types of establishments (including, for example, households, retail and commercial businesses, office complexes, very small quantity generators, small businesses, government organizations, as well as large industrial facilities);

* * * * *

## PART 279—STANDARDS FOR THE MANAGEMENT OF USED OIL

■ 98. The authority citation for part 279 continues to read as follows:

**Authority:** Sections 1006, 2002(a), 3001 through 3007, 3010, 3014, and 7004 of the Solid Waste Disposal Act, as amended (42 U.S.C. 6905, 6912(a), 6921 through 6927, 6930, 6934, and 6974); and sections 101(37) and 144(c) of CERCLA (42 U.S.C. 9601(37) and 9614(c)).

■ 99. Section 279.10 is amended by revising paragraph (b)(3) to read as follows:

**§ 279.10 Applicability.**

* * * * *

(b) * * *

(3) *Very small quantity generator hazardous waste.* Mixtures of used oil and very small quantity generator hazardous waste regulated under § 262.14 of this chapter are subject to regulation as used oil under this part.

* * * * *

[FR Doc. 2016–27429 Filed 11–25–16; 8:45 am]

BILLING CODE 6560–50–P